UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ROBERT KLEIN,

                                    Plaintiff,
                                                              9:13-CV-00437
v.
                                                              (BKS/TWD)
BRIAN FISCHER, et al.,
                                    Defendants.
_____

APPEARANCES:                              OF COUNSEL:

ROBERT KLEIN
Plaintiff *pro se*
560 Berkshire Road
Southbury, CT 06488

HON. ERIC T. SCHNEIDERMAN              COLLEEN D. GALLIGAN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

*Pro se* Plaintiff Robert Klein, previously confined at Altona Correctional Facility

("Altona"), has commenced this *pro se* civil rights action under 42 U.S.C. § 1983 against

Defendants Brian Fischer ("Fischer"), former Commissioner of the Department of Corrections

and Community Supervision ("DOCCS"); John R. Demars ("Demars"), Superintendent of

Altona; Rodney J. Harvey ("Harvey"), former Deputy Superintendent of Security at Altona; and

Altona Corrections Officers Lawrence Decosse ("Decosse"), Joseph Miller ("Miller"), and Jason

Jubert ("Jubert").[1]  (Dkt. No. 72 at ¶¶ 3-8a.[2])  Plaintiff alleges that Defendants violated his Eighth

Amendment right to be free from cruel and unusual punishment by their deliberate indifference

to serious health risks inflicted upon him through exposure to unreasonably high levels of

environmental tobacco smoke ("ETS") due to inadequate enforcement of the New York State

Clean Indoor Air Act, N.Y. Public Health Law § 1399-n, *et seq*. ("N.Y. Clean Air Act") and the

DOCCS indoor smoking ban and outdoor smoking restrictions.  Plaintiff also alleges that

Defendant Decosse retaliated against him in violation of his First Amendment rights and that

Defendants Demars and Harvey failed to intervene in the retaliation.

This matter is now before the Court on the parties' cross-motions for summary judgment

pursuant to Federal Rule of Civil Procedure 56.  (Dkt. Nos. 81 and 85.)  Plaintiff filed a motion

for summary judgment on February 3, 2015.  (Dkt. No. 81.)  Defendants filed a cross-motion for

summary judgment, along with their opposition to Plaintiff's motion, on March 13, 2015.  (Dkt.

No. 85.)  Plaintiff has failed to respond to Defendants' cross-motion.   For the reasons that

follow, the Court recommends that Plaintiff's motion for summary judgment (Dkt. No. 81) be

denied, and that Defendants' cross-motion for summary judgment (Dkt. No.  85) be granted.

## II.     FACTUAL BACKGROUND

### A.     G-dormitory ETS Exposure

Plaintiff arrived at Altona on July 19, 2012, and was confined there until September 2,

2014, when he was released on parole.  (Dkt Nos.  85-13 at 6-7; 85-17 at 2.)  From July 26, 2012,

---

[1]  Defendants have been sued only in their individual capacities, and Plaintiff seeks only
monetary, not injunctive relief.  (Dkt. No. 72 at ¶¶ 9, 35.)

[2]  Plaintiff's Supplemented Civil Rights Complaint Pursuant to 42 U.S.C. § 1983 is the
operative pleading in the case.  (Dkt. No. 72.)

through October 5, 2012, and again from October 24, 2012, through March 15, 2013, Plaintiff

was housed in G-dormitory ("G-dorm"). (Dkt. No. 85-17 at 2-3.) While Plaintiff was housed in

G-dorm, Defendant Decosse worked the 7:00am to 3:00pm shift supervising G-dorm. (Dkt. No.

85-9 at ¶ 3.) Defendant Miller worked the 3:00pm to 11:00pm shift in G-dorm. (Dkt. No. 85-8

at ¶ 3.) G-dorm is an open bay dormitory with divided cubicles in the sleep area, a day room, and

showers and a bathroom off the day room. (Dkt. No. 85-12 at 11-12.) There is no door between

the day room and the showers and bathroom. *Id*. at 12.

Per the N.Y. Clean Air Act and DOCCS policy, effective January 1, 2001, indoor

smoking is prohibited in all areas of DOCCS facilities. (Dkt. No. 85-7 at ¶ 4 and pp. 6-7.)

Plaintiff claims that during his time in G-dorm, the no smoking policy was not well enforced by

Decosse or Miller, particularly Miller, and that he was exposed to unreasonable levels of ETS.

(Dkt. Nos. 72 at ¶¶ 12-13; 85-12 at 24, 28, 30-31.) According to Plaintiff, he was exposed to

ETS in the G-dorm bathroom, shower area, day room, and occasionally in the dormitory area if

the door was left open. (Dkt. No. 85-12 at 13.) Plaintiff claims to have quite often seen four or

more inmates smoking at the same time in the bathroom. *Id*. at 14. Inmates also smoked in the

shower. *Id*. at 17. According to Plaintiff, he used the bathroom in the G-dorm at least fifteen

times a day not counting washing and shaving, and he washed his hands ten to fifteen times a

day. *Id*. at 16-17. Plaintiff generally showered twice a day, sometimes three times a day toward

the end of summer. *Id*. 15-16. Plaintiff also claims that because of the ventilation system and

the fact that there was no door between the bathroom and day room, there tended to be a lot of

smoke in the day room. *Id*. at 17-18.

According to Altona Superintendent Demars, every effort is made by staff to enforce the

DOCCS indoor smoking policy, and he instructs staff to issue Tier I and Tier II misbehavior reports for violations and to suspend privileges in housing units when evidence of smoking is present in order to enforce the policy. *Id.* at ¶ 5. Tier I misbehavior reports issued for smoking violations during the periods alleged in the complaint are unavailable because Tier I misbehavior reports are only maintained in facility records for a period of fourteen days pursuant to DOCCS regulations. (Dkt. No. 85-11 at ¶ 7.) During the period between August 2012 and August 2013, ninety-two Tier II misbehavior reports for smoking violations were prepared by corrections officers at Altona. (Dkt. Nos. 85-1 at ¶ 29; 85-15.)

In their Declarations, Defendants Decosse and Miller state that they are fully aware of the DOCCS policy prohibiting indoor smoking and, as correctional officers, make every effort to enforce the policy. (Dkt. Nos. 85-8 at ¶ 7; 85-9 at ¶ 7.) Decosse and Miller are aware that inmates smoke inside the facility in violation of the policy and make every effort to apprehend and discipline violators they encounter. (Dkt. Nos. 85-8 at ¶ 8; 85-9 at ¶ 8.) In accordance with instructions from their supervisors, Decosse and Miller prepare misbehavior reports when they finds individuals violating DOCCS smoking policy and also issue warnings and restrict housing unit privileges in order to enforce the policy. (Dkt. Nos. 85-8 at ¶ 9; 85-9 at ¶ 9.) The two frequently remind and warn inmates not to smoke in the bathroom and showers when they find out smoking has occurred, and they at times assign work details to clean the bathroom and shower when there is evidence of smoking. *Id*.

According to Miller and Decosse, in 2012 and 2013 they prepared multiple misbehavior reports every month for violations of the DOCCS smoking policy and, when informed of smoking by other inmates, took appropriate action to stop the violations and discipline the

violators when warranted.  (Dkt. Nos. 85-8 at ¶ 9; 85-9 at ¶¶ 10-11.)  DOCCS records show that

seven of the misbehavior reports Decosse issued for smoking violations between August 2012

and March 2013, while Plaintiff was housed in G-dorm, were categorized by a supervisor as Tier

II violations.  (Dkt. Nos. 85-1 at ¶ 30; 85-15.)  Miller and Decosse deny ever having deliberately

ignored violations of DOCCS smoking policy or failed to enforce the DOCCS smoking policy in

order to intentionally or recklessly harm Plaintiff, staff, or other inmates.  (Dkt. Nos. 85-8 at

¶ 17; 85-9 at ¶ 18.)

Decosse and Miller both state that Plaintiff never complained to them or otherwise

brought to their attention the issue of exposure to ETS in the housing units or bathrooms.  (Dkt.

Nos. 85-8 at ¶ 9; 85-9 at ¶¶ 10-11.)  Plaintiff has acknowledged that he never personally

complained to Decosse and Miller about inmates smoking in the bathroom because he would

have received a hostile reaction.  (Dkt. No. 85-12 at 29-31.)

### B.    Outdoor ETS Exposure

Altona's policy with regard to outdoor smoking is set forth in FOM # 15, dated December

2, 2008, and superseded on June 26, 2013.  (Dkt. No. 85-7 at ¶ 4 and pp. 10-11, 13-14.)  The

stated purpose of the Tobacco Use Policy set forth in FOM # 15, dated December 2, 2008, was to

"provide guidelines that ensure smoke-free environments within at least fifty feet of entrances to

major facilities on the grounds of Altona Correctional Facility."  *Id*. at 10-11.  Smoking within

fifty feet of entrances to buildings was prohibited as was smoking inside any building operated

by Altona.  *Id*. at 10.  The policy otherwise allowed inmates to smoke on their way to and from

programs, meals, recreation, etc.  *Id.*  Failure to comply could result in disciplinary action for

violation of Rule 106.10, "Refusal to Obey a Direct Order."  *Id*.

FOM # 15, as revised June 26, 2013, and presently in effect, identifies as its purpose "[t]o provide guidelines that ensure smoke-free environments indoors and in areas in close proximity to entrances to major facilities on the grounds of the Altona Correctional Facility." *Id.* at 13. Smoking "within close proximity to entrances to buildings" is prohibited. *Id.* There are lines painted on the sidewalk beyond which no smoking is allowed. *Id.*

Plaintiff testified at his deposition that inmates would smoke as much as they could while making program runs and going to and from the mess hall during the day, exposing him to heavy ETS exposure if he was with a large group. (Dkt. No. 85-12 at 23.) According to Demars, every effort is made by staff to enforce the outdoor smoking policies, and staff are instructed to issue Tier I and Tier II misbehavior reports for violations. *Id.* at ¶ 5. Decosse, Miller, and Jubert have stated that they are aware of the restrictions on outdoor smoking and prohibition in proximity to building entrances and frequently remind and warn inmates not to smoke outdoors in close proximity to housing units. (Dkt. Nos. 85-5 at ¶ 7; 85-8 at ¶ 9; 85-9 at ¶ 9.)

## C.     D-dormitory ETS Exposure

Plaintiff was housed in D-dormitory ("D-dorm") from April 22, 2013, through January 2014. (Dkt. No. 85-13 at 7, 15.) Defendant Jubert worked the 7:00am to 3:00pm shift in D-dorm from April 2013 through October 2013. (Dkt. No. 85-5 at ¶ 3.) According to Plaintiff, enforcement of the smoking prohibition was even worse in D-dorm than in G-dorm    that there was no enforcement at all. (Dkt. No. 85-12 at 19.) Plaintiff also claims that because there was a tight fitting door between the bathroom and the day room, the smoke remained highly concentrated in the bathroom. *Id.* Plaintiff testified at his deposition that Jubert knew that inmates were smoking in the bathroom because he made comments about them throwing

cigarette butts in the shower and on the toilet seat and told the inmates to dispose of the cigarette butts properly. (Dkt. No. 85-13 at 9.) Plaintiff claims that he complained to Jubert about the consistently heavy smoke in the bathroom when he first moved to D-dorm, probably in early May 2013, and Jubert asked what Plaintiff wanted him to do about it. *Id*. at 17. Plaintiff was at times required to spend up to an hour and twenty minutes twice a day cleaning the bathroom while he was a double module porter in D-dorm from April 2013 to November 2013 *Id*. at 15, 19.

Like Miller and Decosse, Jubert denies ever having deliberately ignored violations of DOCCS smoking policy or failed to enforce the DOCCS smoking policy in order to intentionally or recklessly harm Plaintiff, staff, or other inmates. (Dkt. No. 85-5 at ¶ 14.)

### D. Affidavits of Inmates Regarding Exposure to ETS

In support of his motion for summary judgment, Plaintiff has submitted the Affidavit of Robert Ferullo ("Ferullo"). (Dkt. No. 81-2 at 5.) Ferullo is an inmate housed at Altona since mid-February 2012 and has been D-dorm since August 7, 2013. *Id*. Ferullo was in D-dorm with Plaintiff for approximately five months. (Dkt. No. 85-17 at 2-3.) Ferullo has averred in conclusory fashion that there are high levels of ETS in the inmate bathrooms in every dormitory he has been housed in, the kitchen/dayroom area, gym bathroom and recreation yard bathroom. (Dkt. No. 81-2 at 5.) Ferullo also claims he is exposed to high levels of ETS on the facility walkways during program runs, yard runs and go backs, gym runs and go backs, and movements to and from the mess hall. *Id*.

Plaintiff has also submitted the Affidavit of Jeremiah Williams ("Williams") in support of his motion. *Id*. at 6. Williams has been housed in D-dorm since he arrived at Altona on January 7, 2013. *Id*. According to Williams, there are constantly high levels of ETS in the inmate

dormitory bathroom, kitchen/dayroom area, recreation yard bathroom and gym bathroom, and the staff makes no effort to enforce the no indoor smoking policy.  *Id*.  Williams also claims to be constantly exposed to high levels of ETS on facility walkways during facility movements.  *Id*.

In his Affidavit, also submitted by Plaintiff, Jose Montesoma ("Montesoma"), another Altona inmate, has also averred in conclusory fashion that there are constantly high levels of ETS in inmate dormitory bathrooms, the kitchen/dayroom area, recreation yard bathroom, and mess hall bathroom.  *Id*. at 7.  In his Affidavit, Montesoma does not state how long he has been housed at Altona, nor has he identified the dormitories in which he has been housed.  *Id*.

Darin M. Parsons ("Parsons"), in his Affidavit submitted by Plaintiff, *id*. at 8, has, like Montesoma, not indicated how long he has been incarcerated at Altona and has not identified the dormitories in which he has been housed.  *Id*.  He has complained in conclusory fashion of high levels of second hand smoke in an inmate dormitory bathroom, kitchen/dayroom area, recreation yard bathroom, gym bathroom, and all compound movements.  *Id*.  Parsons admits to being a smoker and claims that he smokes freely in restricted areas without fear of receiving a misbehavior report.  *Id*.

### E.    Plaintiff's Written Complaints and Grievances Regarding ETS Exposure

1.    <u>Request for Interview or Information to Defendant Harvey</u>

On December 19, 2012, Plaintiff sent a Request for Interview or Information to Altona Deputy Superintendent of Security Harvey.  (Dkt. No. 85-10 at 6.)  Plaintiff asked Harvey why every time he went to the bathroom he had to breathe second hand cigarette smoke.  *Id*.  Plaintiff stated that second hand smoke was a proven health hazard being forced upon him in violation of state and federal law and his rights under the Fourteenth Amendment.  *Id*.  Plaintiff informed

Harvey that he felt that the facility was deliberately indifferent to the risk to his health. *Id*.

In response to Plaintiff's complaint, Harvey instructed Captain Strack ("Strack") to conduct an investigation, and Strack instructed Sergeant Dragoon ("Dragoon") to interview Plaintiff to obtain times and dates so that they could determine what shift was involved and to report back. *Id*. at ¶ 8 and p. 17. Dragoon interviewed Plaintiff on December 21, 2012. *Id*. at 18. Dragoon's report to Strack states that Plaintiff was unable to provide specific dates and times but had indicated that it happened more on the 3:00pm to 11:00pm shift than any other. *Id.* at 18. According to Dragoon's report, Plaintiff told him that he saw the problem as more of a lack of respect by the inmates than the corrections officers not doing their jobs, because when the officers made rounds in the bathrooms, they did write up anyone caught smoking. *Id*. Dragoon informed Strack that he told Plaintiff he would speak to the staff and have them patrol the bathroom more often and be mindful of the ongoing problem. *Id*.

Harvey sent a written response to Plaintiff regarding his concerns on December 26, 2012, and informed him that New York State law prohibits smoking in all indoor buildings, and corrections officers assigned to all of the housing units were instructed to vigorously enforce DOCCS policy prohibiting indoor smoking. *Id.* at ¶ 7 and p. 7. Harvey also told Plaintiff that offenders caught smoking were referred for disciplinary action. *Id*. at p. 7. According to Harvey, he had "addressed the smoking issue with security staff and supervisors as well as [his] monthly meetings with the inmate Liaison Committee . . . , and this facility has a zero tolerance policy for smoking and appropriate action will be taken when violators are caught." *Id*.

2.    Grievance ALT-3959-12

Plaintiff filed two grievances complaining about ETS during his confinement at Altona.

Grievance ALT-3959-12 was filed on December 24, 2012. (Dkt. No. 85-14 at 6.) Plaintiff complained about having to constantly breath second hand cigarette smoke while using the bathroom in G-dorm. *Id*. Plaintiff noted in the grievance that it had been the same in all of the dorms in which he had been housed at Altona. *Id*. According to Plaintiff, there were frequently others smoking in the bathroom and shower areas, forcing him to breath in the cigarette smoke, and since inmates often used the stalls for smoking, he at times had to wait for a stall. *Id*. Plaintiff pointed out that there were cigarette burns on the walls of the stalls. *Id*. Plaintiff felt that the facility was deliberately indifferent to the problem and requested that he be given the smoke free environment to which he believed himself to be entitled. *Id*.

On or about January 4, 2013, the Inmate Grievance Resolution Committee ("IGRC") recommended that the grievance be accepted to the extent that the N.Y. Clean Air Act prohibited indoor smoking, and every effort was made to enforce the policy at Altona. *Id*. at 9. On appeal, Superintendent Demars noted that smoking within all facility buildings was prohibited pursuant to Phase IV of the DOCCS Smoke Free Policy, effective January 1, 2001, and pursuant to a prior decision of the Central Office Review Committee ("CORC"), indoor smoking was prohibited by the N.Y. Clean Air Act. *Id*. at 7. On January 14, 2013, Demars accepted the grievance to the extent that every effort was being made by Altona security staff to enforce the no smoking policy in all housing units at the facility, and he advised Plaintiff to address incidents of smoking in the dorm bathroom with the area supervisor. *Id*.

On his appeal to CORC, Plaintiff reasserted his position that no effective policy had been put in place to deal with the problem of ETS exposure, and stated that nothing had changed as the result of the acceptance of his grievance. *Id*. at 10. In its June 5, 2013, determination, CORC

accepted the action requested by Plaintiff only to the extent of upholding the determination of the Superintendent for the reasons stated. *Id*. at 3. CORC asserted that indoor smoking was prohibited under the N.Y. Clean Air Act and that every effort was being made to enforce the policy. *Id*. CORC also advised Plaintiff to address incidents of smoking to the area supervisor for remedial action. *Id*. CORC noted that Plaintiff had not presented any compelling reason to revise the current policy or eliminate the sale of tobacco products. *Id*.

### 3. Grievance ALT-3985-13

Grievance ALT-3985-13, filed by Plaintiff on February 27, 2013, complained that he was being forced to inhale second hand tobacco smoke during compound movements such as, but not limited to, program runs, gym runs, yard runs, and movement to and from the mess hall. *Id*. at 16. Plaintiff noted that although the New York Public Health Law ("Public Health Law") prohibited smoking within 25 feet of entrances to state buildings, the main walkway, on which inmates smoked all the time, was not 25 feet from the entrance to the mess hall, commissary, or state shop. *Id*. According to Plaintiff, it was common practice for inmates to light cigarettes within a step or two of exiting the mess hall, school building, and dormitories and to smoke right up to the doors of the buildings. *Id*. Plaintiff requested that Altona adopt a policy and enforce the Public Health Law to protect non-smokers. *Id*.

On or about March 14, 2013, the IGRC recommended that the grievance be accepted to the extent that there was a facility policy (FOM # 15) in place that dictated how far from the facility building entrances smoking was permitted by offenders and staff. *Id*. at 19. On March, 22, 2013, Superintendent Demars accepted the grievance to the extent there was a policy in place (FOM # 15) outlining when and where smoking was permitted when offenders were outside,

which was being enforced by security staff.  *Id*. at 17.  On July 24, 2013, CORC accepted the

grievance only to the extent it upheld the Superintendent's determination for the reasons stated.

*Id*. at 13.  CORC asserted that inmates were not allowed to smoke within 50 feet of entrances to

buildings and were allowed to smoke on their way to and from programs, meals and exercise, but

not past the lines marked on the sidewalks in accordance with FOM # 15.  *Id*.

### 4. Letter to Defendant Fischer

On February 25, 2013, Plaintiff wrote to then DOCCS Commissioner Fischer regarding

the security staff's continued deliberate indifference to the problem of second hand smoke in the

inmate dormitory bathroom, recreation yard bathroom, and the mess hall bathroom.  (Dkt. Nos.

85-4 at 6; 85-12 at 26.)  According to Fischer, as Commissioner, his office routinely received

thousands of letters a year from inmates or outside individuals writing on an inmate's behalf.

(Dkt. No. 85-4 at ¶ 3.)  The procedure for dealing with the letters was to have one of the

secretaries read the letter and decide the division or bureau to which the letter should be

forwarded, either with an instruction to prepare a response or with a notation that the letter was

being forwarded for whatever action, if any, was deemed appropriate by the official handling it.

*Id*.  The level at which a response to correspondence was generated was entirely within the

discretion of the official to whom it was forwarded.  *Id*.  at ¶ 4.  Sometimes a Deputy or

Associate Commissioner would seek information necessary to respond down the chain of

command and respond to the writer once the information was received.  *Id*.  Other times, he or

she would respond by telling the writer that the matter had been forwarded to a particular official

for response.  *Id.*

Fischer was not personally involved in the alleged conduct about which Plaintiff is suing.

*Id*. at ¶ 2. DOCCS records reflect that Plaintiff's letter to Fischer was received at his office on March 6, 2013. *Id*. at ¶ 5 and p. 6. Fischer has been advised by administrative staff that Deputy Counsel Nancy J. Heywood ("Heywood") responded to Plaintiff's letter on May 6, 2013, referring Plaintiff to the DOCCS smoking policy and informing Plaintiff that his letter was being forwarded for appropriate action and response to Altona Superintendent Defendant Demars. *Id*. at ¶ 5 and p. 5; Dkt. No. 85-13 at 26. There is nothing in DOCCS records indicating that Fischer every personally investigated or responded to Plaintiff's letter, and Fischer has no recollection of ever having done so. *Id*. at ¶ 6.

Demars received the letter forwarded by Heywood on May 13, 2013. (Dkt. No. 85-7 at ¶ 8.) Demars sent Plaintiff a memorandum the same day reminding him that DOCCS policy prohibited all indoor smoking and that staff were instructed by him to enforce DOCCS smoking policy and take appropriate action, including Tier I or II misbehavior reports and suspension of privileges, when violations were discovered. *Id*. at ¶ 8 and p. 18. On June 26, 2013, Demars issued a memorandum to all Altona staff and the offender population reminding them that per the N.Y. Clean Air Act, indoor smoking was prohibited in all areas of the facility as well as in close proximity to entrances to buildings. *Id*. at ¶ 10 and p. 20. The memorandum stated that all smokers were expected to comply with the N.Y. Clean Air Act and the facility's tobacco use policy, and that violations were to be reported to the area supervisor for remedial action if warranted. *Id*.

F.     **Retaliation Claims**

Plaintiff claims that Decosse retaliated against him as a result of his complaint to Harvey and subsequent grievance regarding ETS exposure in the G-dorm. According to Plaintiff, on

13

December 21, 2012, the day he was interviewed by Dragoon regarding his December 19, 2012, written complaint to Harvey, Dragoon came to G-dorm and spoke to Decosse about Plaintiff's complaint. (Dkt. No. 85-12 at 33-34.) Afterwards, during the entire morning, Decosse repeated over and over again that someone had dropped a slip on him saying he was not doing his job because there was a lot of smoking going on in G-dorm, and acted in a hostile manner. *Id*. at 29, 34. When Plaintiff returned from the law library that day, there were crushed up Cheez-It crackers and water on his bunk and a note saying "snitch." *Id*. at 33. According to Plaintiff he had not told anyone that he had sent the complaint to Harvey. *Id*. At his deposition, Plaintiff testified that he thought it was possible that Decosse was responsible for the Cheez-It crackers and water, or that he at least knew who had done it. *Id*. at 35.

In his Supplemented Civil Rights Complaint ("Supplemented Complaint"), Plaintiff has alleged that on March 13, 2013, at 8:45am, his razor was missing from his locker. (Dkt. No. 72 at ¶ 24.) According to Plaintiff, the only time it could have been taken was when he left his locker unattended for approximately thirty seconds the previous morning when Decosse was on duty. *Id*. Plaintiff has alleged that he believes Decosse either removed the razor himself or put an inmate up to it. *Id.* Another corrections officer issued Plaintiff a Tier II misbehavior report for loss of property as a result of the missing razor, and Plaintiff was confined for thirty days. *Id*.

At his hearing, Plaintiff stated he believed that Decosse was behind the taking of his razor, and that it was done for retaliation purposes. *Id*. at ¶ 26. Shortly thereafter, numerous officers made comments about Plaintiff implicating Decosse, making him uncomfortable. Plaintiff believes that Decosse told the officers in retaliation. *Id*.

According to Plaintiff, on March 15, 2013, Decosse told him, "I heard your (sic) running

14

your pie hole about me, you better stop telling lies about me before something really happens to you." *Id*. About two hours later, Plaintiff was moved to F-dormitory, housing with less amenities and double bunked. *Id*. at ¶ 27. In the afternoon of the same day, Plaintiff's locker was broken into and legal papers were taken.[3] *Id*. Plaintiff was offered protective custody and signed a refusal. *Id*. He was then moved to A-dormitory. *Id*.

On April 16, 2013, after Plaintiff had completed the thirty days of cube confinement, the Program Committee assigned him to the mess hall. *Id*. at ¶ 28. However, two days later he was reassigned and given the job of a.m. yard porter and p.m. dorm porter. *Id*. Plaintiff concluded that Decosse was responsible for his assignment to a less desirable job, and that he had done it for retaliatory reasons. *Id*.

Plaintiff has alleged in wholly conclusory fashion in his Supplemented Complaint that Demars and Harvey failed to intervene in the retaliation against Plaintiff. *Id*. at ¶¶ 31-32.

### G. Plaintiff's Legal Mail

Plaintiff claims that his legal mail was tampered with during the first week in March 2013.[4] (Dkt. No. 85-12 at 35-37.) According to Plaintiff, under the legal mail system at Altona,

---

[3] Although in his Supplemented Complaint, Plaintiff appears to suggest that the removal of legal documents from his locker may have been retaliatory action by Decosse (Dkt. No. 72 at ¶ 27, in his Statement of Material Facts, Plaintiff has stated that he believes the legal documents were taken out of his locker by a corrections officer not named as a defendant. (Dkt. No. 81-1 at ¶ 17.)

[4] The First Amendment grants prisoners the right to the free flow of incoming and outgoing mail. *See Johnson v. Goord*, 445 F.3d 532, 535 (2d Cir. 2006). However, Plaintiff has failed to identify which, if any, of the Defendants was involved in tampering with his legal mail and does not appear to have attempted to assert a distinct legal claim regarding the alleged tampering. (Dkt. Nos. 72; 81-1.) Therefore, the Court has not construed Plaintiff's Supplemented Complaint as asserting a First Amendment claim for tampering with an inmates' legal mail  a claim which must in any event show an ongoing practice by prison officials of

the corrections officer takes legal mail out of the mail bag, the inmate to whom it is addressed signs and dates a log sheet, and the officer opens the mail in front of the inmate, shakes it out for contraband, and gives it to the inmate. *Id*. at 36. During the first week in March 2013, when Defendant Miller took Plaintiff's legal mail out of the bag, Miller noticed that there was masking tape on it and told Plaintiff it had been opened. *Id*. It appeared that an attempt had been made to reseal it with the masking tape. *Id*. at 36-37. Plaintiff noted that the mail was postmarked thirteen days prior to the time it was given to him, although it was sent from Port Jefferson and should have arrived in three days. *Id*. at 37. When asked at his deposition what led him to believe that the mail was tampered with in retaliation for his ETS exposure complaints, Plaintiff responded that it may not have been retaliation but rather than effort to snoop on his mail because it was suspected early on that he was going to file a civil suit on the issue. *Id*.; *see also* Dkt. No. 85-10 at 14.

## H. Plaintiff's Health

Plaintiff was diagnosed with hypertension right after he entered the DOCCS system and was treated during his incarceration. (Dkt. No. 85-12 at 31-32.) Plaintiff testified at his deposition that he did not have any type of respiratory problem but had always suffered from sinusitis which he believed was made worse by exposure to ETS, although no doctor had told him that was the case. *Id.* No doctor told Plaintiff that his hypertension was related to exposure

---

interfering with an inmate's mail or some suffering due to the tampering. *Shepherd v. Fisher*, No. 08 CIV. 9297 (LTS)(RLE), 2011 WL 3278966, at * 2, 2011 U.S. Dist. LEXIS 84110, at * 7 (S.D.N.Y. July 27, 2011). Nor, given the absence of facts alleging Decosse's involvement and Plaintiff's acknowledgment in his deposition that it may not have been retaliatory, has the Court included the legal mail incident as an alleged retaliatory action. (Dkt. No, 85-10 at 14.)

to ETS, or that he has any medical condition related to such exposure. (Dkt. No. 85-13 at 19.) At the time of his deposition, Plaintiff did not believe he had any injuries caused by exposure to ETS, and Plaintiff has submitted no evidence of injury on his summary judgment motion or in opposition to Defendants' motion. (Dkt. No. 85-12 at 32-33.)

## III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to be treated as an affidavit.[5]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28,

---

[5]  Plaintiff's Supplemented Civil Rights Complaint in this case was properly verified under 28 U.S.C. § 1746.  (Dkt. No. 72 at 12-13.)  *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

1999)[6] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted).

## IV. DEFICIENCIES IN PLAINTIFF'S MOTION AND HIS FAILURE TO OPPOSE DEFENDANTS' CROSS-MOTION

### A. Plaintiff's Motion for Summary Judgment

Plaintiff has filed a motion for summary judgment against all of the Defendants in this case. (Dkt. No. 81.) In addition to his Notice of Motion (Dkt. No. 81), Plaintiff filed a Statement of Material Facts (Dkt. No. 81-1), supporting Affidavits and documentary evidence (Dkt. No. 81-2), and a Brief in Support of Statement of Material Facts (Dkt. No. 81-1).

N.D.N.Y. L.R. 7.1(a)(3) requires that the Statement of Material Facts "shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue" and "[e]ach fact listed shall set forth a specific citation to the record where the fact is established." Plaintiff's Statement of Material Facts, which consists largely of legal arguments and broad factual conclusions, with few specific facts and limited citations to the record, fails to comply with the requirements of L.R. 7.1(a)(3).

---

[6] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Under the Rule, "failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." L.R. 7.1(a)(3). However, a district court has broad discretion to overlook a *pro se* litigant's failure to fully comply with local rules. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001). Given that Plaintiff, a *pro se* litigant, made a good faith effort to provide the citations for his Statement of Material Facts in his Brief in Support of Statement of Material Facts, and Defendants were able to provide a response, despite the deficiencies (Dkt. No. 85-2), the Court has concluded that Plaintiff's motion should not be denied on the basis of failure to fully comply with the local rule.

### B.   Plaintiff's Failure to Oppose Defendants' Cross-Motion

Despite having filed his own motion for summary judgment and having requested and been granted an extension of time to respond (Dkt. No. 87-88), Plaintiff has failed to file opposition to Defendants' motion. Plaintiff's failure to oppose Defendants' summary judgment motion does not mean that the motion is to be granted automatically. An unopposed motion for summary judgment may be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law."[7] *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (citations and internal quotation marks omitted); *see also Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) (where "the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's

---

[7] N.D.N.Y. L.R. ("L.R.") 7.1(b)(3) provides that '[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."

submissions to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'") (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[8] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[9]  *See Champion,* 76 F.3d at 486 (a non-movant who fails to respond to a summary judgment motion "runs the risk of unresponded-to-statements of undisputed facts proffered by the movant being deemed admitted.") ; *Liberati v. Gravelle*, No. 12-CV-00795 (MAD/DEP), 2013 WL 5372872, at * 7, 2013 U.S. Dist. LEXIS 137826, at * 8 N.D.N.Y. Sept. 24, 2013) (while *pro se* litigants are undeniably "entitled to some measure of forbearance when defending against summary judgment motions, the deference owed to *pro se* litigants . . . does not extend to relieving them of the ramifications associated with the failure to comply with the courts local rules.")  As to any facts not contained in Defendants' Statement Pursuant to Rule 7.1, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff.  *Liberati,* 2013 WL 5372872, at * 7 (quoting *Terry v.*

---

    [8]  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

    [9]  Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion.  (Dkt. No. 85 at 3-5.)

*Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In light of Plaintiff's failure to oppose Defendants' summary judgment motion, the facts set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 46-1) that are, as shown below, supported by record evidence and are uncontroverted by nonconclusory factual allegations in Plaintiff's verified Complaint and evidence submitted by Plaintiff on his motion for summary judgment, are accepted as true. *See McAllister v. Call*, No. 9:10-CV-610, 2014 WL 5475293 (FJS/CFH), at *3, 2014 U.S. Dist. LEXIS 154422, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts in defendant's motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3, 2013 U.S. Dist. LEXIS 14125, at * 6 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff [,who filed no opposition,] has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) . . ., supplemented by Plaintiff's verified Complaint . . ., as true.").

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). However, the Second Circuit has ruled that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, and because he has filed his own motion for

summary judgment, the Court has opted to review the entire summary judgment record in this case.

## V.    PLAINTIFF'S RETALIATION CLAIMS AGAINST DECOSSE, DEMARS AND HARVEY

### A.    Exhaustion of Administrative Remedies

Plaintiff claims that Decosse retaliated against him for complaining about the deliberate indifference of G-dorm staff to smoking in the G-dorm bathroom, and that Defendants Demars and Harvey failed to intercede in the retaliation.  (Dkt. No. 72 at ¶¶ 31-33.)  Defendants seek summary judgment on the retaliation claims for failure to exhaust administrative remedies.  (Dkt. No. 85-3 at 2-6.)

#### 1.    The Prison Litigation Reform Act and DOCCS Inmate Grievance Program

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined.  *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).  In New York state prisons, DOCCS has a well-established three-step inmate grievance program.  N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).  (*See also*

Dkt. 85-6 at ¶¶ 4-5.)

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. at 701.5(d)(3)(ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of

showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier,* No. 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6, 2012 U.S. Dist. LEXIS 185178, at *14-15 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

An exhaustion review does not end when defendants are found to have met the burden of establishing a plaintiff's failure to exhaust. "Once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York*, 380 F. 3d 680, 686 (2d Cir. 2004)]." *Murray,* 2010 WL 1235591, at *4.

*Hemphill* sets forth a three-part inquiry for district courts. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). "The test to determine the availability of an administrative remedy is an objective one: whether a 'similarly situated individual of ordinary firmness' would have deemed it unavailable." *Cuadrado v. Brueault*, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *4, 2015 U.S. Dist. LEXIS 45768, at * 6-7 (N.D.N.Y. April 8, 2015).

Second, the court must determine if the defendants are estopped from presenting non-exhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by "beating him, threatening him, denying him grievance forms and

writing implements, and transferring him to another correctional facility." *Hemphill*, 380 F.3d at 688 (citing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir. 2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray*, 2010 WL 1235591, at *5 & n.26 (collecting cases).

Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified.[10] *Hemphill*, 380 F.3d at 686. "Special circumstances" have been found to include an incorrect but reasonable interpretation of DOCCS' regulations or failing to file a grievance in the precise manner prescribed by DOCCS as a result of threats. *See, e.g., Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004).

### 2. Plaintiff's Failure to Exhaust

There is no evidence in the record that Plaintiff completed the DOCCS grievance process with regard to his retaliation claims, nor does Plaintiff claim to have done so. Jeffrey Hale, Assistant Director of the IGP and custodian of CORC records, conducted a search of the records

---

[10] Subsequent to *Hemphill*, the Supreme Court decided *Woodford v. Ngo*, 548 U.S. 81 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id*. at 83-84. The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion" "using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id*. at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford*, the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews*, 655 F.3d 89, 102-03 (2d Cir. 2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense).

and found that Plaintiff appealed only three grievances, including Grievances ALT-3959-12 and 3985-13, to CORC during his incarceration at Altona. (Dkt. No. 85-6 at ¶¶ 1, 2, 10-13.) The third grievance, Grievance ALT-3992-13, involved the opening of Plaintiff's legal mail. *Id*. at p. 6.

In his Supplemented Complaint, Plaintiff has claimed that on December 23, 2012, he placed a grievance regarding the Cheez-It crackers and water incident in a facility mail box. *Id*. at ¶ 22. According to Plaintiff, after a month passed and he had received no response to the grievance, he sent a February 2, 2013, memorandum to the IGP supervisor, who wrote Plaintiff back on February 4, 2013, informing him that no grievance had been received. *Id*. Weighing the risk of possible retaliation and danger to his personal safety against exercising his right to file a grievance, Plaintiff chose not to refile. *Id*. Plaintiff does not claim to have attempted to file a grievance with regard to any of the other acts of retaliation or failure to intervene alleged by him. Therefore, the Court finds that Plaintiff failed to exhaust his administrative remedies.

As to the first question under the *Hemphill* analysis, New York's IGP is "recognized as an 'available' remedy for purposes of the PLRA." *Taylor v. Chalom*, No. 9:10 CV 1494 (NAM/DEP), 2011 WL 6942891, at *4, 2011 U.S. Dist. LEXIS 150512, at *12 (N.D.N.Y. Dec. 13, 2011). Furthermore, the Court finds that the grievance system was available to Plaintiff, who had utilized it in filing two grievances regarding ETS exposure. (Dkt. No. 85-14 at 13-20.)

Specific threats of retaliation may render the grievance process unavailable if "'a similarly situated individual of ordinary firmness' would be so fearful as to believe that such procedures were unavailable." *Mateo v. O'Connor*, No. 10 Civ. 8426(LAP), 2012 WL 1075830, at * 8, 2012 U.S. Dist. LEXIS 45740, at * 21 (S.D.N.Y. Mar. 29, 2012). However, allegations by

27

a plaintiff that he failed to file a grievance because of a generalized fear for his personal safety or retaliation is insufficient to render the grievance procedures unavailable. *Carlson v. Parry*, No. 06-CV-6621P, 2013 WL 5354517, at * 9, 2013 U.S. Dist. LEXIS 137902, * 24-25 (W.D.N.Y. Sept. 24, 2013). Therefore, the Court finds that Plaintiff's general expression of fear of possible retaliation or for his personal safety as the reason for his decision not to refile the grievance involving the Cheez-It crackers and water, or file grievances with regard to any of the other retaliatory acts alleged or failure to intervene, is insufficient to render the grievance procedure unavailable.[11]

Second, Decosse, Demars, and Harvey are not estopped from asserting an exhaustion defense because there is no evidence that they interfered in any way with Plaintiff filing grievances with regard to his retaliation claims. Third, Plaintiff has failed to submit evidence showing that there were any "special circumstances" excusing his failure to exhaust with respect to his retaliation claims.

Given the foregoing, the Court therefore finds that Plaintiff failed to exhaust his administrative remedies on his retaliation claims against Decosse, Demars, and Harvey, and that the failure is not excused under *Hemphill*. Therefore, the Court recommends that Plaintiff's motion for summary judgment on his retaliation claims against Decosse, Demars, and Harvey be denied and that they be granted summary judgment on Plaintiff's retaliation claims for failure to exhaust.

---

[11] Plaintiff's claim that he had a general fear of retaliation or threat to his personal safety is also seriously weakened by evidence showing that he was not afraid to commence a lawsuit alleging retaliation against Decosse, Demars, and Harvey.

## B.     Merits of Plaintiff's Retaliation Claim

Even if Plaintiff had properly exhausted his retaliation claims against Decosse, Demars, and Harvey, the Defendants would be entitled to summary judgment on the merits.  To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech [or conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema,* 534 U.S. 506, 508 (2002)).  "Adverse action" for purposes of a retaliation claim has been defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381.

An inmate bears the burden of showing that "the protected conduct was a substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*  A showing of temporal proximity, without

more, has been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F.Supp. 2d 353, 370 (S.D.N.Y. 2011) (citations omitted).

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred.") (citation omitted); *Roseboro*, 791 F. Supp. 2d at 371.

Because of the relative ease with which claims of retaliation can be incanted, courts have scrutinized retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds*, *Swierkiewicz*, 534 U.S. 506. As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act.

*Dawes*, 239 F.3d at 491. Accordingly, claims of retaliation must be supported by specific facts; conclusory statement are not sufficient. *Flaherty*, 713 F.2d at 13.

Plaintiff's actions in sending written complaints to Harvey and Fischer and his two grievances complaining of ETS exposure constitute constitutionally protected conduct for grievance purposes. *Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003) (the right to file

grievances is a constitutionally protected activity for retaliation purposes); *Decayette v. Goord*, No. 9:06-CV-783, 2009 WL 1606753, at *9, 2009 U.S. Dist. LEXIS 48127 (N.D.N.Y. June 8, 2009) (plaintiff's right to send a letter of complaint to a prison official was constitutionally protected activity).

According to Decosse, he never took retaliatory action against Plaintiff, and Plaintiff never informed him of the Cheez-It crackers and water incident. *Id*. at ¶¶ 17, 19. Furthermore, the only support for Plaintiff's retaliation claim regarding the Cheez-It crackers and water incident is his speculation that any reasonable person could see that Decosse was somehow involved because Plaintiff's cubicle was less than eight feet from the officer's desk. (Dkt. No. 72 at ¶ 22.) *See Jeffreys*, 426 F.3d at 554 (a party may not rely on unsubstantiated speculation to defeat summary judgment). The Cheez-It crackers and water incident is, in any event, not one that would likely deter a similarly situated individual of ordinary firmness from exercising constitutional rights.

A statement uttered by a prison official in retaliation for protected activity can constitute adverse action only if reasonably calculated and intended to incite others to retaliate against an inmate. *See Gill v. Calescibetta*, No. 9:00-CV-1553 (GTS/DEP), 2009 WL 890661, at * 12, 2009 U.S. Dist. LEXIS 128255, at *25 (N.D.N.Y. Mar. 31, 2009). The record evidence does not support a finding that Decosse's alleged comment about someone dropping a slip on him because of smoking in G-dorm, if made, was calculated or intended to incite other inmates to retaliate against Plaintiff. In his Declaration, Decosse has stated that he never threatened to retaliate against Plaintiff or any other inmate for reporting smoking violations or complaining to him or his supervisors, or filing grievances regarding ETS exposure and never retaliated against

Plaintiff. (Dkt. No. 85-9 at ¶¶ 14, 19.) Decosse has also stated that he would never permit an inmate to retaliate against another inmate for reporting smoking violations were a threat brought to his attention. *Id.* at ¶ 15.

Confiscation of property, such as Plaintiff's razor, for which Plaintiff blames Decosse, can also constitute adverse action. *See Marino v. Watts*, No. 9:12-CV-801 (NAM/RFT), 2014 WL 1794588, at * 6, 2014 U.S. Dist. LEXIS 62289, at 19 (N.D.N.Y. May 6, 2014) (confiscating, losing, or destroying inmate's property can constitute adverse action). However, there is no evidence in the record establishing that Decosse was involved in Plaintiff's razor going missing, and according to Decosse, although he recalled hearing about Plaintiff's razor being missing, he has no knowledge as to how it went missing. (Dkt. No. 85-9 at ¶ 17.)

Courts in the Second Circuit have held that an inmate's reassignment from a job and transfer from one housing unit to another, actions allegedly taken by Decosse in retaliation for Plaintiff's complaints about ETS exposure, can constitute adverse action for purposes of a retaliation claim. *See Vega v. Lareau*, No. 9:04-CV-0750, 2010 WL 2682307, at * 8, 2010 U.S. Dist. LEXIS 66431, at * 24 N.D.N.Y. Mar. 16, 2010) (citing cases) (finding job reassignment can constitute adverse action sufficient to support a retaliation claim); *Chavis v. Struebel,* 317 F. Supp. 2d 232,238 (W.D.N.Y. 2004) ("[T]ransferring an inmate to another housing unit . . . or assigning the inmate a less desirable work assignment satisfies the adverse action requirement.").

In his Supplemented Complaint, Plaintiff has alleged that "the only reasonable conclusion" as to why Plaintiff was reassigned as a porter and moved out of G-dorm after he finished thirty days of cube confinement in mid-April of 2013 is that Decosse did not want him back in G-dorm for retaliatory reasons. *Id.* at ¶ 28. In his Material Statement of Facts, Plaintiff

has stated, without citation to any evidence, that Plaintiff was told by the Program Committee that he was being removed from the mess hall job for security reasons, and that was "reasonable to assume" that Decosse was the security reason. (Dkt. No. 81-1 at ¶ 19.)

Plaintiff's claim that Demars and Harvey failed to intervene to stop Decosse from engaging in retaliatory acts is wholly conclusory. (Dkt. No. 72 at ¶¶ 31-32.) In their Declarations, both Demars and Harvey deny any knowledge that Plaintiff was being retaliated against by staff. (Dkt. Nos. 85-7 at ¶ 11; 85-10 at ¶ 12.) Both state that Plaintiff never brought an issue of retaliation to their attention. *Id.* Furthermore, given the absence of evidence of retaliation by Decosse, there appears to have been nothing in which to intervene.

Plaintiff has presented no evidence beyond his own speculation that Decosse retaliated against him or that Demars and Harvey failed to act on the alleged retaliation. Therefore, the Court finds that even if Plaintiff had exhausted his administrative remedies with regard to his retaliation claims, or exhaustion had been excused, Defendants Decosse, Demars, and Harvey would be entitled to summary judgment on the merits. Further, the Court recommends that Plaintiff's motion for summary judgment on his retaliation claims be denied, and that Defendants' cross-motion for summary judgment on Plaintiff's retaliation claims be granted.

## VI. PLAINTIFF'S EIGHTH AMENDMENT CLAIMS

### A. Exhaustion of Administrative Remedies Regarding Outdoor and D-dorm ETS Exposure

Plaintiff claims that all of the Defendants violated his Eighth Amendment rights by their deliberate indifference to the serious health risks inflicted upon him through exposure to

unreasonably high levels of ETS.[12]  (Dkt. No. 72 at ¶¶ 30-34a.)  Defendants seek summary

judgment dismissing Plaintiff's outdoor ETS exposure and D-dorm claims for failure to exhaust

administrative remedies.  (Dkt. No. 85-3 at 2-6.)

 1. Failure to Complete Exhaustion of Grievance ALT-3985-13 Prior to
  Commencing this Action

Defendants argue that Plaintiff failed to exhaust his administrative remedies with regard

to Grievance ALT-3985-13, complaining of outdoor ETS exposure, because the action was

commenced before complete exhaustion of the grievance.  (Dkt. No. 85-14 at 16.)  Plaintiff

appealed to CORC on March 25, 2013.  (Dkt. No. 85-14 at 13.)  CORC did not issue a written

decision until July 24, 2013.  *Id*. at 17.  Plaintiff's original Complaint in which he raised his

Eighth Amendment claim regarding outdoor ETS exposure, was filed on April 22, 2013,[13] less

than thirty days after the appeal to CORC and well before CORC issued it decision.  (Dkt. No.

1.)

Receiving a decision from CORC *after* filing a federal lawsuit, as was the case herein,

does not satisfy the PLRA's requirement that administrative remedies be exhausted *before* filing

suit, and any claim not exhausted prior to commencement of the suit must be dismissed without

―――――――――――――――

 [12]  The Court has recommended that Fischer be granted summary judgment based upon
his lack of personal involvement in the alleged violation of Plaintiff's Eighth Amendment rights.

 [13]  Defendants argue that under the prisoner's mailbox rule, a pleading is deemed filed on
the date it is signed, in this case on April 17, 2013.  (Dkt. Nos. 1; 85-3 at 6.) Under the prisoner's
mailbox rule, a pleading is deemed filed when it is delivered to prison authorities for forwarding
to the court.  *Houston v. Lack*, 487 U.S. 266, 270 (1988).  There is no evidence in the record as to
when the original complaint was delivered to prison authorities, although it was clearly no earlier
than April 17, 2013, and before the April 22, 2013, filing date of Plaintiff's original Complaint.
(Dkt. No. 1)  Since Plaintiff did not appeal to CORC until March 25, 2013, he filed this action
less than thirty days after his appeal to CORC using either date.  (Dkt. No. 85-14 at 17.)

prejudice.  *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds,*

*Nussle,*  534 U.S. 516.  The Second Circuit has held that "[s]ubsequent exhaustion after suit is

filed . . . is insufficient."  *Neal*, 267 F.3d at 122.  Furthermore, a post-exhaustion amendment of

the complaint cannot cure an exhaustion defect existing at the time the action was commenced.

*See Kasiem v. Switz*, 756 F.Supp. 2d 570, 575 (S.D.N.Y. 2010) (citing *Neal*, 267 F.3d at 122).

Therefore, the filing of Plaintiff's Supplemented Complaint (Dkt. No. 72) after CORC's decision

on the grievance, does not correct Plaintiff's initial failure to exhaust.

The three-part *Hemphill* inquiry reveals no basis for excusing Plaintiff from completely

exhausting his administrative remedies prior to commencing this lawsuit.  As noted above, New

York's IGP is "recognized as an 'available' remedy for purposes of the PLRA,"  *Taylor,* 2011

WL 6942891, at *4, and the grievance system was clearly available to Plaintiff, who was in the

process of utilizing the IGP at the time he filed his original Complaint.  (Dkt. No. 85-14 at 13-

20.)  Furthermore, Defendants are not estopped from asserting failure to exhaust as a defense,

inasmuch as the grievance process that was ultimately completed on Grievance ALT-3985-13.

(*See generally* Dkt. No. 72.)  Nor are there any "special circumstances" excusing Plaintiff's

failure to exhaust prior to commencing the lawsuit.

In sum, Plaintiff failed to exhaust his administrative remedies with regard to Grievance

ALT-3985-13 prior to commencing this action, and none of the *Hemphill* criteria excuse the

failure.  Ordinarily, because Plaintiff's appeal was ultimately decided by CORC, and the time

within which to reassert his outdoor ETS exposure claim has not expired,[14] a grant of summary

---

[14]  Plaintiff filed Grievance ALT-3985-13, complaining of ongoing outdoor ETS
exposure, on February 27, 2013.  (Dkt. No. 85-14 at 16.)  The statute of limitations applicable to
claims brought under § 1983 is three years.  *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d

judgment would be made on exhaustion grounds without prejudice to Plaintiff recommencing his lawsuit asserting the claim. *See Fuentes v. Furco*, No. 13-CV-6846 (AJN), 2014 WL 4792110, at * 4, 2014 U.S. Dist. LEXIS 136261, at * 7-9 (S.D.N.Y. Sept. 25, 2014) (granting summary judgment without prejudice where plaintiff commenced action prior to determination of his appeal by CORC); *Thompson v. Bellevue Hosp.*, No. 9:09-CV-01038 (NAM/GHL), 2011 WL 4369132, at * 3, 2011 U.S. Dist. LEXIS 106073, at * 39-40 (N.D.N.Y. Aug. 29, 2011) (same). However, because, as discussed below, the Court finds that Defendants would be entitled to summary judgment on the merits of Plaintiff's Eighth Amendment outdoor ETS exposure claim even if he had completed the exhaustion requirements, it does not recommend summary judgment without prejudice for failure to exhaust.

2.    Failure to Exhaust on Plaintiff's D-dorm Claims

In his Supplemented Complaint, Plaintiff added Corrections Officer Jubert, who was assigned to D-dorm, as a Defendant and asserted an Eighth Amendment claim alleging that he was exposed to dangerously high levels of ETS as a result of Jubert's deliberate indifference to inmates smoking in the D-dorm bathroom. (Dkt. No. 72 at ¶¶ 14-14b.) Plaintiff filed Grievances ALT-3959-12 and ALT-3985-13 before he was moved to D-dorm on April 22, 2013. (Dkt. No. 85-17 at 4.) Plaintiff has conceded that he did not file any grievances with regard to D-dorm, and Defendants seek summary judgment dismissing the D-dorm claim for failure to exhaust. (Dkt. Nos. 72 at ¶ 14; 85-3 at 2-6.) The Court finds that under the circumstances of this case, Plaintiff was not required to go through the IGP grievance procedure prior to adding Jubert as a Defendant and asserting his Eighth Amendment claims for exposure to ETS in D-dorm in his Supplemented

---

206, 225 (2d Cir. 2004).

Complaint because Plaintiff's D-dorm ETS exposure claim is essentially the same as his G-dorm claim. (*See generally* Dkt. No. 72.)

One of the purposes of the PLRA exhaustion requirement is to "affor[d] corrections officials an opportunity to address complaints internally." *Porter*, 535 U.S. at 525. When inmates are required to bring their grievances before an internal body for resolution before filing a federal lawsuit, prison officials are afforded "a fair opportunity to correct their own errors." *Woodford*, 548 U.S. at 94. A second purpose of the exhaustion requirement is "to improve the quality of inmate suits filed through the production of a 'useful administrative record.'" *Murray v. Goord*, 668 F.Supp. 2d 344, 355 (N.D.N.Y. 2009) (citing *Jones v. Bock*, 549 U.S. 199, 204 (2007)).

In Grievance ALT- 3959-12, Plaintiff described the ETS exposure in the G-dorm bathroom and indicated the problem had been the same in each of the dorms where he had been housed at Altona. (Dkt. No. 85-14 at 6.) In its June 5, 2013, decision on Grievance ALT- 3959-12, CORC found that indoor smoking was prohibited under the N.Y. Clean Air Act and that every effort was being made to enforce the no smoking policy; advised Plaintiff to address incidents of smoking with his area supervisor for remedial action; and concluded that Plaintiff had not presented any compelling reason to revise the current policy or eliminate the sale of tobacco products. (Dkt. No. 85-14 at 3.) DOCCS, and Altona in particular, were given an opportunity to and did address Plaintiff's complaints regarding indoor smoking in dormitory bathrooms in the determination of Grievance ALT- 3959-12.

Grievance ALT- 3959-12 provided a useful administrative record regarding the alleged problems of smoking in dormitory bathrooms and the lack of enforcement of the indoor smoking

ban. There is nothing in the record which suggests that Defendants' response would have been any different had Plaintiff filed a separate grievance with respect to D-dorm. Although Jubert was not involved in Grievance ALT- 3959-12, since New York law does not require that an inmate include the names of the parties responsible for the problems asserted in a grievance, Plaintiff would not have been required to specifically name Jubert in a grievance regarding D-dorm had one been filed. *See Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009).

In light of the foregoing, the Court finds that Plaintiff was not required to file a separate grievance with regard to ESP exposure in D-dorm resulting from lack of enforcement of the ban on indoor smoking in order to exhaust his administrative remedies.

### B.       Merits of Plaintiff's Eighth Amendment Claim

In 1993, the Supreme Court held in *Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993), that an inmate stated a viable Eighth Amendment claim for relief by alleging that prison officials, with deliberate indifference, subjected him to an unreasonable risk of serious damage to his future health by allowing his continued exposure to ETS, even if the inmate "show[ed] no current symptoms."[15]  *See Warren v. Keane*, 196 F.3d 330, 332-33 (2d Cir. 1999). In *Helling*, the

---

[15]  Claims of present serious adverse health consequences or aggravation of an existing medical condition as a result of exposure to ETS are analyzed differently than claims alleging an unreasonable risk of serious damage to future health. *See Liggins v. Parker*, No. 9:04-CV-0966, 2007 WL 2815630, at * 16, 2007 U.S. Dist. LEXIS 98713, at * 51-52 (N.D.N.Y. Sept. 25, 2007). Plaintiff testified at his deposition that he did not believe he had any injuries caused by ETS exposure. (Dkt. No. 85-12 at 32-33.) He has made no claim that the hypertension with which he was diagnosed upon his imprisonment was caused or exacerbated by exposure to ETS, nor has any doctor told him that was the case. (Dkt. Nos. 85-12 at 31-32; 85-13 at 19.) Plaintiff has denied any respiratory problems, and although he believes that the sinusitis from which he has always suffered was worsened by exposure to ETS, no doctor has told him that was the case. (Dkt. No. 85-12 at 31-32.) Medical conditions such as sinus problems exacerbated by ETS exposure have been held not to be a serious medical condition for Eighth Amendment claims in any event. *See Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999). Therefore, Plaintiff's

Supreme Court recognized a two-pronged test containing objective and subjective elements for establishing an Eighth Amendment claim based on ETS exposure.

       1.     <u>Objective Element</u>

Plaintiff must satisfy the objective element "by showing serious harm resulting from exposure to unreasonably high levels of smoke." *Davis v. New York*, 316 F.3d 93, 97 (2d Cir. 2002). To show that a risk was objectively unreasonable, an inmate must establish that he is being exposed to unreasonably high levels of ETS, and that the risk to his health is so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. *Helling*, 509 U.S. at 36. *Helling* does not mandate smoke-free prisons. *Scott v. Dist. of Columbia*, 139 F.3d 940, 942 (D.C. Cir. 1998); *see also Taylor v. Conway*, No 06-CV-1329 (SDU), 2008 WL 4371928, at * 4, 2008 U.S. Dist. LEXIS 72499, at *12 (D. Conn. Sept. 23, 2008) ("All exposure to ETS is not unconstitutional; only exposure to an unreasonably high level of ETS is cognizable as a constitutional violation.") (citing *Helling*, 509 U.S. at 35-36), *aff'd*, 381 F. App'x 40 (2d Cir. 2010).

Plaintiff has established that he was exposed to some level of ETS in G-dorm and D-dorm, outdoors, and in various bathrooms at Altona. (*See, e.g.*, 85-12 at 13-18, 21-23, 30-31.) However, his Supplemented Complaint, deposition testimony, and summary judgment motion all fail to show in other than conclusory and self-serving fashion that the level of ETS to which he was exposed was unreasonably high or that he had any medical problems associated with it. *See Gill v. Smith*, 283 F.Supp. 2d 763, 767 (N.D.N.Y. 2003) ("courts have granted summary judgment for the defendant because the plaintiff failed to provide any evidence about the level of

———————————————

sole Eighth Amendment ETS exposure claim is for an unreasonable risk to his future health.

smoke in the facility, the degree of exposure, or any medical problems associated with exposure to ETS") (citation omitted); *Henry v. Epps*, No. 4:14-CV5-M.M.-SAA, 2015 WL 2348625, at * 4, 2015 U.S. Dist. LEXIS 63970, at * 7-8 (N.D. Miss. May 15, 2015) (objective element not satisfied where plaintiff "presented only vague and conclusory allegations that he has been exposed to unreasonably high levels of environmental tobacco smoke.").

On his motion for summary judgment, Plaintiff relies in part upon the Affidavits of four Altona inmates to prove unreasonably high exposure to ETS. (Dkt. No. 81-2 at 5-8). However, the Affidavits of the Altona inmates are as conclusory in nature as Plaintiff's own exposure claims. Ferullo, Williams, Montesoma, and Parsons state generally that there are high levels of ETS in areas such as inmate bathrooms, kitchen/dayroom area, gym bathroom, recreation yard bathroom, the mess hall bathroom, all program runs and movement to and from the mess hall.[16] *Id*. at 5-8. Both Montesoma and Parsons, who claims he is allowed to smoke freely in restricted areas without fear of receiving a misbehavior report because most officers have no problem with it, give no indication of the dates during which they have been incarcerated at Altona and whether, if at all, they were housed with Plaintiff or spent considerable time with him. *Id.* at 7-8. Williams, offering no specific instances, claims in conclusory fashion that the correction staff is deliberately indifferent to the problem of exposure to ETS and makes no effort to enforce the indoor smoking policy. *Id*. at 6. In sum, the Affidavits are devoid of specific facts with regard to the circumstances surrounding the affiants' claimed ETS exposure and details as to how it compares to the exposure claimed by Plaintiff and are, therefore, of little probative value.

---

[16] Ferullo was housed in D-dorm with Plaintiff for approximately six months (Dkt. Nos. 81-2 at 5; 85-13 at 7, 15.) However, his affidavit is devoid of specifics regarding ETS in D-dorm. (Dkt. 81-2 at 5.)

Plaintiff has also relied upon summaries of New York state session laws 3292 and A5516C dealing with the regulation of smoking, which site as justification health issues and approximate annual number of deaths from second hand smoke, (Dkt. No. 81-2 at 2-4), and an American Cancer Society publication on second hand smoke in support of his motion. *Id*. at 19-21. While the session law summaries and American Cancer Society publication acknowledge recognized hazards of ETS exposure, they do not address Plaintiff's own experience. The inquiry under *Helling* is not whether ETS exposure is generally harmful, or whether it has been shown to cause increased risks in populations exposed to it; the inquiry is whether Plaintiff's particular exposure to ETS caused him to suffer a greater risk of harm. *See McKee v. Director, Florida Civil Commitment Center*, No. 2:11-cv-579-Ftm-38DNF, 2014 WL 2801043, at * 6, 2014 U.S. Dist. LEXIS 83618, at * 19 (M.D. Fl. June 19, 2014) ("[W]ith respect to the objective factor, [a plaintiff] must show that he himself is being exposed to unreasonably high levels of ETS." (quoting *Helling*, 590 U.S. at 35)); *see also Durham v. Lappin*, No. 05-cv-01282-MSK-KLM, 2010 WL 918066, at * 5, 2010 U.S. Dist. LEXIS 72783, at * 13 (D. Colo. Mar. 11, 2010) ("General studies, medical journals and statistics are not sufficient to make the individualized showing of risk that is required, and without such an individualized showing, [the prisoner's] claim fails. To conclude otherwise would be to render ETS cases strict liability; once an inmate showed that he was exposed to secondhand smoke, his burden of proof is satisfied because exposure generally means increased health risks.")

A review of cases in which prisoners' claims regarding future harm from ETS have survived summary judgment demonstrates the type of egregious facts necessary to raise a genuine issue of material fact on the objective element. *See, e.g., Warren v. Keane*, 937 F. Supp. 301,

303 (S.D.N.Y. 1996), *aff'd and remanded*, 196 F.3d 330 (2d Cir. 1999) (district court denied defendants summary judgment where evidence showed smoke in poorly-ventilated facility was so thick that the plaintiffs had to hold wet handkerchiefs over their noses and mouths while in common areas such as the chapel, auditorium, gym and recreational area); *Davis,* 316 F.3d at 100 (reversing grant of summary judgment to defendants where plaintiff showed he was bunked in cell with a smoker and surrounded by seven inmates who were chain smokers or frequent smokers); *Ward v. LeClaire*, Civ. No. 907-CV-26 (GTS/RFT), 2009 WL 6302822, at * 3-4, 2009 U.S. Dist. LEXIS 126246, at * 9-11 (N.D.N.Y. Sept. 16, 2009) (plaintiff satisfied objective element articulated in *Helling* where he claimed forty-seven out of sixty inmates in his housing unit were smokers, and he was exposed to seriously high levels of ETS from May 2006 until his release in January 2008 in common areas such as the bath, shower, laundry, and TV rooms as well as the housing unit, including the day-room and sleeping dorm areas); *Gill,* 283 F.Supp. 2d 763 (denial of summary judgment to defendants where evidence showed that the asthmatic plaintiff was forced to spend a substantial part of each day in a room with a prison employee who smoked constantly); *McPherson v. Coombe,* 29 F.Supp. 2d 141 (W.D.N.Y. 1998) (defendants' motion for summary judgment denied where evidence showed plaintiff was housed in poorly ventilated housing unit where smoking was allowed and there were forty-one smokers).

Cases without such egregious facts have not survived summary judgment.  *See, e.g., Eldridge v. Williams*, 10 Civ. 0423 (LTS), 2013 WL 4005499, at * 7, 2013 U.S. Dist. LEXIS 107555, at * 22 (S.D.N.Y. July 30, 2013) (summary judgment to defendants on plaintiffs' claim of unreasonably high exposure to ETS through continuous exposure to smoke in the shower areas and through the ventilation system); *Islam v. Connolly*, No. 07 Civ. 3225 (PKC), 2011 WL

723568. at * 6, 2011 U.S. Dist. LEXIS 17652, at * 16-17 (S.D.N.Y. Feb. 16, 2011) ("While plaintiff need not establish a level of exposure to ETS equivalent to that of *Helling*, 509 U.S. at 28, where plaintiff shared a cell with a chain-smoker who smoked five packs of cigarettes a day, in order to survive summary judgment . . ., the plaintiff's exposure to ETS as a result of defendants . . . smoking at their Station and the inmates smoking in the bathroom is significantly lower than that experienced by the plaintiff in *Helling*, and does not rise to the level that a reasonable jury could find 'so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such risk.' *Helling*, 509 U.S. at 36") (emphasis in original); *Liggins*, 2007 WL 2815630, at *4, 17 (summary judgment for the defendants where evidence showed only that the plaintiff "was subjected to second hand smoke at the hands of fellow inmates as well as jail workers" and that prisoners' smoking habits were encouraged by jail officials); *see also Griffin v. DeRosa,* 153 F. App'x 851, 853 (2d Cir. 2005) (on motion to dismiss twenty-month exposure to ETS from eight to ten smokers every time inmate used bathroom was found insufficient to allege an eighth amendment violation).

The Court finds that the record evidence in this case does not reveal the type of egregious exposure to ETS in G-dorm, D-dorm, and outside at Altona necessary to satisfy the objective element of Plaintiff's Eighth Amendment claim.

## 2.     Subjective Element

The subjective element requires Plaintiff to prove deliberate indifference.  Deliberate indifference is a "state of mind that is the equivalent of criminal recklessness." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citation omitted).  To show that a prison official has violated the Eighth Amendment through deliberate indifference, a plaintiff must demonstrate that

Defendants have knowingly and unreasonably disregarded an intolerable or excessive risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 839 (1994).

The adoption of a smoking policy, if enforced, "will bear heavily on the inquiry into deliberate indifference." *Helling*, 509 U.S. at 36; *see also Simmons v. Nalley*, No. 9:03-CV-1093 (FJS/RFT), 2009 WL 3199552, at * 10, 2009 U.S. Dist. LEXIS 91034, at * 8 (N.D.N.Y. Sept. 30, 2009) (courts should consider "the prison authorities' current attitudes and conduct, including whether they have adopted and to what extent they have enforced a smoking policy") (citing *Helling*, 509 U.S. at 36) (internal quotation marks omitted). As long as reasonable efforts are made, "imperfect enforcement of [a non-smoking policy] alone may not support a finding of deliberate indifference." *Enigwe v. Zenk*, No. 03-CV-854 (CBA), 2007 WL 1997709, at * 6, 2007 U.S. Dist. LEXIS 68317, at * 18 (E.D.N.Y. Sept. 14, 2007) (citing *Scott*, 139 F.3d at 944).

Even assuming *arguendo* that Plaintiff has raised an issue of fact with regard to the objective element of his Eighth Amendment claim, Defendants, in their unopposed motion for summary judgment, have established that they were not deliberately indifferent to Plaintiff's exposure to ETS.

### a.    Fischer

In his Supplemented Complaint, Plaintiff has alleged that on March 6, 2013, he contacted Defendant Fischer, then Commissioner of DOCCS, by certified mail to complain about the unreasonably high levels of exposure to ETS at Altona, and that after being advised of the problem, Fischer failed to alleviate it. (Dkt. No. 72 at ¶ 30.) Fischer seeks summary judgment on the grounds that responding to, and taking action with respect to, Plaintiff's letter was delegated to Heywood by Fischer's staff, and that he had no personal knowledge of, or

involvement in, the matters complained of by Plaintiff.[17]  (Dkt. No. 85-4 at ¶¶ 5, 6, and 8.)

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977).  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").  "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement."  *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22-23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim") (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)).  Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered."  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged

---

[17]  Paragraph 17 of Defendants' Statement of Material Facts, states that "[Plaintiff's March 6, 2013, letter to Fischer] was read and attended to by staff in Defendant Fischer's office and Defendant Fischer did not read plaintiff's letter or otherwise become aware of his complaints.  (Dkt. No. 85-1 at ¶ 17.)  Given Plaintiff's failure to respond to Defendants' Statement of Material Facts, the evidentiary support for the statement in Fischer's Declaration (Dkt. No. 85-4 at ¶¶ 3-6), and the lack of record evidence contradicting the statement, paragraph 17 is deemed admitted.

constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[18]

Although the Second Circuit expressly held in *Colon* that supervisory liability can be shown by a failure to remedy the alleged wrong after being informed through a report or appeal, both the Second Circuit and numerous district courts have held that "[r]eceipt of letters or grievances, [, alone,] . . . is insufficient to impute personal involvement." *Woods v. Goord*, No. 01 Civ. 3255(SAS), 2002 WL 731691, at * 7, 2002 U.S. Dist. LEXIS 7157, at * 24 (S.D.N.Y. Apr. 23, 2002). "The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter." *Rivera v. Fischer*, 655 F.Supp. 2d 235, 238 (W.D.N.Y. 2009) (citing *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997). *See also Rush v. Fischer*, 923 F.Supp. 2d 545, 552 (S.D.N.Y. 2013) ("[P]ersonal involvement has not been shown where a supervisor's only response to an inmate's complaint is to refer the complaint to the appropriate staff for investigation."); *Mateo v. Fischer*, 682 F.Supp. 2d 423, 430 (S.D.N.Y. 2010) ("[C]ommissioners and prison superintendents receive large numbers of letters from inmates, and

---

[18] The Second Circuit has thus far declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability and has acknowledged that the issue remains unresolved. *See Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (citing *Reynolds v. Barrett*, 685 F.3d 193, 205 n. 14 (2d Cir. 2012).

they delegate subordinates to handle them. . . . If courts found personal involvement every time a supervisor forwarded a complaint to a subordinate, the requirement [for personal involvement] would lose all meaning.") (citation and internal quotation marks omitted).

The evidence establishes that Plaintiff's letter to Fischer was, in accordance with normal DOCCS procedure, forwarded to Heywood for handling by Fischer's staff, and referred by her to Demars, who as Superintendent at Altona, was deemed the appropriate person to address Plaintiff's complaint, with no personal involvement by Fischer and no showing of deliberate indifference to Plaintiff's claimed exposure to unreasonably high levels of ETS on his part. (*See generally* Dkt. No. 85-4.)  The Court therefore concludes that Defendant Fischer did not have the requisite personal involvement in Plaintiff's § 1983 claims and recommends that Plaintiff's motion for summary judgment against Fischer be denied, and that Fischer be granted summary judgment. *See Sealey*, 116 F.3d at 51.

b.      Demars

Superintendent Demars has stated in his Declaration that every effort is made by staff to enforce the DOCCS indoor smoking prohibition and outdoor restrictions, and that staff have been instructed to issue Tier I or Tier II misbehavior reports for smoking violations and suspend privileges in housing unit when evidence of smoking is present.[19]  (Dkt. No. 85-7 at ¶ 5.)  In this case, Demars reviewed Plaintiff's grievances regarding exposure to ETS and took action to further instruct Altona staff to enforce the DOCCS smoking policy and take appropriate action

_____

[19]  Records of Tier I misbehavior reports are retained for only fourteen days.  (Dkt. No. 85-11 at ¶ 7.)  Records submitted by Defendants confirm the issuance of Tier II misbehavior reports from August 2012 to August 2103, albeit in what appear to be relatively small numbers. (Dkt. Nos. 85-1 at ¶¶ 29-30; 85-15.)

with respect to violators. *Id*. at ¶ 9. Demars also reviewed and responded to Plaintiff's May 13, 2013, letter to Fischer and in a June 26, 2013, memorandum reminded all staff of the indoor smoking prohibition and outdoor restrictions. *Id*. at ¶ 10. Demars reminded staff to report violations to the area supervisor. *Id.* Other than Plaintiff's two grievances and letter to Fischer, Demars has no knowledge of Plaintiff's complaints of ETS exposure. *Id*. at ¶ 12.

Plaintiff's claims of deliberate indifference regarding Demars are solely conclusory (Dkt. No. 81-1 at ¶¶ 5-7), and Plaintiff has failed to respond to the statements in Demars' Declaration. The Court finds that Demars has established that while enforcement of the smoking prohibition and restrictions has not been perfect at Altona, he has made reasonable efforts at enforcement and has not been deliberately indifferent to Plaintiff's alleged exposure to unreasonably high levels of ETS. *See Eldridge*, 2013 WL 4005499, at *12 (claim for deliberate indifference will fail where a defendant who has subjective knowledge of an alleged unconstitutional condition after reading a complaint has taken reasonable steps to remedy the problem). Therefore, the Court recommends that Plaintiff's motion for summary judgment against Demars be denied and that Demars be granted summary judgment on Plaintiff's Eighth Amendment claim.

c.      Harvey

According to Altona Deputy Superintendent of Security Harvey, he has made every effort to enforce both the indoor smoking prohibition and outdoor restrictions, including based upon instructions from Superintendent Demars: (1) instructing staff to prepare misbehavior reports, suspend privileges in housing units, issue warnings, assign work details and impose other

disciplinary sanctions for violations of the smoking prohibitions and restrictions.[20]  (Dkt. No. 85-10 at ¶¶ 5-6.)  Harvey responded to the concerns in Plaintiff's December 12, 2012, Request for Interview or Information regarding smoking in G-dorm by, among other things, instructing Strack to investigate the complaint, which resulted in Plaintiff being interviewed by Dragoon, and instructing staff to vigorously enforce DOCCS policy regarding indoor smoking and take appropriate action for violations.  *Id*. at ¶¶ 7-9.  Harvey claims to have no knowledge of Plaintiff's complaints regarding smoking at Altona other than those in the Request for Interview or Information.  *Id*. at ¶ 13.

 As with Demars, Plaintiff's claims of deliberate indifference regarding Harvey are solely conclusory (Dkt. No. 81-1 at ¶¶ 5-7), and Plaintiff has failed to respond to the statements contained in Harvey's Declaration.  The Court finds that Harvey made reasonable efforts at enforcement and has not been deliberately indifferent to Plaintiff's alleged exposure to unreasonably high levels of ETS.  Therefore, the Court recommends that Plaintiff's motion for summary judgment against Harvey be denied, and that Harvey be granted summary judgment on Plaintiff's Eighth Amendment claim.

> d.     Decosse, Miller, and Jubert

Plaintiff testified at his deposition that Decosse, Miller, and Jubert failed to adequately enforce the no indoor smoking policy.  (Dkt. Nos. 85-12 at 15, 31; 85-13 at 13-14.)  However, Plaintiff admittedly never complained to Decosse and Miller about exposure to unreasonably

---

[20]  Minutes from a November 2012 Inmate Liaison Committee meeting reference a statement by Harvey that if they continue to find cigarette butts laying around in the toilets and on toilet seats, they will continue enforcement of the current policy of shutting down cooking and/or television privileges.  (Dkt. No. 81-2 at 22.)

high amounts of ETS in G-dorm prior to the time he sent the December 12, 2012, Request for Interview or Information to Harvey and filed Grievance ALT-3959-12. *Id.* Plaintiff does claim to have complained to Jubert about smoking in the bathroom once when he was first housed in D-dorm, and testified at his deposition that Jubert responded "What do you want me to do about it?" (Dkt. No. 85-15 at 17.)

In his summary judgment motion, Plaintiff has stated in conclusory fashion that Decosse, Miller, and Jubert acted with deliberate indifference in allowing him to be exposed to constant high levels of ETS. (Dkt. No, 81-1 at ¶ 34.) Plaintiff has not, however, responded to Decosse, Miller, and Jubert's Declarations in which they have stated that while they are aware inmates smoke inside the facility, as correctional officers they make every effort to enforce the indoor smoking prohibition and outdoor smoking restrictions; prepare misbehavior reports when they find individuals violating them; and issue warnings and restrict housing privileges when evidence of smoking is found. (Dkt. No. 85-5 at ¶¶ at 8-9; 85-8 at ¶¶ at 8-9; 85-9 at ¶¶ at 8-9.) The three all state in their Declarations that they frequently remind and warn inmates not to smoke in the bathrooms, showers and outside when in close proximity to the housing when they find smoking has occurred. *Id.* Decosse and Miller claim to have issued multiple Tier I, II, or III misbehavior reports every month in 2012 and 2013 when they found individuals violating the DOCCS smoking policies and when informed by other inmates of violations took action to stop inmates from violating the smoking policies and took disciplinary action when warranted. (Dkt. Nos. 85-8 at ¶¶ 10-11.) Jubert claims to have prepared multiple misbehavior reports each month in 2013 and to have taken appropriate action when told by inmates of smoking violations in 2012 and

2013.[21]  (Dkt. No. 85-5 at ¶¶ 10-11.)  Given the conclusory nature of Plaintiff's claims of deliberate indifference and his failure to submit evidence challenging their Declarations, the Court finds that the record evidence does not support a finding of deliberate indifference on the part of Decosse, Miller, or Jubert with respect to Plaintiff's exposure to allegedly unreasonable levels of ETS.  Therefore, the Court recommends that Plaintiff's motion for summary judgment be denied, and that Decosse, Miller, and Jubert be granted summary judgment on Plaintiff's Eighth Amendment claim.

## VII.   QUALIFIED IMMUNITY

Defendants contend that if the Court were to find that their actions violated Plaintiff's rights, they would nonetheless be entitled to qualified immunity.  (Dkt. No. 85-3 at 22.) Inasmuch as the Court is recommending that Defendants' motion for summary judgment be granted on other grounds, it finds it unnecessary to reach their qualified immunity argument.

**ACCORDINGLY**, it is hereby

**RECOMMENDED**, that Plaintiff's motion for summary judgment (Dkt. No. 81) be **DENIED** and Defendants' motion for summary judgment (Dkt. No. 85) be **GRANTED**; and it is hereby

**ORDERED**, that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

---

[21]  The record evidence does not confirm Decosse, Miller, and Jubert's claims that they issued multiple Tier I, II, and III misbehavior reports monthly during the relevant time period. However, because Tier I misbehavior reports issued for smoking violations, are kept for only fourteen days, the Court cannot conclude that they did not issue misbehavior reports as stated in their Declarations.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: July 15 , 2015
      Syracuse, New York

                                        Therese Wiley Dancks
                                        United States Magistrate Judge


Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
Oct. 4, 2012.

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens*[FN1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

> FN1. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his complaint be dismissed on this procedural basis, without addressing its merits.

I. *BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84.[FN2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

> FN2. The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____."

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face.[FN3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

> FN3. According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint.[FN4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances.[FN5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

> FN4. Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

> FN5. Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

mencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor.[FN6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

> [FN6]. Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was

required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No."[FN7] *Id.*

> [FN7]. During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Of-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

ficer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties.[FN8,FN9] ,

FN8. The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

FN9. Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

III. *DISCUSSION*

A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at *4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the

plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements.[FN10],[FN11] *Id.*

> **FN10.** In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantially exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

FN11. In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

**\*6** Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

C. *Application of Governing Legal Principles*

1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

2. *Presentation of Defense/Estoppel*

*7 The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at *3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at *5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at *4 (citing *Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and co-operate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at * 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at *6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

*8 During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

### IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS RE-PORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2012.
Bailey v. Fortier
Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2013 WL 5354517 (W.D.N.Y.)

**(Cite as: 2013 WL 5354517 (W.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Mark Alan CARLSON, Plaintiff,
v.
Jamieson PARRY, Defendant.

No. 06–CV–6621P.
Sept. 24, 2013.

David A. Johns, Pultneyville, NY, for Plaintiff.

George Michael Zimmermann, Office of the New York State Attorney General, Buffalo, NY, Michael J. Russo, New York State Attorney General's Office, Buffalo, NY, for Defendant.

*DECISION & ORDER*
MARIAN W. PAYSON, United States Magistrate Judge.

**PRELIMINARY STATEMENT**

**\*1** On December 13, 2006, Mark Alan Carlson ("Carlson") filed this action against the New York State Department of Correctional Services ("DOCS") and certain of its officers at Livingston Correctional Facility, alleging that the defendants violated his rights under the First, Eighth and Fourteenth Amendments, as well as his rights under the Americans with Disabilities Act and the Rehabilitation Act.[FN1] (Docket # 1). Following resolution of the defendants' summary judgment motion, Carlson's sole remaining cause of action was his claim for deliberate indifference against defendant Jamieson Parry ("Parry") under 42 U.S.C. § 1983. (Docket # 66).

> FN1. Pursuant to 28 U.S.C. § 636(c), the parties consented to have a United States Magistrate Judge conduct all further proceedings in this case,

including the entry of final judgment. (Docket # 28).

After a three-day trial, a jury returned a verdict in favor of Parry on January 16, 2013. (Docket # 80). Currently pending before the Court is Carlson's motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. (Docket # 88). For the reasons discussed below, Carlson's motion for a new trial is denied.

*FACTUAL BACKGROUND*
**I.** *Procedural History*

Carlson commenced this action against Parry claiming that Parry was deliberately indifferent to Carlson's health or safety while he was incarcerated at Livingston Correctional Facility ("Livingston") in 2005. (Docket # 33 at ¶¶ 1–56). Parry, who was employed at Livingston as the Senior Corrections Counselor in 2005, denied that he was deliberately indifferent to Carlson's health or safety and asserted various affirmative defenses, including Carlson's alleged failure to exhaust his administrative remedies. (Docket # 34 at ¶¶ 18–19).

Prior to the trial, Parry filed a motion seeking dismissal of Carlson's claim on the grounds that he had failed to exhaust his administrative remedies because he had never filed a grievance concerning Parry's alleged conduct. (Docket # 70). Carlson opposed the motion, contending that he was excused from exhausting his administrative remedies through the grievance process. (Docket # 73). Specifically, Carlson asserted that he did not grieve Parry's conduct because he felt threatened and feared retaliation. (Docket # 74 at ¶¶ 39–42). According to Carlson, his concerns were two-fold: (1) Parry had the ability to assign him to harsh work assignments and (2) Parry had made a statement that Carlson interpreted to be a "direct threat of bodily injury." (*Id.* at ¶¶ 39–45).

The Court denied the exhaustion motion. Specifically, the Court determined that a ruling on exhaustion would

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5354517 (W.D.N.Y.)
**(Cite as: 2013 WL 5354517 (W.D.N.Y.))**

require the Court to make factual findings that were intertwined with the merits of Carlson's deliberate indifference claim. Accordingly, the Court concluded that the exhaustion defense should be submitted to the jury along with the deliberate indifference claim.

A trial was conducted between January 14, 2013 and January 16, 2013. (Docket 81, 82, 83, 84). On the first day of the trial, prior to jury selection, the Court conducted a conference with the parties outside the presence of the jury. (Tr. at 7).[FN2] During that conference, counsel for Carlson confirmed the Court's understanding that Carlson's evidence relating to exhaustion would be limited to facts supporting "the view that ... Parry's conduct and statements amounted to threats or intimidation such that a person of ordinary firmness would have been deterred from filing a grievance." (*Id.*). The parties agreed that with respect to the exhaustion issue, the jury would need to answer only a single question on the verdict form regarding whether "threats or intimidation effectively made the grievance process unavailable." (*Id.*).

> FN2. The transcript of the trial testimony shall be referred to as "Tr. ___." (Docket 95, 96, 97).

**\*2** Following jury selection, outside the presence of the jury and prior to Carlson's direct testimony, counsel for Carlson alerted the Court to a potential evidentiary issue. (Tr. 101). Specifically, Carlson's counsel informed the Court that he intended to elicit testimony from Carlson regarding the reasons for Carlson's failure to file a grievance with respect to Parry's conduct. Counsel indicated that he expected Carlson would testify that part of the reason that Carlson was intimidated from filing a grievance was that Carlson had witnessed or had knowledge of retaliation inflicted on other inmates who had filed grievances against other officers. (*Id.*). Carlson's counsel conceded that such testimony would not include evidence of

Carlson's knowledge of any actions taken by Parry against other inmates, but would relate solely to actions other officers took against other inmates. (Tr. 102). Counsel for Parry objected to the testimony on the grounds that Carlson had failed to assert such facts in his affidavit in opposition to Parry's exhaustion motion. (Tr. 101–02). In addition, counsel for Parry contended that the testimony would likely involve hearsay and that it would be improper under the equitable doctrine of estoppel to impute other officers' conduct to Parry. (Tr. 102).

The Court determined to exclude the proposed testimony on two grounds. First, the testimony was excluded on the grounds that Carlson had failed to allege such facts in opposition to defendant's exhaustion motion and it was "too late" to do so after the commencement of the trial. (Tr. 102–03). Second, the Court concluded that testimony regarding mistreatment or retaliation suffered by other inmates at the hands of other officers involving unrelated grievances was too attenuated, as a matter of law, to support a finding that the grievance process was unavailable to Carlson because he felt threatened or intimidated. (Tr. 103–04). For that reason, the Court determined that the testimony was also irrelevant. (Tr. 104).

At the conclusion of the trial, the jury was provided a verdict form. (Docket # 80). The first question on the verdict sheet provided:

*EXHAUSTION OF ADMINISTRATIVE REMEDIES*
1. Do you find that plaintiff Carlson has proven by a preponderance of the evidence that defendant Parry's statements or conduct towards him amounted to threats or intimidation that would have caused a person of ordinary firmness who was similarly situated to Carlson to be deterred from filing a grievance about Parry's treatment of him?

YES _____

NO _____

If you answered "yes" to Question # 1, please answer

Question # 2. If you answered "no" to Question # 1, you are now finished. Please sign and date the Verdict Form

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5354517 (W.D.N.Y.)
**(Cite as: 2013 WL 5354517 (W.D.N.Y.))**

and return your verdict to the Court.
(*Id.* at 1). The verdict returned by the jury answered this question in the negative and, in accordance with the Court's instructions, answered no additional questions. (*Id.*). Judgment was entered in favor of Parry. (Docket # 85).

**\*3** Carlson now seeks a new trial on two grounds. (Docket # 88). First, Carlson contends that the Court erred by excluding evidence that Carlson had witnessed "instances of retaliation by prison officials against inmates who had filed grievances against a prison official." (Docket # 88–2 at 2). According to Carlson, such information was relevant to allow the jury to assess whether an inmate who was "similarly situated" to Carlson would have been intimidated from filing a grievance with respect to Parry's conduct. (*Id.* at 4). Second, Carlson contends that the jury's verdict that a person of ordinary firmness who was similarly situated to Carlson would not have been deterred from filing a grievance was against the weight of the evidence. (*Id.* at 5). According to Carlson, the evidence concerning Carlson's disability, his pain, his inability to walk, his vulnerability and Parry's vindictiveness could lead only to the conclusion that a person under such circumstances would have been too intimidated to file a grievance. (Docket # 88–1 at ¶ 15).

Parry opposes the motion on three grounds. First, Parry contends that Carlson failed to preserve his objection to the exclusion of the evidence for subsequent review. (Docket # 90 at 2). According to Parry, Rule 103 of the Federal Rules of Evidence provides that in order to preserve an objection to the exclusion of evidence at trial, a party must make a formal offer of proof. (*Id.* at 3). Carlson's failure to do so, Parry maintains, precludes meaningful review and warrants denial of his request for a new trial. (*Id.* at 4). In addition, Parry contends that even if the exclusion of the proposed testimony was error, such error was harmless and therefore not grounds to warrant a new trial. (*Id.* at 4–5). According to Parry, there was substantial evidence to allow the jury to conclude that an inmate under the circumstances faced by Carlson would not have been intimidated from filing a grievance, partic-

ularly where the evidence showed that Carlson submitted grievances on other issues during the same time period. (*Id.* at 4–5). Finally, Parry asserts that the verdict was not against the weight of the evidence. (*Id.* at 5–6). According to Parry, the verdict was supported by substantial evidence and was based on credibility determinations by the jury. (*Id.*). In Parry's view, the jury's rejection of Carlson's version of the events does not constitute grounds for a new trial.

In reply, Carlson contends that while his counsel may not have used the term "offer of proof" during the trial, his counsel adequately conveyed to the Court the substance of the proposed testimony regarding Carlson's knowledge of retaliation inflicted on other inmates by other corrections officers. (Docket # 91 at ¶ 2). Further, Carlson contends the Court asked questions regarding the proposed testimony, and defense counsel had a full opportunity to respond. (*Id.*). Thus, according to Carlson, the objection was properly preserved on the record and, in any event, the substance of the proposed testimony was apparent from the context and a formal offer of proof was thus not required. (Docket # 92).

**\*4** During oral argument on this post-trial motion, counsel for Carlson made a formal offer of proof. He indicated that Carlson was prepared to testify that several inmates suffered retaliation after filing grievances directed against prison officials. The retaliation took a variety of forms, including the planting and subsequent discovery of contraband in the inmates' personal areas, loss of good time, and placement in solitary confinement. According to Carlson's counsel, Carlson's knowledge concerning the retaliation derived from his personal observations and through conversations with other inmates.

## II. *Evidence Relating to Exhaustion*
During the trial, both parties submitted evidence of the circumstances surrounding Parry's conduct and Carlson's failure to file any grievances relating to that conduct. The pertinent evidence is summarized below.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5354517 (W.D.N.Y.)
**(Cite as: 2013 WL 5354517 (W.D.N.Y.))**

The parties entered into a stipulation regarding the grievance procedures at Livingston and Carlson's knowledge of those procedures. The stipulation, which was read to the jury, provided as follows:

The parties hereby stipulate that as of July 15, 2005, the plaintiff, Mark Alan Carlson, was aware that Livingston Correctional Facility had a grievance procedure which allowed inmates to challenge certain actions of the Livingston staff, including the assignment of inmate programs, work assignments and treatment of medical conditions. It is further stipulated that the plaintiff did not file a grievance regarding the actions of Jamieson Parry.

(Tr. 223–24).

Carlson testified that he first met Parry on July 23, 2005, approximately nine days after his transfer to Livingston. (Tr. 127). At the time, Parry was the Senior Corrections Counselor at Livingston and was the head of the program committee, which was responsible for assigning inmates to therapeutic, educational and work-related programs during their incarceration. (Tr. 127, 248–50, 253–56). Carlson met with Parry and an unidentified corrections employee to discuss appropriate program assignments for Carlson. (Tr. 128–29). According to Carlson, Parry indicated that because of Carlson's conviction for driving while intoxicated, Carlson would be assigned to the ASAT program, which was a treatment program for drug and alcohol addiction. (Tr. 129, 246). Carlson testified that Parry also indicated that he would assign Carlson to work in the mess hall. (Tr. 129). According to Carlson, at that time he told Parry that he was experiencing pain in his leg and shoulder as result of a recent accident at his prior facility and adjustments to his new prosthetic leg. (Tr. 129–30). Carlson contends that he removed his prosthetic leg and showed Parry the areas on his leg that were irritated or "raw." (Tr. 130).

Carlson testified that in response Parry stated the following:

I must be getting soft in my old age, because I'm willing to give you 30 days to get your medical bullshit straightened away .... Believe me when I tell you, if I don't see your name on every AA and NA sign-up sheet that we have in this prison within the next ... for the next 30 days ... I'll stick so many programs so far up your ass, you won't be able to sit down and visit with your mother when she comes to see you.

**\*5** (*Id.*). Carlson further testified that he interpreted the statement as a direct order to attend Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings and it caused him to be "scared to death" of Parry. (Tr. 130–31). After the July 23, 2005 meeting, Carlson began attending AA and NA meetings six nights a week. (Tr. 133). According to Carlson, he had to walk approximately 1400 yards round trip from his dorm to the building where the meetings were held. (Tr. 135–36). Carlson testified that he suffered injuries to the stump of his amputated leg as a result of the distance to and frequency of the meetings. (Tr. 136–37). He attended the meetings for approximately one month, but eventually became unable to walk the distance because of the injuries to his leg. (Tr. 137).

Carlson testified that he did not interact with Parry again until early September 2005. (Tr. 140). At the time, Carlson was in a borrowed wheelchair outside of the school building at Livingston. (Tr. 140–42). According to Carlson, Parry asked him whether he was still attending AA meetings. (Tr. 143). Carlson testified that he told Parry that his leg was too sore to walk to the meetings, but that he would resume his attendance after his leg healed or he was given his own wheelchair. (*Id.*). According to Carlson, Parry responded, "Don't worry about it. I've got a good job for you." (*Id.*). Carlson testified that Parry might have said a "cushy job" instead of a "good job." (*Id.*). Carlson contends that the following day, September 15, 2005, he received a work assignment that assigned him to work in the Utility Gang, which involved maintenance of the outdoor areas at Livingston. (Tr. 143–44, 295).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5354517 (W.D.N.Y.)
**(Cite as: 2013 WL 5354517 (W.D.N.Y.))**

Carlson explained that he did not file a grievance against Parry because he was terrified of him as a result of the statement Parry made when instructing him to attend AA meetings and the "sadistic" manner in which Parry assigned him to the Utility Gang despite Carlson's physical limitations. (Tr. 146). According to Carlson, he wondered "what ... [Parry] would ... do to [him] if [he] filed a grievance on [Parry] [;] ... what other harm would [Parry] try to ... pile on [him]?" (*Id.*).

On cross-examination, Carlson testified that he did not grieve his assignment to the Utility Gang because "it would be redundant" since he had been reassigned from the Utility Gang two days after receipt of the assignment. (Tr. 188). In addition, Carlson testified that he told his counselor at Livingston about Parry's conduct and she told him that he could file a grievance. (*Id.*). According to Carlson, he did not file a grievance at that time because he had already stopped attending the AA meetings and because he was no longer assigned to the Utility Gang. (*Id.*). Further, Carlson conceded that he filed grievances while at Livingston. (*Id* .). Carlson admitted that he filed a grievance on September 8, 2005 relating to the medical care for his shoulder that he was receiving at Livingston. (Tr. 188–90). Carlson also testified that he appealed the resolution of that grievance on September 23, 2005. (Tr. 190–91). Finally, Carlson testified that Parry never discussed grievances with Carlson or used the term "grievance" in Carlson's presence. (Tr. 191).

**\*6** Parry testified that inmates at Livingston were assigned to programming by a majority vote of the program committee, which was comprised of himself and two other Livingston employees. (Tr. 257–58). According to Parry, the medical department, not the program committee, determined whether a particular inmate was physically capable of performing tasks required by particular work assignments. (Tr. 266). The medical department communicated its determination to the program committee through the use of a "Medical Clearance Form." (*Id.*).

Parry testified that he had a vague recollection of his interactions with Carlson. (Tr. 267, 289). According to Parry, he recalled that during the program committee meeting, Carlson appeared "very angry, very resentful, and appeared to be quite adamant that he really was not capable of doing programs." (Tr. 278). According to Parry, he recommended drug and alcohol counseling for Carlson based upon Carlson's history of driving while intoxicated convictions. (Tr. 279). Parry also likely suggested that Carlson be assigned to work in the mess hall because Carlson's medical clearance form indicated that he was cleared for that assignment. (Tr. 279–80; Defendant's Exhibit 400). According to Parry, although the medical clearance form restricted Carlson from climbing stairs and ladders, reaching, bending, jumping and contact sports, the form indicated that Carlson was eligible to work in the mess hall. (Tr. 281).

Parry disputed that he made the statements about which Carlson testified. Although Parry conceded that he likely told Carlson that he had 30 days to obtain a medical clearance and he likely suggested that Carlson attend AA and NA meetings, Parry testified that he did not believe that he used the term "bullshit" and that he would not have ordered Carlson to attend AA or NA because he was not authorized to order an inmate to attend those programs. (Tr. 283–84, 288, 301–03). In addition, Parry denied that he ever threatened Carlson that if he did not attend the meetings Parry would "stick so many programs so far up your ass that you won't be able to sit down and visit with your [mother] when she comes to visit you." (Tr. 287). Finally, Parry testified that he had a very vague recollection regarding a second interaction with Carlson. (Tr. 289, 293–94, 305).

### *DISCUSSION*

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, a "court may, on motion, grant a new trial on all or some of the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a)(1). "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or

Slip Copy, 2013 WL 5354517 (W.D.N.Y.)
**(Cite as: 2013 WL 5354517 (W.D.N.Y.))**

otherwise taking a second bite at the apple." *Kogut v. Cnty. of Nassau,* 2013 WL 3820826, *2 (E.D.N.Y.2013) (internal quotation omitted). Grounds for granting a new trial include substantial errors in the admission or exclusion of evidence or in charging the jury or where the verdict was against the weight of the evidence. *See Farrior v. Waterford Bd. of Educ.,* 277 F.3d 633, 634 (2d Cir.), *cert. denied,* 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002); *Ishay v. City of New York,* 158 F.Supp.2d 261, 263 (E.D.N.Y.2001).

**\*7** Whether to grant a new trial "is committed to the discretion of the trial judge." *Snyder v. Shenendehowa Cent. Sch. Dist.,* 2011 WL 705151, *3 (N.D.N.Y.2011), *aff'd,* 486 F. App'x 176 (2d Cir.), *cert. denied,* —— U.S. ——, 133 S.Ct. 653, 184 L.Ed.2d 483 (2012). On a motion for a new trial, the judge "is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner," and "a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992). Thus, the court "has significant discretion in deciding whether to grant a Rule 59 motion for a new trial." *Okraynets v. Metro. Transp. Auth.,* 555 F.Supp.2d 420, 425 (S.D.N.Y.2008).

"Despite this liberality, however, [a] court should only grant a new trial when a jury's verdict is egregious." *Kogut v. Cnty. of Nassau,* 2013 WL 3820826 at *2 (internal quotation omitted) (alteration in original). Thus, a court should not grant a new trial "unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 370 (2d Cir.1988). Further, "trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, ... and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Raedle v. Credit Agricole Indosuez,* 670 F.3d 411, 418 (2d Cir.) (internal quotation and citation omitted), *cert. denied,* —— U.S. ——, 133 S.Ct. 789, 184 L.Ed.2d 582 (2012).

**I.** *Evidentiary Ruling*

I turn first to Carlson's argument that the Court improperly excluded his proposed testimony concerning acts of retaliation that had been visited upon other inmates by other corrections officers. Carlson contends that the exclusion of the testimony was error and affected his substantial rights. Parry disagrees, contending that Carlson failed to preserve his objection and that, in any event, any error was harmless.

**A.** *Offer of Proof*

Rule 103 of the Federal Rules of Evidence provides that in order to preserve a claim of error resulting from a court's exclusion of evidence during a trial, a party must "inform[ ] the court of [the] substance [of the evidence] by an offer of proof, unless the substance was apparent from the context." Fed.R.Evid. 103(a)(2). "[A]n offer of proof is not an absolute prerequisite in every appeal from the exclusion of evidence." *See Henry v. Wyeth Pharm., Inc.,* 616 F.3d 134, 151 (2d Cir.2010) (internal quotation omitted), *cert. denied,* —— U.S. ——, 131 S.Ct. 1602, 179 L.Ed.2d 516 (2011). Rather, "[t]he purpose of th[e] requirement is to alert the [trial] court and opposing counsel to the thrust of the excluded evidence, enabling them to take appropriate action, and to construct a record appropriate for appellate review." *United States v. Sheffield,* 992 F.2d 1164, 1169 (11th Cir.1993) (internal quotation omitted).

**\*8** During the trial, Carlson's counsel alerted the Court to the evidentiary issue that is now the subject of Carlson's challenge and explained the substance of the proposed testimony. The Court, counsel for Carlson and counsel for Parry engaged in a colloquy about the proposed testimony, following which the Court determined that the testimony should be excluded. Further, during oral argument on this post-trial motion, counsel for Carlson made a formal offer of proof and, while conceding that some of the testimony concerned statements that other inmates made to Carlson, he stated that some related to Carlson's personal observations. Although the question of whether Carlson properly preserved the issue for review is a close one, *see, e.g., Perkins v. Silver Mountain Sports Club & Spa, LLC,* 557

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5354517 (W.D.N.Y.)
**(Cite as: 2013 WL 5354517 (W.D.N.Y.))**

F.3d 1141, 1147 (10th Cir.2009) ("merely telling the court the content of ... proposed testimony is not an offer of proof[;] ... [i]nstead, the proponent must describe the evidence and what it tends to show and ... identify the grounds for admitting the evidence") (internal quotations and citations omitted); *United States v. Adams,* 271 F.3d 1236, 1241–42 (10th Cir.2001) ("[a]n offer of proof of testimony by counsel is the least favored method because of its potential to fall short of the standard required by the rules ... [;][s]pecificity and detail are the hallmarks of a good offer of proof" and an offer of proof should provide both "the significance of the proposed evidence" and the grounds for its admissibility), *cert. denied,* 535 U.S. 978, 122 S.Ct. 1454, 152 L.Ed.2d 395 (2002); *Moore v. City of Clarksville,* 2011 WL 5117776, *9 (M.D.Tenn.2011) ("it was clear what the proposed witnesses would allegedly testify to in light of the repeated and extended discussion about the proposed testimony throughout the trial[;] ... an offer of proof can take the form of a summary"), for the reasons discussed below, the claimed error does not warrant a new trial.

**B. *Exclusion of Testimony***

"It is well-established that a trial court has considerable discretion in determining whether to admit or exclude evidence." *Gavenda v. Orleans Cnty.,* 2000 WL 1375590, *7 (W.D.N.Y.2000) (citing *Barrett v. Orange Cnty. Human Rights Comm'n,* 194 F.3d 341, 346 (2d Cir.1999)). Rule 61 of the Federal Rules of Civil Procedure provides that "no error in admitting or excluding evidence ... is ground for granting a new trial[;] ... [a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed.R.Civ.P. 61. Accordingly, an evidentiary ruling, even if erroneous is not grounds for a new trial unless the ruling affected the movant's substantial rights. *Id.*

"Whether an evidentiary error implicates a substantial right depends on 'the likelihood that the error affected the outcome of the case.' " *Tesser v. Bd. of Educ. of City Sch. Dist. of New York,* 370 F.3d 314, 319 (2d Cir.2004) (quoting *Malek v. Fed. Ins. Co.,* 994 F.2d 49, 55 (2d Cir.1993)). Accordingly, "an evidentiary error in a civil case is harmless 'unless [the movant] demonstrates that it is likely that in some material respect the factfinder's judgment was swayed by the error.' " *Id.* (quoting *Costantino v. David M. Herzog, M.D., P. C.,* 203 F.3d 164, 174 (2d Cir.2000). Thus, "[t]he moving party has the burden of showing that it is likely that in some material respect the factfinder's judgment was swayed by the error." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC,* 467 F.3d 107, 119 (2d Cir.2006) (internal quotation omitted).

**\*9** As an initial matter, Carlson's argument that the Court erred in failing to allow him to testify about his knowledge of alleged retaliation inflicted upon other inmates by other officers is unavailing. Carlson argues that the testimony was relevant because it would have further supported Carlson's testimony that he did not grieve Parry's conduct because he was scared or intimidated. Carlson further argues that the testimony was necessary in order to permit the jury to properly assess whether an inmate who was similarly situated to Carlson would have been deterred from filing a grievance. I disagree.

The Prison Litigation Reform Act, 42 U.S.C. § 1997, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes." *E.g., Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Under limited circumstances, this exhaustion requirement may be excused. *See Snyder v. Whittier,* 428 F. App'x 89, 91 (2d Cir.2011). As relevant to this matter, the failure of an inmate to file an internal grievance may be excused where the inmate establishes that he was threatened and that the threat was "sufficient to render grievance procedures unavailable." *See id.* Whether a threat was sufficient to render grievance procedures unavailable involves an objective inquiry as to whether "a similarly situated individual of ordinary firmness would have deemed [the procedure] [un]available." *Hemphill v. New York,* 380 F.3d 680, 688

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5354517 (W.D.N.Y.)
**(Cite as: 2013 WL 5354517 (W.D.N.Y.))**

(2d Cir.2004).

An inmate's allegations that he failed to file a grievance because of a generalized fear for his personal safety or of retaliation is insufficient to render the grievance procedures unavailable. *See Brown v. Napoli,* 687 F.Supp.2d 295, 297 (W.D.N.Y.2009); *see also Hurd v. Durrand,* 2013 WL 1192351, \* 11 (S.D.Fla.) (citing *Hemphill* and concluding that "[a]n expression of general fear on the part of an [inmate] that defendants might retaliate if he used a grievance procedure to complain, is not enough to make the grievance procedure unavailable"), *report and recommendation adopted,* 2013 WL 1192342 (S.D.Fla.2013); *Howard v. Felton,* 2009 WL 331386, \*1–2 (M.D.Ga.2009) (recognizing that threats of retaliation may render the grievance procedure unavailable, but finding that "[p]laintiff makes no specific allegations of any retaliatory threats ... [and] does not claim that [d]efendant or any other prison official made specific retaliatory threats"). The legal insufficiency of allegations of generalized fear is grounded in the recognition that "[i]f every plaintiff bringing a retaliation claim could have the exhaustion requirement excused by alleging a fear of further retaliation, it would create a general exception to exhaustion for retaliation claims." *Harrison v. Stallone,* 2007 WL 2789473, \*6 (N.D.N.Y.2007).

**\*10** At trial, Carlson sought to bolster his testimony that Parry's statements and conduct caused him to believe he would be retaliated against for filing a grievance with testimony concerning his knowledge that other inmates had been retaliated against by other officers for filing grievances. If credited, such testimony might have suggested that Carlson had a generalized fear of retaliation—a proposition undermined by the fact that Carlson did file grievances during the relevant period—which is insufficient to excuse him from the exhaustion requirement. *See Brown v. Napoli,* 687 F.Supp.2d 295 at 297 ("mere allegation of a generalized fear of retaliation is insufficient to excuse [inmate's] failure to file a grievance"). Thus, the testimony was properly excluded. *See also Nelson v. Butte Cnty. Sheriff's Dep't,* 2012 WL 812385, \*9 (E.D.Cal.) (recognizing that an inmate's failure to grieve may be ex-

cused if the procedures are unavailable, but "the fact that [plaintiff] witnessed correctional staff abuse other inmates does not show that the grievance process was effectively unavailable"), *report and recommendation adopted,* 2012 WL 1194839 (E.D.Cal.2012).

Even if the Court had erred by excluding Carlson's testimony, such error would not justify a new trial because Carlson has failed to establish that the exclusion of the testimony affected his substantial rights. As an initial matter, Carlson's motion is conclusory, fails to provide citations to any of the record evidence and fails to explain how the proposed testimony would have been otherwise admissible as non-hearsay. *See O'Hara v. McAvoy,* 2013 WL 4507067, \*4 (E.D.N.Y.2013) ("[d]efendant's brief fails to move beyond the issue of relevance to demonstrate the full procedure through which the [excluded evidence] could have [been] admitted into evidence ... [,] does not provide an exception to the hearsay rule, nor does he explain how [the excluded evidence] could have been authenticated ... [and] has not identified any reason that the Court's prior ruling merits reconsideration[;] [thus,] [d]efendant has not met his burden of showing substantial errors were made in the exclusion of evidence so as to cause an unfair trial"); *Memorial Drive Consultants, Inc. v. ONY, Inc.,* 2001 WL 241781, \*6 (W.D.N.Y.2001) ("[i]n regard to objections to the [excluded] testimony ..., plaintiff has not offered anything in support of its bare contention and, accordingly, th[e] Court finds such ground to be meritless"), *aff'd,* 29 F. App'x 56 (2d Cir.2002). Further, for the reasons discussed in the next section, there was substantial evidence to support the jury's verdict, and I conclude that it is unlikely that the jury's verdict was swayed in some material respect by the exclusion of the testimony. *See O'Hara v. McAvoy,* 2013 WL 4507067 at \*4 (new trial not warranted where movant failed to show that the exclusion of evidence affected his substantial rights by rendering the jury's verdict "seriously erroneous"); *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.,* 2006 WL 1881744, \*8 (S.D.N.Y.2006) (document was properly excluded; "[p]laintiff has failed to establish that the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice ... [where] [t]he jury's

Slip Copy, 2013 WL 5354517 (W.D.N.Y.)
**(Cite as: 2013 WL 5354517 (W.D.N.Y.))**

verdict ... was reasonable in light of the evidence presented and the issues they were asked to resolve") (internal quotation and citation omitted), *aff'd,* 520 F.3d 109 (2d Cir.2008). Accordingly, the exclusion of the proposed testimony does not warrant a new trial.

## II. *Weight of the Evidence*

**\*11** Rule 59(a) authorizes a court to grant a new trial if the verdict is against the weight of the evidence. *See Raedle v. Credit Agricole Indosuez,* 670 F.3d at 417. "A decision is against the weight of the evidence if and only if the verdict is seriously erroneous or a miscarriage of justice." *Id.* (alterations omitted) (quoting *Farrior v. Waterford Bd. of Educ.,* 277 F.3d at 635).

In a conclusory, one paragraph section of his memorandum of law, Carlson argues that he is entitled to a new trial because the verdict was against the weight of the evidence. (Docket # 88–2 at 5). According to Carlson, it was unreasonable for the jury to conclude that "a person in Carlson's weakened position, unable to walk away, unable to say no, unable to get his own medical care, vulnerable to cruelty and vindictiveness of Mr. Parry, would have submitted himself and his body to such torture without having been ordered to do so; and that he would be afraid of the person who issued such an order." (*Id.*). As an initial matter, Carlson's conclusory assertions are insufficient to meet his burden of establishing that the verdict was either seriously erroneous or a miscarriage of justice. *See O'Connell v. Onondaga Cnty.,* 2013 WL 998598, \*2 (N.D.N.Y.2013) ("[p]laintiff simply casts his disagreement with the verdict in a vague and conclusory fashion, offering nothing more than general references to testimony and evidence in the record").

In any event, the jury's verdict depended, in large part, on an evaluation of the witnesses' testimony. The parties presented the jury with significantly different versions of their interactions. Carlson testified that Parry spoke to him in an abusive and threatening manner. In addition, Carlson contended that Parry directed Carlson to attend AA and NA meetings despite knowing that Carlson would be required to walk 1400 yards several times each week in order

to do so. Finally, Carlson testified that Parry assigned him to the Utility Gang one day after observing Carlson in a wheelchair and learning that Carlson had not been attending AA meetings. In contrast, Parry denied using the language described by Carlson and denied ordering Carlson to attend AA and NA meetings. Further, Parry testified that assignments could not be made by him alone, but had to be approved by the program committee.

Considering this conflicting testimony, the issue of whether a reasonable inmate would have been intimidated from filing a grievance turned in large measure on which testimony the jury credited. Under these circumstances, I decline to disturb the jury's credibility determination. *See Raedle,* 670 F.3d at 418–19 ("where, as here, a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice"); *Claudio v. Mattituck–Cutchogue Union Free Sch. Dist.,* 2013 WL 3820671, \*19 (E.D.N.Y.2013) ("[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial") (alteration in original) (quoting *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993), *abrogated on other grounds, Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)); *O'Connell v. Onondaga Cnty.,* 2013 WL 998598 at \*2 ("[t]he [c]ourt ... declines to disturb the verdict and defers to the jury's interpretation of the evidence and assessment of the testimony").

**\*12** After reviewing the trial evidence, I find that substantial evidence exists to support the jury's verdict that an inmate of ordinary firmness under Carlson's circumstances would not have found that Parry's statements or conduct "amounted to threats or intimidation that would have ... deterred [such inmate] from filing a grievance." (Docket # 80). In addition to the conflicting versions of events presented by Carlson and Parry, which the jury was free to accept or reject as they saw fit, some of Carlson's testimony itself undercut his contention that he was too

Slip Copy, 2013 WL 5354517 (W.D.N.Y.)
**(Cite as: 2013 WL 5354517 (W.D.N.Y.))**

intimidated to file a grievance. First, he conceded that Parry never directly threatened him regarding the grievance procedures or ever even mentioned the word "grievance" during their interactions. *See Snyder v. Whittier,* 428 F. App'x at 91 ("[plaintiff] fails to allege any specific threats related to the grievance procedures"); *Hurd v. Durrand,* 2013 WL 1192351 at * 12 (citing *Hemphill* and concluding grievance procedures were available to inmate even where corrections officer told inmate "you lucky I wasn't there cause I would've beat your ass too [;] ... such a statement by [the corrections officer], without more, does not suffice as a threat of the kind contemplated by the Courts"); *Ory v. McHugh,* 2008 WL 2756463, *5 (N.D.Fla.2008) (citing *Hemphill* and concluding "[t]he context of [the defendant's] statement demonstrates that the threat to 'lock up' plaintiff related to plaintiff's questioning of him further about his diagnosis, not filing an administrative grievance"). Further, Carlson testified that he told his counselor at Livingston about Parry's conduct. *See Snyder,* 428 F. App'x at 91 (inmate's allegations of fear of retaliation undercut where inmate complained to another corrections officer, to his physician and wrote a letter to a corrections officer at another facility); *Black v. Fischer,* 2013 WL 1314940, *9 (S.D.N.Y.2013) ("the fact that [p]laintiff complained to someone ... demonstrates that he was not sufficiently frightened by the threat to refrain from complaining, which cuts against a finding that it was sufficiently serious to justify [p]laintiff's failure to avail himself of the [grievance procedures]").

Finally, Carlson admitted that he filed a grievance regarding his medical care after his first meeting with Parry, but before he received his Utility Gang assignment, and that he subsequently appealed the grievance determination. *See, e.g., Singh v. Lynch,* 460 F. App'x 45, 48 (2d Cir.2012) (affirming summary judgment where plaintiff filed a grievance alleging similar misconduct against different corrections officials approximately one month later); *Mateo v. Ercole,* 2010 WL 3629520, *4 (S.D.N.Y.2010) ("[plaintiff] purports to have been too fearful to exhaust his remedies, [but] he actually filed grievances regarding the September incidents[;] ... [s]uch action is inconsistent with an assertion that fear rendered

the grievance process unavailable to [plaintiff] let alone to one of 'ordinary firmness' "); *Murray v. Palmer,* 2010 WL 1235591, *5 (N.D.N.Y.2010) (plaintiff failed to exhaust where he filed at least three other grievances during the same time period); *Harrison v. Goord,* 2009 WL 1605770, *6 (S.D.N.Y.2009) ("[plaintiff] continued to file grievance after grievance during the same period of time when he was allegedly being threatened and harassed and his mail was allegedly being tampered with"; thus, "it is apparent that a reasonable person of ordinary firmness in [plaintiff's] position ... would not have thought that administrative remedies were unavailable"); *Winston v. Woodward,* 2008 WL 2263191, *8 (S.D.N.Y.2008) ( "[a]lthough [p]laintiff alleges that [d]efendants' threats and retaliation prevented him from appealing his grievance, he ... filed an 'appeal' using the Inmate Grievance Complaint form, ... thus undercutting his claims that an appeal was functionally unavailable to him"); *Amador v. Superintendents of the Dep't of Corr. Servs.,* 2007 WL 4326747, *8 (S.D.N.Y.2007) ("the fact that three of the [p]laintiffs filed formal grievances directly cuts against [p]laintiffs' argument that the process is unavailable to victims of sexual abuse[;] ... [m]oreover, every [p]laintiff complained in some way or another about the abuse"), *dismissed in part, and vacated and remanded in part sub nom. Amador v. Andrews,* 655 F.3d 89 (2d Cir.2011).

**\*13** Viewing the totality of the evidence, I conclude that the jury's verdict was neither seriously erroneous nor a miscarriage of justice. *See O'Connell,* 2013 WL 998598 at *2–3 (upholding verdict where "a review of the evidence that the parties adduced at trial overwhelmingly supports the jury's verdict"); *Densberger v. United Techs. Corp.,* 125 F.Supp.2d 585, 597–98 (D.Conn.2000) (upholding verdict where a review of the evidence failed to persuade the court that "the jury reached a seriously erroneous result or that the verdict [was] a miscarriage of justice"), *aff'd,* 297 F.3d 66 (2d Cir.2002), *cert. denied,* 537 U.S. 1147, 123 S.Ct. 876, 154 L.Ed.2d 849 (2003).

### CONCLUSION

For the reasons stated above, Carlson's motion for a new trial **(Docket # 88)** is **DENIED**.

Slip Copy, 2013 WL 5354517 (W.D.N.Y.)
**(Cite as: 2013 WL 5354517 (W.D.N.Y.))**

    **IT IS SO ORDERED.**

W.D.N.Y.,2013.
Carlson v. Parry
Slip Copy, 2013 WL 5354517 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green Haven
Correctional Facility, R. Pflueger, A. Glemmon, Sgt.
Stevens, Lt. Haubert, Capt. W.M. Watford, Capt. T.
Healey, and John Doe # 1–5, all as individuals, De-
fendants.

No. 93 Civ. 5981(WHP) JCF.

Oct. 28, 1999.

Mr. Craig Cole, Bare Hill Correctional Facility,
Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, New York, for Defendant.

*MEMORANDUM & ORDER*
PAULEY, J.

**\*1** The remaining defendant in this action, Cor-
rection Officer Richard Pflueger, having moved for an
order, pursuant to Fed.R.Civ.P. 56, granting him
summary judgment and dismissing the amended
complaint, and United States Magistrate Judge James
C. Francis IV having issued a report and recommen-
dation, dated August 20, 1999, recommending that the
motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff
does "not contest the dismissal of this action", it is

ORDERED that the attached report and recom-
mendation of United States Magistrate Judge James C.

Francis IV, dated August 20, 1999, is adopted in its
entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*
FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green
Haven Correctional Facility, brings this action pur-
suant to 42 U.S.C. § 1983. Mr. Cole alleges that the
defendant Richard Pflueger, a corrections officer,
violated his First Amendment rights by refusing to
allow him to attend religious services. The defendant
now moves for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the de-
fendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at
the Green Haven Correctional Facility. (First
Amended Complaint ("Am.Compl.") ¶ 3). From June
21, 1993 to July 15, 1993, the plaintiff was in keeplock
because of an altercation with prison guards.
(Am.Compl.¶¶ 17–25). An inmate in keeplock is
confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony An-
nucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS
policy, inmates in keeplock must apply for written
permission to attend regularly scheduled religious
services. (Reply Affidavit of George Schneider in
Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.")

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)

**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Or-

der dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International,*

*Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se's*] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B.** *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[FN1]

> FN1. In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

S.D.N.Y.,1999.
Cole v. Artuz
Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2015 WL 1606178 (N.D.N.Y.)
**(Cite as: 2015 WL 1606178 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Dimas CUADRADO, Plaintiff,
v.
BRUEAULT, Correction Officer, Coxsackie Correc-
tional Facility, Defendant.

No. 9:14–CV–1293 (DNH/CFH).
Signed April 8, 2015.

Dimas Cuadrado, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, Rachel M. Kish, Esq.,
Ass't Attorney General, Albany, NY, for Defendant.

### DECISION and ORDER
DAVID N. HURD, District Judge.

**\*1** Pro se plaintiff Dimas Cuadrado brought this
civil rights action pursuant to 42 U.S.C. § 1983. On
March 17, 2015, the Honorable Christian F. Hummel,
United States Magistrate Judge, advised by Re-
port–Recommendation that defendant's motion to
dismiss pursuant to Federal Rule of Civil Procedure
12(b)(6) be granted. Plaintiff timely filed objections to
the Report–Recommendation.

Based upon a de novo review of the portions of
the Report–Recommendation to which plaintiff ob-
jected, the Report–Recommendation is accepted and
adopted in all respects. See 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendant Brueault's motion to dismiss is
GRANTED;

2. To the extent plaintiff asserts claims against
defendant Brueault in his official capacity, those
claims are DISMISSED WITH PREJUDICE;

3. All remaining claims are DISMISSED
WITHOUT PREJUDICE based on plaintiff's failure
to fully exhaust administrative remedies;

4. The Central Office Review Committee
("CORC") is directed to render a decision on plain-
tiff's pending grievance within thirty days of the date
of this Decision and Order, that is, by May 8, 2015;

5. If plaintiff does not receive a decision from the
CORC by May 8, 2015, administrative remedies may
be deemed unavailable to him and he may therefore be
excused from exhausting;

6. In the event plaintiff does not receive a decision
from the CORC by May 8, 2015, he may refile this suit
indicating such;

7. In the event plaintiff does receive a decision
from the CORC by Mail 8, 2015, he may refile this
suit indicating such; and

8. The Clerk is directed to serve a copy of this
Decision and Order upon the parties in accordance
with the Local Rules.

IT IS SO ORDERED.

DIMAS CUADRADO, Plaintiff,

v.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1606178 (N.D.N.Y.)
**(Cite as: 2015 WL 1606178 (N.D.N.Y.))**

STATE OF NEW YORK; BRUEAULT, Correction Officer, Coxsackie Correctional Facility; Carrol, Correction Officer, Coxsackie Correctional Facility; and Millet, Correction Officer, Coxsackie CorrectionalFacility,

Defendants.

### REPORT–RECOMMENDATION AND ORDER[FN1]

> **FN1.** This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

**CHRISTIAN F. HUMMEL**, United States Magistrate Judge.

Plaintiff *pro se* Dimas Cuadrado, an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Brueault violated his constitutional rights under the Eighth Amendment. Compl. (Dkt. No. 1).[FN2] At all relevant times, plaintiff was an inmate incarcerated at Coxsackie Correctional Facility ("Coxsackie"). Additional defendants were named, but the claims against them have since been dismissed. Dkt. No. 10. Plaintiff demands monetary damages in the amount of $2,000,000 from New York State, "paid dental expenses, the removement [sic] from [Coxsackie] correctional facility," [FN3] and the suspension of the "officer." Compl. at 5. For the following reasons, it is recommended that Brueault's motion for dismissal be granted.

> **FN2.** This action was administratively closed on October 21, 2014 due to plaintiff's failure to properly certify his in forma pauperis ("IFP") application. Dkt. No. 4. The action

was reopened on November 14, 2014 after plaintiff properly complied with the filing fee requirements. Dkt. No. 7.

> **FN3.** Plaintiff was moved to Great Meadow Correctional Facility located in Comstock, New York sometime after filing this action.

### II. **Background**

**\*2** The allegations of plaintiff's complaint are viewed as true. *See* subsection III(A) *infra.* Plaintiff alleges that on October 13, 2014 he was on his way to Jewish services when he was approached by Officer Brueault and asked to "get on the wall for a 'pat frisk.' " Compl. at 5. While plaintiff obeyed Brueault's order, other officers notified Brueault that "the area was 'clear' ". *Id.* Brueault then swung and hit plaintiff in his face, breaking his jaw and rendering him unconscious. *Id.* Plaintiff regained consciousness while the other officers "beat on [him] until a sergeant came." *Id.*

### III. **Discussion**[FN4]

> **FN4.** All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

Plaintiff contends that defendant Brueault violated the Eighth Amendment by using excessive force during the October 13 incident. Compl. at 5. Brueault argues that plaintiff has failed to exhaust his administrative remedies as required under 42 U.S.C. § 1997e(a), the Prison Litigation Reform Act ("PLRA") and that the Eleventh Amendment bars the claims against Brueault in his official capacity. Dkt. No. 13–1.

#### A. **Legal Standard**

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a

Slip Copy, 2015 WL 1606178 (N.D.N.Y.)
**(Cite as: 2015 WL 1606178 (N.D.N.Y.))**

motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations and internal quotation marks omitted). Determining whether plausibility exists is a "context-specific [task] that requir[es] the reviewing court to draw on its [judicial] experience and common sense." *Iqbal,* 556 U.S. at 663–64 (citation omitted).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

**\*3** [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude,"... that a *pro se* litigant's submissions must be con-

strued "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations ... or arguments that the submissions themselves do not "suggest"... that we should not "excuse frivolous or vexatious filings by *pro se* litigants". and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law[.]"

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

### A. Exhaustion

Brueault contends that his motion to dismiss must be granted because plaintiff failed to exhaust administrative remedies. Specifically, Brueault argues that plaintiff failed to wait until he received a decision on his final appeal before commencing this action. Under the PLRA, an inmate must exhaust all administrative remedies before bringing an action for claims arising out of his or her incarceration. *Porter v. Nussle,* 534 U.S. 516, 524 (2002); *see also Woodford v. Ngo,* 548 U.S. 81, 82 (2006). To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. *Jones v. Bock,* 549 U.S. 199, 218 (2007) (internal citation omitted). The exhaustion requirement applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Nussle,* 534 U.S. at 524.

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1606178 (N.D.N.Y.)
**(Cite as: 2015 WL 1606178 (N.D.N.Y.))**

*Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)). Thus, a court must conduct a three-part inquiry to determine whether an inmate's failure to follow the applicable grievance procedures is fatal to his or her claims. A court must consider whether:

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

**\*4** Administrative remedies are unavailable when there is no "possibility of ... relief for the action complained of." *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (citing *Booth v. Churner,* 532 U.S. 731, 738 (2001)). The test to determine the availability of an administrative remedy is an objective one: whether "a similarly situated individual of ordinary firmness" would have deemed it available. *Hemphill,* 380 F.3d at 688 (citation omitted). Unavailability may be found in circumstances "where plaintiff is unaware of the grievance procedures or did not understand it ... or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* No.04–CV–4587 (DST), 2007 WL 389003, at \*8 (E.D.N.Y. Jan 31, 2007) (internal citations omitted). Further, "where a prisoner has made a 'reasonable attempt' to file a grievance, and prison officials have prevented the prisoner from filing that grievance, the grievance procedures are not 'available' to the defendant, and thus, the [PLRA] does not preclude the prisoner from suing in federal court." *Thomas v. New York State Dep't of Corr. Servs.,* 00–CV–7163 (NRB), 2002 WL 31164546, at \*3 (S.D.N.Y. Sept. 30, 2002) (citations omitted).

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5 (2014). First, the inmate is required to file a complaint with an inmate grievance program clerk ("IGP") within twenty-one days of the alleged action. *Id.* at § 701.5(a) (1). An IGP representative has sixteen calendar days to informally resolve the issue. *Id.* at § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after conclusion of the hearing. *Id.* §§ 701.5(b)(2)(i), (ii). If unfavorable, a grievant may appeal the IGP committee's determination to the facility superintendent within seven calendar days of receipt of the determination. *Id.* § 701.5(c)(1). If the superintendent's determination is unfavorable, the grievant may take the third step of the grievance procedure by appealing to the central office review committee ("CORC") within seven days after receipt of the unfavorable superintendent's determination. *Id.* §§ 701.5(d) (i),(ii). CORC must issue a written decision within thirty days of receipt of the grievant's appeal. *Id.* § 701.5(d)(2)(ii).

Here, plaintiff presumably completed the first two steps of the administrative grievance process. His complaint states that his "grievance is still pending." Compl. at 5. Despite his claim otherwise, he has not completed the final step of the administrative grievance process as CORC has not yet addressed plaintiff's appeal. Dkt. No. 18. Plaintiff does not allege in his response that he failed to meet the exhaustion requirement due to administrative remedies being unavailable to him, nor does he allege that the defendant has waived the defense of failure to exhaust or acted in such a way as to estop him from raising such a defense. *Ruggiero,* 467 F.3d at 175. Plaintiff also does not allege any special circumstances that would justify his failure to comply with the exhaustion requirement. *Id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*5** As discussed, the exhaustion of administrative remedies must be fully completed prior to the filing of an action in federal court. *Neal v. Goord,* 267 F.3d 116, 123 (2d Cir.2001), *overruled on other grounds, Porter,* 534 U.S. at 532. Thus, "where it appears that plaintiff has begun, but not completed, the grievance procedure, the appropriate course would be to dismiss the action without prejudice to allow plaintiff to meet the exhaustion requirement." *Leal v. Johnson,* 315 F.Supp.2d 345, 347 (W.D.N .Y.2004). Dismissal is required even in cases where the exhaustion requirement is met subsequent to the filing of the complaint. *Rossi v. Fishcer,* 13–CV–3167 (PKC)(DF), 2015 WL 769551, at \*4 (S.D.N.Y. Feb. 24, 2015). Because plaintiff has not received a written decision from CORC yet, and has demonstrated no exception, he has not met the exhaustion requirement under the PLRA.

Accordingly, it is recommended that Brueault's motion for dismissal be granted on this ground, but that such dismissal be without prejudice.

### B. Eleventh Amendment

Brueault argues that he is entitled to Eleventh Amendment immunity relating to plaintiff's claims against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. A MEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U .S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v.*

*Jordan,* 440 U.S. 332, 340–41 (1979).

Moreover, suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Faird v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer in his official capacity. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985).

Here, because plaintiff seeks monetary damages against Brueault for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Brueault's motion on this ground be granted.

### III. CONCLUSION

For the reasons stated above, it is hereby **RECOMMENDED** that defendant Brueault's motion for dismissal (Dkt. No. 13) of plaintiff's complaint (Dkt. No. 1) be **GRANTED;** and it is further

**RECOMMENDED** that:

1. all claims against defendant Brueault in his official capacity be dismissed with prejudice, and;

2. all other claims remaining in plaintiff's complaint be dismissed without prejudice, for plaintiff's failure to exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a).

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action, pursuant to local rules.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1606178 (N.D.N.Y.)
**(Cite as: 2015 WL 1606178 (N.D.N.Y.))**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRE-CLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Filed March 17, 2015.

N.D.N.Y.,2015.
Cuadrado v. Brueault
Slip Copy, 2015 WL 1606178 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
David DECAYETTE, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.

No. 9:06–CV–783.
June 8, 2009.

West KeySummary**Federal Civil Procedure 170A**
☞2491.5

**170A** Federal Civil Procedure
　**170AXVII** Judgment
　　**170AXVII(C)** Summary Judgment
　　　**170AXVII(C)2** Particular Cases
　　　　**170Ak2491.5** k. Civil Rights Cases in
General. Most Cited Cases

　Genuine issue of material fact as to whether prison official had a reasonable opportunity to intervene in an incident precluded summary judgment in favor of inmate who brought a § 1983 action against a prison official who allegedly failed to intervene while other prison officials where beating inmate in violation of his Eighth amendment right. There were multiple issues of fact, including whether the other prison officials actually beat inmate, and if so whether prison official observed the beating, and if she observed the beating, whether she was capable of preventing or mitigating it. U.S.C.A. Const.Amend 842 U.S.C.A. § 1983.

David Decayette, Romulus, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Christina L. Roberts–Ryba, Esq., of Counsel, New York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

　**\*1** This matter brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. George H. Lowe, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

　The Report–Recommendation dated March 31, 2009 recommended that Defendants' motion be granted in part and denied in part. On April 21, 2009, Plaintiff filed an objection to the Report–Recommendation. Plaintiff's objection focused primarily on the dismissal of the Complaint against Defendant Commissioner Goord for lack of sufficient personal involvement. On May 19, 2009, Defendant Volpe filed an objection to the Report–Recommendation on the grounds that the action against her should be dismissed in its entirety.

　When objections to a magistrate judge's Report–Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

　Having reviewed the record *de novo* and having considered the issues raised in Plaintiff's and Defendant's objections respectively, with the exception of the Eighth Amendment claim of inadequate medical care against Defendant Volpe, this Court has determined to accept the recommendations of Magistrate Judge Lowe for the reasons stated in the Report–Recommendation.

　For a plaintiff to succeed on a claim of inadequate

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

medical care in violation of the Eighth Amendment, two factors must be shown: (1) that the plaintiff's medical need was sufficiently serious; and (2) that the defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A plaintiff's medical need is deemed sufficiently serious under an Eighth Amendment claim if, looked at objectively, it is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996) (citations omitted). A defendant acts with deliberate indifference when she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id.*

Plaintiff has failed to show that the alleged injuries present at the time of his interactions with Defendant Volpe were sufficiently serious to satisfy the first prong. While it is unclear from Plaintiff's testimony whether Defendant Volpe was present at the time that the alleged injuries were suffered (Dkt. No. 36–4, at 43, lines 7–23), or whether she was brought into the room shortly thereafter, this distinction is immaterial to this claim. Plaintiff admits that his visible injuries were limited to cuts, bruises and swelling. Dkt. No. 36–4, at 49, lines 12–18. Injuries of this nature are not conditions of urgency that threaten death, degeneration or extreme pain. *Hickey v. City of New York,* No. 01–Civ. 6506(GEL), 2004 WL 2724079, *16 (S.D.N.Y. Nov. 29, 2004) (holding that cuts and bruises do not constitute sufficiently serious medical needs). Moreover, during a meeting with medical personnel on August 5, 2004, which was seven days after the alleged assault, the only injury complained of by Plaintiff was back pain (Dkt. No. 36–4, at 48, 49). Plaintiff admits that his back pain was caused by a 2002 bus accident, and does not allege that

it was exacerbated by the incident in question. Dkt. No. 36–4, at 15–16. Accordingly, Plaintiff has failed to demonstrate that he had a sufficiently serious medical need.

**\*2** Assuming, *arguendo,* that Plaintiff's alleged injuries were sufficiently serious, Plaintiff has provided insufficient evidence that Defendant Volpe both knew of and disregarded any such injuries. Plaintiff alleges that he currently suffers nerve damage in his groin area as a result of the alleged assault. Dkt. No. 36–4, at 9. However, the evidence provided by Plaintiff is insufficient to show that Defendant Volpe either knew of or disregarded such injury during her encounters with Plaintiff on or about July 29, 2004 and July 31, 2004.

The first interaction between Defendant Volpe and Plaintiff occurred on July 29, 2004. Dkt. No. 36–12, at 7. According to Plaintiff, Defendant Volpe was either in the room during the alleged assault, or she was brought into the room immediately thereafter. Dkt. No. 36–4, at 43, lines 7–23. However, Plaintiff does not allege that he notified Defendant Volpe of any specific injuries, including to his groin, during this interaction. Further, the fact that Plaintiff was wearing undershorts during this interaction suggests that, even upon visual inspection, Defendant Volpe would likely have been unable to observe an injury to Plaintiff's groin. While Plaintiff does allege to have had blood visible in his underwear, he did not notice this blood until July 31, 2004 (Dkt. No. 1, at 6), approximately two days after his initial interaction with Defendant Volpe. Accordingly, there is an insufficient basis upon which to conclude that Defendant Volpe was aware of Plaintiff's alleged groin injury at the time of their initial interaction.

The second interaction between Defendant Volpe and Plaintiff occurred on or about July 31, 2004. Dkt. No. 36–4, at 43. On this date, Plaintiff alleges that he noticed blood in his underwear and notified Capt. Felix. Dkt. No. 1, at 5–6. Plaintiff was subsequently

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

removed from his cell to be photographed and in-spected. *Id.* Shortly thereafter, Defendant Volpe at-tended to Plaintiff and attempted to retrieve a urine sample from him. Dkt. No. 36–4, at 43. Plaintiff states that he was unable to provide a urine sample at that time, and that another nurse obtained a urine sample from him the following day. Dkt. No. 36–4, at 46, lines 5–13. Plaintiff admits that he saw medical staff on the day that he was removed from his cell to be inspected and photographed, which was the same day that Defendant Volpe attempted to retrieve his urine sample. Dkt. No. 36–4 at 46–47. Further, Plaintiff admits that he has received consistent medical care from a urologist from the time of the alleged assault to the present date. Dkt. No. 36–4, at 10. As such, there is insufficient evidence to suggest that Defendant Volpe disregarded Plaintiff's injuries once she became aware of the possibility that they may exist.

For the foregoing reasons, Plaintiff has not pro-vided sufficient evidence upon which a fair minded trier of fact could reasonably conclude that he sus-tained sufficiently serious injuries, or that Defendant Volpe acted with deliberate indifference to a serious injury of which she was aware.

**\*3** It is therefore

**ORDERED** that summary judgment be granted dismissing all claims against Defendants Goord, Al-lard, Berry, Meeks, Martin, and Sugg; and it is further

**ORDERED** that summary judgment be granted dismissing the Eighth Amendment claim of inade-quate medical care against Defendant Volpe; and it is further

**ORDERED** that Defendant Volpe's motion for summary judgment be denied as to the Eighth Amendment claim of failure to intervene.

The case shall proceed to trial against Defendant

Volpe on Plaintiff's Eighth Amendment claim of failure to intervene, against Defendants Schewnki and Roberts on Plaintiff's Eighth Amendment claims of excessive force, and against Defendants Schewnki and Roberts on Plaintiff's First Amendment retaliation claims.

**IT IS SO ORDERED.**

*REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, com-menced pursuant to 42 U.S.C. § 1983, has been re-ferred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, David Decayette ("Plaintiff") alleges that in July and August of 2004, while he was incarcerated at the Franklin Correctional Facility ("Franklin C.F."), ten employees of the New York State Department of Correctional Services ("DOCS") violated certain of his constitutional rights. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion for partial summary judgment [FN1] pursuant to Fed.R.Civ.P. 56. (Dkt. No. 36.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

> FN1. The motion is made on behalf of all Defendants except Roberts and Schewnki.

**I. BACKGROUND**

**A. Summary of Plaintiff's Complaint**

Liberally construed, Plaintiff's Complaint alleges as follows. (Dkt. No. 1.) Plaintiff and another inmate (identified in subsequent pleadings as inmate Rashad) were transferred to Franklin C.F. on or about the same day. Certain of Rashad's personal property was miss-ing. On or about July 13, 2004, Defendants Sgt. Berry

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
(Cite as: 2009 WL 1606753 (N.D.N.Y.))

and Corrections Officer Sugg confiscated certain of Plaintiff's personal property. These Defendants permitted Rashad, who was gang affiliated, to view Plaintiff's personal property, including personal photographs.

In his Memorandum of Law submitted in opposition to Defendants' summary judgment motion, Plaintiff alleges that although Rashad's property was not found among Plaintiff's property, Rashad nevertheless believed that Plaintiff possessed it. Rashad threatened Plaintiff, claiming that while viewing Plaintiff's personal property he had obtained information concerning Plaintiff's family and their address. Rashad warned of "serious problems" if he did not get his property back. Dkt. No. 39, at 8–9.[FN2]

> FN2. The page numbers referred to in this Report–Recommendation are those assigned by the ECF system.

In his Complaint Plaintiff alleges that he subsequently filed a grievance concerning this matter. It appears that the grievance was in the form of a letter to Defendant Goord, then the Commissioner of DOCS. Upon the recommendation of Defendant Goord, Plaintiff was interviewed by Defendant Lt. Meeks. Defendant Berry gave Plaintiff "an ultimatum [to] re-write and sign a statement informing Comm. Goord that there was a misunderstanding." Dkt. No. 1, at 2. Plaintiff declined to do so, and he was issued a false misbehavior report.

**\*4** Without being given a formal hearing on the report Plaintiff was taken to the Special Housing Unit ("SHU"). Upon his arrival at SHU he was confronted by Defendants Sgt. Schewnki, Corrections Officer Roberts, and an unidentified Corrections Officer. They "started reminding the plaintiff about the incident with the statement that he refused to write," (Dkt. No. 1, at 4), and then they beat him. He suffered significant injuries and endured severe pain, but he was denied medical treatment.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN4]

> FN3. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN4. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[FN5] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[FN6] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[FN7]

> FN5. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

fendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

FN6. *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

FN7. *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added]. The undersigned will provide a copy of all electronically-available-only opinions in this Report–Recommendation to Plaintiff in light of the Second Circuit's recent decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court.[FN8] Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed

motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.* [FN9] A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." [FN10]

FN8. N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

FN9. *Hernandez v. Nash,* 00–CV–1564,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted] ).

FN10. *See Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Finally, in construing Plaintiff's claims, the Court has afforded Plaintiff's Complaint the liberal construction that all pleadings must be afforded, under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). Furthermore, the pleadings of *pro se* litigants are construed with even more liberality than is required under Fed.R.Civ.P. 8,[FN11] and the Court has done so here. The rationale for extending this special liberality to the pleadings of *pro se* litigants is that, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process.

FN11. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted].

## III. ANALYSIS

### *POINT I*
**The claims against Defendants Goord and Allard should be dismissed because of a lack of personal involvement.[FN12]**

FN12. Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

**\*5** " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a DOCS Commissioner or a correctional facility superintendent, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

With respect to Defendant Goord, in 2004 he was the Commissioner of DOCS. Dkt. No. 1 at 1. Defendant Allard was the Superintendent of Franklin C.F. *Id.* In his Complaint Plaintiff alleges that he "wrote a letter" to them, [FN18] advising them as to what had occurred and his concerns. *Id.,* at 2–3. In his "Statement Pursuant to Rule 7.1(a)(3)," Plaintiff alleges that Goord "ordered an investigation into the incident." Dkt. No. 39, at 3. The investigation was conducted by Defendant Meeks. Dkt. No. 1, at 2; Dkt. No. 39, at 4; Dkt. No. 36–7, at 2–3.

FN18. Beyond Plaintiff's allegation the record reflects only a letter to Defendant Goord, which was forwarded to Defendant Allard. Dkt. No. 36–7, at 5.

The foregoing does not constitute personal involvement in the alleged constitutional violations. "Defendant Goord was, during the time in question, entitled to (1) refer letters of complaint to subordinates ..., and (2) rely on those subordinates to conduct an appropriate investigation and response." *Fletcher v. Goord,* 07–CV–0707, 2008 WL 4426763, at * 17

(N.D.N.Y. Sept.25, 2008) (Sharpe, J., adopting Report–Recommendation by Lowe, M.J., on *de novo* review); *see also Cabassa v. Gummerson,* 01–CV–1039, 2008 WL 4416411, at *7 (N.D.N.Y. Sept.24, 2008) (Hurd, J., adopting Report–Recommendation by Lowe, M.J. on *de novo* review) ("[A]s the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue."); *Garvin v. Goord,* 212 F.Supp.2d 123, 126 (W.D.N.Y.2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action."); *cf. Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter).

**\*6** Accordingly, it is recommended that summary judgment be granted in favor of Defendants Goord and Allard, dismissing the Complaint as against them.

### POINT II
**The conduct of Defendants Berry and Sugg in the examination of Plaintiff's personal property did not amount to a constitutional violation.[FN19]**

FN19. Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

As indicated above, Plaintiff and another inmate ("Rashad") were transferred to Franklin C.F. on the

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

same day. Certain of Rashad's personal property was missing. Plaintiff alleges that "Defendants Berry and Sugg elected to allow inmate Rashad to go through Plaintiff's property to look for his missing items." Dkt. No. 39, at 2. Plaintiff's objection appears to be that Berry and Sugg alone should have examined his property and taken an inventory to ascertain whether Rashad's missing property was included with his. *Id.*, at 2–3. Berry and Sugg have declared under oath that at no time did they "allow the plaintiff's property to be viewed by inmate Rashad or any other inmate." Dkt. No. 36–8, at 2; *see also* Dkt. No. 36–11, at 2–3. In addition, Plaintiff has no non-hearsay evidence to support his claim that Rashad examined his property. Dkt. No. 39, at 3. Finally, Plaintiff has not even alleged, not to mention proffered admissible evidence, that Berry and Sugg knew or should have known that Rashad subsequently would threaten Plaintiff.

In any event, even assuming *arguendo* that Plaintiff's version of the events is correct, there were no constitutional violations. With respect to the Fourth Amendment, it provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (internal quotation marks and citation omitted). "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619 (internal quotation marks and citations omitted). In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citations omitted), *accord, Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). The Fourth Amendment's proscription

against unreasonable searches does not apply *at all* within the confines of a prison cell. *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Therefore, Plaintiff has not stated a Fourth Amendment claim.

With respect to the Eighth Amendment, generally, to prevail on a claim of inadequate prison conditions, a plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005). "[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence." *Farmer,* 511 U.S. at 835. Here, again assuming *arguendo* that Plaintiff's version of the events is correct, for Defendants Berry and Sugg to have allowed Rashad to go through Plaintiff's property to look for his missing items, at a point in time when they had no reason to anticipate the alleged subsequent events, clearly was not a serious deprivation. Similarly, their conduct, at the most, was negligent, and not deliberately indifferent.

**\*7** Accordingly, it is recommended that summary judgment be granted in favor of Defendants Berry and Sugg, dismissing Plaintiff's claims based upon the examination of his personal property.

### *POINT III*
### Plaintiff's excessive force claims against Defendants Allard, Meeks, Berry, Sugg, and Martin should be dismissed.

In his Complaint Plaintiff alleges that the aforementioned Defendants, along with Defendants Schewnki and Roberts (and John Doe), "wantonly and with malice assaulted and battered him." Dkt. No. 1, at 7. However, in his "Statement Pursuant to Rule 7.1(a) (3)," Plaintiff stated that Defendants Roberts and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

Schewnki (and John Doe) "beat him"; "those were the only Defendants that beat Plaintiff." Dkt. No. 39, at 5. His deposition testimony was consistent with these statements. Dkt. No. 36–4, at 26–33.

Defendants Schewnki and Roberts have not moved for summary judgment on Plaintiff's excessive force claims. Dkt. No. 36–13, at ii (ftn.1). Given Plaintiff's concession that only Defendants Schewnki and Roberts allegedly beat him, it is recommended that summary judgment be granted in favor of all other Defendants, dismissing as against them Plaintiff's Eighth Amendment excessive force claims.

### POINT IV
**Triable issues of fact exist as to whether Defendant Volpe was deliberately indifferent to a serious medical need.**

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted); *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance,* 143 F.3d at 702. With respect to the second prong, "deliberate indifference describes a state of mind more blameworthy than negligence;" it is a state of mind akin to criminal recklessness. *Farmer,* 511 U.S. at 827, 835.

The argument of Defendant Volpe (a Registered Nurse) that Plaintiff's Eighth Amendment claim of insufficient medical care should be dismissed as against her opens with the contention that she "was

brought into the room after [Plaintiff] was allegedly assaulted by Defendants Roberts and Schewnki." Dkt. No. 36–13, at 10. In support of this contention, Volpe cites to page 39 of the transcript of Plaintiff's deposition, at lines 22–25. It is dismaying to this Court that Volpe failed to cite to the following questions and answers that appear on the same page of the transcript:

Q: Why is [Volpe] a defendant? Why do you have her listed here as a defendant?

**\*8** A: Because she was—she was—she was in the room at the time during the incident happened and she never entered into the record that she noted that—she noticed that I was bleeding.

Q: She was in the room when you're claiming that the three officers—

A: Right.

Q:—beat you?

A: Right.

Dkt. No. 36–4, at 39, lines 5–15. In his Memorandum of Law [FN20] Plaintiff states:

> FN20. In an Affidavit Plaintiff swears that "[a]ll statements made by me in my Complaint and associated documents are true." Dkt. No. 39, at 1. Fed.R.Civ.P. 56(e) provides: "When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Here the Court is mindful of the special leniency to be afforded to a *pro se* litigant

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

alleging a civil rights violation.

Upon Plaintiff's arrival at the S.H.U. Defendant Roberts began to physically assault Plaintiff, and Sgt. Schewnski eventually joined in the assault as Defendant Volpe watched from the doorway. Dkt. No. 39, at 10. In his "Statement Pursuant to Rule 7.1(a) (3)" Plaintiff states: "during and after he was being beat, he saw Defendant Volpe." Dkt. No. 39, at 5.

In short, there clearly is an issue of fact as to whether Defendant Volpe observed the alleged beating. If the trier of fact concludes that she did, and accepts Plaintiff's version of the alleged beating (punching and slapping both sides of his face, punching him in the ribs, kicking him in the groin area; *see* Dkt. No. 36–4 at 32–37) and further accepts Plaintiff's version of his condition following the alleged beating ("multiple bruises, cut above my eye, and as well as blood that was shown to my underwear and stuff like that"; Dkt. No. 36–4, at 47; *see also* Dkt. No. 1, at 3–5), a finding of an Eighth Amendment violation would not be unreasonable.

Accordingly, it is recommended that Defendant Volpe's motion for summary judgment dismissing Plaintiff's Eighth Amendment claim as against her be denied.

### POINT V

**Triable issues of fact exist as to whether Defendant Volpe is liable for failing to intervene during the alleged beating of Plaintiff.**

Liberally construed, based upon the allegations referenced above in Point IV, Plaintiff has asserted a failure to intervene cause of action against Defendant Volpe.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional

rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.; see also Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability.") Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1992) ( "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

**\*9** Here there are multiple issues of fact, including whether Defendants Schewnki and Roberts beat the Plaintiff, if so whether Defendant Volpe observed the beating, and if so whether she was capable of preventing or mitigating it. Accordingly, it is recommended that dismissal of Plaintiff's Eighth Amendment failure to intervene claim as against Defendant Volpe be denied.

### POINT VI

**Plaintiff's retaliation claims based upon allegedly false misbehavior reports should be dismissed.**[FN21]

FN21. Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

In his Complaint Plaintiff alleges that "on or about July 26, 2004, after filing a grievance the plaintiff was interviewed by Lt. Meeks, per recommendation by Comm. Glenn Goord." Dkt. No. 1, at 2. This "grievance" presumably was the letter that he wrote to Defendant Goord. *Id.* at 2–3. In his Memorandum of Law Plaintiff alleges that he "was subjected to retaliation by receiving false misbehavior reports, for exercising his first amendment right to file grievances pertaining to the search for his personal property." Dkt. No. 39, at 8. Again, the only "grievance[ ] pertaining to the search for his personal property" that is reflected in the record is the letter to Defendant Goord.

The Court acknowledges that Plaintiff's right to send a letter of complaint to Defendant Goord was a constitutionally protected activity. *Davis,* 320 F.3d at 352–53. However, first, the only "inmate misbehavior reports" that are reflected in the record were issued by *non-parties. See* Dkt. No. 36, Exhibits B and C. In addition, Plaintiff has proffered no evidence whatsoever that these non-parties were even aware of the existence of his letter to Defendant Goord. Accordingly, there is no party defendant in this action against whom Plaintiff has made a retaliation claim based upon an allegedly false inmate misbehavior report. Furthermore, there is no evidence of a causal connection between the protected conduct, *i.e.,* the letter to Defendant Goord, and the "adverse actions," *i.e.,* the issuance of the inmate misbehavior reports. Therefore it is recommended that summary judgment be granted dismissing Plaintiff's retaliation claims based upon allegedly false misbehavior reports.

*POINT VII*

**Triable issues of fact exist with respect to Plaintiff's retaliation claims against Defendants Schewnki and Roberts.**[FN22]

> FN22. Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

As noted above, Plaintiff's right to send letters of complaint to Defendant Goord was a constitutionally protected activity. *Davis,* 320 F.3d at 352–53. Also as noted above, Defendants Schewnki and Roberts are not seeking summary judgment on Plaintiff's excessive force claims. Questions of fact clearly exist as to whether they took "adverse action" against him.

**\*10** Finally, on the "causal connection" prong of the retaliation cause of action, in his Complaint Plaintiff alleges, in paragraph "14", that prior to the commencement of the alleged beating, Defendants Schewnki and Roberts "started reminding the plaintiff about the incident with the statement that he refused to write." Dkt. No. 1, at 4. This "incident with the statement that he refused to write" presumably is the one described in paragraph "4" of the Complaint, when Defendant Berry allegedly gave Plaintiff "an ultimatum [to] re-write and sign a statement informing Comm. Goord that there was a misunderstanding." *Id.,* at 2. In short, there clearly are triable questions of fact as to whether there was a causal connection between Plaintiff's letter to Defendant Goord and the alleged beatings by Defendants Schewnki and Roberts. Accordingly, it is recommended that Plaintiff's First Amendment retaliation claims against Defendants Schewnki and Roberts proceed to trial.

*POINT VIII*
**Plaintiff's Fourteenth Amendment Due Process claims should be dismissed.**[FN23]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
(Cite as: 2009 WL 1606753 (N.D.N.Y.))

FN23. Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

In his Complaint Plaintiff alleges that he was not "afforded substantive Due Process" and that his Fourteenth Amendment right "against arbitrary and capricious conduct" [FN24] was violated. Dkt. No. 1, at 6 and 7. However, as the Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth ... Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor,* 490 U.S. 386, 392–94 [1989] ). Because the Court has already analyzed Plaintiff's claims under the appropriate specific legal standards, an analysis is not required under the Fourteenth Amendment substantive due process standard.

FN24. "Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and Order (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

However, in addition to substantive due process, the Due Process Clause of the Fourteenth Amendment has a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The procedural component bars "the deprivation by state action of a constitutionally protected interest in

life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. In his Memorandum of Law Petitioner argues that "Defendants Sugg and Berry violated his Procedural Due Process Rights ... against unreasonable searches." Dkt. No. 39, at 8.

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Here the Court already has conducted the first step analysis of the conduct of Defendants Berry and Sugg and found no deprivation of a property interest. *See* Point II above. Therefore an analysis is not required under the Fourteenth Amendment procedural due process standard.

**\*11** Accordingly, it is recommended that the Defendants' motion for summary judgment dismissing Plaintiff's Fourteenth Amendment due process claim be granted.

### *POINT IX*
### Qualified Immunity[FN25]

FN25. Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* —— U.S. ——, ——, 129 S.Ct. 808, 815,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

172 L.Ed.2d 565 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 812, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A determination of this issue involves deciding whether the facts that a plaintiff has alleged, or shown, make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson,* 129 S.Ct. at 815–16 (citing *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

A right is sufficiently clearly established if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007). The following three factors are considered when determining whether a particular right was clearly established at the time a defendant acted:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[FN26] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy,* 505 F.3d at 169–70 (citations omitted).[FN27] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). As the Supreme Court has explained,

FN26. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

FN27. *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

*Malley,* 475 U.S. at 341.

However, when "there are facts in dispute that are material to a determination of reasonableness," dismissal on the basis of a qualified immunity defense is inappropriate. *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999); *Ali v. Szabo,* 81 F.Supp.2d 447, 461 (S.D.N.Y.2000) ("The Court cannot conclude as a matter of law that [the officers'] conduct was objectively reasonable since there are material issues of fact as to whether [plaintiff] was obeying the officers' order and who started the physical confrontation.").

**\*12** The Court has recommended that Defendant Volpe should not be entitled to summary judgment because triable issues of fact exist as to whether she was deliberately indifferent to a serious medical need of Plaintiff's and as to whether she is liable for failing to intervene during the alleged beating of Plaintiff. Therefore, Defendant Volpe should not be entitled to summary judgment on the defense of qualified immunity. *See Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) ("[S]ummary judgment based either on the merits or on qualified immunity requires that no disputes about material facts remain.") (citations omitted); *Deal v. Yurack,* No. 9:04–CV–0072, 2007 WL 2789615, at \*14 (N.D.N.Y. Sept.24, 2007) (Kahn, J.) (adopting Report–Recommendation of Magistrate Judge David E. Peebles, finding that whether "the defendants maintained a good faith belief that their actions did not violate clearly established rights depends on the resolution of fact issues similar to those identified as precluding entry of summary judgment on the merits of plaintiff's retaliation and excessive force claims. As such ... the court is not currently positioned to determine defendant's entitlement to qualified immunity.").[FN28] Accordingly, I recommend denying summary judgment in this regard.

FN28. *See also Jeanty v. County of Orange,* 379 F.Supp.2d 533, 542 (S.D.N.Y.2005) ("[T]he same genuine issues of material fact that preclude summary judgment on plain-

tiff's excessive force claim, also preclude application of the defense of qualified immunity at the summary judgment stage."); *Dellamore v. Stenros,* 886 F.Supp. 349, 352 (S.D.N.Y.1995) (finding that material factual disputes exist on the issue of qualified immunity for the same reasons that the court denied the motion for summary judgment on the plaintiff's Eighth Amendment excessive force claim).

**ACCORDINGLY,** it is

**RECOMMENDED** that summary judgment be granted dismissing all claims against Defendants Goord, Allard, Berry, Meeks, Martin, and Sugg; and it is further

**RECOMMENDED** that Defendant Volpe's motion for summary judgment be denied; and it is further

**RECOMMENDED** that the case proceed to trial against Defendants Volpe, Schewnki and Roberts on Plaintiff's Eighth Amendment claims of excessive force and failure to intervene, against Defendants Schewnki and Roberts on Plaintiff's First Amendment retaliation claims, and against Defendant Volpe on Plaintiff's Eighth Amendment claim of inadequate medical care; and it is further

**ORDERED** that the Clerk serve copies of the electronically-available-only opinions cited on pages 4, 5, 7, and 20 of this Report–Recommendation on Plaintiff.

**ANY OBJECTIONS to this Report–Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report–Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28

Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)
**(Cite as: 2009 WL 1606753 (N.D.N.Y.))**

U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**[FN29]

> FN29. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection[ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to

the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson–Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report–Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2009.
Decayette v. Goord
Not Reported in F.Supp.2d, 2009 WL 1606753 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5437617 (N.D.N.Y.)
**(Cite as: 2013 WL 5437617 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
David DOUGLAS, Sr., Plaintiff,
v.
PERRARA, Corrr. Officer, Great Meadow C.F.;
Lawrence, Corr. Officer, Great Meadow C.F.; Whittier, Corr. Officer, Great Meadow C.F.; Mulligan,
Corr. Officer, Great Meadow C.F.; Deluca, Corr.
Sergeant, Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
Sept. 27, 2013.

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Colleen D. Galligan, Esq., Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

### DECISION and ORDER
GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil
rights action filed by David Douglas, Sr., ("Plaintiff")
against the six above-captioned New York State correctional employees, are the following: (1) Defendants' motion for partial summary judgment (requesting
the dismissal of Plaintiff's claims against Defendant
Russell, and his claims against the remaining Defendants in their official capacities); and (2) United
States Magistrate Judge Randolph F. Treece's Report–Recommendation recommending that Defendants' motion be granted. (Dkt.Nos.70, 80.) Neither
party filed an objection to the Re-

port–Recommendation, and the deadline by which to
do so has expired. (*See generally* Docket Sheet.) After
carefully reviewing the relevant filings in this action,
the Court can find no clear error in the Report–Recommendation: Magistrate Judge Treece employed the proper standards, accurately recited the
facts, and reasonably applied the law to those facts. As
a result, the Court accepts and adopts the Report–Recommendation for the reasons stated therein.
(Dkt. No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–Recommendation (Dkt. No. 80) is *ACCEPTED*
and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion for partial
summary judgment (Dkt. No. 70) is *GRANTED;* and
it is further

**ORDERED** that the following claims are *DISMISSED* from this action: (a) all claims asserted
against Defendant Russell, and (b) all claims asserted
against Defendants in their official capacities only.
The Clerk is directed to terminate Defendant Russell
from this action; and it is further

**ORDERED** that the following claims *REMAIN
PENDING* in this action: (a) Plaintiff's claim that
Defendants Whittier, Mulligan, Perrara and/or Lawrence subjected him to inadequate prison conditions
by depriving him of meals for approximately five
consecutive days in December 2009, in violation of
the Eighth Amendment; (b) Plaintiff's claim that Defendants Whittier, Mulligan, Perrara and Lawrence
used excessive force against him, and that Defendant
Deluca failed to protect him from the use of that excessive force, in violation of the Eighth Amendment

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5437617 (N.D.N.Y.)
**(Cite as: 2013 WL 5437617 (N.D.N.Y.))**

and New York State common law; and (c) Plaintiff's claim that Defendant Deluca was deliberately indifferent to Plaintiff's serious medical needs (following the assaults) in violation of the Eighth Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the Plaintiff for purposes of trial only; any appeal shall remain the responsibility of the plaintiff alone unless a motion for appointment of counsel for an appeal is granted; and it is further

**ORDERED** that upon assignment of Pro Bono Counsel, a final pretrial conference with counsel will be scheduled in this action before the undersigned, at which time the Court will schedule a jury trial for Plaintiff's remaining claims as set forth above against Defendants Whittier, Mulligan, Perrara, Lawrence and DeLuca. Counsel are directed to appear at the final pretrial conference with settlement authority from the parties.

### REPORT–RECOMMENDATION and ORDER
RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell [FN1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of

physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

> FN1. Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

### I. DISCUSSION
#### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5437617 (N.D.N.Y.)
**(Cite as: 2013 WL 5437617 (N.D.N.Y.))**

there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

**B. Personal Involvement**
As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8.[FN2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5437617 (N.D.N.Y.)
**(Cite as: 2013 WL 5437617 (N.D.N.Y.))**

using excessive physical force against him and denying him medical attention.

> FN2. Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

**\*4** With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.[FN3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

> FN3. The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

**\*5** Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion, he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high

position of authority).

### C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh

Slip Copy, 2013 WL 5437617 (N.D.N.Y.)
**(Cite as: 2013 WL 5437617 (N.D.N.Y.))**

amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

**\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining

Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

N.D.N.Y.,2013.
Douglas v. Perrara
Slip Copy, 2013 WL 5437617 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 918066 (D.Colo.)
**(Cite as: 2010 WL 918066 (D.Colo.))**



Only the Westlaw citation is currently available.

United States District Court,
D. Colorado.
Jeffrey Scott DURHAM, Plaintiff,
v.
Robert A. HOOD, T.G. Werlich, and Randy Madison,
Defendants.

No. 05–cv–01282–MSK–KLM.
March 11, 2010.

Jeffrey Scott Durham, Pine Knot, KY, pro se.

Amanda Adams Rocque, Amy L. Padden, Marcy Elizabeth Cook, U.S. Attorney's Office, Denver, CO, for Defendants.

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

MARCIA S. KRIEGER, District Judge.

**\*1** **THIS MATTER** comes before the Court pursuant to the Defendants' Motion for Summary Judgment (# 287), Mr. Durham's response (# 295), and the Defendants' response (# 297); and Mr. Durham's Fed.R.Civ.P. 72(a) Objection (# 296) to the June 16, 2009 Minute Order (# 294) of the Magistrate Judge, denying Mr. Durham's Motion for Judicial Notice (# 291), and the Defendants' response (# 298).

*FACTS*

At all times relevant, Mr. Durham was an inmate of the Federal Bureau of Prisons ("BOP"), housed at the Administrative Maximum ("ADX") facility in Florence, Colorado. He contends that from October 2003 until September 29, 2004, inmates were allowed to smoke tobacco products in their cells. He contends that, as a result of inadequate ventilation, he was exposed to hazardous levels of environmental tobacco smoke ("ETS" or "secondhand smoke") during this period. He asserts a single *Bivens* claim against each Defendant, sounding in a violation of the 8th Amendment to the United States Constitution. In short, he alleges that each Defendant ignored federal regulation, BOP policies, and Mr. Durham's grievances concerning ETS, thereby condoning his exposure to it.

The Defendants move **(# 297)** for summary judgment on the Plaintiff's claim arguing: (i) he cannot establish that he was actually exposed to a risk of serious damage to his future health; (ii) he cannot establish that any Defendant knew of and disregarded an excessive risk to his health and safety; (iii) he cannot show that the contours of the 8th Amendment were "clearly established" in the circumstances presented herein; and (iv) to the extent the Court permits the claims to proceed, the statute of limitations prevents Mr. Durham from recovering for events preceding July 13, 2005.

The Defendants' motion follows a ruling by the Court regarding the admissibility of testimony by James Repace, an expert proffered by the Plaintiff. Pursuant to Fed.R.Evid. 702, the Defendants challenged the admissibility of Mr. Repace's opinions on various grounds **(# 239).**[FN1] The Court conducted several days of hearings **(# 265, 277, 279)** on the request. On March 13, 2009, the Court ruled, **(# 280)** finding that Mr. Repace could opine that: (i) secondhand smoke is well-known to cause morbidity and mortality from lung cancer and heart disease and to increase the risk of chronic lung disease; (ii) that secondhand smoke causes irritation of the eyes, nose, and throat and can cause migraine headaches; and (iii) that secondhand smoke contains numerous toxic chemicals in both the gas and particulate phase.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 918066 (D.Colo.)
**(Cite as: 2010 WL 918066 (D.Colo.))**

However, the Court found that Mr. Repace could not express several different opinions regarding the specific exposure levels experienced by Mr. Durham and the risks resulting therefrom because he did not reliably apply his methodology to derive the opinions.[FN2]

> FN1. The motion also addressed opinions by two experts proffered by the Defendants, but it is not necessary to address those opinions herein.

> FN2. Among other things, the Court found that Mr. Repace did not reasonably justify his assumption that every smoking inmate at ADX was a habitual smoker and that such inmates had access to an unlimited supply of cigarettes. In actuality, cigarettes may be obtained by ADX inmates only through the commissary, and commissary records show that inmates purchased 533,000 cigarettes during the relevant time period, not the 3.1 million cigarettes that Mr. Repace assumed were smoked.

Following that ruling, Mr. Durham moved **(# 291)** that, pursuant to Fed.R.Evid. 201, the Court take judicial notice of four documents: a 1986 Report of the Surgeon General entitled "The Health Consequences of Involuntary Smoking," a 2006 Report of the Surgeon General entitled "The Health Consequences of Involuntary Exposure to Tobacco Smoke," a 1992 report of the Environmental Protection Agency entitled "Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders," and certain portions of BOP regulations found in various portions of Title 28 of the Code of Federal Regulations, as well as policy statements published by the BOP.

**\*2** The Court referred this motion to the Magistrate Judge pursuant to Fed.R.Civ.P. 72(a). On June 16, 2009, the Magistrate Judge entered a Minute Order **(# 294)** denying Mr. Durham's motion, stating that

"the Court is aware of its authority to take judicial notice of adjudicative facts under Fed.R.Evid. 201 and will consider all relevant law and facts in resolving the merits of the case." Although this Order nominally denied the motion, it clearly stated that the Court would properly take judicial notice of any facts properly subject to notice. Mr. Durham filed a Rule 72(a) Objection [FN3] **(# 296),** contending that the Magistrate Judge "failed to consider the applicable legal standard as developed in the Tenth Circuit," and repeated, essentially verbatim, the arguments he previously raised in the motion.

> FN3. Without making specific findings as to the issue, the Court assumes that Mr. Durham's Objection was timely, given the operation of the prison mailbox rule.

## *ANALYSIS*

**A. Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.,* 45 F.3d 357, 360 (10th Cir.1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Kaiser–Francis Oil Co. v. Producer's Gas Co.,* 870 F.2d 563, 565 (10th Cir.1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson,* 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.,* 305 F.3d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 918066 (D.Colo.)
**(Cite as: 2010 WL 918066 (D.Colo.))**

1210, 1213 (10th Cir.2002).

Where, as here, the moving party does not have the burden of proof at trial, it must point to facts showing the non-movant's inability to produce sufficient evidence to establish one or more elements of the claim or defense that the non-movant is obligated to prove. The non-movant is then required to come forward with sufficient competent evidence to establish a genuine dispute of fact as to the existence of the challenged element(s). If the non-movant does so, a trial is required. If the non-movant fails to produce sufficient competent evidence that, taken in the light most favorable to him, would establish its claim or defense, the claim or defense must be dismissed as a matter of law. See *Celotex Corp. v.. Catrett,* 477 U.S. 317, 322–23 (1986).

As always, the Court construes Mr. Durham's *pro se* pleadings liberally. *Haines v. Kerner,* 404 U.S. 519, 520–21 (1972). However, such liberal construction is intended merely to overlook technical formatting errors and other defects in Mr. Durham's use of legal terminology and proper English. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991). *Pro se* status does not relieve Mr. Durham of the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law, and in these regards, the Court will treat Mr. Durham according to the same standard as counsel licensed to practice law before the bar of this Court. See *McNeil v. U.S.,* 508 U.S. 106, 113 (1993); *Ogden v. San Juan County,* 32 F.3d 452, 455 (10th Cir.1994).

**B. Defendants' Motion**

**\*3** To establish a violation of the Eighth Amendment in these circumstances, Mr. Durham must establish two basic elements: (i) he was exposed to a serious risk of harm; and (ii) the Defendants were deliberately indifferent to that risk. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). In the context of an Eighth Amendment claim arising from exposure to

ETS, Mr. Durham must prove these two elements by showing: (i) he was exposed to unreasonably high levels of ETS constituting a present or future hazard to his health; (ii) the magnitude of the risk to his health was such that it violated contemporary standards of decency to expose anyone to such a risk; (iii) that the Defendants were objectively aware of the facts demonstrating the risk of serious harm to his health; and (iv) that they subjectively recognized the risk and chose not to remedy it. *Id.* at 828; *Helling v. McKinney,* 509 U.S. 25, 35–36 (1993).

Turning first to the question of exposure, Mr. Durham must come forward with evidence that "he himself is being exposed to unreasonably high levels of ETS." *Helling,* 509 U.S. at 35. It is not sufficient for the inmate to show "sporadic" or "fleeting" exposure to ETS, nor is it sufficient for the inmate to show that the exposure level was simply "unwelcome and unpleasant" and that it caused nausea and coughing. *Adams v. Banks,* 663 F.Supp.2d 485, 497 (S.D.Miss.2009), *citing Richardson v. Spurlock,* 260 F.3d 495, 498 (5th Cir.2001). Moreover, anecdotal accounts of the amount of smoke in the jail is usually insufficient, as *Helling* calls for "objective" evidence of exposure. *Scott v.. District of Columbia,* 139 F.3d 940, 942 (D.C.Cir.1998); *Larson v. Kempker,* 414 F.3d 936, 940 (8th Cir.2005) (affirming summary judgment to defendants where inmate's proffered expert "performed no scientific tests to establish levels of ETS in Larson's cell" and inmate offered "no reliable basis to estimate the levels of ETS to which he is exposed or specific evidence concerning how those levels of ETS would affect his future health").

With Mr. Repace's opinions on this issue found inadmissible, Mr. Durham relies primarily on only his own anecdotal evidence of his exposure level. Indeed, Mr. Durham attempts to establish an unreasonable level of exposure almost entirely by reference to the symptoms he experienced. For example, he contends that the smoke entering his cell caused him headaches, watery and itchy eyes, difficulty breathing, migraine

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 918066 (D.Colo.)
**(Cite as: 2010 WL 918066 (D.Colo.))**

headaches, coughing, and so on. But symptoms, alone, do not establish an exposure level; an inmate who is unusually sensitive to secondhand smoke might exhibit severe symptoms at low exposure levels, or a particularly hardy inmate might tolerate a very high exposure level without demonstrating any symptoms. Thus, evidence that an inmate experienced adverse symptoms from exposure to secondhand smoke is not sufficient to establish that his exposure level was unreasonable.

**\*4** Mr. Durham's anecdotal evidence of exposure level is further weakened by the fact that he occupied a single cell throughout the time period at issue, and was exposed to ETS only through what he contends was inadequate ventilation, with ETS circulating into his cell air from cells where other inmates smoked unknown amounts of cigarettes. Mr. Durham's situation differs from those in which courts have found purely anecdotal evidence of exposure to be sufficient where such anecdotal evidence demonstrated quantitatively ascertainable amounts of smoke being generated directly by inmates within the plaintiff inmate's cell. *See e.g. Adams v. Banks,* 663 F.Supp.2d 485, 498 (S.D.Miss.2009) (inmate produced affidavits from present and former cellmates that they smoked two to five packs of cigarettes per day in the same cell as plaintiff inmate) *and cases cited therein.* Thus, the Court finds that Mr. Durham's limited anecdotal evidence of his exposure level is insufficient to establish the "objective" level of exposure required by *Helling.*

Moreover, it is not sufficient for an inmate simply to show that he was exposed to a certain level of ETS. Under *Helling,* he must also show that that exposure level was such that it posed a present or future health risk. In this regard, Mr. Durham's evidence is also insufficient. He relies on his testimony of symptoms described above that occurred when he was exposed to ETS, and generally points to reports and other documents for the proposition that there is no safe level of exposure to secondhand smoke. Both arguments miss the mark.

*Helling* requires that the exposure must result in the kind of risk to health that "violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." 509 U.S. at 36 (emphasis in original). The fact that Mr. Durham suffered adverse symptoms when exposed to secondhand smoke does not, of itself, demonstrate that his exposure level was such that it presented a serious risk of harm to his health, much less to anyone else. In addition, his symptoms, bothersome as they were to him, are not sufficient to demonstrate that the smoke to which he was exposed created a health risk that violated "contemporary standards of decency".[FN4] *See e.g. Abdullah v. Washington,* 530 F.Supp.2d 112, 117–18 (D.D.C.2008) (inmate failed to come forward with sufficient evidence of risk of harm caused by exposure where, as here, court struck testimony by Mr. Repace on the subject, leaving only the inmate's insufficient anecdotal testimony on the objective element).

> FN4. The Court observes that, in Colorado, legislation to prohibit smoking in restaurants and bars did not take effect until January 2006, well after the events at issue in this case. To the extent one attempts to judge "contemporary standards of decency" during the period at issue here, it is evident that society readily contemplated the possibility that non-smokers would be exposed to ETS in bars and restaurants, possibly suffering temporary symptoms like Mr. Durham's as a result.

Consideration of the various reports concerning secondhand smoke that are proffered by Mr. Durham does not change this result. These reports iterate the facts underlying the admissible opinions of Mr. Repace: *e.g.* that exposure to secondhand smoke increases the risk of various illnesses. The statements in these reports that ETS exposure results in greater observed health maladies in a population—which arguably leads to a conclusion that a certain level of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 918066 (D.Colo.)
**(Cite as: 2010 WL 918066 (D.Colo.))**

exposure to ETS results in a specific increase in health risks—does not address either what Mr. Durham experienced or what he must prove.

**\*5** Mr. Durham must prove that *he* has suffered an increased risk of health problems. *See Williams v. District of Columbia,* 530 F .Supp.2d 119, 127 (D.D.C.2008). The inquiry here is not whether ETS is generally harmful, or whether it has been shown to cause increased risks in populations exposed to it; the inquiry here is whether *Mr. Durham's* particular exposure to ETS caused *Mr. Durham* to suffer a greater risk of harm. *Id.* General studies, medical journals, and statistics are not sufficient to make the individualized showing of risk that is required, and without such an individualized showing, Mr. Durham's claim fails. To conclude otherwise would be to render ETS cases strict liability; once an inmate showed that he was exposed to secondhand smoke, his burden of proof is satisfied because exposure *generally* means increased health risks. Mr. Durham's failure to demonstrate that he himself has suffered an increased risk of prevents him from proving his claim.

Accordingly, because Mr. Durham cannot establish the objective element of *Helling*—that he was exposed to an unreasonable level of ETS, resulting in increased risk to his health, the Defendants are entitled to summary judgment. [FN5] Because the Court's conclusion is the same regardless of whether the Court takes judicial notice of the documents cited by Mr. Durham, his Rule 72(a) Objection to the Magistrate Judge's ruling is overruled, as moot.

> FN5. Although the Court need not reach the issue, it would also find that Mr. Durham has failed to come forward with evidence sufficient to show that the Defendants were subjectively aware of Mr. Durham's exposure level and the risks to his health. Indeed, the Defendants testified that they did not witness frequent smoking among inmates in Mr. Durham's vicinity, and Mr. Durham does not

directly refute that testimony. The fact that the Defendants may have witnessed Mr. Durham with watery eyes, a cough, or headache does not establish that these witnesses suspected that Mr. Durham's condition was a result of ETS, much less that they subjectively believed that such exposure presented a significant risk to his general health.

### CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (**# 287**) is **GRANTED.** Judgment in favor of the Defendants shall enter contemporaneously with this Order. Mr. Durham's Rule 72(a) Objection (**# 296**) is **OVERRULED** as moot, and the Court **AFFIRMS** the Magistrate Judge's ruling (**# 294**) denying his Motion for Judicial Notice (**# 291**).

D.Colo.,2010.
Durham v. Hood
Not Reported in F.Supp.2d, 2010 WL 918066 (D.Colo.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Tammi ELDRIDGE et al., Plaintiffs,
v.
Superintendent E. WILLIAMS et al., Defendants.

No. 10 Civ. 0423(LTS).
July 30, 2013.

*MEMORANDUM OPINION AND ORDER*
LAURA TAYLOR SWAIN, District Judge.

**\*1** *Pro se* plaintiffs Tammi Eldridge, Joyce Powell, Jazmin Shelton, and Sharon Mabry ("Plaintiffs"), all of whom are current or former inmates of Bedford Hills Correctional Facility ("BHCF"), bring this action, pursuant to 42 U.S.C. § 1983, against eight current or former New York State Department of Corrections and Community Supervision ("DOCCS") employees—Superintendent E. Williams, Deputy M. Capra, Deputy J. Hayden, Deputy M. Brynes, Deputy L. Zwillinger, Captain J. Fitzgerald, Captain L. Hammond, and Corrections Officer K. Davoren (collectively, "Defendants")—in their individual capacities.[FN1] Plaintiffs allege that Defendants were deliberately indifferent to serious health risks that were inflicted on Plaintiffs through exposure to unreasonably high levels of environmental tobacco smoke ("ETS") due to inadequate enforcement of BHCF's indoor smoking ban. Plaintiffs assert that Defendants' deliberate indifference to violations of the ban violated their right under the Eighth Amendment to the Constitution of the United States to be free from cruel and unusual punishment. Plaintiffs also allege that Defendants violated New York state law through inadequate enforcement of the New York State Clean Indoor Air Act and the DOCCS Indoor Smoke–Free Policy. Plaintiffs purport to sue on behalf of themselves and all others similarly situated. All of the Plaintiffs seek compensatory and punitive damages, and Eldridge, Powell, and Shelton seek declaratory and injunctive relief as well.[FN2]

> FN1. Plaintiffs' claims against Defendants in their official capacities were previously dismissed by the Court. (*See* docket entry no. 39.)

> FN2. Plaintiff Mabry's claims for declaratory and injunctive relief were previously dismissed by the Court. (*See* docket entry no. 39.)

Currently pending before the Court is Defendants' motion, pursuant to Federal Rule of Civil Procedure 56, for summary judgment dismissing the complaint. The Court has jurisdiction of Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1367. The Court has reviewed carefully all of the parties' submissions. For the following reasons, the Court grants the motion in its entirety.

*BACKGROUND*

The following facts are drawn from the parties' submissions and are undisputed unless otherwise indicated.[FN3] Plaintiffs Tammi Eldridge and Joyce Powell are current inmates at Bedford Hills Correctional Facility, and Plaintiffs Jazmin Shelton and Sharon Mabry were inmates there until June 2011 and June 2010, respectively. (Def. 56.1 St. ¶¶ 2–5; Pl. 56.1 St. ¶ 2.) Although Plaintiffs allege that most of BHCF's inmates smoke and generally do so throughout the facility, they allege that they suffered unreasonably high exposure to ETS in two areas of the facility's housing unit in particular: their individual cells, in which they allege that they were continuously

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

exposed to smoke through the ventilation system, and the shower areas. (Def. 56.1 St. ¶¶ 27–28, 41–42, 53, 81; Pl. 56.1 St. ¶¶ 3, 15, 24, 41, 57.) The units in which Plaintiffs are or were (before their release) housed consist of single-cell units with windows that can be opened, doors that are solid except for openings along the perimeters, and air vents. (Def. 56.1 St. ¶¶ 15, 110; Pl. 56.1 St. ¶¶ 3, 61.) Defendants deny that smoke constantly enters through vents in the cells. Instead, Defendants assert that the ventilation system should filter out such smoke before it enters another cell, that smoke detectors should be triggered by in-cell smoking and that, to the extent that inmates take measures to conceal their in-cell smoking from detection by the smoke detector (such as by smoking at a window or over a flushing toilet), the measures would tend to reduce or eliminate the migration of ETS to other cells. (Def. 56.1 St. ¶¶ 106–08.) Plaintiffs contend that smoke detectors generally have not been sensitive enough for smoking to activate them. (Pl. 56.1 St. ¶ 59.)

> FN3. Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

**\*2** Since 2001, the Department of Corrections and Community Supervision ("DOCCS") has had in effect an internal policy banning indoor smoking in correctional facilities. (Id. ¶ 16.) Violations of this policy are required to be treated as disciplinary infractions, leading prison officials to issue misbehavior reports initiating disciplinary proceedings. Penalties for such violations range in severity based on the offense, with Tier I disciplinary proceedings involving the least severe infractions and punishments, and Tier III in-

volving the most severe. (Id. ¶ 103.) Tier II and Tier III proceedings regarding smoking policy violations [FN4] declined from 63 charges (50 guilty findings) in 2008 to 21 charges (17 guilty findings) in 2012. (Id. ¶ 105.) Smoking in outdoor areas is not banned, and inmates are allowed to possess tobacco products and lighters in their cells. (Kap.Decl.¶ 29.)

> FN4. Statistics for Tier I disciplinary proceedings are not tracked. (Def. 56.1 St. ¶ 105.)

Other approaches that prison officials have used to enforce the indoor smoking ban include giving oral warnings, instead of issuing misbehavior reports, to inmates not known to have a history of violating the ban. (Id. ¶¶ 103–04.) Defendants also assert that they have the option of curtailing inmate privileges for an entire housing unit to address smoking violations when officers have found that identifying and punishing specific violators is otherwise impossible, but note that this form of punishment has rarely been necessary. (Id. ¶ 111.) Inmates' complaints about specific individuals and smoke detectors may further aid enforcement efforts. (Id. ¶ 108.)

In 2007, Plaintiff Powell made a written complaint to former Superintendent Ada Perez, complaining that her unit had been "locked down" in response to unauthorized smoking, asserting that she should not have been punished for others' infractions, and requesting redesignation to a non-smoking unit. (Fitz.Decl.¶ 8.) The letter was forwarded to Defendant Fitzgerald, who responded that the facility takes indoor smoking seriously and that a shutdown of common areas "has to be done to encourage all inmates to follow the rules." (Id.)

Plaintiffs made multiple complaints about ETS and inadequate enforcement of the indoor smoking ban in the summer of 2009. (Def. 56.1 St. ¶¶ 29, 43, 54, 65, 86.) In July 2009, Eldridge filed an inmate

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

grievance about the response of Defendant Corrections Officer Davoren to an asthma attack that Eldridge had suffered and requested that prison officials enforce the indoor smoking ban in order to ensure a smoke-free environment. (Schul. Decl., Exh. A at 10.) Prison officials consolidated Eldridge's grievance with the other Plaintiffs' grievances that followed. (Def. 56.1 St. ¶ 97.) Plaintiffs generally complained of ETS exposure in the housing unit occurring in the shower area, as well as in their cells through the ventilation system such that they have even had to "tape" and "cover" up their vents to reduce exposure. (Schul. Decl., Exh. A at 26–28, 33–35, 50.) After an investigation by Sergeant Peperone, which concluded that while there was smoking, it "was not enough to be a problem," and that "the only way to stop secondhand smoke is to not allow tobacco at all," Defendant Superintendent Williams ultimately declined to institute new measures to enforce the indoor smoking ban as requested by Plaintiffs. (Def. 56.1 St. ¶¶ 98–99 .)

**\*3** In addition, Plaintiffs allege that they suffer from medical conditions that have been caused or exacerbated by ETS exposure. Eldridge has suffered the most serious of the conditions as she has a history of asthma attacks and has had multiple inpatient stays in the infirmary. (Def. 56.1 St. ¶¶ 49, 61, 67; Pl. 56.1 St. ¶ 21.) The other Plaintiffs have had less serious medical episodes and have not required hospitalizations, although Mabry has been provided with emergency treatment for asthma. (Pl. 56.1 St. ¶¶ 34–35.) Mabry and Powell's asthma conditions have been usually characterized as "mild intermittent," the least severe of four possible assessment levels of asthma. (Def. 56.1 St. ¶¶ 38, 73–74; Pl. 56.1 St. ¶¶ 14, 34–35.) Eldridge, Mabry, and Powell attribute their asthmatic conditions, and/or the exacerbation of those conditions, allergies, nasal and eye discomfort, and headaches, to ETS exposure. (Def. 56.1 St. ¶¶ 23–24, 36, 49, 72; Pl. 56.1 St. ¶¶ 9, 14, 21, 33–35.) No diagnostic link between ETS and these conditions is recorded in the medical documentation that has been proffered in this motion practice, although the records reflect that Plaintiffs complained to medical personnel that their conditions had been triggered or exacerbated by ETS. (Def. 56.1 St. ¶¶ 25, 37, 73, 75; Pl. 56.1 St. ¶¶ 9, 14, 21, 36.) Furthermore, Mabry has testified that her respiratory illness has only had a "slight" impact on her daily activities, and there is no evidence that Mabry has developed a more serious medical condition since she left BHCF in June 2010. (Def. 56.1 St. ¶¶ 75–76; Pl. 56.1 St. ¶¶ 36–37.) Shelton does not suffer from asthma, but claims that the ETS to which she was exposed exacerbated pre-existing allergies, causing problems such as difficulty in breathing and chest pains. (Def. 56.1 St. ¶¶ 23–25; Pl. 56.1 St. ¶ 9.) In May 2012, nearly a year after she left BHCF, Shelton testified that she has no physical health issues and has not been taking any prescribed medications. (Def. 56.1 St. ¶ 34; Pl. 56.1 St. ¶ 13.)

## DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact. *See Anderson,* 477 U.S. at 256. A fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

In deciding a summary judgment motion, the Court must consider all of the admissible evidence, including affidavits, depositions, answers to interrogatories, and admissions on file, and "resolve all ambiguities and draw all factual inferences in favor of the nonmovant." *See Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Moreover, the Court must generally afford "special

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

solicitude" to pro se litigants. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

**\*4** Nevertheless, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which the party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322. The nonmoving party cannot defeat summary judgment "merely upon a 'metaphysical doubt' concerning the facts or on the basis of conjecture or surmise." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

*Section 1983 Claim*

For Plaintiffs to prevail on a claim under 42 U.S.C. § 1983 against state prison officials in their individual capacities, two elements must be met: (1) the defendants must be acting under the color of state law, and (2) their actions must have deprived the plaintiffs of a right guaranteed by the Constitution or the laws of the United States. *Bryant,* 923 F.2d at 983–84. There is no dispute here about the first element—Defendants were state employees acting in their official capacities, and thus acting under color of state law. The second element subsumes inquiries as to whether Defendants were personally involved in the alleged constitutional violation and the elements required to establish that the alleged violation occurred. *See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)); *see also, Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983"). Here, Plaintiffs claim that Defendants violated their rights under the Eighth Amendment to the Constitution through "deliberate indifference to a substantial risk of serious harm," that is, medical risks associated with exposure to ETS.

The Court will first consider whether the Plaintiffs have alleged facts sufficient to demonstrate that each of the Defendants was personally involved in the alleged deprivation of constitutional rights.

*Personal Involvement*

To establish supervisory liability under Section 1983, Plaintiff must show "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Under *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), a supervisory defendant can be found to be personally involved in a Section 1983 violation by showing any of the following:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.[FN5]

> FN5. While the Supreme Court in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), may have narrowed the viability of some of the *Colon* predicates for supervisory liability, the Court need not determine to what extent the *Colon* predicates survive here as none of the potentially narrowed predicates are at issue. *See, e.g., Grullon v. City of New Haven,* Docket No. 11–3184, 2013 WL 3023464, at \*4 (2d Cir. Jun.19, 2013) (the "requirements for showing a supervisor's personal involvement with respect to certain constitutional violations"

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

"may have [been] heightened").

**\*5** A defendant's personal receipt of a complaint or letter and subjective awareness of the alleged unconstitutional conditions may be one factor that helps establish personal involvement. *See Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) ("[i]f ... the official does personally look into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved"). However, even if a complaint or letter is directly addressed to the defendant and the defendant becomes subjectively aware of the alleged problem, if the defendant "lacks the authority to remedy or 'take action with respect to any constitutional violation,' " personal involvement "cannot be found." *Kregler v. City of New York,* 821 F.Supp.2d 651, 658 (S.D.N.Y.2011) (quoting *Kuolkina v. City of New York,* 559 F.Supp.2d 300, 317 (S.D.N.Y.2008)); *see, e.g., Denis v. N.Y. S. Dept. of Correctional Services,* No. 05 Civ. 4495, 2006 WL 217926, at \*21 (S.D.N.Y. Jan. 30, 2006), *report and recommendation adopted by,* 2006 WL 406313 (S.D.N.Y. Feb.22, 2006) (granting summary judgment for the Chief Medical Officer of the correctional facilities due to lack of personal involvement because, while he may have received a complaint, he did not participate in the formulation, approval, implementation, or enforcement of the facilities' smoking policy and thus did not participate in the alleged deprivation). Moreover, if a supervisor merely received information of unconstitutional acts but reasonably acted upon it such as by "forward[ing] [a complaint] to [a] subordinate for investigation and response," that does not establish personal involvement under *Colon. Grullon,* 720 F.3d 133, 2013 WL 3023464, at \*5 (quoting *Sealey v. Gilmer,* 116 F.3d 47, 51 (2d Cir.1997)).

### Defendants Zwillinger, Hayden, and Capra

Defendants Zwillinger, the Deputy Superintendent for Administration, and Hayden, the Deputy Superintendent for Programming, both received copies of Plaintiffs' complaints about ETS exposure ad-dressed either to others or directly to them. Defendants have testified, however, that remedying complaints about the enforcement of the smoking prohibition in the housing units is not within their authority. (Def. 56.1 St. ¶¶ 44, 59, 91, 101.) Zwillinger and Hayden have authority only over administrative matters and the program buildings, respectively. (*Id.*) Plaintiff Mabry also claims to have raised her request that security place female "rover" corrections officers in the shower area directly with Defendant Zwillinger, but he similarly does not have the authority to address security matters. ( *Id.* ¶ 91.) Although Plaintiffs assert that "it is within each one of [these defendants'] supervisory capabilities to implement policies to stop or minimize the violation," they do not cite any evidence in the record to support their claim. (Pl. 56.1 St. ¶ 53.) Because Defendants Zwillinger and Hayden lacked the authority to remedy the alleged ETS problem and they acted reasonably upon receipt of information alleging unconstitutional acts, they do not have the requisite personal involvement for Section 1983 liability. *See Denis,* 2006 WL 217926, at \*21; *see also Sealey,* 116 F.3d at 51.

**\*6** Deputy Superintendent for Security Capra supervised Defendants Captain Fitzgerald and Captain Hammond. The extent of his involvement appears limited to receiving of copies of complaints addressed to others, which, without more, is, again, not enough to establish personal involvement. (Pl. 56.1 St. ¶ 16.) *See Sealey,* 116 F.3d at 51. Section 1983 liability cannot be established by *respondeat superior* alone. *See Iqbal,* 556 U.S. at 676. Accordingly, the Court concludes that Defendants Zwillinger, Hayden, and Capra are entitled to summary judgment due to lack of personal involvement.

### Defendant Byrnes

Defendant Byrnes, the Deputy Superintendent for Health, also received copies of Plaintiffs' complaints about inadequate enforcement of the indoor smoking ban and referred the matter to other prison officials. However, although Plaintiffs assert otherwise, like

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

Zwillinger and Hayden, Byrnes lacked the authority to enforce the indoor smoking ban in the housing units. (Def. 56.1 St. ¶¶ 68, 101; Pl. 56.1 St. ¶ 53.)

Defendants acknowledge, however, that Byrnes did have the authority to remedy the alleged wrong with respect to Eldridge, who had written a letter to Byrnes asserting that doctors "threatened" to place her in the Regional Medical Unit (RMU) because of her asthmatic condition, in order to provide her with a smoke-free environment. (Def. 56.1 St. ¶ 67.) Byrnes responded to Eldridge's letter but allegedly failed to subsequently ensure that Eldridge would be able to live in a smoke-free environment. (*Id.*) The Court finds that there is sufficient evidence to establish Byrnes' personal involvement with regards to Eldridge's claims.

*Defendants Davoren, Williams, Fitzgerald, and Hammond*

Defendants do not dispute that the remaining Defendants—Davoren, who worked as a corrections officer in the housing unit, Williams, who was superintendent until 2009, and Captains Fitzgerald and Hammond, who worked in security—were personally involved in the enforcement of the DOCCS smoking policy in the housing units.

*Deliberate Indifference Claims Against the Remaining Defendants: Byrnes, Davoren, Williams, Fitzgerald and Hammond*

Plaintiffs allege that these Defendants deprived them of their Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent in inadequately enforcing the indoor smoking ban, thereby exposing them to unreasonably high amounts of ETS. To show that a prison official has violated the Eighth Amendment through deliberate indifference, a plaintiff must demonstrate that: (1) the conditions of confinement objectively posed a "substantial risk of serious harm," and (2) the defendant was subjectively aware of and unreasonably disregarded this health or safety risk. *Helling v.*

*McKinney,* 509 U.S. 25, 33–35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Farmer v. Brennan,* 511 U.S. 825, 839, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

*Objective Prong: Substantial Risk of Serious Harm*

Plaintiffs may satisfy the objective prong of a deliberate indifference claim by demonstrating that ETS exposure is causing them to suffer, or is exacerbating their suffering from, "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (internal quotation marks and citation omitted); see also *Denis,* 2006 WL 217926, at *13; *Koel v. Bernstein,* No. 10 Civ. 3808, 2011 WL 2436817, at *20 (S.D.N.Y. Jun.17, 2011), *report* and *recommendation adopted* by, 2011 WL 4390007 (S.D.N.Y. Sep.21, 2011).

**\*7** The Supreme Court has recognized that, even without a demonstration of contemporaneous harm, an inmate may satisfy the objective prong by offering proof that she herself "is being exposed to unreasonably high levels of ETS" that "pose an unreasonable risk of serious damage to [her] future health." *Helling,* 509 U.S. at 35. While the *Helling* Court did not specify a threshold level or degree of immediacy of such an unreasonable risk, its illustrations involving "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," the viability of a complaint about "demonstrably unsafe drinking water without waiting for an attack of dysentery," and the impropriety of "deliberate indifferen[ce] to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms" suggest that the risk, type, and likely immediacy of harm must be serious and non-speculative. *Id.,* at 33. The Court further made it clear that a determination of whether the challenged

conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the poten-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

tial harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Id.,* at 36. Noting that the complaining prisoner, who had originally been double-bunked with a five-pack-a-day smoker, had been transferred to a prison that had recently instituted a policy restricting smoking in certain program areas, the Court in *Helling* observed that "it is possible that the new policy will be administered in a way that will minimize the risk to [the complainant] and make it impossible for him to prove that he will be exposed to unreasonable risk with respect to his future health." *Id.; see also Lee v. Taylor,* 327 F. App'x 253, 254 (2d Cir.2009) ("[A] plaintiff 'states a cause of action under the Eighth Amendment by alleging that prison officials have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health' "); *Shepherd v. Hogan,* 181 F. App'x 93, 95 (2d Cir.2006) (noting that while the plaintiff "also alleged that he had experienced a number of medical problems as a result of his ETS exposure ... this allegation was not necessary for him to prevail [because a] future risk can suffice to constitute a substantial risk of serious harm, even if an inmate experiences no present symptoms").

To prevail on their claim of deliberate indifference to unreasonable future risk associated with ETS exposure, Plaintiffs must demonstrate that their exposure poses a risk that "is not one that today's society chooses to tolerate." *Zaire v. Artuz,* No. 99 Civ. 9817, 2003 WL 230868, at *4 (S.D.N.Y. Feb.3, 2003) (quoting *Helling,* 509 U.S. at 35–36). Because "the Constitution does not mandate comfortable prisons," some exposure to ETS does not necessarily violate the

Constitution. *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (holding that housing two inmates in a single cell did not violate the Constitution); *Scott v. Dist. of Columbia,* 139 F.3d 940, 942 (D.C.Cir.1998) ("*Helling* did not read the Eighth Amendment as mandating smokefree prisons").

**\*8** Courts have generally found ETS exposure to be unreasonably high mainly when the plaintiff shares a cell with an inmate who is a frequent or chain smoker, or when the plaintiff is housed in a cell surrounded by such smokers. *See, e.g., Helling,* 509 U.S. at 35–36 (living with a cellmate who smokes five packs of cigarettes a day may satisfy the objective prong); *see also Davis,* 316 F.3d at 100 (plaintiff's experience in having a cellmate who smoked and being housed in areas where he was surrounded by smokers, such that "the smell of smoke fills the air and enter[s] my cell in a manner as though I was myself smoking," may satisfy the objective prong). The Second Circuit has also upheld the sufficiency of a claim of ETS exposure as an unreasonable risk to future health when a plaintiff was housed in close quarters with a chain smoker for more than a month, even if the plaintiff often left his cell during the day. *Shepherd,* 181 F. App'x at 95.

On the other hand, courts in this Circuit have generally found ETS exposure to be insufficiently high when the exposure was limited to common areas outside of immediate living quarters, such as recreational areas where a plaintiff is only temporarily and/or voluntarily exposed to ETS. *See Zaire,* 2003 WL 230868, at *5 (ETS was not unreasonably high where the plaintiff was exposed to it only in common areas like the gymnasium and he visited it only three times a week while his cell was smoke-free); *see also Gill v. Bracey,* No. 99 Civ. 10429, 2001 WL 34045758, at *2, *4 (S.D.N.Y. Jul.17, 2001) (ETS was not unreasonably high where the plaintiff was exposed to the ETS for four and a half hours a day while in the law library and in line at the medical dispensary and he was not exposed to ETS in his cell).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

Here, if Plaintiffs' allegations are accepted as true, perceptible ETS exposure occurred primarily in the shower area and in Plaintiffs' cells through the ventilation system, and to a lesser extent, through the spaces around the cell doors. (Def. 56.1 St. ¶¶ 27–28, 41–42, 53, 81; Pl. 56.1 St. ¶¶ 3, 15, 24, 41, 57.) The Plaintiffs have alluded to a 2007 Surgeon General's report that finds it impossible to identify a safe level of ETS and have referenced academic articles regarding ETS exposure risks, but have not proffered any scientific evidence to indicate that the level of ETS to which they have been exposed is unreasonable under the *Helling* standard in the context of general health risks. The recent decision in *Islam v. Connolly* is instructive. No. 07 Civ. 3225, 2011 WL 723568, at *6 (S.D.N.Y. Feb.16, 2011). There, the court held that the plaintiff's exposure to ETS in the bathroom, which he visited twelve times daily for four or five minutes each time, was not unreasonably high. *Id.* Here, going to the shower area exposed Plaintiffs to ETS briefly, once a day. Plaintiffs also had some control over when they showered and, according to Defendants' uncontroverted proffer, the ability to ask the officers on duty to clear the shower room of smokers if anyone was smoking. (Def. 56.1 St. ¶ 121.) Under these factual circumstances, Plaintiffs' allegations regarding the presence of smokers in the shower room and lingering smells on their hair, bodies, and clothing, are insufficient to frame a genuine issue of fact as to whether the failure to enforce completely the indoor smoking ban presented an objectively unreasonable risk to Plaintiffs' health within the meaning of *Helling,* much less that the situation was one to which *anyone's* involuntary exposure would "violate[ ] contemporary standards of decency." *See Helling,* 509 U.S. at 36.

**\*9** There is little case law in the Second Circuit on allegations involving cigarette smoke entering an inmate's cell through a ventilation system. *Enigwe v. Zenke,* No. 03 Civ. 854, 2007 WL 2713849, at *4 (E.D.N.Y. Sept. 14, 2007) was one case in the Second Circuit where the plaintiff alleged not only that this cellmate chain-smoked, but also that cigarette smoke entered his cell through the ventilation system for two months. The district court held that the plaintiff did not meet the objective prong in showing a substantial risk of serious harm. The plaintiff, though, had contradicted his own allegations, admitting that he never saw anyone smoke inside the housing unit or in his cell and that he could not recall whether he ever actually saw smoke coming from any vents. *Id.,* at *4–5.

Here, Plaintiffs have been or were incarcerated at Bedford Hills and allege daily exposure to ETS in their cells for years. (Def. 56 .1 St. ¶¶ 2–5, 27, 60; Pl. 56.1 St. ¶¶ 15, 57.) For example, Eldridge alleges that her cell has been "engulfed in smoke," and that she has awakened "out of her sleep to a smoke induced [sic] room, making her gasp for air, ... wheeze and [have] pain in her chest." (Compl. at 7.) Likewise, Shelton alleges that smoke has entered her cell such that she "has been unable to sleep due to the smoking she is forced to inhale." (*Id.* at 27; Def. 56.1 St. ¶ 27.) Shelton furthermore estimated that roughly forty out of sixty inmates in her housing unit smoked, but she has not indicated how often they smoked indoors or how much of that smoke traveled into her cell through the ventilation system. (*Id.* at 27.) Plaintiffs also cite observations by another inmate, Audra Harris, who complained that she "smell[ed] smoke," and by Corrections Officer Alvarez, who "witnessed makeshift ashtrays," as evidence of widespread smoking in the housing units. (Schul. Decl., Exh. A at 18, 34.)

Defendants contend that ETS exposure cannot be that high because the ventilation system "should" filter the smoke out of the air before it enters a cell and, as Eldridge testified, the prison installed a new ventilation system in 2009. (Def. 56.1 St. ¶ 108; Eldridge Dep. at 47.) Defendants further argue that, if indoor smoking was as prevalent as Plaintiffs claim, the smoke detectors would set off alarms and prompt investigations frequently, noting that Plaintiffs have identified only one incident where an alarm sounded due to smoking. (Def. 56.1 St. ¶ 108.) Plaintiffs con-

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

tend, though, that the smoke detectors are not sensitive enough to be activated by most smoking violations. (Pl. 56.1 St. ¶ 59.) Other evidence suggesting that ETS is not such a significant problem include the fact that no inmate has filed a grievance about ETS exposure since Plaintiffs last filed a grievance in 2009, and the American Correctional Association audits of BHCF in 2009 and 2012 did not mention any problems with ETS exposure. (Def. 56.1 St. ¶¶ 115–16.)

*10 Overall, even assuming Plaintiffs' evidence to be true, the constant smell of smoke, some smoke entering cells through the vents, and occasional instances of Plaintiffs' cells being "engulfed" in ETS do not amount to the level of unconstitutional ETS exposure that is comparable to living with a cellmate who is a frequent or chain smoker. Furthermore, there is no constitutional right to be free from merely the smell of cigarette smoke and the Plaintiffs cite no evidence that exposure to the smell of cigarette smoke poses a substantial risk of serious harm to future health. Accordingly, the Court finds that the evidence of general ETS exposure in Plaintiffs' cells through the ventilation system is insufficient to meet the objective prong of an Eighth Amendment claim.

The Court also considers whether Plaintiffs' specific medical injury claims sufficiently allege a serious medical condition that has been caused or aggravated by the influx of ETS into their cells. Factors relevant to determining the seriousness of a medical condition include whether: (1) "a reasonable doctor or patient would find [it] important and worthy of comment," (2) it "significantly affects an individual's daily activities," and (3) it causes "chronic and substantial pain." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). Severe asthmatic conditions may be found sufficiently serious to meet the objective element, but courts have rejected medical conditions as insufficiently serious where asthma was relatively mild, was not life-threatening, and did not require hospitalization, notwithstanding use of prescription medication

and inhalers. *See Oliver v. Deen,* 77 F.3d 156, 158–60 (7th Cir.1996); *see also Colon v. Drew,* 335 F. App'x 86 (2d Cir.2009).

Plaintiff Eldridge has a relatively severe asthmatic condition and alleges that, due to ETS exposure, she has had a history of asthma attacks requiring inpatient stays in the infirmary and has been awakened out of her sleep, "gasping to be in air." (Def. 56.1 St. ¶¶ 49, 61, 67; Compl. at 10.) Defendants contend that her conduct suggests that her injuries are not that serious and that a smoke-free environment would be unnecessary to ensure that she is protected against unreasonable risks arising from ETS exposure. In particular, they contend that since April 2012, she has voluntarily worked in the asbestos removal program, for which she declared herself to be in good health, was medically cleared, and has had to take precautions to protect against the hazards of asbestos exposure. (*Id.* ¶¶ 51, 113–14.) Eldridge minimizes the importance of her volunteering for the asbestos removal program, though, contending that the program provides adequate protection and, as a result, does not exacerbate her asthma as ETS exposure does. Overall, notwithstanding her participation in the asbestos removal program, Eldridge's medical records indicate hospitalizations and difficulty sleeping due to ETS exposure, which present a genuine issue of material fact for trial as to whether Eldridge has suffered from sufficiently serious injuries to meet the objective prong. (*Id.* ¶¶ 49, 61, 67; Compl. at 10.)

*11 In contrast, Plaintiffs Powell, Mabry, and Shelton, like the plaintiff in *Oliver,* have had less serious medical incidents that have not required hospitalizations. 77 F.3d at 158–60. Their claimed injuries include asthmatic conditions usually assessed as "mild intermittent," or the least severe type of asthma, and/or symptoms such as headaches, irritated and watery eyes, and breathing problems. (Def. 56.1 St. ¶¶ 23–25, 38, 74.) Mabry also has testified that her medical condition has only had a "slight" impact on her daily activities. (Def. 56.1 St. ¶¶ 75–76; Pl. 56 .1

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

St. ¶¶ 36–37.) Shelton furthermore has testified that, as of May 2012, nearly a year after she left BHCF, she has not had any physical health issues and has not been taking any prescribed medications. (Def. 56.1 St. ¶ 34; Pl. 56.1 St. ¶ 13.) These medical conditions, although clearly ones that have caused Plaintiffs discomfort and worry, do not rise to the level of seriousness as required to violate the Eighth Amendment. *See, e.g ., Gill v. Bracey,* 99 Civ. 10429, 2001 WL 34045758, at *4 (S.D.N.Y. July 17, 2001) (not sufficiently serious injury where plaintiff suffered from a treatable infection and respiratory problem such as asthmatic bronchitis); *Johnson v. Goord,* No. 01 Civ. 9587, 2005 WL 2811776, at *5–6 (S.D.N.Y. Oct.27, 2005) (not sufficiently serious injury where plaintiff suffered from "temporary discomfort" and was occasionally treated for respiratory conditions); *Blyden v. Bartlett,* No. 95 Civ. 1071, 1997 WL 584308, at *2 (W.D.N.Y. Sept.9, 1997) (not sufficiently serious injury where plaintiff suffered only from headaches, irritability, and nausea and no medical records substantiated causation of or aggravation of allergies due to ETS exposure).

Accordingly, there is a genuine issue of material fact with respect to whether Plaintiff Eldridge has suffered sufficiently serious medical injuries that have been caused or aggravated by exposure to ETS, which precludes granting summary judgment against her. However, the Court grants summary judgment against Plaintiffs Powell, Mabry, and Shelton and dismisses all their claims against Defendants from this case for lack of a sufficiently serious risk of medical harm.

*Subjective Prong: Deliberate Indifference*

Deliberate indifference is a "state of mind that is the equivalent of criminal recklessness." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). For their conduct to amount to an Eighth Amendment violation, Defendants must have knowingly and unreasonably disregarded an intolerable or excessive risk of harm to Plaintiffs. *Farmer,* 511 U.S.

825, 839, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (adopting a subjective test for deliberate indifference and holding that plaintiff prisoner did not necessarily have to provide advance notice of a concern for his safety to the defendants). The alleged unconstitutional conduct must constitute "more than ordinary lack of due care for the prisoner's interests or safety," but the law does not require that the conduct be intended to cause harm. *Id., at 835.*

**\*12** Where a defendant has subjective knowledge of alleged unconstitutional conditions after reading a complaint but has taken reasonable steps to remedy the problem, a claim will fail for lack of deliberate indifference. *See Grullon* at *6–7 (citing *Sealey,* 116 F.3d at 50–51)). Also, mere imperfect enforcement of an indoor smoking ban in a prison, as long as reasonable enforcement efforts are made, does not amount to deliberate indifference. *See e.g., Scott,* 139 F.3d at 944.

Because Plaintiffs Powell, Mabry, and Shelton's claims have been dismissed for failure to demonstrate that there is an objectively substantial risk of serious harm, the Court will consider evidence of deliberate indifference only with respect to Plaintiff Eldridge's specific medical needs.

*Defendant Byrnes*

The basis for Plaintiff Eldridge's claim against Defendant Byrnes is a letter Eldridge wrote to Byrnes asserting that doctors "threatened" to place her in the Regional Medical Unit (RMU) because of her asthmatic condition in order to provide her with a smoke-free environment. (Def. 56.1 St. ¶ 67.) Defendants contend that Byrnes acted reasonably by replying that Eldridge could choose to accept or decline that placement offer, and that Eldridge willingly accepted ETS exposure in the housing unit by declining to be transferred to the RMU. (*Id.*) However, Eldridge claims that the RMU is not actually smoke-free because inmates still smuggle in tobacco and smoke inside the facility. (Eldridge Aff. Jul. 9, 2013.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

Nonetheless, there is no evidence in the record that Byrnes was aware of a problem with smoking in the RMU, especially as Eldridge's letter did not raise the issue, and thus there was no reason for Byrnes to believe that a transfer to the RMU would not have addressed Eldridge's medical needs. (Schul. Decl., Exh. A at 15–16.) Because the evidence is insufficient to establish that Byrnes was deliberately indifferent, the Court grants summary judgment and dismisses Eldridge's claim against Byrnes.

*Defendant Davoren*

Plaintiffs allege that Corrections Officer Davoren was deliberately indifferent in inadequately enforcing the indoor smoking ban whenever she worked in the housing unit, emphasizing in particular one incident involving Eldridge. (Def. 56.1 St. ¶ 64; Pl. 56.1 St. ¶ 28.) Eldridge claims that, on July 21, 2009, the ETS in her cell caused her to be unable to breathe and woke her up. (Def. 56.1 St. ¶ 60.) At the time, Davoren had gone to verbally admonish a neighboring inmate who had smoked and activated the smoke detector. (*Id.*; Pl. 56.1 St. ¶ 26.) Plaintiffs claim that Davoren's failure to issue a misbehavior report to that violator demonstrates her deliberate indifference.

Davoren did, however, respond to the smoke alarm by investigating and telling the inmate to stop smoking. (Def. 56.1 St. ¶ 60; Pl. 56.1 St. ¶ 28.) There is no evidence that Davoren knew of the smoking before the alarm went off. More importantly, there is no evidence that Davoren, before the incident occurred, was subjectively aware of but still chose to disregard Eldridge's asthma and other medical conditions that allegedly made her more susceptible to harm when exposed to ETS. To the contrary, Davoren immediately called for medical assistance upon finding out about Eldridge's difficulty with breathing. (Def. 56.1 St. ¶¶ 61–62.)

**\*13** Given the undisputed facts proffered by the Defendants, the Court concludes there is not sufficient evidence for a rational fact finder to conclude that

Davoren was deliberately indifferent. The Court therefore grants summary judgment as to Defendant Davoren and dismisses from this case all claims against her.

*Defendants Williams, Fitzgerald, and Hammond*

As for the remaining Defendants' response to Plaintiff Eldridge's specific medical needs, there is no dispute that Williams, Fitzgerald, and Hammond have personal knowledge of Eldridge's serious asthmatic condition. (Def. 56.1 St. ¶ 71.) Eldridge admits, however, that BHCF medical personnel had offered her placement in the RMU to provide her with a smoke-free environment. (*Id.* ¶ 67.) Although Eldridge asserts she declined the offer due to the RMU not actually being smoke-free because inmates still smuggle in tobacco and smoke there, there is no evidence that prison officials were aware of a problem with smoking in the RMU. (Eldridge Aff. Jul. 9, 2013.) It would be reasonable to believe that the option of transferring to the RMU would adequately address Eldridge's medical needs.

In addition, Defendants have provided evidence that there have been continued efforts to enforce the indoor smoking ban generally. Defendants assert that complaints are investigated and violators either are issued misbehavior reports initiating formal disciplinary proceedings (typically for inmates who are "repeat" or "egregious" violators of the smoking ban), or are given oral warnings (usually for inmates who are not known to have a history of smoking violations). (Def. 56.1 St. ¶¶ 103–05.) Disciplinary proceedings for smoking violations declined from 63 charges (50 guilty findings) in 2008 to 21 charges (17 guilty findings) in 2012, for a population of roughly 750 inmates. (Def. 56.1 St. ¶¶ 14, 105.) Defendants argue that this decrease in the number of disciplinary proceedings over the years reflects fewer smoking violations. While the Court finds that enforcement of the indoor smoking ban clearly has not been perfect, imperfect enforcement efforts do not amount to deliberate indifference to ETS exposure. *See, e.g., Scott,* 139

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

F.3d at 944.

Defendants furthermore contend that their specific interactions with Eldridge do not demonstrate deliberate indifference. Williams reviewed and decided Plaintiffs' consolidated grievance—including Eldridge's—which complained of ETS exposure and inadequate enforcement of the indoor smoking ban in general. (*Id.* ¶ 97.) In her formal response to the grievance, Williams indicated that the facility had a ban on indoor smoking that would continue to be enforced, but declined to introduce new enforcement measures that the Plaintiffs requested, including designated smoke breaks. (*Id.* ¶ 99.) Defendants argue that Williams reasonably relied on Sergeant Peperone's investigation to address the grievance, which found that "some inmates were smoking, but not enough to be a problem." (*Id.* ¶ 98.) As a supervisor, Williams may rely on findings by her subordinate, Sergeant Peperone, if "those decisions do not appear to be obviously invalid, illegal or otherwise inadequate." *Poe v. Leonard,* 282 F.3d 123, 144 (2d Cir.2002). It would be administratively impractical for a supervisor to have to independently investigate everything. *Id.* There does not appear to have been reason for Williams to have disregarded Sergeant Peperone's findings. The Court finds that Williams' denial of a grievance based on a subordinate's investigation does not amount to deliberate indifference.

**\*14** Defendants Hammond and Fitzgerald met with Plaintiffs Eldridge and Mabry to discuss and investigate their ETS exposure concerns. Hammond allegedly responded that, if Eldridge and Mabry declined to provide names of inmates violating the smoking ban, he could not do anything to address the problem of smoking violations in the RMU. (Def. 56.1 St. ¶ 46.) Fitzgerald allegedly responded, "Are you kidding ... I can't stop [inmates] from having sex in the jail so how do you think I'm going to stop them from smoking[?]" (*Id.* ¶ 92; Pl. 56.1 St. ¶ 47; Schul. Decl., Exh. A at 33.) Although Plaintiffs assert that these statements demonstrated deliberate indifference, De-

fendants contend that they were reasonable responses that simply recognized the difficulty of achieving full compliance with the indoor smoking ban. The Court finds that these statements are insufficient evidence for a rational fact finder to conclude that Hammond and Fitzgerald were deliberately indifferent to Eldridge's serious medical needs.

Because Eldridge was offered placement in a smoke-free environment, her complaints were appropriately investigated and responded to, and there have been general efforts to enforce the indoor smoking ban even though they may have been imperfect, the Court grants summary judgment for the remaining Defendants, Williams, Fitzgerald, and Hammond, and dismisses all claims against them for lack of evidence of deliberate indifference.

*Qualified Immunity*

Even if there were a triable question as to whether Defendants Byrnes, Davoren, Williams, Fitzgerald, and Hammond were deliberately indifferent to Eldridge's serious medical needs, Plaintiffs' claims against them may be dismissed on qualified immunity grounds. Defendants are entitled to qualified immunity if (1) their actions did not violate clearly established law, or (2) it was objectively reasonable for them to believe that their actions did not violate such law. *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)). *Helling* "clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate's exposure to levels of ETS that posed an unreasonable risk of future harm to the inmate's health." *Keane* at 333. However, the Court finds that it was objectively reasonable for the Byrnes, Davoren, Williams, Fitzgerald, and Hammond to believe that their actions did not violate the law. Again, undisputed evidence indicates that once Davoren found out about Eldridge's serious medical needs, she acted reasonably by immediately calling for assistance. Williams, Fitzgerald, and Hammond appropriately investigated and addressed

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 4005499 (S.D.N.Y.)
**(Cite as: 2013 WL 4005499 (S.D.N.Y.))**

Eldridge's complaints of inadequate enforcement of the indoor smoking ban. Finally, Byrnes reasonably responded to Eldridge's letter by informing her that she could accept or reject the offer of placement in the smoke-free RMU. There is no evidence that any of the Defendants were aware of a smoking problem in the RMU that would have made the RMU inadequate for addressing Eldridge's serious medical needs. Accordingly, the Court finds that claims against Defendants Byrnes, Davoren, Williams, Fitzgerald, and Hammond may be dismissed on qualified immunity grounds as well.

*State Law Claims*

**\*15** Plaintiffs argue that the New York Correction Law Section 24, which provides immunity for corrections officers against any state law claims, violates the Supremacy Clause of the Constitution of the United States. The statute provides that "[n]o civil action shall be brought in any court of the state ... against any officer or employee of the [Department of Corrections and Community Supervision], ... in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee." New York Correction Law § 24 (McKinney 2011). However, because the law provides immunity only from state law claims and it does not purport to restrict any federal laws, the Supremacy Clause does not affect its validity. Accordingly, pursuant to New York Correction Law Section 24, the Court dismisses all of Plaintiffs' state law claims.

### CONCLUSION

For the foregoing reasons, the Court grants the Defendants' motion for summary judgment in its entirety.[FN6] Because the Court dismisses all claims, it does not consider arguments with respect to Plaintiffs' class action claims and Plaintiff Shelton's claims for declaratory and injunctive relief against Defendants.

FN6. The Court has also thoroughly reviewed Plaintiffs' unauthorized surreply and concludes that it does not materially impact the Court's findings.

This Memorandum Opinion and Order resolves docket entry number 70. The Clerk of Court is hereby directed to enter judgment dismissing all of the named Plaintiffs' claims and close this case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

S.D.N.Y.,2013.
Eldridge v. Williams
Slip Copy, 2013 WL 4005499 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4792110 (S.D.N.Y.)
**(Cite as: 2014 WL 4792110 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Robert FUENTES, Plaintiff,
v.
B. FURCO and Dana Gage, Defendants.

No. 13–CV–6846.
Signed Sept. 25, 2014.

*MEMORANDUM AND ORDER*

ALISON J. NATHAN, District Judge.

**\*1** Before the Court is Defendants' motion to dismiss Plaintiff's Complaint on the grounds that (1) Plaintiff has not exhausted his administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA") and (2) Plaintiff has failed to state a claim upon which relief can be granted. For the reasons stated herein, the motion is GRANTED and the claims are dismissed without prejudice on the limited ground of exhaustion.

## I. BACKGROUND

Plaintiff is a 65–year–old inmate in the custody of the New York State Department of Corrections and Community Supervision at Sing Sing Correctional Facility ("Sing Sing"). Compl. at 2. He alleges a violation of his constitutional rights stemming from the alleged deliberate indifference to his medical needs on the part of Sing Sing medical personnel.

On June 11, 2013, Plaintiff filed a complaint pursuant to the Inmate Grievance Program. Hale Decl. ¶ 8, Ex. B. The grievance was denied and Plaintiff appealed to the Superintendent, who appears to have denied the grievance on July 29, 2013. Dkt. No. 2 at

18; Hale Decl. ¶ 8, Ex. B. Plaintiff then appealed the Superintendent's denial on or about August 1, 2013, and the appeal was received by the clerk of the Central Office Review Committee on or about August 20, 2013. Hale Decl. ¶ 9, Ex. C. Plaintiff appears to have prepared and possibly mailed his Complaint to this Court on or about September 17, 2013. Dkt. No. 2 at 5. The pro se office of this Court received Plaintiff's Complaint on September 23, 2013, and the Complaint was filed with this Court on the same day. Dkt. No. 2 at 1.

## II. LEGAL STANDARD

Where a defendant asserts nonexhaustion of administrative remedies as a defense, a court must consider whether the motion should be decided via a Rule 12(b)(6) motion for failure to state a claim or a Rule 56 motion for summary judgment. "If nonexhaustion is clear from the face of the complaint (and incorporated documents), a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted." *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003) (Chin, J.). On the other hand, "[i]f nonexhaustion is not clear from the face of the complaint, a defendant's motion to dismiss should be converted, pursuant to Rule 56[ ], to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." *Id.* (citing *Torrence v. Pesanti,* 239 F.Supp.2d 230, 233–34 (D.Conn.2003)). Read together, Rules 12 and 56 suggest that "if a district court considers matters outside of the pleadings, it must then convert a motion under Rule 12(b)(6) to one for summary judgment and ensure that the opposing party is given proper notice of the conversion." *Id.* (citing *Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 521 (2d Cir.1986)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4792110 (S.D.N.Y.)
**(Cite as: 2014 WL 4792110 (S.D.N.Y.))**

**\*2** Here, conversion of Defendant's motion to dismiss to one for summary judgment is proper because both parties submitted and referenced documents outside of the pleadings relating to the very narrow issue of exhaustion. *See, e.g., Bennett v. Wesley,* No. 11 Civ. 8715(JMF), 2013 U.S. Dist. LEXIS 61133, at \*7, 2013 WL 1798001 (S.D.N.Y. Apr. 29, 2013). Moreover, pursuant to Local Rule 12.1, Defendants provided Plaintiff with notice, Dkt. No. 19, that the Court might treat Defendants' motion to dismiss pursuant to Rule 12(b)(6) as a motion for summary judgment. *See, e.g., id.* (citing *Hernandez v. Coffey,* 582 F.3d 303, 308 n. 2 (2d Cir.2009) (citing cases finding that a Local Rule 12.1 Notice provides sufficient notice to *pro se* parties)).

Summary judgment shall be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, a court views all evidence in the light most favorable to the non-movant, *Overton v. NY. State Div. of Military & Naval Affairs,* 373 F.3d 83, 89 (2d Cir.2004), and "resolve[s] all ambiguities and drCir. Ct. ()aw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004).

## III. DISCUSSION

The PLRA contains an exhaustion of remedies requirement, which provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e(a) *"requires* exhaustion of available adminis-

trative remedies *before* inmate-plaintiffs may bring their federal claims to court at *all." Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (citation omitted, emphasis in original), *overruled on other grounds, Porter v. Nussle,* 534 U.S. 516, 523, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Failure to exhaust administrative remedies prior to filing suit in federal court is an absolute bar to this court's adjudication of Plaintiff's claims—"Subsequent exhaustion after suit is filed [ ] is insufficient." *Neal,* 267 F.3d at 122.

The Court must therefore determine whether Plaintiff exhausted his administrative remedies before bringing this suit, which requires examining the administrative remedies created by the relevant institution. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2d Cir.2007). Here, those remedies are set forth in Title 7 of New York's Codes, Rules and Regulations (N.Y.C.R.R.), which creates a three-step internal complaint process known as the Inmate Grievance Program ("IGP"). *Torres v. Carry,* 672 F.Supp.2d 338, 343 (S.D.N.Y.2009); *see also Garcia v. Heath,* No. 12 Cv. 4695, 2013 U.S. Dist. LEXIS 90480, at \*10–11, 2013 WL 3237445 (S.D.N.Y. June 25, 2013). First, the inmate must file a complaint within 21 days of an alleged occurrence to the Inmate Grievance Review Committee ("IGRC"). 7 N .Y.C.R.R. § 701.5(a). The IGRC then reviews the grievance and makes a formal or informal determination. § 701.5(b). If the inmate wants to appeal the IGRC's determination, he must appeal to the superintended by submitting an appeal form to the grievance clerk within seven calendar days after receipt of the IGRC's written response. § 701.5(c). Finally, the third step in the process is an appeal to the Central Office Review Committee ("CORC"), which must be made within seven days after receipt of the superintendent's written response. § 701.5(d). "The CORC shall review each appeal, render a decision on the grievance, and transmit its decision ... within thirty (30) calendar days from the time the appeal was received." § 701.5(d)(3)(ii). Section 701.5 does not indicate what happens when the CORC fails to render a decision

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4792110 (S.D.N.Y.)
**(Cite as: 2014 WL 4792110 (S.D.N.Y.))**

within 30 days of receiving a grievant's appeal.

**\*3** Documents supplied by both Plaintiff and Defendants indicate that Plaintiff timely completed the first two steps of the administrative review process and timely filed an appeal to the CORC, but that the CORC had not rendered a decision on his appeal at the time that Plaintiff filed his Complaint with this Court. *See* Hale Decl. at 2; Ex. B and C (Dkt. No. 18). As far as this Court is aware, the CORC still has not rendered a decision regarding Plaintiff's appeal, which was submitted to the CORC on or about August 1, 2013 and received by the CORC on or about August 20, 2013. Hale Decl. Ex. C (Dkt. No. 18 at 11). Plaintiff filed his Complaint commencing this lawsuit on September 23, 2013, Compl. at 1, which is 34 calendar days after the CORC received his appeal.

Thus, it is apparent that Plaintiff brought suit more than 30 calendar days after the CORC received his appeal, but before the CORC issued a response. What this means for Plaintiff's exhaustion of remedies is unclear, however, due to the IGP's silence as to the effect of the CORC's failure to issue a response within 30 days. This silence has created problems for federal courts applying the PLRA. *See, e.g., Couvertier v. Jackson,* No. 9:12–CV–1282 (GLS/DEP), 2014 U.S. Dist. LEXIS 85873, at \*12 (N.D.N.Y. May 22, 2014) (noting "[t]he IGP provides no mechanism for enforcing the requirement that the CORC issue a decision in thirty days"); *see also Peoples v. Fischer,* No. 11 Civ. 2694(SAS), 2012 U.S. Dist. LEXIS 62428, at \*15–20 , n. 125, 2012 WL 1575302 (S.D.N.Y. May 3, 2012) (analyzing the effect of the CORC's failure to timely respond to an appeal). And there is no clear answer as to how a court should proceed under the PLRA when it appears that an inmate plaintiff has followed all the requirements of his institution's administrative procedures, but the final review panel is delinquent in its response to his appeal. On the one hand, an inmate plaintiff should not be penalized for his institution's failure to follow its own administrative procedures. *Peoples,* 2012 U.S. Dist. LEXIS 62428, at

33 n. 125, 2012 WL 1575302. On the other hand, in light of the PLRA's purpose, a court should hesitate to decide the underlying action before according the CORC the first opportunity to do so.

The Second Circuit has not addressed this issue, but district courts in the Circuit have fashioned solutions that attempt to balance the PLRA's goal of allowing institutions the first opportunity to address an inmate's grievances against the inmate's right to a federal forum when he has complied with all of the procedural formalities expected of him. In such circumstances, it appears that Courts tend to hold that a CORC response is required for exhaustion to be satisfied, but that a motion to dismiss or for summary judgment should be granted without prejudice to allow the inmate plaintiff to refile his complaint once the CORC responds to his appeal. *See, e.g., Rambert v. Mulkins,* No. 11 Civ. 7421(KPF), 2014 U.S. Dist. LEXIS 74091, at \*46–48, 2014 WL 2440747 (S.D.N.Y. May 30, 2014); *Bennett,* 2013 U.S. Dist. LEXIS 61133, at \*17–18, 2013 WL 1798001 (S.D.N.Y. Apr. 29, 2013); *Torres,* 672 F.Supp.2d at 345–46; *McCoy,* 255 F.Supp.2d at 245–251.[FN1]

> FN1. In a thorough and well-reasoned opinion, then-district Judge Chin analyzed the procedural peculiarity that necessitates a grant of summary judgment without prejudice in the context of a failure to exhaust administrative remedies under the PLRA when the failure to exhaust is not apparent from the face of the complaint. *McCoy,* 255 F.Supp.2d at 245–251. The Court agrees with his analysis.

**\*4** The Court follows that approach here and GRANTS the motion for summary judgment and dismisses the claims without prejudice. Summary judgment is based on the very narrow issue of exhaustion of administrative remedies. This approach is consistent with the principle that "failure to exhaust administrative remedies is usually a 'curable, proce-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4792110 (S.D.N.Y.)
**(Cite as: 2014 WL 4792110 (S.D.N.Y.))**

dural flaw' that can be fixed by exhausting those remedies and then reinstituting the suit." *Neal,* 267 F.3d at 123 (quoting *Snider v. Melindez,* 199 F.3d 108, 111–12 (2d Cir.1999)). The Court further holds that if no CORC decision is rendered within 30 days from the date of this Order, Plaintiff may re-file his complaint with this Court, which will re-open the case and, upon reopening, will "deem administrative remedies to be unavailable such that [Plaintiff] may proceed with his claim." *Torres,* 672 F.Supp.2d at 345–46.

Because the Court is granting the motion based on failure to exhaust administrative remedies, it need not consider Defendants' alternative arguments that Plaintiff failed to state a claim upon which relief can be granted.

## IV. CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss is GRANTED and the claims are dismissed without prejudice. In light of the Court's resolution of the motion to dismiss, Plaintiff's application for pro bono counsel is DENIED as moot. This resolves Dkt. Nos. 16 and 23. The Clerk of Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,2014.
Fuentes v. Furco
Slip Copy, 2014 WL 4792110 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Anthony G. GILL, Plaintiff,
v.
F. CALESCIBETTA, et al., Defendants.

No. 9:00–CV–1553 (GTS/DEP).
March 31, 2009.

West KeySummary**Federal Civil Procedure 170A**
☞**2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most Cited Cases

    A triable issue of material fact existed with respect to a former inmate's claim that he was terminated from his mess hall job in retaliation for his filing of grievances, in violation of his free speech rights. The officials claimed the inmate was excused and removed from his position for health reasons after having asthma attacks while in the mess hall. However, the record revealed a significant question of fact regarding the motivation for the inmate's removal as he was removed very soon after filing the grievances. In addition, the job removal could be sufficiently adverse to deter a similarly situated person from exercising rights guaranteed under the First Amendment. Thus, summary judgment was precluded on the issue of whether the job removal was an act of retaliation. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

Anthony G. Gill, Bronx, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Michael G. McCartin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*
Hon. GLENN T. SUDDABY, District Judge.

   **\*1** Currently before the Court in this *pro se* prisoner civil rights action are Defendants' motion for summary judgment (Dkt. No. 45), and United States Magistrate Judge David E. Peebles's Report–Recommendation recommending that one of Plaintiff's retaliation claims be dismissed, and that the remaining three retaliation claims withstand dismissal (Dkt. No. 102). Neither party has filed Objections to the Report–Recommendation. For the reasons set forth below, the Report–Recommendation is accepted and adopted in its entirety, and Defendants' motion for summary judgment is granted in part and denied in part.

**I. RELEVANT BACKGROUND**

   On October 11, 2000, Plaintiff filed this action against thirteen (13) individuals employed by the New York State Department of Correctional Services, at Auburn Correctional Facility. Although Plaintiff's Complaint asserts a number of constitutional violations on the part of these thirteen Defendants, the only claims that remain after the Second Circuit's February 1, 2006, Summary Order are Plaintiff's four (4) retaliation claims against five (5) Defendants. (Dkt. No. 78.) [FN1] With regard to these retaliation claims, generally, in his Complaint, Plaintiff alleges that his rights under the First Amendments were violated when Defendants retaliated against him on four separate occasions for filing grievances. (*See generally* Dkt. No. 1.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

FN1. The remaining Defendants in this action are F. Calescibetta, Sergeant Letourneau, R. French, B. Harrington, and Chris Pidlypchak. (*See* Dkt. No. 102, at 8.)

On April 16, 2001, Defendants filed their Answer to Plaintiff's Complaint. (Dkt. No. 26.) On October 11, 2002, Defendants filed a motion for summary judgment. (Dkt. No. 45.) On February 12, 2003, Plaintiff filed a response in opposition to Defendants' motion for summary judgment. (Dkt.Nos.60, 61.) On September 10, 2003, District Judge Joseph M. Hood issued a Memorandum–Decision and Order granting Defendants' motion for summary judgment and dismissing Plaintiff's Complaint with prejudice. (Dkt. No. 68.) On October 10, 2003, Plaintiff filed a Notice of Appeal to the Second Circuit from the Decision and Order. (Dkt. No. 73.) On February 1, 2006, the Second Circuit issued a Summary Order, affirming in part and remanding in part Judge Hood's Memorandum–Decision and Order. (Dkt. No. 78.) Specifically, the Second Circuit remanded Plaintiff's four (4) retaliation claims against the five (5) Defendants, with specific instruction that the Court "determine, in light of the Second Circuit's intervening decision of *Gill v. Pidlypchak,* 389 F.3d 379 (2d. Cir.2004), whether there exists a genuine issue of material fact as to whether defendants engaged in retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his constitutional rights.' " *Gill v. Calescibetta,* 157 F. App'x. 395 (2d Cir.2005). (*See also* Dkt. No. 78.)

In February 2007, the parties submitted supplemental briefing on the retaliation issue. (Dkt.Nos.94, 95.) In their brief, Defendants concede that triable issues of fact exist regarding the portion of Plaintiff's retaliation claim relating to the two periods of keeplock confinement he experienced. (Dkt. No. 95.) However, Defendants argue that the remaining two retaliation claims (which deal with the termination of Plaintiff's employment in the prison mess hall, and the

posting of one of his grievances in the mess hall) should be dismissed. (Dkt. No. 95.)

**\*2** On March 11, 2009, Magistrate Judge Peebles issued a Report–Recommendation recommending that Defendants' motion be granted in part and denied in part. (Dkt. No. 102.) Specifically, Magistrate Judge Peebles recommended (1) that Plaintiff's retaliation claim against Defendants Pidlypchak and Calescibetta relating to the posting of Plaintiff's grievances in the mess hall be dismissed, but (2) that Plaintiff's retaliation claim relating to his termination from employment in the prison mess hall be referred for trial, along with Plaintiff's two retaliation claims relating to his keeplock confinement.FN2 Familiarity with the grounds of the Report–Recommendation is assumed in this Decision and Order.

FN2. Because Defendants acknowledge that triable issues of fact exist with regard to the two incidents in which Plaintiff was placed in keeplock confinement after filing grievances, Magistrate Judge Peebles did not address the merits of these claims, but instead properly concluded that they are "ill-suited for resolution on motion for summary judgment." (Dkt. No. 102.)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review on Objection from Report–Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).FN3 When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,*

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).[FN4] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

> FN3. On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

> FN4. *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**B. Standard Governing Motion for Summary Judgment**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

**\*3** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

*Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.*[FN5] (This is because the Court extends special solicitude to the *pro se* litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [FN6] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[FN7] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement [FN8]-even where the nonmoving party was proceeding *pro se* in a civil rights case.[FN9]

FN5. *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04–1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97–CV–1741, 2004 U.S. Dist. LEXIS 20746, at *12–13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04–CV–1144, 2006 U.S. Dist. LEXIS 9147, at *1–4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003)

(Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371–372 (N.D.N.Y.2003) (Hurd, J.).

FN6. *Krug v. County of Rensselaer,* 04–CV–0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept.18, 2006) (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant in not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted]; *see also* Jessica Case, *"Pro Se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90 Ky. L.J. 701, 704, n. 24 (Spring 2001)* ("The Second, Fourth, Seventh, Tenth, Eleventh, and D.C. Circuit Courts of Appeals mandate that notice of summary judgment requirements be given to *pro se* litigants.... The Ninth Circuit requires notice of summary judgment requirements for *pro se* prisoner litigants only.") [citations omitted].

FN7. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wig-*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

*gins,* 465 U.S. 168, 184, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*"[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them.... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ( "[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

FN8. Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

FN9. *See, e.g., Hassig v. N.Y.S. Dep't of Environmental Conservation,* 01–CV–0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04–1773, 2005 WL 290210 (2d Cir. Feb.2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at *12–13, 15, *aff'd,* No. 04–1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99–CV–1913, 2003 WL 21402561, at *1, 3–4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99–CV–1913, Order, at 2–3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04–1008, 115 F. App'x 521 (2d Cir. Dec.23, 2004); *Krug,* 2006 WL 2669122, at *2–3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at *2–3; *Singleton v. Caron,* 03–CV–0455, 2005 WL 2179402, at *3–4 (N.D.N.Y. Sept.5, 2005) (Peebles, M.J.), *adopted by* 03–CV–0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295; *Butler v. Weissman,* 00–CV–1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00–CV–1240, Decision and Order, at 1–2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car–Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96–CV–1634, 1998 WL 743710, at * 1, n. 2 (N.D.N.Y. Oct.21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96–CV–1812, 1998 WL

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

566773, at *1, n. 2 (N.D.N.Y. Aug.21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its business").

## III. ANALYSIS

Neither party has objected to any portion of Magistrate Judge Peebles's Report–Recommendation. As a result, the Court reviews the entire Report–Recommendation under the "clear error" standard. After carefully reviewing all of the papers in this action, including Magistrate Judge Peebles's Report–Recommendation, the Court concludes that the Report–Recommendation is not clearly erroneous. Magistrate Judge Peebles employed the proper legal standards, accurately recited the established facts of this case, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report–Recommendation in its entirety for the reasons stated therein.[FN10]

> FN10. The Court notes that the Report–Recommendation would survive even a de novo review.

For example, Magistrate Judge Peebles correctly determined that filing a grievance is a protected activity, and that removal from a prison job may constitute adverse action under certain circumstances. In addition, Magistrate Judge Peebles correctly determined that there is a question of fact as to whether Plaintiff's removal from his prison job constitutes retaliation, given that he was removed from his job in the mess hall within close temporal proximity to his filing grievances relating to the conditions of the mess hall. This Court agrees with Magistrate Judge Peebles that it is quite possible that the motivation for Plaintiff's removal from his position in the mess hall was his asthma and/or asthmatic attack while in the mess hall kitchen recreation area. However, as Magistrate

Judge Peebles also noted, the affidavit of Dr. Anthony Graceffo, submitted by Defendants in support of their motion for summary judgment, is evidence of a question of material fact as to the motivation for Plaintiff's removal. As a result, the Court finds, for the same reasons as Magistrate Judge Peebles, that there is an issue of fact as to whether Plaintiff's removal was pretextual.

**\*4** For all of these reasons, the Court accepts and adopts the Report–Recommendation

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles's Report–Recommendation (Dkt. No. 102) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 45) is *GRANTED* **in part and** *DENIED* **in part;** and it is further

**ORDERED** that Plaintiff's retaliation claim relating to his termination from employment in the prison mess hall survive Defendants' motion for summary judgment and be referred for trial, along with Plaintiff's two retaliation claims relating to his keeplock confinement.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Anthony Gill, a former New York State prison inmate who is not unfamiliar to the federal court system, having instituted a host of suits in this and other districts while incarcerated, has commenced this proceeding pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. Although his complaint originally contained a significantly broader array of assertions, plaintiff's claims have since been winnowed down to four separate instances of alleged

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

retaliation on the part of various of the defendants, in violation of his rights under the First Amendment.

Following the entry of summary judgment dismissing all of plaintiff's claims and a subsequent partial reversal of the resulting judgment by the United States Court of Appeals for the Second Circuit, the action is now back before this court for consideration of plaintiff's remaining retaliation claims. Procedurally, the matter is being considered by the court as a renewal of defendants' earlier-filed summary judgment motion. Both parties have submitted supplemental briefing in connection with the four remaining claims, and specifically addressing whether one or more of them can be disposed of on summary judgment as a matter of law.

Having carefully considered the parties' submissions, in light of the standard under which retaliation claims are reviewed, I recommend a finding that while one of plaintiff's retaliation claims is susceptible of resolution on motion for summary judgment, triable issues of material fact exist with respect to the remaining three, and accordingly that the action proceed to trial in connection with those claims.

I. *BACKGROUND*[FN1,FN2]

> FN1. Because only plaintiff's retaliation causes of action remain in the case, I will recount only the facts giving rise to those claims.

> FN2. In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells–Williams v. Kingsboro Psychiatric Ctr.,* No. 03–CV–134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted). It should be noted, however, that many if not

most of plaintiff's allegations are sharply contested by the defendants.

Plaintiff is a former prison inmate previously entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his claims plaintiff was designated to the Auburn Correctional Facility ("Auburn"), located in Auburn, New York. *See generally* Complaint (Dkt. No. 1). On July 17, 2000 Gill, who is a non-smoker claiming to suffer from chronic asthma and sinus ailments, began working in the prison mess hall where, apparently consistent with the DOCS policy regarding the use of tobacco products, "no smoking" signs are posted in various locations. Complaint (Dkt. No. 1) ¶¶ 3–5. Plaintiff maintains that despite those notices and the underlying policy prohibiting such conduct, various defendants repeatedly smoked cigarettes in the mess hall area during their shifts, and additionally allowed inmates to smoke in the kitchen recreation areas, forcing Gill to be exposed to secondhand smoke, or environmental tobacco smoke ("ETS"). *Id.* at ¶¶ 8–12.

**\*5** On August 7 and 8, 2000, while in the mess hall kitchen recreation area, plaintiff experienced two severe asthma attacks, requiring hospitalization and resulting in his being placed on "excuse from work" ("EFW") status by medical personnel at the facility. Complaint (Dkt. No. 1) at ¶ 13. Gill also contends he suffered from headaches during and after working in the mess hall area. *Id.* at ¶ 16.

Plaintiff filed a grievance on or about August 11, 2000, complaining of defendants' lax enforcement of the DOCS "no-smoking" policy in Auburn's mess hall and his resulting exposure to ETS. Complaint (Dkt. No. 1) at ¶ 14 and Exh. C. Plaintiff maintains that in retaliation for the filing of that grievance, defendant Calescibetta lodged a false misbehavior report against him, resulting in Gill's placement in keeplock confinement for a period of sixteen days.[FN3] *Id.* at ¶¶ 15, 19, 23, 25–26, 51 and Exh. C. Upon his release from

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

restricted confinement on August 30, 2000, plaintiff returned to his position at the mess hall, where he worked until on or about September 17, 2000. *Id.* at ¶¶ 27, 44–45.

> FN3. Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord*, 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene*, No. 95–CV–1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin*, 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals. *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

Following his release from keeplock confinement Gill was pressed by prison officials, including defendants Letourneau, Harrington and French, to withdraw his grievance regarding ETS exposure. *See, e.g.* Complaint (Dkt. No. 1) ¶¶ 33, 35–37. Plaintiff asserts that as a result of his refusal to accede to that request defendants Letourneau and Harrington caused him again to be placed in keeplock confinement, this time for an additional fifteen days. *Id.* at ¶¶ 33, 35–38,

40, 63.

Plaintiff's complaint alleges two additional instances of alleged retaliation. According to Gill, he was discharged from his prison mess hall position by defendant Letourneau in September of 2000 in retaliation for his having filed grievances, and was informed that he was no longer permitted into the mess hall area in light of his asthma. Complaint (Dkt. No. 1) ¶¶ 46, 71; *see also* Plaintiff's Rule 7.1(a)(3) Statement (Dkt. No. 60) ¶ 26. Plaintiff also asserts that on September 25, 2000, again in retaliation for having filed grievances, defendants Pidlypchak and Calescibetta obtained a copy of one of his grievances and posted it in the mess hall area for review by those in general inmate population. *Id.* at ¶¶ 48, 77.

## II. *PROCEDURAL HISTORY*

Despite its age and somewhat tortured history, the salient portions of the suit's procedural history can be succinctly summarized. Plaintiff commenced the action on October 11, 2000, Dkt. No. 1. As defendants, plaintiff's complaint names Corrections Officers Calescibetta, Pidlypchak, Mattes, Harvey, French and Harrington; Corrections Sergeants M. Murray and Letourneau; Lieutenant Ashby; Edward A. Dann, Deputy Superintendent of Security; Captain G. Gummerson; Auburn Superintendent Hans Walker, and Inmate Grievance Program Supervisor Cheryl Parmiter. *Id.* Plaintiff's complaint asserts a variety of claims arising under the First, Eighth and Fourteenth Amendments, as well as the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*

**\*6** On October 11, 2002 defendants moved for the entry of summary judgment in their favor on each of plaintiff's claims. Dkt. No. 45. That motion, which was vigorously opposed by the plaintiff, resulted in the issuance of a decision and order on September 10, 2003 by District Judge Joseph M. Hood, sitting by designation, granting the motion and dismissing plaintiff's complaint in its entirety, with prejudice. Dkt. No. 68. Addressing plaintiff's claims of retalia-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

tion, which are the focus of this report, Judge Hood found that plaintiff did not establish that defendants' actions, allegedly prompted by retaliatory animus, had the desired effect of deterring Gill from exercising his protected First Amendment rights, particularly in light of his prodigious history of litigation and filing of countless inmate grievances. Decision and Order (Dkt. No. 68) at pp. 11–13. Believing such actual chilling to be a prerequisite to a finding of unlawful retaliation, Judge Hood ordered dismissal of the retaliation claims as a matter of law. *Id* . Judgment was subsequently entered on September 10, 2003, dismissing plaintiff's retaliation claims as well as the balance of his complaint based upon Judge Hood's decision. Dkt. No. 69.

Plaintiff appealed the judgment of dismissal to the United States Court of Appeals for the Second Circuit. Dkt. No. 73. In a summary order issued on December 7, 2005, that court affirmed the district court's determination except as to plaintiff's First Amendment retaliation claims. *Gill v. Calescibetta,* 157 Fed. Appx. 395 (2d Cir.2005) (unpublished disposition); *see also* Dkt. No. 78 (mandate). Addressing plaintiff's retaliation claims, the Second Circuit noted that "in the narrow context of prisoner retaliation suits, a prisoner need not demonstrate 'actual chill[,]' " citing its opinion in *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004), which post-dated Judge Hood's decision. *Gill,* 157 Fed. Appx. at 397. The Second Circuit remanded the matter to this court for evaluation of whether defendants subjected Gill to a sufficiently adverse action to constitute retaliation, describing the necessary inquiry as limited to determining whether "there exists a genuine issue of material fact as to whether defendants engaged in retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his [or her] constitutional rights.' " *Id.* (citing *Gill,* 389 F.3d at 381).

This lingering issue, which was the subject of supplemental briefing by the parties, *see* Dkt. Nos. 94–95, and involves only defendants Calescibetta, Letourneau, French, Harrington and Pidlypchak, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U .S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[FN4] *See* Fed.R.Civ.P. 72(b); *see also* Dkt. No. 93.

> FN4. I previously recommended that this matter be dismissed, based on plaintiff's repeated failure to notify the court of changes in his current address, pursuant to Local Rule 41.2(b). Dkt. No. 97. Since the issuance of that recommendation, however, plaintiff has resumed compliance with this court's local rules and has supplied the court with his address changes on several occasions. *See* Dkt. Nos. 99, 101. Accordingly, my prior recommendation was withdrawn, and this matter was returned to me for further review regarding plaintiff's retaliation claims. *See* Text Order dated February 20, 2008.

III. *DISCUSSION*

A. *Failure To Provide Discovery*

**\*7** In his supplemental briefing Gill complains of defendants' failure to answer interrogatories propounded by him on March 13, 2006, shortly after the remand of this matter by the Second Circuit. *See* Plaintiff's Supplemental Brief (Dkt. No. 94) at pp. 6–7. In deference to his *pro se* status, I have construed this portion of plaintiff's brief as interposing an objection to the granting of summary judgment based upon the defendants' failure to provide discovery, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

Rule 56(f) states that

> [s]hould it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

davit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such order as is just.

Fed.R.Civ.P. 56(f). As can be seen, Rule 56(f) provides a narrow exception to the availability of summary judgment in instances where a party simply cannot fairly respond to a summary judgment motion because of the inability, through no fault of the opposing party, to acquire evidence which is available and would preclude the entry of summary judgment. *See Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.,* 769 F.2d 919, 925–27 (2d Cir.1985); *Crystalline H₂O, Inc. v. Orminski,* 105 F.Supp.2d 3, 6–9 (N.D.N.Y.2000)* (McAvoy, J.). In order to successfully assert a Rule 56(f) defense to a summary judgment motion a litigant must provide specific indication of the evidence sought, its relevance to the issues underlying the motion, the efforts that were made to attain that evidence, and why those efforts have been unsuccessful. *Hudson River Sloop Clearwater, Inc. v. Department of Navy,* 891 F.2d 414, 422 (2d Cir.1989) (citing *Burlington,* 769 F.2d at 926–27); *Young v. Corbin,* 889 F.Supp. 582, 584–85 (N.D.N.Y.1995) (McAvoy, C.J.).

In this case, as defendants appropriately note, discovery closed February 22, 2002 under the court's case management order issued pursuant to Rule 16 of the Federal Rules of Civil Procedure. Dkt. No. 30; *see also* Northern District of New York Local Rule 16.2. I note, moreover, that plaintiff's interrogatories were improperly served at a point in time when the case was stayed by order of District Judge Lawrence E. Kahn, issued on March 6, 2006, Dkt. No. 82, and were appropriately disregarded by the defendants for both of these reasons.[FN5] *Zhao v. City of New York,* No. 07 Civ. 3636(LAK)(MHD), 2008 WL 2940598, at *1 (S.D.N.Y. July 24, 2008) (untimeliness of discovery request in violation of case management order sufficient basis for denial).

FN5. The service of plaintiff's interrogatories was followed with a request by him to the court, dated March 13, 2006, for permission to serve additional interrogatories exceeding the twenty-five question limit imposed under Rule 33 of the Federal Rules of Civil Procedure. Dkt. No. 83. That request was denied by text order issued on March 23, 2006 with the added notation "[t]his action was STAYED in its entirety by Order of Judge Kahn filed on 3/9/06." *See* 3/23/06 Text Order.

This action has been pending for more than eight years, and discovery has been closed for seven. Rather than adding an element to the retaliation standard, in which case Gill legitimately could claim a need for further discovery, the Second Circuit's decision eliminated what was thought by the district court to be a required showing, but did not otherwise alter the standard to be applied. Under these circumstances, I recommend that plaintiff's request for additional discovery be denied, and that the court determine that defendants' failure to answer Gill's interrogatories presents no impediment to the issuance of a decision on the balance of the pending summary judgment motion.

B. *Summary Judgment Motion Standard*

**\*8** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

(2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A moving party seeking the entry of summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also*

*Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Retaliation*

**\*9** Though often challenging in its application, the standard under which retaliation claims such as those raised by Gill are gauged is by now well-established, and easily articulated. When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

When analyzing retaliation claims, courts resort to the burden shifting algorithm established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny including, *inter alia, St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 76–77 (2d Cir.2001); *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000); *Heinemann v. Howe and Rusling,* 529 F.Supp.2d 396, 405 (W.D.N.Y.2008). Under that model, the plaintiff bears the initial burden of demonstrating a *prima facie* case of discrimination utilizing the standard set forth above. *Holtz,* 258 F.3d at 76–77. Upon the establishment of such a *prima facie* case, the burden of going forward shifts to the defendant to articulate a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

legitimate non-discriminatory reason for taking the action under consideration. *Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872, 876 (2d Cir.1988). Once such a reason has been cited, the burden of production reverts to the plaintiff, who retains the ultimate burden of establishing both pretext and that retaliation was a motivating factor in the determination, by a preponderance of evidence. *Holtz,* 258 F.3d at 77. *See also, Brock,* 839 F.2d at 876.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). In the prison context, an "adverse action" is considered retaliatory when it "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381 (quotations and citations omitted).

**\*10** Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case-specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

In his complaint, Gill asserts four separate allegations of retaliatory conduct, claiming that (1) defendant Letourneau discharged him from his prison job at the Auburn mess hall in retaliation for his filing of grievances, Complaint (Dkt. No. 1) at ¶¶ 46, 71; (2) defendants Pidlypchak and Calescibetta obtained one of his grievances and displayed it in the mess hall area in retaliation for Gill's filing of grievances, *id.* at ¶¶ 48, 77; (3) defendant Calescibetta filed a false misbehavior report against him and placed him in keeplock confinement for sixteen days, in retaliation for his filing of grievances regarding the underenforcement of Auburn's smoking policy, Complaint (Dkt. No. 1) at ¶¶ 15, 19–20, 23, 25–26, 51 and Exh. C; and (4) defendants Letourneau and Harrington placed him in keeplock confinement for fifteen days for refusing to withdraw a filed grievance, *id.* at ¶¶ 33, 35–38, 40, 63. In their supplemental brief, defendants acknowledge the existence of triable fact issues surrounding the portion of plaintiff's retaliation cause of action related to the two periods of keeplock confinement, but argue that the remaining two retaliation claims, addressing the termination of his employment in the prison mess hall and the posting of one of his grievances, are subject to dismissal as a matter of law and that no reasonable factfinder could find otherwise.

### 1. Removal Of The Plaintiff From His Prison Job

While plaintiff maintains that he was removed from his job in the prison mess hall as a direct consequence of his filing of grievances, defendants contend that Gill was excused and removed from his position for health reasons after sustaining asthma attacks, headaches, and sinus ailments while present in the mess hall or shortly after leaving, and that no reasonable factfinder could conclude otherwise. De-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

fendants' Supplemental Memorandum (Dkt. No. 95) at p. 5. According to defendants, Gill's removal could not constitute adverse action because the discharge occurred to safeguard his health and to address his multiple grievances related to smoking in the mess hall. *Id.*

It is well-established, as defendants seemingly acknowledge, that the filing by plaintiff's filing of numerous grievances complaining of smoking in the mess hall is protected activity sufficient to satisfy the first element of a retaliation cause of action. *See Graham,* 89 F.3d at 80. The analysis of plaintiff's retaliation claim thus turns upon whether the termination of his mess hall job assignment constituted a sufficiently adverse action, and whether he can establish the requisite link between his filing of grievances, as a protected activity, and that action.

**\*11** The termination of a job assignment can under circumstances constitute adverse action, for purposes of the retaliation analysis. *Baker v. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990) ("a claim for relief can be stated under section 1983 for job for reassignments or terminations which were in retaliation for an inmate's efforts to seek vindication of his [or her] legal rights ..."); *see also Gill v. Mooney,* 824 F.2d 1235, 1248–49 (2d Cir.1987); *Jackson v. Cain,* 864 F.2d 1235, 1248–49(5th Cir.1989) "[A]ny 'otherwise routine administrative decision,' made in retaliation for the exercise of constitutional rights could give rise to a cause of action." *Baker,* 741 F.Supp. at 439, (quoting *Gill v. Mooney,* 824 F.2d at 194). In this instance a reasonable factfinder could conclude that the termination of plaintiff's mess hall position was sufficiently adverse to deter a similarly situated person of ordinary firmness from exercising rights guaranteed under the First Amendment. *Davis v. Artuz,* 133 F.3d 906, 1998 WL 29763, \*1 (2d Cir.1998); *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing, *Flaherty,* 1713 F.2d at 14).

The critical issue, then, is establishment of a nexus between the two. In this instance a *prima facie* case of retaliation has been stated; the close proximity in time between the filing of grievances and plaintiff's removal from his mess hall position alone could suffice to meet this relatively modest burden. *Ayers v. Stewart,* 101 F.3d 687, 1997 WL 34609, at \*1 (2d Cir.1999); *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 14).

In response to plaintiff's retaliation claim, defendants maintain that Gill was removed from his position due to his health condition, and in response to his complaints regarding lack of enforcement of the smoking policy. Defendants' Supplemental Memorandum (Dkt. No. 95) at p. 5. Plaintiff asserts that this proffered reason is pretextual, and that retaliation was the true motivating factor.

The record reveals a significant question of fact regarding the motivation for plaintiff's removal from his mess hall position. While a reasonable factfinder could conclude that plaintiff was removed from his mess hall position due to his asthma, that result is not necessarily compelled. In an affidavit given in support of plaintiff's original summary judgment motion by Dr. Anthony Graceffo, a clinical physician employed by the DOCS and assigned to Auburn, it is noted that while Gill complained of respiratory problems and asthma attacks on numerous occasion to prison medical officials, he never mentioned alleged exposure to ETS at the Auburn mess hall, adding that "[i]f [Gill] had made it known to the medical staff that he was being exposed to second-hand smoke in the messhall [sic], and that second-hand smoke exacerbated his respiratory problems, the medical staff very likely would have investigated the conditions at the mess hall, inquired of the facility administration about the alleged underenforcement of DOCS' strict no-smoking policy, and if necessary, restricted Gill's employment so that he would not continue to be exposed to second-hand smoke." Graceffo Aff. (Dkt. No. 47) ¶¶ 1, 10. Tellingly, there is no indication in the record that any such investigation was made.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

**\*12** Based upon the record now before the court, a reasonable factfinder could conclude that plaintiff's removal from his mess hall position was improperly motivated by the filing of his grievances. Accordingly, I recommend against dismissal of this aspect of plaintiff's retaliation claim as a matter of law. *Contrast Crenshaw v. Herbert,* 445 F.Supp.2d 301, 303–04 (W.D.N.Y.2006) (finding that inmate was not subject to retaliation when he was removed from certain prison jobs after filing a grievance where the record revealed that he was removed from his nurse's aide position due to his own fears for his safety, and his laundry job for poor performance).

2. *The Posting Of Plaintiff's Grievance*

Plaintiff further argues that defendants Calescibetta and Pidlypchak retaliated against him by posting one of his grievances in the Auburn mess hall. Defendants contend that even assuming plaintiff's allegations are true, at most the implication created by the posting of plaintiff's grievance is that he has been labeled a "snitch" or an informant, a matter which is not considered an adverse action under the relevant case law.

A statement uttered by a prison official, in retaliation for protected activity, reasonably calculated and intended to incite inmates, prisoners, or fellow corrections workers to retaliate against an inmate can form the basis for a cognizable retaliation claim under section 1983. *Islam v. Goord,* No. 05 Civ. 7502(RJH) 2006 WL 2819651, at \*5 (S.D.N.Y. September 29, 2006) (citing *Williams v. Muller,* No. 99 Civ. 1680(SAS) 2001 WL 936297, at \*4 (S.D.N.Y. March 16, 2002). Not every statement made by a prison guard regarding an inmate's exercise of free speech, however, constitutes adverse action under the applicable retaliation analysis. *Dawes,* 239 F.3d at 493. Rather, "[a]bsent some factual showing that the comments by the prison officials actually risked inciting other inmates against [the plaintiff]" *id.,* a court should not assume that other inmates would be incited to attack

the plaintiff for complaining about a prison guard's conduct. *See Dawes,* 235 F.3d 489 (finding that a prison guard telling other inmates that plaintiff was an informant does not constitute adverse action); *see also Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002), *abrogated on other grounds, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (asserting that prison official's labeling plaintiff a "stoolie" in the presence of other inmates was not adverse action).

Analogous to those cases involving verbal harassment by prison officials, which is not actionable in the absence of resulting physical harm to a plaintiff, the mere posting of a grievance in the Auburn prison mess hall, although perhaps supporting the implication that the plaintiff is a complainer or a snitch, without more, likely would not deter a similarly situated individual of ordinary firmness from filing grievances. *See, e.g., Snyder v. McGinnis,* No. 03–CV–0902, 2004 WL 1949472, at \*11 (W.D.N.Y. Sept. 2, 2004) (finding that inmate's retaliation claim against prison official who publically referred to plaintiff as a "snitch" and a child molester must fail because plaintiff failed to allege that he was subsequently physically harmed by his fellow inmates); *Williams v. Muller,* No. 98 CIV. 5204, 2001 WL 936297, at \*4 (S.D.N.Y. Aug. 17, 2001) (holding that prison official's alleged spreading of rumors intended to incite inmates to harm plaintiff was insufficient to support a retaliation claim in the absence of physical harm to plaintiff).

**\*13** Although Gill claims, in markedly conclusory terms, that his "life, safety and well-being" were in "grave danger" as a result of defendants' posting his grievance regarding their lack of enforcement of the prison smoking ban amidst a prison population comprised primarily of smokers, *see* Complaint (Dkt. No. 1) ¶ 48, the record is devoid of any evidence that defendants' actions actually prompted other inmates to harm him. In that regard, the record lacks evidence that he was assaulted by other inmates or sustained

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

any physical injuries because others believe him to be an informant. In fact, Gill testified at his deposition that after the grievance was posted, no inmates or employees of DOCS inflicted any harm on him. Goglia Decl. (Dkt. No. 46) (Gill Dep. Tr.) at pp. 121–22. Although he claims that he was "indirectly" threatened after the posting of the grievance, Gill is unable to name any individuals who initiated these threats, nor does he make any allegations beyond the claim that these unidentified inmates called him "a rat and a snitch." *Id.* at 122–23.

Based on the foregoing, I recommend a finding that the mere posting by defendants Calescibetta and Pidlypchak of plaintiff's ETS grievance, without more, did not constitute adverse action, and that no reasonable factfinder could conclude otherwise. I therefore recommend dismissal of this aspect of plaintiff's retaliation claim.

C. *Qualified Immunity*

Defendant Letourneau, the only defendant implicated in this portion of plaintiff's retaliation claim, asserts that he is entitled to qualified immunity with respect to plaintiff's allegation that he was fired from his job in the prison mess hall for filing a grievance regarding the prison nonsmoking policy.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 367 (2d

Cir.2007); *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162–63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> **\*14** [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Until recently, it was generally agreed that a proper qualified immunity analysis entailed a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211–12 (2d Cir.2003). As a threshold matter a court considering the issue was charged with first determining whether, based upon the facts alleged, the plaintiff had facially established a constitutional violation. *Id .; Gilles v. Repicky,* 511 F.3d 239, 243–44 (2d Cir.2007). If the answer to this inquiry was in the affirmative, then the focus turned to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132–33 (2d Cir.2002). Finally, upon determining that the plaintiff had a clearly established, constitutionally protected right which was violated, the court next considered whether it was nonetheless objectively reasonable for the defendant to believe that his or her action did not abridge that established

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

right. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

The United States Supreme Court recently had the opportunity to reconsider the analysis prescribed in *Saucier,* holding that while the sequence of the inquiry set forth in that case is often appropriate, it should no longer be regarded as compulsory. *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 172 L.Ed.2d 565, 2009 WL 128768, at *9 (Jan. 21, 2009). In *Pearson,* the Court reasoned that while the *Saucier* protocol promotes the development of constitutional precedent and is "especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable," the rigidity of the rule comes with a price. *Id.* at *10, 129 S.Ct. At 818. The Court noted, for example, that the inquiry often wastes both scarce judicial and party resources on challenging questions that have no bearing on the outcome of the case. *Id.* Given that the intended purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Court opined that the rigid catechism prescribed by Saucier may serve to defeat this goal by requiring the parties "to endure additional burdens of suit—such as the cost of litigating constitutional questions and delays attributable to resolving them—when the suit otherwise could be disposed of more readily." *Id.* (quotations and citation omitted). As a result of its reflection on the matter, the Pearson Court concluded that because the judges of the district courts and courts of appeals "are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* at *9, 129 S.Ct. at 818.

**\*15** I have already found that a plausible claim of

unlawful retaliation has been alleged based upon plaintiff's removal from his mess hall position. The constitutional right at issue—the First Amendment right to be free from retaliation in return for having engaged in protected activity—was clearly established at the time of the alleged violation in April of 2006. *Rivera v. Senkowski,* 62 F.3d 80, 85 (2d Cir.1995) (citing *Franco,* 854 F.2d at 589–90). From the limited record now before the court, I discern no basis to conclude that defendant Letourneau would have been reasonable in his belief that terminating plaintiff from his job in the prison mess hall, in retaliation for Gill having engaged in protected activity in the form of filing grievances, did not violate plaintiff's First Amendment rights. Accordingly, I recommend a finding at this juncture that defendant Letourneau is not entitled to qualified immunity from suit, though with leave to raise the issue at trial.[FN6] *See id.* at 85–86.

> FN6. In light of my determination on the merits I have not engaged in a separate qualified immunity analysis regarding the portion of plaintiff's retaliation claim growing out of the posting of his grievance.

## IV. *SUMMARY AND RECOMMENDATION*

Currently under consideration are retaliation claims by Gill against five of the defendants in this case. Of the four remaining claims, defendants concede that two present triable issues of fact, making them ill-suited for resolution on motion for summary judgment. Of the remaining two, I find the existence of triable issues of fact regarding the claim arising out of plaintiff's removal from his mess hall position, precluding the entry of summary judgment on that claim, but conclude that no reasonable factfinder could determine that the posting of plaintiff's grievance in the mess hall was sufficiently adverse to deter a similarly situated person of ordinary firmness from engaging in protected activity under the First Amendment, and thus recommend summary dismissal of that claim as a matter of law.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)
**(Cite as: 2009 WL 890661 (N.D.N.Y.))**

Based upon the foregoing it is therefore hereby

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 45), to the extent that it relates to the remaining retaliation claims, be GRANTED, in part, and that plaintiff's claim against defendants Pidlypchak and Calescibetta, related to the posting of grievances in the mess hall, be dismissed, but that the remaining three retaliation causes of action, against defendants Calescibetta, Letourneau, French, and Harrington, be referred for trial based upon the existence of genuinely disputed issues of material fact which must be resolved before those claims can be adjudicated.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2009.
Gill v. Calescibetta
Not Reported in F.Supp.2d, 2009 WL 890661 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Kenneth Carl GROVES, Sr., Plaintiff,
v.
Brett DAVIS, Secure Care Treatment Aid; David W.
Sill, Secure Care Treatment Aid; Thomas Nicolette,
RN, Ward Nurse; Charmaine Bill, Treatment Team
Leader; Jill E. Carver, Social Worker, Primary Ther-
apist; Edwin Debroize, Psychologist Assist; Jeff
Nowicki, Chief of Mental Health Treatment Serv.;
Terri Maxymillian, Ph.D., Dir. of Mental Health
Serv.; Sgt. Sweet, Security Services, CNYPC; Mi-
chael Hogan, Comm'r, Dep't of Mental Health, De-
fendants.

No. 9:11–CV–1317 (GTS/RFT).
Feb. 28, 2012.

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

*MEMORANDUM DECISION and ORDER*
Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil
rights action filed by Kenneth Carl Groves, Sr.
("Plaintiff"), against numerous employees of New
York State or the Central New York Psychiatric
Center ("Defendants"), are Plaintiff's motion to pro-
ceed *in forma pauperis,* his motion for a temporary
restraining order and preliminary injunction, and his
motion for appointment of counsel. (Dkt.Nos.2, 3, 4.)
[FN1] For the reasons set forth below, Plaintiff's motion
to proceed *in forma pauperis* is granted; his motion for
a preliminary injunction is denied; his motion for
appointment of counsel is denied; Plaintiff's claims of
deliberate indifference to his mental health needs

against Defendants Bill, Carver and DeBroize are *sua
sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are
*sua sponte* dismissed without prejudice and with leave
to amend in this action in accordance with
Fed.R.Civ.P. 15; Sgt. Sweet is *sua sponte* dismissed
without prejudice as a Defendant in this action; the
Clerk is directed to issue summonses, and the U.S.
Marshal is directed to effect service of process on
Defendants Davis, Sill, and Nicolette.

> FN1. This is the fourth civil rights action
> filed by Plaintiff in this District. Generally,
> two of these actions arose out of Plaintiff's
> refusal to consent to a strip search and the
> subsequent actions taken against Plaintiff as
> a result of his refusal. *See Groves v. New
> York,* 09–CV–0406, Decision and Order
> (N.D.N.Y. filed May 11, 2009) (Hurd, J.)
> (*sua sponte* dismissing complaint pursuant to
> 28 U.S.C. § 1915[e][2][B] ); *Groves v. The
> State of New York,* 9:09–CV–0412, Decision
> and Order (N.D.N.Y. filed Mar. 26, 2010)
> (Sharpe, J.) (granting defendants' motion to
> dismiss the complaint pursuant to
> Fed.R.Civ.P. 12[b][6] ). The third action al-
> leged numerous violations of Plaintiff's con-
> stitutional rights during the period July 23,
> 2009, and August 26, 2009, and was dis-
> missed without prejudice upon Plaintiff's
> request in October, 2010. *See Groves v.
> Maxymillian,* 9:09–CV–1002, Decision and
> Order (N.D.N.Y. filed Oct. 8, 2010)
> (Suddaby, J.). As a result, it does not appear
> that the current action is barred because of res
> judicata, collateral estoppel, and/or the rule
> against duplicative litigation.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

## I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action *pro se* by filing a civil rights Complaint, together with a motion to proceed *in forma pauperis.* (Dkt. Nos.1, 2.)[FN2] Liberally construed, Plaintiff's Complaint alleges that the following constitutional violations against him occurred during his confinement at Central New York Psychiatric Center ("CNYPC"): (1) Defendants Davis and Sill used excessive force against him under the Eighth and/or Fourteenth Amendments; (2) Defendant Nicolette knew of and failed to take action to protect Plaintiff from the assault under the Eighth and/or Fourteenth Amendments; (3) Defendants Bill, Carver, and De-Broize were deliberately indifferent to his mental health needs under the Eighth and/or Fourteenth Amendments; and (4) Defendants Bill, Carver, De-Broize, Nowicki, Maxymillian, Bosco, and Hogan failed to "adequately train the staff under their supervision" and to take appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

> FN2. At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any

time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[FN3]

> FN3. The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for

failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [FN4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[FN6]

FN4. *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN5. *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN6. It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under

Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

victed criminals in unsafe conditions, it must be un-constitutional [under the Due Process Clause] to con-fine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* *457 U.S. at 315–16.* As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memoran-dum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [FN7]

> FN7. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a cus-todial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an uncon-victed detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "de-liberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial de-tainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, De-fendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally as-saulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (inter-nal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plain-tiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an op-portunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

**2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize**

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).)[FN8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703.[FN9]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
(Cite as: 2012 WL 651919 (N.D.N.Y.))

FN8. Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

FN9. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading.[FN10] Rather, this claim is hereby dismissed with prejudice.

FN10. The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN11]

FN11. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997).[FN12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011).[FN13]

FN12. *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

FN13. *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

**IV. MOTION FOR INJUNCTIVE RELIEF**

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defend-

ants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

[T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case.[FN14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

FN14. For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private

sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

**\*10 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;**[FN15] and it is further

> FN15. Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and De-Broize are *sua sponte* **DISMISSED** with prejudice pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED** without prejudice and with leave to be reinstated as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

**writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

N.D.N.Y.,2012.
Groves v. Davis
Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2015 WL 2348625 (N.D.Miss.)
**(Cite as: 2015 WL 2348625 (N.D.Miss.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Mississippi,
Greenville Division.
Willie L. HENRY, Jr., Plaintiff
v.
Christopher EPPS, et al., Defendants.

No. 4:14CV5–MPM–SAA.
Signed May 15, 2015.

Willie L. Henry, Jr., Gulfport, MS, pro se.

John M. Colette, John M. Colette & Associates,
Tommy D. Goodwin, Office of the Attorney General, Jackson, MS, for Defendants.

### MEMORANDUM OPINION

MICHAEL P. MILLS, District Judge.

**\*1** This matter comes before the court on the *pro se* prisoner complaint of Willie Lee Henry who challenges the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit. Henry alleges that the defendants violated the Eighth Amendment prohibition against cruel and unusual punishment by placing him in housing where he was exposed to environmental tobacco smoke. The defendants have filed a motion [48] for summary judgment; the plaintiff has not responded to the motion, and the deadline to do so has expired. For the reasons set forth below, the motion by the defendants for summary judgment will be granted, and judgment will be entered for the defendants.

### Summary Judgment Standard

Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a) and (c)(1). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners,* 204 F.3d 629, 633 (5th Cir.2000) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986), *cert. denied,* 484 U.S. 1066 (1988)). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v.. Liberty Lobby,* Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Beck,* 204 F.3d at 633; *Allen v. Rapides Parish School Bd.,* 204 F.3d 619, 621 (5th Cir.2000); *Ragas v. Tennessee Gas Pipeline Company,* 136 F.3d 455, 458 (5th Cir.1998). Substantive law determines what is material. *Anderson,* 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.,* at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex,* 477 U.S. at 327. "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 89 L.Ed.2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl,* 968 F.2d 500, 503 (5th Cir.1992). The facts are reviewed drawing all reasonable inferences in favor of the non-moving

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

party. *Allen,* 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.,* 177 F.3d 351, 161 (5th Cir.1999); *Banc One Capital Partners Corp. v. Kneipper,* 67 F.3d 1187, 1198 (5th Cir.1995). However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994); *see Edwards v. Your Credit, Inc.,* 148 F.3d 427, 432 (5th Cir.1998). In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little,* 37 F.3d at 1075 (emphasis omitted).

### Undisputed Material Facts

**\*2** At all times pertinent to the present cause, Willie Lee Henry was an inmate in the custody of the Mississippi Department of Corrections ("MDOC"). Henry is currently in the Free World, as he was recently released on parole [44]. He filed the instant complaint on January 15, 2014, alleging that when he was transferred back to the Mississippi State Penitentiary on August 22, 2013, from the Marshall County Correctional Facility (MCCF) that environmental tobacco smoke in his unit aggravated his pre-existing asthma condition. This, in turn, caused him to use a large amount of asthma inhalers [1 at 4]. Henry states that he was seen in the medical clinic at the Mississippi State Penitentiary for irritated eyes and throat from tobacco smoke from November 17, 2013, through November 23, 2013 [1 at 6]. During that time his eyes were constantly swollen and burning and his throat was scratchy and sore, all as a result exposure to tobacco smoke[1 at 6]. On November 26, 2013, he submitted a sick call request for shortness of breath, sore throat, and burning eyes—and was seen in the Mississippi State Penitentiary medical clinic on December 3, 2013 [1 at 6–7]. Henry was treated for his complaints with two injections on December 3, 2013, and breathing treatments on five occasions from December 4, 2013, through December 8, 2013 [1 at 7]. Henry underwent a chest x-ray on December 10, 2013 [1 at 7].

In response to Henry's complaints about tobacco smoke, Deputy Warden Marshall Turner visited him on December 11, 2013. Henry then received correspondence on December 16, 2013, from Warden Ron King advising him that Turner had found no evidence of smoking in his unit—and urging Henry to report offenders who are smoking in his unit to staff for immediate corrective action [1 at 7, 15]. Henry refused to provide information to staff regarding the identity of smokers in his unit because he did not want "[the Mississippi Department of Corrections to] use [him] as an informant and put [his] life in danger." [1 at 7]. Henry seeks monetary damages and injunctive relief to prevent exposure to environmental tobacco smoke, as well as release from custody or transfer to a smaller regional facility [1 at 5].

### Injunctive Relief

The transfer of a prisoner out of the institution out of which his complaints arise renders his requests for injunctive relief moot. *Oliver v. Scott,* 276 F.3d 736, 741 (5th Cir.2002); *Zajrael v. Harmon,* 677 F.3d 353, 355 (5th Cir.2012); See also *Daniels v.. Waller,* 2006 WL 763115 at \*1 (S.D.Miss.2006.) To show that his claims for injunctive relief have not become moot, Henry must show that the claims are "capable of repetition yet evading review," *Harwick v. Brinson,* 523 F.2d 798, 800 (5th Cir.1975), by showing it likely that his parole would be revoked and he would return to Mississippi Department of Corrections custody—and again be exposed again to environmental tobacco smoke. *Oliver,* 276 F.3d at 741. Henry has not made that showing; as such, his claims for injunctive relief will be dismissed as moot.

### Environmental Tobacco Smoke

**\*3** Henry's only claim is that the defendants have violated the Eighth Amendment prohibition against cruel and unusual punishment by permitting him to be exposed to environmental tobacco smoke. The two-pronged analysis regarding a prisoner's Eighth Amendment claims regarding exposure to environ-

Slip Copy, 2015 WL 2348625 (N.D.Miss.)
**(Cite as: 2015 WL 2348625 (N.D.Miss.))**

mental tobacco smoke can be found in *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). First, a prisoner must provide objective evidence that he is "being exposed to unreasonably high levels of [environmental tobacco smoke]." *Helling,* 509 U.S. at 35. To analyze the first prong, the court must assess the seriousness of the potential harm and the likelihood that environmental tobacco smoke will actually cause such harm. *Helling* at 36. The court must find "whether society considers the risk ... to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Id.* Sporadic and fleeting exposure to second-hand smoke, even if it causes coughing and nausea, does not rise to the level of a constitutional violation. *Id.; see also Oliver v. Deen,* 77 F.3d 156, 158 (7th Cir.1996) (denying Eighth Amendment claim by asthmatic that smoke caused him to wheeze, gasp for breath and suffer dizziness and nausea). Indeed, even sustained exposure to second-hand smoke has failed to rise to the level of an Eighth Amendment violation. *Oliver,* 77 F.3d at 159 (133 days of sharing cell with smoker fails to state Eighth Amendment claim); *Guilmet v. Knight,* 792 F.Supp. 93 (E.D.Wash.1992) (sharing cell with smoker for 15 days did not "pose ... an unreasonable risk to [the non-smoking inmate's health], much less [deny him] 'the minimal civilized measure of life's necessities.' ")

Under the second prong of the *Helling* test, a prisoner must show that prison officials have subjectively demonstrated "deliberate indifference" to his situation. *Id.* To prove deliberate indifference, a prisoner plaintiff must prove that a prison official actually knows that an inmate faces a substantial risk, but nonetheless fails to take reasonable steps to abate it. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811. The official must be aware of facts from which an inference may be drawn that a substantial risk of serious harm exists—and must actually draw the inference. *Id.* The plaintiff must show that the defendant acted with "obduracy and wantonness, not inadvertence or error in good faith." *Callicut v.*

*Anderson,* 48 Fed.Appx. 916, 2002 WL 31114947, at *2 (citing *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)).

With this standard in mind, courts should consider the following factors in evaluating deliberate indifference to ETS: "the adoption of a smoking policy; the administration of that policy; and 'the realities of prison administration.' " *Id.* (citing *Helling,* 509 U.S. at 36–37). As an initial matter, Henry has not satisfied the first prong of the *Helling* test—as he has presented only vague and conclusory allegations that he has been exposed to unreasonably high levels of environmental tobacco smoke without documentary support. Conclusory allegations are not, however, competent summary judgment evidence. *See Richardson v. Oldham,* 12 F.3d 1373, 1378 (5th Cir.1994). In addition, Henry alleges only that the tobacco smoke caused wheezing and eye and throat irritation. As set forth above, under the holdings in *Helling* and *Oliver, supra,* this level of discomfort does not rise to the level of a constitutional violation. ("[S]poradic and fleeting exposure" to [environmental tobacco smoke] does not constitute "unreasonably high levels," even it if is "unwelcome and unpleasant" and causes plaintiff discomfort, such as nausea and coughing. *Richardson v. Spurlock,* 260 F.3d 495, 498 (5th Cir.2001)). Henry's medical records also show that Henry's problems with tobacco smoke were merely "sporadic and fleeting," resulting only in irritation to the throat and eyes. *See Henry's MDOC Medical Records, Bates Numbered 1–440.* Henry's medical records show only that he received regular treatment for his preexisting asthma condition, mostly with the use of an inhaler, and he has provided no medical evidence that he was treated for exposure to tobacco smoke.

**\*4** Moreover, Henry has not satisfied the second prong of the *Helling* test—that the defendants were deliberately indifferent to his serious medical needs by permitting Henry's exposure to tobacco smoke. Through a July 1, 2012, change in policy, all Mississippi Department of Corrections facilities and prop-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 2348625 (N.D.Miss.)
**(Cite as: 2015 WL 2348625 (N.D.Miss.))**

erty became tobacco-free, and any offender found in violation of this policy is subject to punishment. [1 at 12]. Henry's complaints were investigated by Deputy Warden Marshall Turner; however, Henry simply did not agree with the Turner's findings. [1 at 15]. Certainly, Henry has not shown that any defendant "[knew] of and disregard[ed] an excessive risk to [Henry's] health or safety;" as such, he has not shown that any defendant acted with deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Thus, Henry's claims arising out of exposure to environmental tobacco smoke must be dismissed.

### Conclusion

For the reasons set forth above, the motion by the defendants for summary judgment will be granted; the plaintiff's claims for injunctive relief will be dismissed as moot; judgment will be entered for the defendants as to the plaintiff's claims regarding exposure to environmental tobacco smoke, and this case will be closed.

**SO ORDERED.**

N.D.Miss.,2015.
Henry v. Epps
Slip Copy, 2015 WL 2348625 (N.D.Miss.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2011 WL 723568 (S.D.N.Y.)
**(Cite as: 2011 WL 723568 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Nurideen ISLAM, Plaintiff,
v.
William CONNOLLY, et al., Defendants.

No. 07 Civ. 3225(PKC).
Feb. 16, 2011.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.

**\*1** Plaintiff Nurideen Islam, proceeding *pro se,* brings suit against certain prison officials of Fishkill Correctional Facility ("FCF") pursuant to 42 U.S.C. § 1983, alleging that his rights under the Eighth Amendment to the United States Constitution were violated by his exposure to a dangerous level of environmental tobacco smoke ("ETS"), commonly known as secondhand smoke, while incarcerated on the 9/2 Housing Unit at FCF. Discovery in this action is closed. Defendants now move for summary judgment pursuant to Rule 56(a), Fed.R.Civ.P. For the reasons set forth below, the motion is granted.

BACKGROUND

On or about April 23, 2007, plaintiff filed his Complaint naming seven individuals as defendants: Brian Fischer, Commissioner of the New York Department of Corrections ("DOCS"), Lucien J. Leclaire, the Deputy Commissioner of Facilities Operations and Acting Commissioner of DOCS, William Connolly, Superintendent of FCF, Lieutenant Simmons, Sergeant Turner, and Corrections Officers Petrie and Hirsch. (Docket # 2.) By Memorandum and Order dated January 9, 2008, I granted in part a motion

to dismiss filed by defendants Fischer, Leclaire, Connolly, Hirsch and Simmons. *Islam v. Fischer,* 07 Cv. 3225(PKC), 2008 WL 110244 (S.D.N.Y. Jan. 9, 2008). I dismissed all claims against defendants Fischer and Leclaire on the ground that plaintiff had not pled sufficient facts to establish their personal involvement in the alleged violation. *Id.* at \*3–4. In addition, I dismissed the retaliation claim against defendant Hirsch as moot. *Id.* at \*4. Finally, I dismissed plaintiff's claim, to the extent it sought money damages against any defendant in his official capacity, under principles of sovereign immunity. *Id.* at \*5. By Memorandum and Order dated March 6, 2008, I granted in part defendant Connolly's motion to reconsider my denial of the motion to dismiss insofar as liability was premised on Grievance # 28447–06, Grievance # 28900–07 and the letter of February 28, 2007 and adhered, in all other respects, to my ruling denying the motion to dismiss. *Islam v. Fischer,* 07 Civ. 3225(PKC), 2008 WL 650380, \*2–3 (S.D.N.Y. Mar. 6, 2008). Finally, by Memorandum and Order dated June 25, 2008, I granted in part a motion to dismiss filed by defendants Petrie and Turner. *Islam v. Fischer,* 07 Civ. 3225(PKC), 2008 WL 2600054 (S.D.N.Y. June 25, 2008). All claims against defendant Petrie were dismissed on the ground that plaintiff had not pled sufficient facts to establish his personal involvement in the alleged violation. *Id.* at \*2. In addition, I dismissed all claims against defendant Turner other than the claim against him in his individual capacity regarding plaintiff's alleged exposure to ETS. *Id.* at \*3–4.

The claims that remain and that are the subject of the present motion are those against defendants Connolly, Simmons, Hirsch and Turner in their individual capacities regarding plaintiff's alleged exposure to ETS while housed in the 9/2 Housing Unit at FCF.[FN1] Plaintiff alleges that he was exposed to harmful amounts of ETS while housed on the 9/2

Not Reported in F.Supp.2d, 2011 WL 723568 (S.D.N.Y.)
**(Cite as: 2011 WL 723568 (S.D.N.Y.))**

Housing Unit at FCF as a result of inmates routinely smoking in the 9/2 Housing Unit bathroom despite the prohibition against doing so. Plaintiff asserts that defendants failed to enforce policies within FCF to ensure that indoor smoking was banned. Additionally, plaintiff asserts that defendants Turner and Hirsch violated the indoor smoking ban by smoking during their shifts on the 9/2 Housing Unit in which plaintiff was housed. In his deposition, plaintiff testified that he suffers from asthma and sinus infections as a result of exposure to secondhand smoke while at FCF; he reports no other physical problems. (Islam Dep. 123:18–124:15; 80:23–81:2, attached at Harben Decl. Ex. B.)

> FN1. While plaintiff's Complaint references a February 28, 2007 letter to Superintendent Connolly in which plaintiff asks Connolly to "implement testing the 'air quality' on each housing unit in Fishkill," plaintiff does not claim that he was exposed to ETS in any part of the FCF facility, save the 9/2 Housing Unit.

DISCUSSION

I. *Summary Judgment Standard*

**\*2** Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, affidavits and other materials show "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law ..." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor

as a matter of law. *Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

In turn, to defeat a motion for summary judgment, the non-movant must raise a genuine issue of material fact. In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. U.S. Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (internal quotations marks and citations omitted); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986). In the absence of any disputed material fact, summary judgment is appropriate. *See* Rule 56(a), Fed.R.Civ.P.

The pleadings of a *pro se* plaintiff are read "liberally and interpret[ed] ... to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment. *See Odom v. Keane,* 95 Civ. 9941(SS), 1997 WL 576088, \*3 (S.D.N.Y. Sept. 17, 1997) ("[A] *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (quoting *Carey v. Crescenzi,* 923 F.2d 18. 21 (2d Cir.1991))). As a *pro se* litigant, plaintiff was served with notice

Not Reported in F.Supp.2d, 2011 WL 723568 (S.D.N.Y.)
**(Cite as: 2011 WL 723568 (S.D.N.Y.))**

required by Local Rule 56.2 informing him of the nature of a summary judgment motion and the manner in which it could be opposed. (Docket # 57.) Mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) (citing *Matsushita,* 475 U.S. at 587); *see also Anderson,* 477 U.S. at 249–50 (summary judgment may be granted if the evidence is "merely colorable" or "not significantly probative"). An "opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." *Contemporary Mission, Inc. v. U.S. Postal Serv.,* 648 F.2d 97, 107 n. 14 (2d Cir.1981) (internal quotation marks omitted).

## II. *Plaintiff's ETS Claim*

**\*3** Plaintiff asserts that his exposure to ETS while housed on the 9/2 Housing Unit at FCF amounted to cruel and unusual punishment in violation of the Eighth Amendment as incorporated by the Fourteenth Amendment. He pursues a remedy under 42 U.S.C. § 1983. To succeed on a section 1983 claim against state officials in their individual capacities, a plaintiff must demonstrate "personal involvement of defendants in alleged constitutional deprivations .... " *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (internal quotation marks omitted). Plaintiff has failed to come forward with some evidence from which a reasonable jury could conclude that his exposure to ETS while at FCF rose to the level of a constitutional deprivation of his Eighth Amendment right to be free from cruel and unusual punishment.

Deliberate indifference to serious medical needs of a prisoner falls under the Eighth Amendment's prohibition of "cruel and unusual punishment" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102 (1976) (internal quotation marks omitted); *see Wilson v. Seiter,* 501 U.S. 294, 298 (1991). In the context of ETS, the Supreme Court

in *Helling v. McKinney* determined that a plaintiff "states a cause of action under the Eighth Amendment by alleging that [defendants] have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." 509 U.S. 25, 35 (1993); *accord Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002).

Plaintiff's ETS claim is considered under a two-prong analysis. With respect to the objective prong, plaintiff must come forward with some evidence from which a reasonable jury could find that "he himself is being exposed to unreasonably high levels of ETS." *Helling,* 509 U.S. at 35. Also with respect to the objective prong, the plaintiff must come forward with some evidence from which a reasonable jury could find that the risk to his health is sufficiently serious and "not one that today's society chooses to tolerate." Id at 36. To meet the subjective prong of the test, plaintiff must come forward with some evidence from which a reasonable jury could find that the prison official acted with a culpable state of mind. *Id.* The evidence must show that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *accord Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

### A. *Objective Prong*

Plaintiff alleges in his Complaint that "his life expectancy has been compromised by exposure to dangerous levels of ETS" and that "the dangerous levels of [ETS] was suffocating (i.e., his ability to breathe was impaired by ETS)." (Compl.¶ 34.) Additionally, plaintiff alleges that he suffered from "breathing difficulties, nausea, aggravated headaches, and dizziness due to the constant exposure to high levels of [ETS] on the 9/2 Housing Unit." (*Id.* ¶¶ 20, 57, 97.) In his deposition, plaintiff testified that he suffers from asthma and sinus infections, but has

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 723568 (S.D.N.Y.)
**(Cite as: 2011 WL 723568 (S.D.N.Y.))**

experienced no other physical problems, as a result of exposure to secondhand smoke while at FCF. (Islam Dep. 123:18–124:15; 80:23–81:2.)

**\*4** In moving for summary judgment, defendants argue that plaintiff has failed to come forward with some evidence from which a reasonable jury could find that the risk to his health is sufficiently serious and "not one that today's society chooses to tolerate." *Helling,* 509 U.S. at 36. In support of their motion, defendants have submitted a sworn declaration of Dr. John Supple, a licensed physician since 1967 and doctor at FCF since 1988 where he is responsible for the treatment of the inmates, including plaintiff when he was an inmate at the facility. (Supple Decl. ¶ 1.) Based on Dr. Supple's review of plaintiff's medical records, he found nothing leading him to believe that "any purported exposure to secondhand tobacco smoke by plaintiff was life threatening, serious or caused any long-term health consequences, particularly in light of the fact that plaintiff only made two complaints about secondhand tobacco smoke to medical staff even though he was regularly being seen by medical staff for other matters." (*Id.* ¶ 6.)

Plaintiff's medical records do not demonstrate that the levels of ETS that he was exposed to posed "an unreasonable risk of serious damage to his future health." *Helling,* 509 U.S. at 35. Plaintiff's medical progress notes from May 2, 2002 to November 5, 2007 indicate that plaintiff had access to and was seen by a member of FCF's medical staff approximately once a month and occasionally more frequently. (Medical Progress Notes, attached at Supple Decl. Ex. A.) Despite regular access to medical care while at FCF, plaintiff only complained to medical staff about cigarette smoke on two occasions: October 20, 2006 and March 14, 2007. (*Id.;* Supple Decl. at ¶¶ 3, 5.) On October 20, 2006, plaintiff complained to a member of FCF's nursing staff about cigarette smoke. On plaintiff's medical progress report, the nurse notes "c/o headaches worsening RT smoking on unit ... H/AS chronic intermittent x 15 years. Wants MD for res-

piratory complaints. Claim S.O.B./ 'hard time catching my breath when exposed to prolonged smoking.' Wants MD for review labs." (October 20, 2006 Medical Progress Note, attached at Supple Decl. Ex. A.) However, according to Dr. Supple's medical progress note, at plaintiff's visit with him approximately two weeks later on November 3, 2006, he made no note of plaintiff complaining about respiratory problems or cigarette smoke. (November 3, 2006 Medical Progress Note, attached at Supple Decl. Ex. A.) According to Dr. Supple's declaration, had plaintiff made such complaints, he would have noted them. (Supple Decl. ¶ 4.) Interpreting the nurse's notes, Dr. Supple states in his declaration that "these complaints ... by themselves do not necessarily indicate that plaintiff was suffering from asthma or any condition other than perhaps temporary discomfort from cigarette smoke, which, in my experience as a DOCS doctor and a doctor in private practice, is extremely common." (*Id.* ¶ 5.)

**\*5** On March 14, 2007, plaintiff complained to Dr. Supple about certain respiratory problems and cigarette smoke. (Supple Decl. at ¶ 3.) According to Dr. Supple's declaration, he did not find medical evidence to substantiate plaintiff's complaints:

I examined plaintiff at that time and found no wheezing or any other symptoms that would lead me to believe that plaintiff was suffering from asthma. Had plaintiff exhibited symptoms of asthma at that time, I would have taken further diagnostic steps and prescribed an asthma inhaler and/or medication. Under no circumstances would I have left symptoms of asthma untreated because if a patient with asthma suffers an asthma attack and does not have access to an inhaler, the consequences could be fatal.

(Supple Decl. at ¶ 3.) As a precautionary measure, however, Dr. Supple ordered a chest x-ray for plaintiff, which was completed on May 24, 2007. (*Id.*) The x-ray report indicated no abnormalities. (Supple Decl. at ¶ 3; Chest X-ray Report, attached at Supple Decl.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 723568 (S.D.N.Y.)
**(Cite as: 2011 WL 723568 (S.D.N.Y.))**

Ex. B.)

Dr. Supple personally examined plaintiff on September 17, 2003, April 20, 2004, March 2, 2005, July 6, 2005, August 25, 2005, December 9, 2005, May 19, 2006, June 27, 2006, November 20, 2006, January 10, 2007, April 4, 2007, September 21, 2007, September 26, 2007, October 19, 2007 and November 5, 2007 and did not indicate in his notes following these visits any complaints by plaintiff about respiratory problems or cigarette smoke. (Supple Decl. ¶ 4.) According to Dr. Supple's declaration, had plaintiff made such complaints he would have noted them as was his regular practice. (*Id.*) As Dr. Supple states, "had plaintiff been experiencing serious health consequences as a result of purported exposure to secondhand tobacco smoke, I would have expected there to be more references to exposure in his medical records. Plaintiff was treated by numerous doctors and other medical staff and had many opportunities to complain to them about his situation." (*Id.* ¶ 8.)

The medical records submitted by plaintiff do not create a material issue of fact on this issue. In opposition to defendant's motion for summary judgment, plaintiff attaches five pages of what appear to be handwritten notes of a medical provider, although they are not clearly identified as such and are largely illegible. (Pl. Opp. to Def. Mot. for Sum. Judg. Ex. 8–8D.) Two of the pages submitted do not include plaintiff's name and thus cannot be identified as relating to plaintiff. (*Id.*) On one such page without patient identification, under the heading "assessment" is written the word "asthma," with no accompanying explanation or context. (*Id.*) On another page dated January 19, 2008, on which plaintiff's name appears along with the illegible stamp of a medical provider, is written the word "wheezing." (*Id.*) On a similar page dated February 8, 2008, the word "wheezing" again appears. (*Id.*) On this page, the word "flu" also appears twice. (*Id* .) There is no explanation about a connection or lack thereof between the two. Finally, on a page dated May 3, 2008, the word "wheezing"

appears along with the phrase "asthma stable." (*Id* .) When read together, these five pages of medical records from 2008 are not evidence from which a reasonable jury could find that plaintiff was exposed "to levels of ETS that pose an unreasonable risk of serious damage to his future health." *Helling,* 509 U.S. at 35.

**\*6** Plaintiff also has not come forward with evidence from which a reasonable jury could find that "he himself is being exposed to unreasonably high levels of ETS." *Helling,* 509 U.S. at 35. "The Supreme Court made clear in *Helling* ... that inmates do not have an unqualified constitutional right to a smoke-free environment, but only a right to be free of involuntary exposure to a level of ETS which unreasonably endangers their future health...." *Johnson v. Goord,* 01 Civ. 9587(PKC), 2005 WL 2811776, \*7 (S.D.N.Y. Oct 27, 2005) (internal quotation marks omitted); *see Enigwe v. Zenk,* 03 Civ. 854(CBA), 2007 WL 2713849, \*5 (E.D.N.Y. Sept. 14, 2007) ("Inmates do not have a constitutional right to be free of any or all levels of exposure to ETS, but only unreasonable levels of exposure."). While plaintiff need not establish a level of ETS exposure equivalent to that of *Helling,* 509 U.S. at 28, where plaintiff shared a cell with a chain-smoker who smoked five packs of cigarettes a day, in order to survive summary judgment *Warren v. Keane,* 196 F.3d 330, 333 (2d Cir.1999), the plaintiff's exposure to ETS as a result of the defendants Hirsch and Turner smoking at their Station and the inmates smoking in the bathroom is significantly lower than that experienced by the plaintiff in *Helling* and does not rise to the level that a reasonable jury could find "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling.* 509 U.S. at 36 (emphasis in original); *see Zaire v. Artuz,* 99 Civ. 9817(LTS), 2003 WL 230868, \*5 (S.D.N.Y. Feb. 3, 2003) (granting summary judgment to defendants where plaintiff was exposed to ETS primarily in common areas, such as the television area of the gymnasium, in recreation areas and at the industry work site, for a period of approximately five months); *Griffin v. DeRosa,* 153

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 723568 (S.D.N.Y.)
**(Cite as: 2011 WL 723568 (S.D.N.Y.))**

Fed.Appx. 851, 853 (3d Cir.2005) (affirming district court finding that exposure to eight to ten inmates smoking every time plaintiff went to any prison restroom over a twenty month period failed to state a claim that plaintiff was exposed to levels of ETS that posed an unreasonable risk of damage to his future health).

Plaintiff testified that defendants Hirsch and Turner, both assigned to the 9/2 Housing Unit, chain-smoked at the Officer's Station on the 9/2 Housing Unit. (Islam Dep. 103:21–104:11.) Plaintiff also alleges that inmates smoked in the bathroom on the 9/2 Housing Unit in violation of facility rules. Plaintiff testified that the 9/2 Housing Unit restroom was small, had three toilet stalls and one small window, which prisoners could open or close. (*Id.* 62:24–63:10.) Plaintiff also testified that when he entered the bathroom he would be exposed for four or five minutes to six or seven inmates smoking. (*Id.* 90:19–25.) Plaintiff alleges that he entered the bathroom approximately twelve times daily, (Compl.¶ 107.) Accepting as true for purposes of this motion that defendants Hirsch and Turner smoked in the Officer's Station and that the inmates in the 9/2 Housing Unit bathroom smoked to the degree alleged by plaintiff, it cannot be said that such smoking exposed plaintiff to unreasonable levels of ETS.

**\*7** Plaintiff first complained of ETS exposure in an October 6, 2006 grievance. (Grievance # 28447–06, attached at Harben Decl. Ex. H.) At the time plaintiff filed this grievance he was housed in his own cell on the 9/2 Housing Unit at FCF, a cell he had occupied since February 26, 2006. (Roberts Decl. ¶ 4.) Plaintiff's cell had one window, walls separating it from other cells and a door that opened onto a hallway. (Islam Dep. 64:14–65:3.) Significantly, plaintiff testified that the door to his cell could be closed at his preference. (*Id.* 65:2–3.) Plaintiff's cell was situated on a hallway between two other cells, but not across from any cells. (*Id.* 65:7–22.) The inmate in the cell to plaintiff's right was not a smoker; the inmate in the cell to plaintiff's left was a smoker. (*Id.* 65:7–14.) Also on plaintiff's hall were four other inmates housed in single cells, three of whom were smokers. (*Id.* 65:7–66:15.) Plaintiff does not claim that he was exposed to unreasonable levels of ETS as a result of the smoking habits of these inmates.

The 9/2 Officer's Station was located approximately 58 feet away from plaintiffs cell; at the opposite end of the hallway and opposite side of the hallway from plaintiff's cell. (Roberts Decl. ¶ 7.) The Officer's Station had two windows. (Islam Dep. 105:3–7.) In his deposition, plaintiff testified that he could not smell the inmate smoking in the cell furthest away from his on the hallway because of the doors and windows in the hallway, unless it was a breezy day and his window was open. (*Id.* 66:16–22.) The Officer's Station was situated further away from plaintiffs cell than the cell of this furthest inmate and the windows in the Officer's Station, unlike the windows in the inmate's cell, faced out onto a different part of the facility. (*Id.* 105: 11–14.)

Additionally, defendants Hirsch and Turner worked the day shift, approximately 6:30 A.M. to 2:30 P.M. (*Id.* 68:16–69:18.) In his declaration, Officer Hirsch states that, "most of the inmates who live on the 9–2 Housing Unit are out of the unit for the majority of my shift ... eating breakfast or lunch off of the housing unit or are working in jobs or taking classes off of the housing unit. After lunch, which ends at approximately 12:45 P.M., many inmates go to the yard for recreation if they do not have afternoon jobs or classes." (Hirsch Decl. ¶ 13.) Plaintiff testified that he "took quite a few classes" while at FCF, "probably average[ing]" about three hours a day. (Islam Dep. 92:24–93:12.) Moreover, plaintiff's programming and work history report indicates that from January 16, 2006 to approximately September 30, 2007, plaintiff held the position of Porter I in E Block during the day and Paralegal Assistant in the Law Library in the evenings. (Programming and Work History Report, attached at Roberts Decl. Ex. G.) After September 30,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 723568 (S.D.N.Y.)
**(Cite as: 2011 WL 723568 (S.D.N.Y.))**

2007, plaintiff held the position of Porter I in Hall Squad both during the day and in the evenings. (*Id.*) The combination of classes, programming and work likely kept plaintiff away from the 9/2 Housing Unit for a large part of defendants Hirsch and Turner's shift.

**\*8** With respect to the objective prong, plaintiff has not come forward with some evidence from which a reasonable jury could find that "he himself is being exposed to unreasonably high levels of ETS" and that the risk to his health is sufficiently serious and "not one that today's society chooses to tolerate." *Helling,* 509 U.S. at 35.

B. *Subjective Prong*

Having concluded that plaintiff has failed to come forth with evidence on which a reasonable jury could find that he has met the objective prong of the Eighth Amendment inquiry, summary judgment is appropriate. Nevertheless, I will address the subjective prong as well. In order to satisfy the subjective prong, plaintiffs must come forward with some evidence from which a reasonable jury could conclude that prison officials have acted with deliberate indifference, taking into account prison officials' "current attitudes and conduct and any policies that have been enacted." *Warren,* 196 F.3d at 333 (internal quotation marks omitted). The adoption of a smoking policy, if enforced, "will bear heavily on the inquiry into deliberate indifference." *Helling,* 509 U.S. at 36.

In support of summary judgment, defendants have come forward with evidence of the smoking policies in effect at FCF during the time period at issue and enforcement of those policies, including disciplinary actions taken against inmates who violated the smoking policies as they existed at the time. As of January 1, 2001, all indoor smoking within all FCF facility buildings was prohibited. (FCF Smoking Policy § V, attached at Roberts Decl. Ex. H.) All staff, inmates and visitors were advised of this policy and of other requirements of the New York State Clean Indoor Air Act as it related to FCF in a March 24, 2000

memorandum from FCF's Superintendent, then William Mazzuca. (Roberts Decl. ¶ 9.) Among other things, the memorandum provided that "each area supervisor shall evaluate monthly all areas under his/her supervision to determine compliance." (FCF Smoking Policy at § VI, attached at Roberts Decl. Ex. H.)

Monthly reports from April 20, 2004 to December 4, 2007 detailing the number of disciplinary actions taken with respect to violations of the indoor smoking ban by inmates at FCF demonstrate that the smoking policies were being enforced at all times relevant to plaintiff's Complaint. For example, in July 2006, 14 inmates were found guilty of Tier II disciplinary violations of the smoking policy. (Monthly Disciplinary Reports at p. 29, attached at Roberts Decl. Ex. I.) In August 2006, 9 inmates were found guilty of Tier II disciplinary violations of the smoking policy. (*Id.* at p. 30.) In September 2006, 13 inmates were found guilty of Tier II disciplinary violations of the smoking policy, and 1 inmate was found guilty of a Tier III disciplinary violation of the smoking policy. (*Id.* at p. 31.) In October 2006 the month in which plaintiff first grieved about ETS 16 inmates were found guilty of Tier II disciplinary violations of the smoking policy. (*Id.* at p. 32.) A review of the remaining entries on the record demonstrates a similar pattern of enforcement. In total, "inmates were found guilty 1,008 times of violating the indoor smoking ban (although in several instances the same inmate was found guilty at different times)." (Roberts Decl. ¶ 11; Monthly Disciplinary Reports, attached at Roberts Decl. Ex. J.)

**\*9** Moreover, entries in the 9/2 Housing Unit Warning Log Book from September 26, 2004 to November 22, 2007 demonstrate that warnings were often given to inmates who violated the smoking policy by smoking in the 9/2 bathroom. (Warning Log Book, attached at Roberts Decl. Ex. F.) In a sworn declaration, defendant Hirsch explains that warnings, rather than misbehavior reports, were often issued to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 723568 (S.D.N.Y.)
**(Cite as: 2011 WL 723568 (S.D.N.Y.))**

inmates for violations of the smoking ban, particularly in the first instance. (Hirsch Decl. ¶ 8.) By way of example, this Court counts 18 warnings given to inmates for smoking in the 9/2 bathroom in the 2006 calendar year. (Warning Log Book, attached at Roberts Decl. Ex. F.) Similarly, there were about 20 warnings given to inmates for smoking in the 9/2 bathroom in the 2007 calendar year. (*Id.*) Finally, copies of "Monthly Safety and Environmental Services Inspection Reports" for the 9/2 Housing Unit from 2006 and 2007 indicate that monthly inspections of the 9/2 Housing Unit revealed general compliance with the indoor smoking ban. (Roberts Decl. ¶ 12; Monthly Safety and Environmental Services Inspection Reports, attached at Roberts Decl. Ex. K.)

Taken together, these records demonstrate that, while inmate compliance with the smoking ban was not universal, supervisory personnel at FCF were hardly indifferent to the enforcement of the smoking policies. Moreover, the enforcement of the smoking policies, when viewed in light of the issues faced in administering a correctional facility, does not show that the prison official "knows of and disregards an excessive risk to inmate health or safety ...." *Farmer, 511 U.S. at 837.* For example, in his sworn declaration, defendant Hirsch explains that in order to be able to issue a misbehavior report for smoking in the 9/2 Housing Unit bathroom, he must actually see the inmate violating the policy (Hirsch Decl. ¶ 7.) Often inmates would see him approaching through the window on the door to the bathroom or be warned of his coming by other inmates and put out and discard their cigarettes before he arrived. (*Id.* ¶ 7.) Without more evidence as to a violation by a specific inmate, defendant Officer Hirsch could not justify issuing a misbehavior report. (*Id.* ¶ 8.)

The evidence also shows that each grievance plaintiff filed regarding noncompliance with the smoking policy appears to have been respectfully considered by the defendants. (Harben Decl. Exs. E, F, H.) Plaintiff first grieved about ETS exposure in an October 6, 2006 grievance, Grievance # 28447–06. (Harben Decl. Ex. H.) Much of plaintiff's grievance is devoted to describing an incident and verbal exchange unrelated to ETS between himself and defendant Sergeant Turner. (*Id.*) Plaintiff does, however, in one sentence grieve of defendant Sergeant Turner and "the area supervisor" congregating at the 9/2 Officer's Station to smoke, exposing plaintiff to dangerous levels of ETS. (*Id.*) Plaintiff grieved again about ETS exposure on November 6, 2006, Grievance # 28571–06. (Harben Decl. Ex. E.) In plaintiff's grievance he states that defendant Officer Hirsch smokes on the 9/2 Housing Unit in violation of the facility's smoking policies. (*Id.*)

**\*10** In connection with plaintiff's October 6, 2006 grievance, defendants Hirsch and Turner were questioned and submitted written statements, defendant Lieutenant Simmons conducted an investigation and submitted written findings and a full hearing was conducted of the facts and circumstances of the grievance. (Harben Decl. Ex. H.) Similarly, in connection with plaintiff's November 6, 2006 grievance plaintiff was interviewed by Captain Pelc, Officers Hirsch, Turner and Lucas submitted written statements, and Lieutenant Simmons conducted an investigation. (Harben Decl. Ex. E.) I note that in connection with the investigation of this grievance, plaintiff refused to provide the names of inmates whom he alleged witnessed violations of the smoking ban by the prison staff. (*Id.*) Plaintiff similarly refused to provide the names of witnesses or the names of inmates who were smoking in the bathroom in violation of the smoking policy in connection with his January 5, 2007 grievance, Grievance # 28796–07. (Harben Decl. Ex. F.) By refusing to fully cooperate with the investigation, plaintiff hindered defendants' efforts to enforce the smoking policies. All of plaintiff's grievances, after full consideration, were deemed to be without merit. (Harben Decl. Ex. E, F, H.) Despite finding plaintiff's grievance to be without merit, Captain Pelc nevertheless instructed Lieutenant Simmons to monitor the smoking of the Officers stationed to the 9/2

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 723568 (S.D.N.Y.)
**(Cite as: 2011 WL 723568 (S.D.N.Y.))**

Housing Unit. (Harben Decl. Ex. E.)

In opposition to defendants' motion, plaintiff has not come forward with evidence from which a reasonable jury could find that defendants acted with deliberate indifference to an excessive risk to inmate health or safety.

CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment on plaintiffs' ETS claims is GRANTED. The Clerk is directed to enter a judgment in favor of the defendants.

SO ORDERED.

S.D.N.Y.,2011.
Islam v. Connolly
Not Reported in F.Supp.2d, 2011 WL 723568 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Aldo Contreras LIBERATI, Plaintiff,
v.
GRAVELLE, Sgt., Clinton County Jail, Defendant.

No. 9:12–CV–00795 (MAD/DEP).
Sept. 24, 2013.

Aldo Contreras Liberati, Philipsburg, PA, pro se.

Lemire, Johnson Law Firm, Gregg T. johnson, Esq,
Mary E. Kissane, Esq, of Counsel, Malta, NY, for
Defendant.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** On May 14, 2012, Plaintiff commenced this
civil rights action pursuant to 42 U.S.C. § 1983, al-
leging that upon arrival at Clinton County Correc-
tional Facility, Defendant used excessive force against
Plaintiff, causing him injury. *See* Dkt. No. 1. On De-
cember 28, 2012, Defendant moved for summary
judgment seeking dismissal of Plaintiff's claim pur-
suant to Rule 56 of the Federal Rules of Civil Proce-
dure. *See* Dkt. No. 22–7 at 5. Defendant argues that
dismissal is appropriate based on (1) plaintiff's failure
to exhaust the available administrative remedies at
Clinton before commencing suit; (2) the record evi-
dence, from which no reasonable factfinder could
conclude that he used force that violated Plaintiff's
constitutional rights; and (3) his entitlement to quali-
fied immunity from suit. *See generally* Dkt. No. 22–7.
Plaintiff failed to oppose Defendant's motion for
summary judgment. *See* Dkt. No. 31 at 6.

In a Report–Recommendation and Order dated
August 9, 2013, Magistrate Judge Peebles recom-
mended that the Court grant Defendant's motion for
summary judgment and dismiss Plaintiff's complaint.
*See* Dkt. No. 31 at 2. Specifically, although Magistrate
Judge Peebles found that questions of fact preclude
granting the motion on exhaustion grounds, he found
that the motion should be granted on the merits be-
cause no reasonable factfinder could conclude that
Defendant violated Plaintiff's Eighth Amendment
rights. *See id.* at 21. Neither party objected to Magis-
trate Judge Peebles Report–Recommendation and
Order.

On February 5, 2012, Plaintiff was transferred to
Clinton Correctional Facility ("Clinton") located in
Dannemora, New York. *See* Dkt. No. 22–2 at 3.
During the transfer, the corrections officers escorting
Plaintiff called Clinton to notify them that Plaintiff
was difficult and combative. *See id.* Upon arrival, the
staff at Clinton prepared Plaintiff for housing by per-
forming the routine intake and booking procedures.
See id. at 4. Part of the normal procedure was to
conduct a patdown search to detect any contraband
that was not detected by the "BOSS" chair. *See id.* at
3. During the pat-down, Plaintiff disobeyed orders on
at least two occasions when he refused to face and
keep his hands on the wall. See id. at 4.

When the Clinton officers realized that Plaintiff
had a second layer of pants underneath his jeans, they
instructed him to remove them in a private changeout
room. See id. at 4. After removal of the pants Plaintiff
refused to remain on the wall, so they attempted to
physically restrain him. See id. at 5. Upon hearing this
commotion, Defendant entered the changeout room to
assist with the situation. See id. He observed Plaintiff
resisting the officers that were trying to restrain him.
See id. Defendant administered "a single, one second,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

application of O.C. spray towards other officers to continue to gain control over Plaintiff and secure his hands." *Id* . After he administered the spray, Defendant placed it back in his holster and retreated to allow the other officers to gain control of Plaintiff. See id. Although Defendant remained in the room, he used no further force against him other than to place his feet near the Plaintiff to prevent him from putting his hands under his body. See id. at 5–6. When the Plaintiff was fully secured, Defendant left the room. See id. at 6. Plaintiff was then escorted to a holding cell to provide him an opportunity to calm down, decontaminate his eyes with eye wash and see medical staff at the facility. See id.

**\*2** Plaintiff's verified complaint alleges that Defendant punched him in the head twice and that he did not file a grievance regarding these allegations because the corrections officers at Clinton refused to provide him with the necessary form. See id. at 2.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

Cir.1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. See id. at 295 (citing *Showers v. Eastmond,* No. 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidenced" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Upon review of Magistrate Judge Peebles' Report–Recommendation and Order, the Court finds that the report correctly determined that Defendant's motion for summary judgment should be granted. In support of the motion for summary judgment, Defendant argues that he did not violate Plaintiff's Eighth Amendment rights because there is no record evidence that he punched Plaintiff in the head or used excessive force. *See* Dkt. No. 22–7 at 8–11. To state a claim for excessive force, a plaintiff must show defendant's acts are "incompatible with 'the evolving standards of decency that mark the process of a maturing society,' or involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958); *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). Even though the Eighth Amendment does not mandate that prisons be comfortable, they must be sufficiently humane. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two componentsone subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson v. McMillian,* 503 U.S. 1, 7–8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). The subjective element is satisfied when plaintiff demonstrates that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the alleged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry looks at "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 6 (quoting *Whitley v. Albers,* 475 U.S. 312, 320 (1986)).

The objective element examines the harm inflicted in relation to "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8). Malicious or sadistic harm caused by prison officials, notwithstanding the extent of injury, always violates the "contemporary standards of decency." *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9). The amount of force is examined in proportion to the need reasonably perceived by prison officials and what, if anything, did they do to limit such force. *See Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993).

In the present matter, no evidence in the record suggests that Defendant, Gravelle used force maliciously or sadistically against Plaintiff. The record reveals that action was initiated against Plaintiff in response to his repeated failures to obey orders to keep his hands on the wall during the pat-down search. Defendant administered a single O.C. spray to assist the corrections officers and then moved away from Plaintiff, using no more force or spray than was necessary to control Plaintiff. The undisputed material facts make clear that no reasonable factfinder could conclude that Defendant used malicious or sadistic force against Plaintiff because such actions were taken in response to Plaintiff's failure to obey orders and the need to restore order. Although Plaintiff's claim that Defendant punched him in the head would constitute malicious or sadistic force in violation of Plaintiff's Eighth Amendment rights, there is no evidence in the record to support such claim. Therefore, Plaintiff fails to state a claim that Defendant violated his Eighth

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

Amendment rights.

**\*4** After careful review of Magistrate Judge Peebles' Report–Recommendation and Order, the parties' parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' August 9, 2013 Report–Recommendation and Order is **ADOPTED in its entirety;** and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 22) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Aldo Conteras Liberati has commenced this action pursuant to 42 U.S.C. § 1983, alleging the deprivation of his rights under the United States Constitution. In his complaint, plaintiff alleges that, upon his arrival at the Clinton County Correctional Facility ("Clinton"), he suffered injuries arising from the use of excessive force by defendant Gravelle, a sergeant corrections officer stationed at Clinton at the times relevant to this action.

Currently pending before the court is defendant's motion for summary judgment on the merits, and based also on plaintiff's failure to exhaust the available administrative remedies and defendant's assertion that he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendant's motion be granted, and plaintiff's complaint be dismissed.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

On February 5, 2012, plaintiff was transported to Clinton, located in Dannemora, New York, by United States immigration officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 8. Prior to his arrival at Clinton, immigration officers called Clinton to notify staff that, during the transport, plaintiff was difficult and combative. *Id.* Upon arriving at Clinton, facility staff began to prepare plaintiff for housing by subjecting him to routine intake and booking procedures. *Id.* at ¶ 10. This process included scanning plaintiff using a "BOSS" chair, which is designed to detect any metal contraband, as well as pat-searching him in a private room called the "changeout room" for any contraband not detected by the BOSS chair.[FN2] Id. at ¶¶ 3, 10.

> FN2. A camera is installed in the changeout room. *Id.* at ¶ 10. In support of his motion, defendant submitted, as Exhibit A to his declaration, a copy of the recording from plaintiff's intake during the pat-search on February 5, 2012. Gravelle Decl. Exh. A (traditionally filed).

During the pat-search, plaintiff was directed by Clinton corrections officers to face and keep his hands on the wall. Gravelle Decl. (Dkt. No. 22–2) at ¶ 11. On at least two occasions, however, plaintiff disobeyed this order, and turned toward the officer conducting

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

the search. Gravelle Decl. Exh. A (traditionally filed) at 0:33, 1:05. At some point during the search, the officer performing the pat-down discovered that plaintiff was wearing a second layer of pants underneath his jeans. Gravelle Decl. (Dkt. No. 22–2) at ¶ 12. Plaintiff was then directed to move into a more private part of the changeout room and remove his jeans. *Id.* When plaintiff refused to remain on the wall after he removed his jeans, several Clinton corrections officers attempted to take physical control of the plaintiff to restrain him. *Id.;* Gravelle Decl. Exh. A (traditionally filed) at 1:11.

**\*5** Moments after the pat-search began, defendant Gravelle, whose office is located nearby the changeout room, heard the commotion arising from plaintiff's search, and went to assist the other officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:15. Upon entering the changeout room, defendant observed plaintiff resisting the officers attempting to restrain plaintiff. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13. Defendant immediately administered one, single application of "O.C. spray" to regain control of plaintiff.[FN3] Gravelle Decl. (Dkt. No. 22–2) at ¶¶ 13, 14; Gravelle Decl. Exh. A (traditionally filed) at 1:17. Defendant then moved back away from Liberati and allowed the other corrections officers to secure plaintiff's hands. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:18. Although defendant remained in the changeout room until plaintiff was secured, he did not use any further force against him. Gravelle Exh. A (traditionally filed) at 1:18–2:16. After plaintiff was secured, Clinton corrections officers escorted him to a holding cell to provide him opportunity to clam down, following which his eyes were decontaminated with eye wash and he was seen by medical staff at the facility. Gravelle Dec. (Dkt. No. 22–2) at ¶ 15.

> [FN3]. The term "O.C. spray" is not defined in defendant's motion papers. *See,* e.g., Gravelle Decl. (Dkt. No. 22–2); Def.'s L.R. 7 .1(a)(3)

Statement (Dkt. No. 22–6).

In plaintiff's verified complaint, he alleges that defendant punched him twice in the head. Compl. (Dkt. No. 1) at 8. He also contends that he did not file a grievance regarding these allegations due to the refusal of corrections officers at Clinton to provide him with the necessary form. *Id.* at 2.

## II. *PROCEDURAL HISTORY:*

Plaintiff commenced this action on May 14, 2012, by the filing of a complaint, motion to stay deportation, and application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1–3. Plaintiff's complaint is comprised of eight claims, and names six defendants, including defendant Gravelle. *See generally* Compl. (Dkt. No. 1). On August 27, 2012, District Judge Mae A. D'Agostino issued a decision and order granting plaintiff's request to proceed IFP, denying his motion to stay deportation, and dismissing all claims with the exception of plaintiff's Eighth Amendment excessive force cause of action asserted solely against defendant Gravelle. Dkt. No. 9.

Now that discovery in this matter is closed, the remaining defendant, Sergeant Gravelle, has moved for the entry of summary judgment, dismissing plaintiff's remaining claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 22. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. *See generally* Def.'s Memo. of Law (Dkt. No. 22–7).

**\*6** Defendant's motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B)

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Plaintiff's Failure to Oppose Defendant's Motion*

The court's local rules require that a party seeking summary judgment must submit a statement of material facts that it contends are undisputed by the record evidence. N.D.N.Y. L.R. 7.1(a)(3). The local rules also instruct the non-moving party to respond to the moving party's statement of material facts by specifically admitting or denying each of the facts listed in the moving party's statement. *Id.* The purpose underlying this rule is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N.Y.,* Nos. 09–CV0360, 09–CV–0363, 2011 WL 1770301, at *1 n. 2 (N.D.N.Y. May 9, 2011)* (Sharpe, J.).FN4 To meaningfully fulfill this purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement from the non-moving party.

> FN4. Copies of all unreported decisions cited have been appended to this report for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

In this instance, defendant Gravelle has complied with local rule 7.1(a)(3), providing a statement setting forth twenty-three facts as to which, he contends, there is no genuine triable issue. Def.'s L.R. 7.1(a)(3) Statement (Dkt. No. 22–6). Plaintiff, however, has failed to respond either to that statement, or to defendant's motion generally.FN5 See *generally* Docket Sheet.

> FN5. Plaintiff's response was due on January

22, 2013. Notice to Plaintiff (Dkt. No. 24). On July 24, 2013, the court received a letter from plaintiff requesting leave to file a response in opposition to the pending motion. Dkt. No. 29. Because plaintiff's request was over six-months late, and he was adequately put on notice previously of the consequences of failing to respond to defendant's motion, and in light of the unfair prejudice that defendant would incur as a result of such a delayed response, I denied that motion. Text Order Dated July 24, 2013.

By its terms, local rule 7.1 provides, in part, that "*[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*" N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this provision in cases where a non-movant fails to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010)* (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998)* (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a *pro se* litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011)* (Mordue, C.J.).

**\*7** Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's rule 7.1(a)(3) statement, Dkt. Nos. 22–1,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

24–1, but has nonetheless failed to do so, I have construed defendant's facts contained therein as true to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at \*1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's rule 7.1(a)(3) statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

## B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); see also *Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

## C. *Exhaustion of Available Administrative Remedies*

**\*8** In his motion, defendant Gravelle argues that, because plaintiff did not file a grievance addressing the issues now raised in this action before commencing suit and pursue that grievance through the administrative grievance procedure available at Clinton, he is procedurally barred from pursuing this action. Def.'s Memo of Law (Dkt. No. 22–7) at 11–12.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular epi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

sodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." [FN6] *Jones v. Bock,* 549 U.S. 199, 216 (2007). In the event a defendant establishes that the inmate-plaintiff failed to complete the administrative review process prior to commencing the action, the plaintiff's complaint is subject to dismissal. *See Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[FN7]

> **FN6.** In this case, defendant Gravelle raised failure to exhaust administrative remedies as a defense in his answer to plaintiff's complaint. Dkt. No. 14 at ¶ 14.

> **FN7.** While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

There are grievance procedures in place and

available to any Clinton inmate who desires to complain regarding prison conditions at the facility. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17; Johnson Decl. Exh. B (Dkt. No. 22–5). In this case plaintiff's complaint, which is signed under penalty of perjury, and thus has the same force and effect as an affidavit,[FN8] alleges that he requested a grievance form from Clinton corrections officers but they refused to provide one to him. Compl. (Dkt. No. 1) at 4, 8. In support of his motion, defendant Gravelle avers that plaintiff did not file a grievance regarding the events giving rise to this action while at Clinton. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17.

> **FN8.** 18 U.S.C. § 1746; *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes[.]").

**\*9** Although it is clear from the record that plaintiff failed to avail himself of the administrative remedies available to him, his failure to do so does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

*Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

In this instance, although there is no record evidence to suggest that grievance procedures at Clinton were not fully available to plaintiff while he was at the facility, plaintiff does allege that corrections officers stationed at the facility refused to provide him with a grievance form. Under ordinary circumstances, this could justify a recommendation to the assigned district judge that she hold a hearing to develop plaintiff's allegation regarding special circumstances pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011). However, as is discussed more fully below, because I recommend that defendant's motion be granted based on a finding that no reasonable factfinder could conclude that defendant violated plaintiff's rights, a determination of whether plaintiff should be precluded from bringing this action based on a failure to exhaust administrative remedies is not necessary.

D. *Plaintiff's Excessive Force Claim*

In support of defendant's motion, defendant Gravelle argues that there is no record evidence to support the allegation that he punched plaintiff, and that the record instead supports a finding that defendant's use of force against plaintiff did not violate his Eighth Amendment rights. Def.'s Memo. of Law (Dkt. No. 22–7) at 8–11.

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable pris-

ons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.. Chapman,* 452 U.S. 337, 349 (1981)).

**\*10** A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319 (internal quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (internal quotation marks omitted), accord, *Blyden,* 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins,* 559 U.S. at 37; *Hudson,* 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

a prisoner's constitutional rights.' *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (internal quotation marks omitted); *see also Griffin,* 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.' *Hudson,* 503 U.S. at 9–10 (internal quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8); *see also Blyden,* 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter,* 501 U.S. 294, 303 (1991), *accord Hudson,* 503 U.S. at 8; *see also Wright,* 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident." *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins,* 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano,* 998 F.2d at 105.

**\*11** Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *Wright,* 554

F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")).

In this case, although plaintiff's complaint alleges that defendant Gravelle punched him twice in the head, there is no record evidence to support this claim. Compl. (Dkt. No. 1) at 8. Instead, the record reveals that defendant used O.C. spray against plaintiff on one occasion during the course of an altercation with corrections officers, while those officers attempted to gain control over him. The video recording submitted in support of defendant's motion shows defendant coming into the changeout room after plaintiff was already on the ground with several officers trying to restrain him. Defendant quickly applied the O.C. spray to plaintiff's face, and then moved away from plaintiff and the other officers. According to defendant, corrections officers initiated the use of force against plaintiff as a result of his failure to obey orders to keep his hands on the wall during the pat-search. Defendant's use of force lasted a matter of seconds, and he sprayed plaintiff only to assist corrections officers in restraining him. In addition, although defendant states that plaintiff was seen by medical staff at Clinton following the incident, nothing in the record, including plaintiff's complaint, indicates that plaintiff suffered a physical injury as a result of the incident. In light of all of this record evidence, I find that no reasonable factfinder could conclude that defendant used force against plaintiff maliciously or sadistically, or for any other purpose than restoring order. *See Kopy v. Howard,* No. 07–CV0417, 2010 WL 3808677, at \*3 (N.D.N.Y. Aug. 11, 2010) (Treece, M.J.), *report and recommendation adopted by* 2010 WL 3807166 (N.D .N.Y. Sept. 21, 2010) (Hurd, J.) (granting summary judgment where the record evidence demonstrated that the defendants used pepper spray on the plaintiff

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5372872 (N.D.N.Y.)
**(Cite as: 2013 WL 5372872 (N.D.N.Y.))**

only once after plaintiff was repeatedly ordered to return to his cell and plaintiff suffered no injuries). Accordingly, I recommend that defendant's motion be granted.[FN9]

> **FN9.** Because I recommend dismissal of plaintiff's complaint based on the merits, I have not considered defendant's qualified immunity argument.

IV. *SUMMARY AND RECOMMENDATION*

In defendant's motion, he challenges the legal sufficiency of plaintiff's excessive force claim. Because the record contains a dispute of material fact as to whether plaintiff's failure to exhaust available administrative remedies may be excused, defendant is not entitled to dismissal on that basis. However, after a careful review of the record evidence, including a video recording of defendant's use of force, I find that no reasonable factfinder could conclude that defendant violated plaintiff's Eighth Amendment rights.

**\*12** Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 22–7) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 86 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2013.
Liberati v. Gravelle
Slip Copy, 2013 WL 5372872 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jeffrey LIGGINS, Plaintiff,
v.
Douglas PARKER, et al., Defendants.

No. 9:04-CV-0966.
Sept. 25, 2007.

Jeffrey Liggins, pro se.

Ryan, Smallacombe Law Firm, Claudia A. Ryan, Esq., John F. Moore, Esq., of Counsel, Albany, NY, for the Defendant.

### ORDER

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge David E. Peebles, duly filed on the 5th day of September, 2007. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The Defendants' motion for summary judgment (Dkt. No. 33) is granted, and the Plaintiff's complaint is dismissed in its entirety.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Jeffrey Liggins, who is proceeding *pro se* and *in forma pauperis,* has commenced this inmate civil rights action pursuant to 42 U.S.C. § 1983 against Hamilton County and the County's Sheriff, as well as certain other County employees, complaining of conditions which he endured while confined as a pretrial detainee in the Hamilton County Jail ("HCJ"). Plaintiff's complaint represents a comprehensive, wide-ranging critique of the operations of the defendants' prison facility, with his allegations ranging in severity from the failure of prison guards to wear name tags, tuck in their shirts, lace and polish their shoes, and refrain from the use of foul language and boorish behavior, to defendants' failure to provide him with adequate medical care and interference with his access to the attorneys representing him and the courts. In light of the treatment which he received over the nine month period during which he was incarcerated at the HCJ, described by him as "inhumane", plaintiff seeks recovery of compensatory and punitive damages totaling $6 million.

Currently pending before the court is a motion made on behalf of the defendants in the action seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety, both on the merits and based upon qualified immunity. For the reasons set forth below, I recommend that defendants' motion be

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

granted.

## I. *BACKGROUND*

### A. *The HCJ Generally*

Between June 27, 2002 and April 1, 2003, plaintiff was confined within the HCJ as a result of criminal charges originating in the Town of Lake Pleasant, New York located within Hamilton County. Amended Complaint (Dkt. No. 12) ¶ 18; Parker Aff. (Dkt. No. 33-3) ¶ 4; *see also* Defendants' Exhibits (Dkt. No. 35) Exh. 21. The HCJ is a six-cell prison facility located in Lake Pleasant, and comprised of four cells on the facility's main floor and two upstairs, with an additional group room located outside of the cells, containing an eating area, a television, and a table. Parker Aff. (Dkt. No. 33-3) ¶¶ 8-9; Defendants' Exhibits (Dkt. No. 35) Exh. 16-A. The HCJ typically houses and co-mingles both sentenced and non-sentenced inmates.

**\*2** Inmates confined within the HCJ are subject to rules and regulations which are reduced to writing and included in a prison rule book. Amended Complaint (Dkt. No. 12) ¶ 23; Parker Aff. (Dkt. No. 33-3) ¶ 10; Defendants' Exhibits (Dkt. No. 34) Exh. 10-A. The facility's rules and regulations were read to the plaintiff on the day of his arrival at the facility by Corrections Officer Robert Krugal, who is named in plaintiff's complaint as defendant "Robe Doe", and plaintiff signed a document acknowledging that this in fact occurred. Parker Aff. (Dkt. No. 33-3) ¶¶ 10-12; Defendants' Exhibits (Dkt.Nos.34-35) Exhs. 10-A, 24; *see also* Amended Complaint (Dkt. No. 12) ¶ 23. Included among the policies and procedures in existence at the HCJ is a grievance book to which all inmates within the facility have access.[FN1,FN2] Parker Aff. (Dkt. No. 33-3) ¶ 13. Although they appear to have been available to him for review, plaintiff was not provided with a copy of either the facility rule book or the grievance procedure. Amended Complaint

(Dkt. No. 12) ¶ 23.

FN1. Plaintiff disputes the availability of a functional grievance procedure at the facility. *See* Amended Complaint (Dkt. No. 12) ¶ 15 ("[t]here is no prison grievance procedure at the [HCJ]"); Liggins Aff. (Dkt. No. 39) ¶ 6(gg) ("[i]ntake made mention of a grievance book however I was never permitted to use this procedure").

FN2. While Sheriff Parker indicates that the grievance book is attached to as Exhibit 16 to the affidavit of defendants' counsel, that procedure manual does not accompany Exhibit 16 as filed with the court and I have been unable to locate it among the voluminous materials submitted by defendants in conjunction with their motion.

### B. *Missing Belongings*

In accordance with the policy in existence at the HCJ at the relevant times, each inmate is given a milk crate, which is tagged with the prisoner's name, in which to place clothing. Parker Aff. (Dkt. No. 33-3) ¶ 16. Clothing that does not fit within the milk crate is hung in a closet at the facility. *Id.* This practice was apparently followed with respect to the plaintiff. *Id.*

Shortly after his arrest on June 27, 2002, a relative of the plaintiff delivered dress clothes to the HCJ for his use during court appearances; though later recovered on or about October 9, 2003 from a cabinet outside of another prisoner's cell door, those dress clothes were apparently misplaced for a time. Amended Complaint (Dkt. No. 12) ¶¶ 18, 32. In addition to his missing court clothes, plaintiff also maintains that at one point in October of 2002, prison officials at the HCJ misplaced a tee shirt and a CD, following his return from a brief stay at the Central New York Psychiatric Center in Marcy, New York; those items, however, were discovered in January of 2003 in a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

trash bag located within a milk crate. Amended Complaint (Dkt. No. 12) ¶ 33.

### C. *Attorney Access*

One of the central issues raised in plaintiff's complaint concerns communications with attorneys in connection with the pending criminal prosecution against him. There is no specific written policy in existence at the HCJ governing telephonic communication between inmates and their attorneys; as a matter of practice, however, inmates are permitted to call their attorneys of record upon request, subject only to the availability of telephone facilities. Parker Aff. (Dkt. No. 33-3) ¶ 17. In-person legal visitation is a matter governed by a specific policy under which inmates are allowed to receive visits from their attorneys during normal hours of operation, provided that no disruption of the facility's operations results. *Id.* ¶ 18.

**\*3** While acknowledging these policies, plaintiff attributes the failure of his first court appointed lawyer, Sterling Goodspeed, Esq ., to visit him over the summer of 2002 to defendants' actions. Amended Complaint (Dkt. No. 12) ¶ 36. Neither plaintiff's complaint nor his affidavit in opposition to defendants' motion, however, supplies further amplification, nor does the record contain anything tending to corroborate his claim that the lawyer's failure to visit him is properly attributable to defendants' policies or actions.[FN3]

> [FN3]. In their motion, defendants note that plaintiff was able to confer by telephone with Attorney Goodspeed following his initial booking into the HCJ, and that he was always permitted by prison officials to speak with Attorney Goodspeed by telephone or to receive his visits. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 44-45, 136 and Exh. 16-B. A log maintained at the HCJ reflects several telephone conversations between the plaintiff and Attorney Goodspeed, as well as

calls made by the plaintiff to other attorneys during the time that Goodspeed acted as his counsel of record. *See* Defendants' Exhibits (Dkt. No. 34) Exh. 16-B.

As a result of his inability to communicate with Attorney Goodspeed, plaintiff retained attorney Richard Bach, Esq., of Utica, New York. Amended Complaint (Dkt. No. 12) ¶¶ 37-39. After announcing during a court appearance in mid-September of 2002 that he had retained that attorney to replace court-appointed lawyer Goodspeed, plaintiff received a letter from Attorney Bach advising that he was unable to represent him and stating, in relevant part, as follows: "In reviewing my upcoming trial schedule-I have determined that I would be unable to represent Jeffrey in the manner which would best serve his legal interest." Defendants' Exhibits (Dkt.Nos.34-35) Exh. 14 at pp. 63, 72-77 and Exh. 20. Though once again offering no specifics or corroborating evidence, plaintiff attributes the withdrawal of Attorney Bach and the return of his retainer to counsel's inability to speak with Liggins by telephone. Amended Complaint (Dkt. No. 12) ¶¶ 37-39.

Following Attorney Bach's withdrawal, the court appointed a second attorney, William Martuscello, Esq., to represent the plaintiff. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 80-81. That attorney represented Liggins in the course of the criminal prosecution against him up until the time of his sentencing. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 10.

### D. *Monitoring of Telephone Calls*

Plaintiff asserts that while speaking by telephone with attorneys or family members from the jail he could hear indications that his conversations were being monitored, including clicking sounds and other voices. Amended Complaint (Dkt. No. 12) ¶ 41. In response, defendants assert that pursuant to the policy in effect at the HCJ, prison officials are typically present during, and monitor inmate non-legal tele-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

phone conversations, although they are able to hear only the inmate portion of any given conversation.[FN4] Parker Aff. (Dkt. No. 33-3) ¶¶ 26-27. Plaintiff attributes any clicking or other similar sounds to "technical difficulties" resulting from having only one line into the facility. *See* Defendants' Exhibits (Dkt. No. 34) at pp. 66-67.

> FN4. Significantly, that policy did not apply to inmate conversation with attorneys, which remained private and confidential. Parker Aff. (Dkt. No. 33-3) ¶ 28.

### E. *Access to Law Library and Legal Materials*

Another facet of plaintiff's complaint concerns the availability of legal resources at the prison. Plaintiff maintains that the refusal of prison officials to make photocopies of legal documents without charge, the lack of "trained personnel to assist in the preparation of legal documents[,]" and the unavailability of a law library within the facility, impermissibly interferes with the right of inmate court access, in violation of the First Amendment. Amended Complaint (Dkt. No. 12) ¶¶ 44-45; Liggins Aff. (Dkt. No. 39) ¶ 6(p).

**\*4** Because of its small size, the HCJ does not contain a law library, nor does it have a specific written policy concerning library use. Parker Aff. (Dkt. No. 33-3) ¶¶ 49-51. In practice, however, inmates at the facility are afforded the opportunity to request legal materials, which are then retrieved from a law library maintained within the county supervisor's office, a short distance from the jail facility. *Id.* While on occasion plaintiff did apparently request legal materials, and did not always receive the correct books, he was ultimately provided with the requested legal materials. *Id.; see also* Liggins Aff. (Dkt. No. 39) ¶ 6(q), (r) (Dkt. No. 12). It should be noted, moreover, that those requests were made at a time when Liggins was represented by counsel, and thus any failure to provide him with legal materials did not hinder his ability to defend against pending criminal charges. *See* Defendants' Exhibits (Dkt. No. 34) Exh.

14 at p. 95.

### F. *Medical Care and Treatment*

Another major focus of plaintiff's multi-faceted complaint is the medical care and treatment which he received while confined by the defendants within the HCJ. Plaintiff's medical care claim falls into two categories, one addressing his exposure to second hand smoke, or environmental tobacco smoke ("ETS"), and the second related to a chronic back condition which, he maintains, was inadequately addressed by the defendants during his stay there.

### 1. *ETS*

Plaintiff maintains that subsequent to his arrival at the HCJ in June of 2002, he was subjected to second hand smoke at the hands of fellow inmates as well as jail workers. Amended Complaint (Dkt. No. 12) ¶¶ 27-28, 48. According to the plaintiff, not only was smoking not prohibited at the HCJ but in fact inmates' smoking habits were encouraged by jail officials who were known to transport them to local ATM machines to withdraw cash for the purchase of cartons of cigarettes, and to go to the store for inmates on Thursdays and Fridays for the purpose of purchasing cigarettes. *Id.* ¶¶ 47-48.

In January of 2003, as a direct result of plaintiff's complaints regarding exposure to second hand smoke, defendant Parker implemented a smoking ban, applicable to both inmates and employees alike, within the entire inside HCJ facility.[FN5,FN6] Parker Aff. (Dkt. No. 33-3) ¶ 77. In accordance with that ban, which was strictly enforced, neither employees nor inmates were permitted to smoke inside of the facility. *Id.* ¶ 78.

> FN5. According to the plaintiff, there was a no-smoking policy in effect at the HCJ at the time of his arrival in June of 2002, although it was not enforced until January, 2003. Liggins Aff. (Dkt. No. 39) ¶ 6(d).

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

FN6. Shortly after the smoking ban went into effect plaintiff was separated from two inmates who were smokers. Parker Aff. (Dkt. No. 33-3) ¶ 82. That separation was implemented for plaintiff's protection, with defendants fearing the possibility of retaliation against the plaintiff for implementation of the smoking ban. Parker Aff. (Dkt. No. 33-3) ¶ 82. That separation was short-lived, however, in light of assurances by the plaintiff that he did not fear being harmed as a result of the smoking ban. *Id.* ¶ 83.

Prior to implementation of the smoking ban, while employees and inmates were permitted to smoke, the plaintiff and other non-smoking inmates were free to move about the facility between 7:00 am and 11:00 pm, in such a way as to avoid anyone smoking. Parker Aff. (Dkt. No. 33-3) ¶ 80. Plaintiff and other inmates were also permitted to open windows to obtain ventilation of smoke. *Id.* ¶ 81. Additionally, in response to his complaints regarding ETS, plaintiff was offered the option of a second floor cell; Liggins, however, refused that proposed transfer. Parker Aff. (Dkt. No. 33-3) ¶ 76.

### 2. *Plaintiff's Back Condition*

**\*5** At the time of his entry into the HCJ, plaintiff had a documented history of a chronic lumbar back condition. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 103-09, 123-24; Eagan Aff. (Dkt. No. 33-4) ¶¶ 2-3; *see also* Defendants' Exhibits (Dkt. No. 35) Exh. 17. Records associated with plaintiff's pre-custodial medical treatment reveal that well prior to his incarceration at the HCJ he was diagnosed as suffering from degenerative disc disease and a herniated disc at L5-S1. *Id.*

In light of the size of the facility the HCJ does not employ a physician working at the jail; instead, HCJ inmates in need of medical care are treated by physicians and other medical personnel employed at the Speculator Primary Care Center or the Nathan Littauer

Hospital, both of which apparently are located relatively near the prison facility. Parker Aff. (Dkt. No. 33-3) ¶ 58; Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 130.

Plaintiff initially was seen at the Speculator Health Center for his low back pain on August 9, 2002, at which time he was treated with a muscle relaxant but found to be neurologically intact. Defendants' Exhibits (Dkt. No. 35) Exh. 15-A. From that point until August 18, 2002, when plaintiff was taken to the Nathan Littauer Hospital Emergency Room complaining of low back discomfort, though without radicular pain, plaintiff's condition was treated with anti-inflammatory medications, pain medication and/or muscle relaxants on almost a daily basis. *Id.* Notes from that emergency room visit record a history of a herniated disc and pain "on and off" for ten years, with a diagnosis of acute exacerbation of chronic low back strain/spasm, but with no acute disc herniation or neurological problems requiring further specialty care. *Id.; see also* Eagan Aff. (Dkt. No. 33-4) ¶ 5. Following that emergency room visit prison officials at the HCJ continued to treat the plaintiff's condition with anti-inflammatory medications, pain relief medication and/or muscle relaxants on a daily basis. Defendants' Exhibits (Dkt. No. 34) Exh. 15-D.

Plaintiff was next seen by outside medical professionals on September 27, 2002 when he was taken to the Speculator Primary Care Center complaining of shortness of breath, chest pain and back pain experienced after opening a window. Defendants' Exhibits (Dkt. No. 35) Exh. 15-A. Plaintiff was taken on that same day to Nathan Littauer Hospital for a chest x-ray and EKG, and was diagnosed as suffering from musculoskeletal pain and was prescribed medication for the pain. *Id.*

Plaintiff was taken to the Speculator Primary Care Center on October 8, 2002, again complaining of back pain. Defendants' Exhibits (Dkt. No. 35) Exh. 15-A. On that occasion, plaintiff was diagnosed with acute

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

lumbosacral strain with spasms, and was prescribed various medications.[FN7] *Id.*

> **FN7.** According to the HCJ medication log, at or about this time plaintiff refused medication offered to him on three separate occasions. Defendants' Exhibits (Dkt. No. 34) Exh. 15-D.

Plaintiff was returned to the Speculator Primary Care Center on March 17, 2003, complaining of worsening pain based upon daily exercise from December of the previous year. Defendants' Exhibits (Dkt. No. 35) Exh. 15-A. On that occasion plaintiff was diagnosed as suffering from chronic lumbosacral spine spasm/strain. *Id.* An x-ray of plaintiff's lumbar spine taken at Nathan Littauer Hospital two days later revealed disc space narrowing at L5-S1, but with no fractures. *Id.* Exh. 15-A. Plaintiff continued receiving muscle relaxers on almost a daily basis between that time and his transfer out of the jail into the Clinton Correctional Facility on April 1, 2003. *Id.* Exh. 15-A, 15-D.

**\*6** At the heart of plaintiff's claims regarding the defendants' treatment of his back condition is his contention that he requested but was denied magnetic resonance imaging ("MRI") testing to determine the cause and the extent of his back pain, and that while x-rays were ultimately taken, as requested, he was not promptly notified of their results.[FN8,FN9] *See* Amended Complaint (Dkt. No. 12) ¶¶ 50-57; Liggins Aff. (Dkt. No. 39) ¶ 6(h)-(o).

> **FN8.** Plaintiff's medical records do not substantiate his claim of having requested MRI testing of his back during his stay at the HCJ. *See* Defendants' Exhibits (Dkt. No. 35) Exh. 15-A.

> **FN9.** According to the plaintiff, shortly after his transfer out of the HCJ he was adminis-

tered an MRI, revealing a herniated disc, chronic degenerative disc disease of the lumbar region, narrowing of the disc space at L4-L5, and paracentral disc extrusion in contact with a nerve, and was scheduled for an epidural steroid injection. Liggins Aff. (Dkt. No. 39) ¶ 6(o). Defendants' medical expert, Dr. Eagan, confirms that such an MRI was conducted on May 19, 2003, but notes that while there was contact with the S1 nerve there was no displacement of the nerve root, and x-rays taken on June 10, 2003 revealed only mild degenerative disc disease. *See* Eagan Aff. (Dkt. No. 33-4) ¶ 6.

In sum, it appears that while incarcerated at the HCJ between June 27, 2002 and April 1, 2003 plaintiff was treated on at least eight separate occasions for that condition by outside sources, and was provided medications on a regular basis to assist him in coping with his pain. It is true, as defendants acknowledge, that on between three and five occasions plaintiff requested to be seen by a doctor for his back pain; those requests, however, were denied on the basis either that they were made on weekends, when there were no deputies available for transport, or at times when snow conditions made travel hazardous. Defendants' Exhibits (Dkt. No. 34) Exh. 6 (Defendants' Responses to Interrogatories) ¶ 3(e)(1)(iii); Exh. 14 at pp. 112, 119; *see also* Amended Complaint (Dkt. No. 12) ¶ 49. The records also disclose, however, that plaintiff declined offers of doctor visits on several occasions including on January 6, 2003. Defendants' Exhibits (Dkt. No. 34) Exh. 10-D and Exh. 14 at pp. 112-13.

### G. *Unprofessional Conduct and Other Miscellaneous Complaints*

Interspersed among the more serious claims set forth in this complaint, as amended, are allegations by the plaintiff of unprofessional conduct and unpleasant conditions experienced by the plaintiff as a result of the defendants' actions. Typical of those are allegations that 1) inmates are not properly overseen when

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

washing and returning dishes for reuse, Amended Complaint (Dkt. No. 12) ¶ 66; 2) on one occasion, at plaintiff's request, prison officials purchased for him bread which later turned out to contain mold, *id.* ¶ 68; 3) dust is allowed to accumulate in the facility, *id.* ¶ 74; 4) there is evidence of insects, mosquitos and mice located within the jail, *id.* ¶¶ 74-77; 5) Liggins was required to use a cup with dry black stains on the outside when served milk by prison officials, *id.* ¶ 83-85; 6) prison administrators failed to properly supervise and monitor inmates, *id.* ¶¶ 87-92; and 7) prison guards were permitted to use inappropriate language, failed to wear proper uniforms or to wear name tags, and were permitted to wear denim jeans, *id.* ¶ 21.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on August 16, 2004 and, at the direction of the court, filed an amended complaint on September 30, 2004. Dkt. Nos. 1, 8, 12. Named as defendants in plaintiff's complaint, as amended, are Hamilton County; Hamilton County Sheriff Douglas Parker; the Hamilton County Sheriff's Department; and several Hamilton County employees, including Corrections Lieutenant Carl Abrams, and Corrections Officers Robe Doe, Mike Doe and Dan Doe, each of whose last names are unknown to the plaintiff.[FN10] Plaintiff's complaint asserts various claims under the Eighth and Fourteenth Amendments to the United States Constitution, as well as alleging defendants' violation of state law and regulation associated with the operation of the HCJ. Dkt. No. 12.

> FN10. While the Hamilton County Court was also named as a defendant in plaintiff's initial complaint, the court sua sponte ordered dismissal of his claims against that entity based upon a routine review of plaintiff's complaint and *in forma pauperis* application. *See* Dkt. No. 5.

**\*7** On September 21, 2006, following the joinder of issue and completion of pretrial discovery, de-

fendants moved seeking summary judgment dismissing plaintiff's complaint in its entirety. Dkt. Nos. 33-35. In their motion, defendants argue that, as a matter of law, plaintiff's claims are deficient on the merits, and additionally assert their entitlement to qualified immunity from suit. *Id.* Plaintiff has since submitted an affidavit and memorandum in opposition to defendants' motion.[FN11] Dkt. No. 39. With the filing of that opposition and a subsequent reply on behalf of the defendants, filed on January 3, 2007, *see* Dkt. No. 41, this matter is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

> FN11. As will be seen, plaintiff's opposition papers do not include a response to defendants' statement of material facts not in dispute, submitted pursuant to Northern District of New York Local Rule 7.1(a)(3). *See* pp. 20-23, *post.*

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.[FN12] *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

FN12. In their reply papers, defendants argue that in order to avoid summary judgment the plaintiff was not entitled to rest upon the allegations of his complaint, but instead was duty bound to come forward with materials of evidentiary value in order to demonstrate the existence of genuine, triable issues of material fact, citing, *inter alia, Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). *See* Defendants' Reply Memorandum (Dkt. No. 41-2) at 2. This argument, however, overlooks the fact that plaintiff's *pro se* complaint in this action is signed by the plaintiff under penalty of per-

jury, and consequently represents the functional equivalent of an affidavit, *see Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1998) (citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), thus readily distinguishing this case from the circumstances extant in *Rexnord Holdings.*

**\*8** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to Provide a Local Rule 7.1(a)(3) Counterstatement of Disputed Facts*

In support of their motion defendants have submitted a comprehensive statement of material facts which, they contend, are not genuinely disputed, as required by Rule 7.1(a)(3) of this court's local rules.[FN13] *See* Dkt. No. 33-5. Plaintiff's opposing motion papers, however, fail to contain such a statement or to otherwise specifically address the assertions set forth in defendants Local Rule 7.1(a)(3) statement. In their reply, defendants argue that this shortcoming carries with it fatal consequences, establishing their entitlement to the relief sought in their motion. As a threshold procedural matter, I must address the significance, if any, of plaintiff's failure to properly respond to defendants' 7.1(a)(3) statement.

FN13. That rule provides, in relevant part, that

[a]ny motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established....

* * *

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs....

N.Y.N.D.L.R. 7.1(a)(3). Plaintiff was reminded of the requirements of this meaningful rule through defendants' attachment to their notice of motion of this court's "Notification Of The Consequences Of Failing To Respond To A Summary Judgment Motion." *See* Dkt. No. 33-6.

Undeniably, the consequences of plaintiff's failure to properly refute the assertions set forth in defendants' rule 7.1(a)(3) statement are potentially significant. By its express terms, Local Rule 7.1(a)(3) provides that "[a]ny facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L .R. 7.1(a)(3). This and similar rules from other districts are routinely enforced by courts, resulting in facts set forth in such statements being deemed as admitted based upon an opposing party's obligation to respond properly to the statement. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

In this instance, while it is true that the plaintiff is in technical violation of the provisions of Local Rule 7.1(a)(3), he has not totally defaulted in connection with defendants' summary judgment motion, and indeed has clearly articulated in his opposing memorandum and affidavit-albeit in an extremely terse and conclusory fashion-his position concerning each of the factual matters at issue in this case. Accordingly, and in view of his *pro se* status and the reluctance of courts to decide cases on the basis of such procedural shortcomings, *see Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996), while underscoring the importance of Local Rule 7.1(a)(3) and its utility in ensuring an orderly and reasoned presentation to the court of summary judgment motions, I nonetheless recommend against a wooden application of the rule to deem all matters set forth in the defendants' Local Rule 7.1(a)(3) statement as admitted.

### C. *Court Access and Access to Counsel*

**\*9** In his complaint, plaintiff asserts that by their actions defendants unlawfully interfered with his access to counsel and the courts. Plaintiff's court access claim is comprised of two distinct components. Plaintiff initially asserts that while confined in the HCJ he was denied access to adequate legal resources, including a law library and photocopying facilities. Additionally, Liggins maintains that prison officials at the HCJ interfered with and hampered communication with the lawyers representing him in the criminal matter which resulted in his confinement.

### 1. *Access to Legal Materials*

The first portion of plaintiff's complaint relates to the alleged insufficiency of the legal materials and resources made available to inmates at the HCJ. Defendants seek summary dismissal of this claim as a matter of law.

Without question, an inmate's constitutional right

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

to "meaningful" access to the courts is firmly established.[FN14] *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495 (1977). Although in *Bounds* the Supreme Court held that this right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law [,]" *id.* at 828, 97 S.Ct. at 1498, the Court later clarified that

> FN14. The right of court access derives from the First Amendment. *See Bill Johnson's Restaurants, Inc. v. N.L.R.B.,* 461 U.S. 731, 741, 103 S.Ct. 2161, 2169 (1983). Although plaintiff's complaint does not purport to state a claim under that constitutional provision, in light of his *pro se* status I recommend that the court construe his complaint, as amended, liberally to assert such a cause of action. *See Abbas v. Dixon,* 480 F.3d 636, 638 (2d Cir.2007).

prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.

*Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 2180 (1996) (internal quotations and citations omitted). Instead, an inmate "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* In other words, to establish a violation of the right of access to the courts, a plaintiff must demonstrate that defendants' interference caused him or her actual injury-that is, that a "nonfrivolous legal claim had been frustrated or was being impeded" as a result of

defendants' conduct. *Id.* at 352, 116 S.Ct. at 2181. This is a particularly challenging requirement to meet in a case such as this, where the prison inmate asserting the court access denial claim is represented by legal counsel in the civil or criminal matter at issue. *See Santiago v. New York City Dep't of Corr.,* 2003 WL 1563773, at *6 n .2 (S.D.N.Y. Mar. 6, 2003) (noting that where an inmate is represented by counsel, "there can be no violation of his constitutional right to access to the courts as a matter of law") (quotations omitted) (collecting cases); *see also Smith v. City of New York,* No. 03 Civ. 7576, 2005 WL 1026551, at * 7 (S.D.N.Y. May 3, 2005).

**\*10** It should be noted, moreover, that the law does not mandate that every prison facility, however small in size, maintain a physical library for use by inmates. *See Bounds,* 430 U.S. at 830-31, 97 S.Ct. at 1499. Indeed, courts have approved alternative measures deemed sufficient to afford appropriate legal materials in settings comparable to those now presented. *See, e.g., Holmes v. Buffardi,* No. 9:01-CV-980, Dkt. No. 17 (N.D.N.Y. May 9, 2002) (DiBianco, M.J.), *aff'd,* Dkt. No. 19 (N.D.N.Y. June 10, 2002) (Kahn, J.); (approving of the provision of legal materials through use of a CD Rom system); *Torres v. Buffardi,* No. 9:01-CV-1599, Dkt. No. 12 (N.D.N.Y. May 9, 2002) (DiBianco, M.J.), *aff'd,* Dkt. No. 13 (N.D.N.Y. June 12, 2002) (Kahn, J.) (approving of the provision of legal materials through use of a CD Rom system).

As a small, six-cell facility, the HCJ does not include a law library. Parker Aff. (Dkt. No. 33-3) ¶¶ 8, 49-53. Instead, inmates are informed that upon request prison officials will retrieve law books and legal materials from the local county supervisor's office, which is within walking distance from the jail, and provide them to inmates. *Id.* ¶¶ 50-51. According to Sheriff Parker, each time the plaintiff requested legal materials, they were provided through this mechanism.[FN15] *Id.* ¶ 52. Such an alternative measure to maintaining a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

complete library for a six-cell prison facility suffices to satisfy the constitutional court access mandate, and no reasonable factfinder could conclude otherwise. *See, e.g., Saucedo v. Enders,* No. Civ. EP03CA433, 2004 WL 911309, at *2 (W.D.Tex. Apr. 16, 2004) ("[A]ccess to the courts may be satisfied either by availability of legal materials, by counsel, or by any other appropriate device of the State; ... [the] alternatives open to the State are legion.") (quoting *Cruz v. Hauck,* 515 F.2d 322, 331 (5th Cir.1975)).

> FN15. In his answering affidavit, submitted in opposition to defendants' motion, Liggins asserts that he requested legal materials on several occasions to assist in the preparation of his defense and to prepare for sentencing but that "[t]he guards failed to provide the correct material." *See* Liggins Aff. (Dkt. No. 39) ¶ 6(r). This statement, however, is at odds with plaintiff's deposition testimony, during which he acknowledged that while on occasion guards would return with the wrong legal materials, he would then be provided with the requested materials a few days later. *See* Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 95; *see also* Parker Aff. (Dkt. No. 33-3) ¶ 53. An affidavit given in opposition to a summary judgment motion which conflicts with other sworn statements of the opposing party cannot alone suffice to raise a genuine issue of material fact. *See Reisner v. Gen. Motors,* 671 F.2d 91, 93 (2d Cir.) (disregarding factual claims made in opposition to summary judgment motion which contradicted earlier affidavits, deposition testimony, and interrogatory responses), *cert. denied,* 359 U.S. 858, 103 S.Ct. 130 (1982).

In addition to failing to establish a deprivation of constitutional significance resulting from the lack of a prison library at the HCJ, plaintiff has also failed to establish that he suffered prejudice as a result of that shortcoming. It is well-established that a necessary component of a court access deprivation claim under the First Amendment is the showing of actual injury sustained as a direct consequence of the deprivation. *Lewis,* 518 U.S. at 351-53, 116 S.Ct. at 2180-81; *Monsky v. Moraghan,* 127 F.3d 243, 246-47 (2d Cir.1997) (citing *Lewis* ), *cert. denied,* 525 U.S. 823, 119 S.Ct. 66 (1998). As was previously discussed, to sustain a First Amendment court access claim a plaintiff must prove that he or she was hindered in the pursuit of a nonfrivolous legal claim as a result of the alleged constitutional violations. *Lewis,* 518 U.S. at 351-55, 116 S.Ct. at 2180-81; *see also Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998). In this instance, plaintiff has not established the existence of any such injury. Unlike plaintiffs in many First Amendment court access claims arising under 42 U.S.C. § 1983, the plaintiff in this instance was represented by counsel at all stages of the criminal prosecution against him. Plaintiff's bare, conclusory allegation that because of defendants' actions he was ill-prepared to enter a plea and for sentencing are wholly unavailing to establish a cognizable injury resulting from the alleged First Amendment violation.

*2. Interference With Communications With Attorneys*

**\*11** The second aspect of plaintiff's court interference claim arises from limitations allegedly placed by the defendants on his ability to select and communicate with an attorney to represent him in connection with the pending criminal proceedings. *See* Amended Complaint (Dkt. No. 12) ¶¶ 35-41. "[T]he right to counsel and the right of access to the courts are interrelated, since the provision of counsel can be a means of accessing the courts." *Benjamin v. Fraser,* 264 F.3d 175, 186 (2d Cir.2001). The Second Circuit has determined that, in cases involving a pretrial detainee's right to utilize counsel in his defense, both the due process right of access to the courts and the Sixth Amendment right to counsel are implicated. *Id.* at 187 (considering whether prison restrictions on pretrial detainees' visits with their attorneys violated the detainees' rights to counsel and of access to the courts). Where a plaintiff contests his or her access to counsel

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

as a pretrial detainee, the court must consider whether the challenged prison conduct " 'unjustifiably obstruct[s] the availability of professional representation or other aspects of the right of access to the courts' " in light of " 'the central objective of prison administration, safeguarding institutional security.' " *Id.* at 187 (quoting *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814 (1974), *overruled on other grounds, Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1974 (1989) and *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878 (1979)); *see also Elmaghraby v. Ashcroft,* No. 04 CV 1409, 2005 WL 2375202, at *22 (E.D.N.Y. Sept. 27, 2005), *affirmed in part, reversed in part, remanded by, Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007).

In the instant case, plaintiff alleges that once he determined to retain counsel in order to replace his court appointed lawyer, he was provided with an antiquated, out-of-date version of the telephone book yellow page business entries. *See* Amended Complaint (Dkt. No. 12) ¶ 37. During his deposition, however, plaintiff acknowledged that a short time later he was provided with a more current version, and that he did not have any court appearances during the intervening time period while he was awaiting an updated telephone book. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 59-61. Defendants' exhibits, moreover, including logs of telephone contacts, reveal that plaintiff was able to communicate on several occasions with his newly retained attorney, Richard Bach, Esq., who while initially agreeing to represent him later declined the role and returned plaintiff's retainer to him. Defendants' Exhibits (Dkt.Nos.34-35) Exh. 14 at pp. 63, 72-77 and Exh. 20. By the time of his plea and subsequent sentencing, Liggins was represented by yet another assigned counsel, William Martuscello. The record thus discloses no unjustifiable obstruction by prison officials of Liggins' ability to communicate with his lawyers. Plaintiff's access claim arising from alleged interference with communications with his lawyers is therefore subject to dismissal as a matter of law.[FN16] *See, e.g., Beyah v. Putman,* 885

F.Supp.2d 371, 374075 (N.D.N.Y.1995) (Baer, J.) (rejecting pretrial detainee's claims that the limitation of his telephone privileges violated his right to access the courts and his right to legal counsel where detainee conceded he was permitted to call his counsel and stated only that his personal calls were restricted).

FN16. One portion of plaintiff's court access claim surrounds his suspicion that defendants were responsible for his sentencing being advanced from the originally scheduled date. *See* Amended Complaint (Dkt. No. 12) ¶¶ 61-62. During his deposition, however, plaintiff acknowledged that his allegations in that regard were the result of sheer surmise as to the defendants' involvement in the establishment of his sentencing date, and the record contains nothing of evidentiary value to substantiate his suspicions in this regard. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 102-03.

**D.** *Prison Conditions*

*12 At the heart of plaintiff's diverse and amalgamated claims is his complaint regarding the conditions to which he was exposed during the period of incarceration at the HCJ.[FN17] Plaintiff asserts that those conditions, when considered in their totality, resulted in a deprivation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

FN17. Many of the claims made by Liggins fail to identify a particular defendant as the party responsible for the constitutional deprivation alleged. Although defendants have not raised this issue in their motion, the lack of a showing of personal involvement on the part of various defendants could provide a proper basis for dismissal of those claims for which no responsible party has been identified. *See Bass v. Jackson,* 790 F.2d 260, 263. And, while plaintiff appears to assert liability

on the part of Sheriff Parker, that liability is plainly based upon his role in overseeing the jail facility and, there being no *respondeat superior* liability under 42 U.S.C. § 1983, *see Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003), his role is in and of itself insufficient to establish his personal involvement in many of the complained of acts. *Id.; see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences. *Benjamin v. Fraser,* 343 F.3d 35, 49-50 (2d Cir.2003). Under the Due Process Clause, government officials may subject a pretrial detainee to restrictions inherent to confinement in a detention facility so long as the resulting conditions do not "amount to punishment of the detainee." *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872 (1979). "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense[.]" *Id.* at 537, 99 S.Ct. at 1873. As the court noted in *Benjamin v. Fraser,* however, "because this punitiveness inquiry focuses principally on the *purpose* of an imposed disability, it is of limited utility when evaluating the environmental challenges to prison conditions at issue in this case, which ... were not affirmatively imposed." 343 F.3d at 50 (emphasis in original).

In *Benjamin,* the Second Circuit acknowledged the government's duty to assume responsibility for the safety, general well-being, and basic human needs of those whose liberty it involuntarily restrains, and specifically distinguished between the circumstances presented by a pretrial detainee, who is still presumed innocent, and an inmate who has been convicted of a crime. *Id.* at 50-51. In light of those considerations, the court held that "although a pretrial inmate

mounting a constitutional challenge to environmental conditions must show deliberate indifference, it may generally be presumed from an absence of reasonable care"; according to the Second Circuit, an inmate who challenges prison conditions like the ones at issue in *Benjamin* and in the instant case need not "show anything more than actual or imminent substantial harm." *Id.*

### 1. *Deliberate Medical Indifference*

A portion of plaintiff's complaint addresses the medical care provided to him and other inmates at the HCJ. Plaintiff complains, for example, of the fact there is no physician actually present and on staff at the jail facility. *See, e.g.,* Amended Complaint (Dkt. No. 12) ¶ 49. Plaintiff also challenges the medical care provided for his back condition, and specifically the failure of prison officials to arrange for MRI testing despite requests for such testing by him on several occasions. *Id.* ¶¶ 50-57.

In contrast to the well-established body of jurisprudence addressing deliberate medical indifference claims of sentenced prisoners under the Eighth Amendment, there is both a dearth of case law and significant uncertainty surrounding the precise standard to be applied to such claims brought by pretrial detainees. That such claims are subject to analysis under the Due Process Clause of the Fourteenth Amendment is clear. *Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991). The precise contours of the medical care obligation imposed under the Due Process Clause with respect to pretrial detainees, however, have not been firmly defined by either the Second Circuit or the Supreme Court. *See Pressley v. Green,* No. 02 CIV. 5261, 2004 WL 2978279, at *3 (S.D.N.Y. Dec. 21, 2004). Since the Second Circuit has seemingly endorsed, at least implicitly, application of the Eighth Amendment's analysis to such claims, *id.; see also Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (applying the Due Process Clause of the Fifth Amendment to a deliberate indifference claim brought by a federal pretrial detainee, and not-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

ing that "[w]e have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment") (citations omitted), I will look to the now-familiar medical indifference Eighth Amendment standards for guidance.

**\*13** The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing

*Farmer* ); *Waldo,* 1998 WL 713809, at \*2 (same).

a) *Serious Medical Need*

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at \*2-\*3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.).

**\*14** In their motion defendants invite the court to conclude, as a matter of law, that plaintiff's back condition does not constitute a sufficiently serious condition to rise to a level of constitutional significance. In support of this assertion defendants offer the expert opinion of Dr. Thomas Stanford Eagan, a practicing orthopedic surgeon. *See generally,* Eagan Aff. (Dkt. No. 33-4). Based upon his review of plaintiff's medical records Dr. Eagan has opined, *inter alia,* that the progression of the protrusion of plaintiff's L5-S1 disc, identified as a condition which preexisted

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

his incarceration at the HCJ, did not occur during the time of his incarceration there. *Id.* ¶ 11. Dr. Eagan therefore concludes that "the worsening of plaintiff's back condition had no relationship to his confinement at the Hamilton County facility or to the treatment that the plaintiff received while confined at the Hamilton County Jail." *Id.* ¶ 12.

In his response to defendants' motion, plaintiff has asserted that his back condition was "exacerbated" during his incarceration and that his conditions worsened during that time period. *See* Liggins Aff. (Dkt. No. 39) ¶¶ 6(h), (j). In light of this assertion and the pain which he claims to have experienced while at the HCJ due to his back condition, however skeptical I may be that a reasonable factfinder will ultimately agree with the plaintiff on this score, I am unable to say as a matter of law that plaintiff's back condition was not capable of causing a sufficient level of pain or degenerating to such a degree as to constitute a serious medical condition to trigger the protections of the Eighth Amendment.

b) *Defendants' Indifference*

Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques

and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

**\*15** The record in this case reflects that defendants' efforts to address plaintiff's medical needs far exceeded anything tantamount to indifference. While having no medical personnel on staff at the facility, defendants treated the medical needs of the plaintiff and other inmates by utilizing resources available at nearby medical facilities, including the Speculator Primary Care Center and Nathan Littauer Hospital. Parker Aff. (Dkt. No. 33-3) ¶ 58.

A review of the relevant medical records reveals that plaintiff was provided care at those facilities on several occasions, and that he was provided or offered medication, including pain relievers and muscle relaxants, on a frequent basis. In the opinion of Dr. Eagan, based upon his review of the plaintiff's medical records, not only was defendants' care and treatment of the plaintiff not indifferent, but indeed during the time of his incarceration at the HCJ it comported fully with generally accepted standards in the medical community. *See* Eagan Aff. (Dkt. No. 33-4) ¶ 16.

It is true that despite plaintiff's requests during the period of his incarceration that he be provided with MRI testing, no such testing occurred during that period. Based upon his review of plaintiff's medical records, Dr. Eagan found no basis to conclude that the failure to provide an MRI represented a departure from the level of care ordinarily anticipated within the medical community. Eagan Aff. (Dkt. No. 33-4) ¶ 16. In his affidavit, Dr. Eagan also noted that the MRI testing conducted on May 19, 2001-some six weeks after plaintiff's transfer out of the HCJ-showed a paracentral disc extrusion on the right L5-S1 with no

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

evidence of any neural-compression, and did not reveal the existence of neurological problems which would require further evaluation by an orthopedic or a neurosurgical specialist. *Id.* ¶ 14. At best, then, plaintiff's complaints regarding the failure to conduct MRI testing represent a classic disagreement by him with forms of treatment offered for his chronic back condition, and do not rise to a level of constitutional significance. *Rodriguez v. Yin,* 328 F.Supp.2d 414, 416-17 (W.D.N.Y.2004).

In sum, based upon the record now before the court, no reasonable factfinder could conclude that defendants were deliberately indifferent to plaintiff's serious medical needs. *See Rodriguez,* 328 F.Supp. at 416-17. Accordingly, I recommend the dismissal of plaintiff's medical indifference claims.

### 2. *Exposure to Second-Hand Smoke*

In another portion of his complaint implicating the Fourteenth Amendment, plaintiff also complains of exposure to second hand smoke, or environmental tobacco smoke ("ETS"), while incarcerated at the HCJ. Amended Complaint (Dkt. No. 12) ¶¶ 47-48. Plaintiff's complaints in this regard are premised upon his allegation that corrections officers and other inmates were freely permitted to smoke near prisoners, including within the jail, during the period of his confinement. *See id.*

**\*16** In addressing plaintiff's ETS claims, which because of his status as a pretrial detainee arise under the Fourteenth Amendment, I have again drawn upon a well-established body of Eighth Amendment jurisprudence which differentiates between claims alleging present harm due to ETS exposure, and those complaining of future harm caused by exposure to second hand smoke. *See Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir.2001); *Henderson v. Sheahan,* 196 F.3d 839, 845-47 (7th Cir.1999), *cert. denied,* 530 U.S. 1244, 120 S.Ct. 2691 (2000); *Oliver v. Deen,* 77 F.3d 156, 159-60 (7th Cir.1996); *Goffman v. Gross,* 59 F.3d 668, 672 (7th Cir.1995); *McPherson v. Coombe,* 29 F.Supp.2d 141, 145 (W.D.N.Y.1998); *see also, e.g., Warren v. Keane,* 196 F.3d 330, 333 (2d Cir.1999).

#### a) *Present Injury*

Like other Eighth Amendment claims of deliberate indifference to medical needs, plaintiff's claim of ETS exposure endangering his existing health is governed by *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285 (1976). *Alvarado,* 267 F.3d at 651; *see also Davidson v. Coughlin,* 920 F.Supp. 305, 309 (N.D.N.Y.1996) (McAvoy, C.J.). To state a claim under the objective prong of the *Farmer* test for present injury caused by ETS exposure, a plaintiff must show that ETS caused him or her to suffer serious adverse health consequences.[FN18] *Henderson,* 196 F.3d at 845. A serious medical need or injury is one that a physician has diagnosed as requiring treatment, which is so obvious that even a lay person would recognize the need for treatment. *Id.* at 846.

> FN18. In certain circumstances, exposure to ETS can also give rise to a cognizable constitutional claim when it has the known effect of aggravating an existing medical condition. *See, e.g., Alvarado,* 267 F.3d at 651 (plaintiff stated Eighth Amendment claim under *Estelle* when he submitted documentation showing that his severe chronic asthma was made worse by ETS).

In this instance plaintiff does not seriously assert any present injury suffered by virtue of his exposure to ETS, nor do any records now before the court reflect the existence of such a reaction. While it is true that according to plaintiff's medical records he complained of shortness of breath attributed by him to exposure to ETS on at least one occasion, on September 27, 2002, when taken for treatment to the Speculator Center, a chest x-ray taken on that date at Nathan Littauer Hospital proved negative, and there is no indication in plaintiff's medical records of any asthma or similar condition which would be directly caused or triggered by his exposure to ETS. Defendants' Exhibits (Dkt.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

No. 35) Exh. 15-A. Accordingly, defendants are entitled to summary judgment dismissing the portion of plaintiff's ETS exposure claim based upon consideration of present injury suffered from that exposure. *Contrast, e.g., Gill v. Smith,* 283 F.Supp.2d 763, 769 (N.D.N.Y.2003) (Scullin, C.J.) (summary judgment denied where defendant allegedly smoked in plaintiff's presence despite non-smoking policy and knowledge of plaintiff's asthmatic condition).

(b) *Future Harm*

Plaintiff's claim based upon future harm caused by exposure to ETS is governed by *Helling v. McKinney,* in which the Supreme Court squarely held that deliberately indifferent exposure of an inmate to levels of ETS which poses an unreasonable risk of serious damage to future health can run afoul of the Eighth Amendment's proscription on cruel and unusual punishment. *Id.* at 35, 113 S.Ct. at 2481-82. While distinctly similar to the analysis employed to evaluate claims alleging present harm, objective analysis of allegations of future harm based upon ETS exposure is slightly more complicated, in that it involves two components. As a threshold matter, to prevail on such a claim plaintiff "must show that he [or she] ... is being exposed to unreasonably high levels of ETS." 509 U.S. at 35, 113 S.Ct. at 2482. Additionally, as the *Helling* Court further explained,

**\*17** determining whether [plaintiff's] conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Id.* at 36, 113 S.Ct. at 2482 (emphasis in original).

In light of *Helling* plaintiff has failed to advance allegations of future harm sufficient to satisfy the objective prong of the ETS exposure test. While Liggins has alleged that he was exposed to ETS while at the HCJ, he has submitted nothing concrete to establish that such circumstances could result in harm to him; simply stated, plaintiff has failed to describe conditions which rise to a level which today's society chooses not to tolerate. *See LaCroix v. Williams,* No. 97-CV-0790, 2000 WL 1375737, at \*2-3 (W.D.N.Y. Sept. 21, 2000) (no serious injury when plaintiff merely alleged residence in a smoking dormitory and there was no objective medical evidence showing that plaintiff's symptoms were caused by exposure to ETS). As the District of Columbia Circuit observed in *Scott v. District of Columbia, Helling* does not mandate smoke-free prisons. 139 F.3d 940, 942 (D.C.Cir.), *cert. denied sub nom., Dawson v. District of Columbia,* 525 U.S. 851, 119 S.Ct. 125 (1998). Accordingly, plaintiff's Eighth Amendment claims of exposure to ETS based upon a future harm theory lacks merit.

4. *Miscellaneous Prison Conditions*

In addition to the claims already discussed, plaintiff's complaint contains a litany of grievances regarding the conditions to which he was exposed while confined in the HCJ. Plaintiff complains, for example, of suffering verbal harassment at the hands of certain of the defendants, and of Sheriff Parker permitting such conduct. *See, e.g.,* Amended Complaint (Dkt. No. 12) ¶ 21; Liggins Aff. (Dkt. No. 39) ¶ 6(bb). Such allegations, however, are insufficient to establish a constitutional violation since, regardless of how boorish and reprehensible such conduct may appear, verbal harassment of inmates by prison officials generally does not arise to a level of constitutional significance. *Chabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *see also Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

In his complaint plaintiff also challenges the defendants' failure to establish a meaningful grievance procedure through which he and other inmates could seek redress of constitutional violations. While the lack of such a procedure, or defendants' failure to properly administer it, might well provide a basis for excusing the plaintiff's failure to exhaust available administrative remedies as required under 42 U.S.C. § 1997e(a), *see* Hargrove v. Riley, No. CV-04-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan. 31, 2007), it does not independently establish a constitutional violation. [FN19] "Grievance procedures are the internal procedures and requirements of [prison officials] and, as such prison inmates [do not] have a constitutionally protected right to a grievance procedure...." *Faison v. Hash,* No. 03-CV-6475P, 2004 WL 944523, at *3 (W.D.N.Y. Apr. 23, 2004) (citations omitted); *see also* Adams v. Rice, 40 F .3d 72, 75 (4th Cir.1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."). The plaintiff's allegations regarding the lack of a meaningful grievance procedure thus do not rise to a level of constitutional significance.

> FN19. There is considerable question as to whether the plaintiff fulfilled his obligation to exhaust available, internal remedies in order to seek redress of his complaints as required under 42 U.S.C. § 1997e(a) before commencing this action. In their motion defendants have not relied upon this procedural basis to seek dismissal of plaintiff's claims, perhaps owing to plaintiff's allegation that despite the existence of a grievance procedure he "was never permitted to use the procedure." *See* Liggins Aff. (Dkt. No. 39) ¶ 6(gg).

*\*18* Plaintiff next complains regarding unsanitary conditions and practices at the HCJ, and in particular in connection with the preparation and service of food within the HCJ. In his complaint and supporting affidavit, for example, plaintiff asserts claims associated with the food served to him while at the HCJ alleging, *inter alia,* that he "was served food with hair in it", was "served from an ink stained cup on several occasions" and that "eating utensils were unclean." *See* Liggins Aff. (Dkt. No. 39) ¶¶ 6(kk), (mm), (nn); *see also* Amended Complaint (Dkt. No. 12) ¶¶ 66-72. Defendants contest the sufficiency of plaintiff's allegations, both as lacking in factual support and, even if true, failing to rise to a level of constitutional significance.

Undeniably, the Eighth Amendment's prohibition of cruel and unusual punishment extends to the food provided to prison inmates. While the Eighth Amendment does not elevate to constitutional significance an inmate's dislike for the food served or the portions received, *see, e.g.,* Word v. Croce, 169 F.Supp.2d 219, 226 (S.D.N.Y.2001), it does require that prisoners be given "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Ramos v. Lamm, 639 F.2d 559, 570-71 (10th Cir.1980) (citations omitted), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759 (1981); *see also* Robles v.. Coughlin, 725 F.2d 12, 15 (2d Cir.1983) (citing *Lamm* ); Cunningham v. Jones, 567 F.2d 653, 659-60 (6th Cir.1977).

In their motion defendants assert that the food served to inmates within the HCJ is prepared by qualified and experienced individuals, with significant oversight by the New York State Department of Health. Parker Aff. (Dkt. No. 33-3) ¶¶ 30-31. Sheriff Parker's affidavit lists the identity and qualifications of the four individuals principally involved in food handling at the facility. Sheriff Parker also specifically addresses plaintiff's claims regarding a stained cup, explaining in his affidavit that an investigation into plaintiff's claims of discoloration of the beverage cup, attributed by Liggins to ink stains, revealed that the discoloration was due to exposure to hot temperatures in the facility dishwasher. *See* Parker Aff. (Dkt.33-3) ¶

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

38; *see also* Defendants' Exhibits (Dkt. No. 34) Exh. 10-C.

Plaintiff's complaint and affidavit in opposition to defendants' motion are comprised largely of conclusory allegations regarding the food and unsanitary conditions under which it is served, without evidentiary support or a great deal of specifics. By contrast, in their motion defendants have provided substantial, detailed information regarding the food service practices at the facility and the standards under which it operates. Since nothing in plaintiff's submissions reveals the existence of any condition associated with the preparation or service of food which would present immediate danger to the health and well-being of inmates at the HCJ, I conclude that no reasonable factfinder could find in plaintiff's favor on his Eighth Amendment claims associated with food service.

**\*19** The balance of plaintiff's prison condition claims relate to minor matters, none of which, either singly or in combination, rise to a level sufficient to support a constitutional claim. Plaintiff alleges, for example, that his civilian clothes and property were misplaced on two occasions. The record reveals, however, that in both instances the missing items were ultimately located, and no evidence has been adduced to reflect that their temporary misplacement was the result of intentional acts on the part of any of the defendants.[FN20] In any event plaintiff's claim for loss of property does not lie in this instance in light of the fact that the State of New York provides inmates with a remedy under section 9 of the New York Court of Claims Act associated with such property losses. *See Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203-04 (1983); *Gadson v. Goord,* No. 96 Civ. 7544, 1997 WL 714878, at \*7 (S.D.N.Y. Nov. 17,1997).

> FN20. As previously noted, personal involvement in a constitutional violation is a prerequisite to a finding of liability under 42 U.S.C. § 1983. *See Wright,* 21 F.3d at 501. Nothing in plaintiff's submissions identifies

any of the particular defendants in this case as having been involved in the misplacement of plaintiff's clothes or, for that matter, in most of the incidents complained of, thus providing a independent basis for dismissal of plaintiff's claims. *See Barnes v. Henderson,* 490 F.Supp.2d 313, 318-19 (W.D.N.Y.2007).

Plaintiff also apparently complains of the fact that while at the HCJ he was not provided with an outside exercise area. *See* Liggins Aff. (Dkt. No. 39) ¶ 6(c). Without question, prison officials must afford at least some opportunity for exercise to prison inmates under the Eighth Amendment; consequently, the Due Process Clause of the Fourteenth Amendment, at a minimum, requires that some opportunity be provided. *See Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985). Cases addressing this requirement do not, however, set forth specific parameters associated with this requirement, instead leaving such matters to the sound discretion of prison officials. *See id.; see also Davidson v. Coughlin,* 968 F.Supp. 121, 130 (S.D.N.Y.1997). In determining whether a plaintiff's right to exercise has been abridged, courts generally look to a number of factors, including (1) the duration of the deprivation, (2) the extent of the deprivation, (3) the availability of other out-of-cell activities, (4) the opportunity for in-cell exercise, and (5) the justification for the deprivation. *Davidson,* 968 F.Supp. at 130 (citations omitted). The provision of an hour of exercise daily to prison inmates has been found to satisfy the minimum threshold requirement under the Eighth Amendment. *Anderson,* 757 F.2d at 35.

In this instance plaintiff was permitted to remain outside of his cell and was freely allowed access to the entire jail facility each day between the hours of 7:00 am and 11:00 pm. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 132-34; Parker Aff. (Dkt. No. 33-3) ¶¶ 14-15. While it is true that inmates at the HCJ are not provided with an outdoor exercise area, in light of practical constraints, they are free to exercise both in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

their cells and anywhere else in the jail facility during the sixteen hours that they were permitted to remain outside of their cells. Accordingly, I find that no reasonable factfinder could conclude that plaintiff's Eighth Amendment rights were violated in this regard.

**\*20** Plaintiff also complains of the failure of the defendants in several respects to comply with regulations governing the operation of county jails and penitentiaries, codified at 9 N.Y.C.R.R. §§ 7000-7103. The violation of a state law regulation, standing alone, however, does not arise to a level of constitutional significance actionable under section 1983. *See Ali v. Timmons,* No. 04-CV-0164, 2004 WL 1698445, at \*3 (W.D.N.Y. July 26, 2004) (citing *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229 (1987)).

In sum, while plainly not portraying conditions which could be described as exceedingly pleasant, none of plaintiff's allegations describe circumstances from which a reasonable factfinder could discern the existence of actual or imminent substantial harm sufficient to establish the violation of the Due Process Clause of the Fourteenth Amendment. I therefore recommend the entry of summary judgment dismissing plaintiff's prison condition claims as a matter of law.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint, which recounts varied grievances regarding his nine month detention within the HCJ, includes an amalgamation of claims principally implicating his right to substantive Due Process under the Fourteenth Amendment United States Constitution. The HCJ, as portrayed by the plaintiff, is anything but a model prison. It may well be that with judicial oversight, many of the practices of which Liggins has complained could be rectified. The Supreme Court long ago sagely counseled against such judicial intervention, however, in its decision in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861 (1979), observing that "the problems that arise in the day-to-day

operation of a corrections facility are not susceptible of easy solutions", falling within the ambit and expertise of corrections officials and requiring that "[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878 (citations omitted). For these reasons the Supreme Court has urged courts to resist the impulse to become "enmeshed in the minutiae of prison operations", noting that

under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution or, in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

**\*21** *Id.* at 562, 99 S.Ct. at 1886.

Based upon a careful review of the record before the court, considered in a light most favorable to him, I find that none of the matters complained of rise to a level of constitutional significance and could lead to a finding by a reasonable factfinder that plaintiff's constitutional rights have been violated.[FN21] Accordingly, it is hereby

FN21. In light of my recommendation on the merits I have not addressed defendants' additional arguments, including to the effect that plaintiff's failure to establish a physical injury deprives him of the right to recover

Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)
**(Cite as: 2007 WL 2815630 (N.D.N.Y.))**

damages for mental anguish and emotional distress in this action under 42 U.S.C. § 1997e(e), as well as their claim of entitlement to qualified immunity from suit.

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 33) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2007.
Liggins v. Parker
Not Reported in F.Supp.2d, 2007 WL 2815630 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 1794588 (N.D.N.Y.)
**(Cite as: 2014 WL 1794588 (N.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Vincent Michael MARINO, Plaintiff,
v.
Harrell WATTS, General Counsel/BOP/DOJ, Deborah G. Schult, Warden/BOP/DOJ, Robert Helms, SIS Lieutenant/BOP/DOJ, Jason Poirier, Correctional Officer/BOP/DOJ, D. Ryan, Disciplinary Hearing Officer/BOP/DOJ, Ms. Sepanek, Counselor/BOP/DOJ, Mr. Lucas, Case Manager/BOP/DOJ, Joseph Smith, Correctional Officer/BOP/DOJ, John and Jane Does 1–20, Defendants.

No. 9:12–CV–801 (NAM/RFT).
Signed May 6, 2014.

Vincent Michael Marino, Welch, WV, pro se.

The Hon. Richard S. Hartunian, United States Attorney of the Northern District of New York, Karen F. Lesperance, Esq., James T. Foley U.S. Courthouse, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**
NORMAN A. MORDUE, Senior District Judge.
**INTRODUCTION**
**\*1** Plaintiff, an inmate in the federal correctional system, brings this *pro se* civil rights action pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971). Defendants move (Dkt. No. 41) to dismiss the action, on the ground of failure to state a claim and/or *res judicata.* Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge Randolph F. Treece has prepared a

Report-Recommendation and Order (Dkt. No. 47) recommending dismissal. Plaintiff has filed objections (Dkt. No. 41). Given the extensive nature of plaintiff's objections, the Court conducts a *de novo* review. *See* 28 U.S.C. § 636(b)(1)(C). As set forth below, the Report–Recommendation and Order is accepted insofar as it summarizes the facts and procedural background of this case, and otherwise rejected. The Court grants dismissal of the complaint with leave to replead certain claims.

**BACKGROUND**
Magistrate Judge Treece sets forth in detail the procedural history of this action. The Court briefly summarizes it here. On December 22, 1999, plaintiff was convicted in the Worcester Division of the United States District Court for the District of Massachusetts on a Racketeer Influence and Corrupt Organizations Act violation and related crimes. Plaintiff's claims in this action arise from an incident occurring on December 3, 2009, while plaintiff was incarcerated at Ray Brook Federal Correctional Institute ("Ray Brook"). During a search of plaintiff's cell, prison authorities found betting slips, $2,729.32 worth of unused stamps, and ten gallons of homemade intoxicants. Plaintiff was charged with making, possessing, or using intoxicants, possessing gambling paraphernalia, conducting a gambling pool, and possessing unauthorized items. On December 15, 2009, after a disciplinary hearing presided over by defendant Disciplinary Hearing Officer ("DHO") D. Ryan, plaintiff was found guilty. As a result, plaintiff spent two and one-half months in the Special Housing Unit ("SHU") and lost 36 days of earned good time credits. Plaintiff's administrative appeal was denied.

Plaintiff filed a *habeas corpus* petition in this district pursuant to 28 U.S.C. § 2241, seeking the restoration of the 36 days good time credits or, in the alternative, judicial review of the December 3, 2009

Slip Copy, 2014 WL 1794588 (N.D.N.Y.)
**(Cite as: 2014 WL 1794588 (N.D.N.Y.))**

video tape and an evidentiary hearing. On October 20, 2011, the petition was transferred to Western District of Louisiana. On April 16, 2012, United States Magistrate Judge James D. Kirk issued a Report and Recommendation recommending that the *habeas* petition be denied with prejudice. *Marino v. Schult,* 2012 WL 2133630 (W.D.La. Apr. 16, 2012). Magistrate Judge Kirk summarized plaintiff's section 2241 claims as follows:

1. DHO Officer Ryan violated Marino's due process rights by precluding Marino from receiving core exculpatory material evidence at his DHO hearing to prove the critical 10 gallons of "unknown liquid" depicted in the BOP's first incident report (# 1950877) supports the BOP's second incident report (# 1951307) issued 2 full days later, which was false, misleading, inaccurate and should be expunged, since Marino was denied an opportunity to confront and refute the evidence.

**\*2** 2. DHO Officer Ryan violated Marino's right to due process and his liberty interest by failing to allow Marino to call witnesses CO/Joe Smith in his defense.

3. DHO Officer Ryan's preclusion to review the critical video tape of Mohawk–B Unit at FCI–Ray Brook in New York, from 8 a.m. through 2 p.m. on December 3, 2009, which data showed the second incident report (# 1951307) dated December 5, 2009 to be inaccurate and false since the 10 gallons of then "unknown liquid" could not have logically turned into intoxicant 2 days later when it did not exist and it was already deemed "unknown liquid" in the first incident report (# 1950877) by BOP staff and thus was not available for further testing.

4. BOP/DOJ staff retaliated against Marino when the BOP staff intentionally manipulated Marino's security level points from 11 points (low level security institution) to 24 points (high level security

institution), which adversely affects Marino, placing Marino over 500 miles away from his home, and again retaliated against Marino by placing Marino on the "BOP's Diesel Therapy Program" by putting him in transit without his legal mail and legal property from December 3, 2009 to February 12, 2010 through July 13, 2010, so Marino did not receive his legal mail and legal material until August 2010 (eight months).

5. The DHO officer's failure to dismiss the BOP's second incident report (# 1952307) due to untimely service, in violation of Policy Statement 5270.07 Chapter 2, page 3, subsection I, and CFR 541.11 is refuted by the BOP's first incident report (# 1950877), in violation of Marino's right to due process and liberty interest, since Marino lost 36 days of earned good time credit.

6. The BOP's intentional delay of over 6 months to respond to Marino's BP-ll (# 570917–Al) was excessive and required review or dismissal of the second incident report (# 19513077).

*Id.* at \*1–\*2. On June 12, 2012, United States District Judge James T. Trimble denied the petition and dismissed it with prejudice for the reasons set forth in Magistrate Judge Kirk's Report and Recommendation. *Marino v. Schult,* 2012 WL 2126944 (W.D. La. June 12, 2012).

On March 23, 2012 plaintiff filed the instant civil rights action .[FN1] As Magistrate Judge Treece observes: "Plaintiff re-alleged, nearly verbatim, the claims he raised in his federal habeas petition ... and further expounded upon those claims adding additional facts and allegations, and naming several new Defendants." The causes of action in the complaint before this Court are as follows [FN2]:

FN1. Plaintiff filed the action in District of Columbia District Court, which transferred it

Slip Copy, 2014 WL 1794588 (N.D.N.Y.)
**(Cite as: 2014 WL 1794588 (N.D.N.Y.))**

to the Souuthern District of Virginia, which transferred it to this Court on May 15, 2012.

FN2. The Court quotes from the complaint directly without correcting or noting errors.

First Cause of Action

The willful, intentional actions of Defendants: Watts, Schult, Helms, Poirier, Ryan, Sepanek, Lucas, Smith, & several John & Jane Does 1–20, all conspired together with each other & others known & unknown BOP/DOJ employees to file a false SECOND INCIDENT REPORT # 1951307, used to days of earned good time jail credits from Marino, as retaliation for Marino exercising his First Amendment's Freedom of Speech & Fifth & Sixth Amendment's Due Process as described supra. Also violating the 8th Amendment's Cruel & Unusual Punishment without due process of law.

**\*3** Second Cause of Action

The willful & intentional actions of Defendants: Watts, Schult, Helms, Poirier, Ryan, Sepanek, Lucas, Smith & several John & Jane Does 1–20, all conspired together with each other & others known & unknown to retaliate against Marino for leaving Marino in FCI Ray Brook's SHU without access to flush the toilet, without access to control the lights, without a shower, without clean linen & clothes without his legal work & legal mail, over 2 months over his sanctioned DHO time in violations of the First Amendment's Freedom of Speech, Fifth & Sixth Amendment's Due Process failing to allow Marino the use of the Administrative Remedy Process, and in violations of the Eighth Amendment's Cruel & Unusual Punishment of the United States Constitution leaving Marino in SHU for over 2 months for a false INCIDENT REPORT TWO # 1951307.

Third Cause of Action

The willful & intentional actions of Defendants: Watts, Schult, Helms, Ryan, Sepanek, Lucas, Smith, Poirier, & several John & Jane Does 1–20, retaliated against Marino by taking Marino's Federal Rules of Civil Procedure Book on December 3, 2009, over 600 books Commissary bought United States Postage Stamps bought 3 books per week for the past 13–14 years at various prison commissaries as the commissary records so supports, taking Marino's 300 commissary bought fish, seizing Marino's legal mail & legal work preventing Marino from access to the courts, in violations of the 1st Amendments Freedom of Speech, 5th & 6th Amendment's Due Process & 8th Amendment's Cruel & Unusual Punishment of the U.S. Constitution.

Fourth Cause of Action

The willful & intentional actions of Defendants: Watts, Schult, Helms, Ryan, Sepanek, Lucas, Smith, Poirier, & several John & Jane Does 1–20, retaliated against Marino by "Manipulation of Marino's Custody & Security Points" from 11 points to 24 points ...

Against Marino for exercising his First Amendment's Freedom of Speech & Fifth & Sixth Amendment's Due Process as seen supra, violating Marino's 1 st, 5th, & 6th Amendments, designed to place Marino in USP Pollock, Louisiana that has a history of 15 murders, over 300 stabbings, over 300 knife shots & known as a "Lock Down" institution preventing Marino from access to the Courts, Law Library & the exercise of his Due Process, also in violations of the 8th Amendment's Cruel & Unusual Punishment.

Fifth Cause of Action

Slip Copy, 2014 WL 1794588 (N.D.N.Y.)
**(Cite as: 2014 WL 1794588 (N.D.N.Y.))**

The willful & intentional actions of Defendants: Watts, Schult, Helms, Poirier, Ryan, Smith, Sepanek, Lucas, & several John & Jane Does 1–20, placing Marino on "Defendants/BOP'S Diesel Therapy Program" from December 3, 2009 through July 13, 2010, Marino was without his legal mail & legal work. In fact Marino did not receive his legal work until August 2010. Marino received some of his "Legal Mail" from 3–6 months later, some was lost, some was destroyed, some was sent back to sender.

Sixth Cause of Action

The willful & intentional actions of Defendants: Watts, Schult, Helms, Poirier, Ryan, Smith, Sepanek, Lucas, & several John & Jane Does 1–20, intentional infliction of emotional distress and anguish, as the defendants intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of Defendants unconstitutional conduct as described supra; That the conduct was extreme and outrageous was beyond all possible bounds of decency and utterly intolerable in a civilized community; That the actions of Defendants were the cause of Plaintiff Marino's distress; and That the emotional distress sustained by Marino was severe and of a nature that no reasonable man could be expected to endure it, in violations of the 8th Amendment of the United States Constitution & Due Process.

**\*4** (References to exhibits omitted.)

## DISCUSSION

In addressing this motion to dismiss, the Court views the facts alleged in the complaint in the light most favorable to plaintiff and construes the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. *See Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013). The Court interprets

this *pro se* plaintiff's factual allegations to raise the strongest arguments that they suggest. *See id.* "The court should freely give leave [to amend] when justice so requires." Fed .R.Civ.P. 15(a)(2). Moreover, a court should not dismiss a complaint without leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated. *See Grullon,* 720 F.3d at 139. Leave to amend, however, is not required where "the problem with [plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

Plaintiff's claim in this Court for money damages and other relief for constitutional violations committed by federal agents acting under color of federal law is properly brought under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971). A *Bivens* action shares the same "practicalities of litigation" with claims under 42 U.S.C. § 1983 for constitutional violations committed by state agents acting under color of state law; thus, federal courts "have typically incorporated § 1983 law into *Bivens* actions." *Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir.1995). For purposes of this Memorandum–Decision and Order, the Court relies on both *Bivens* and section 1983 case law.

Defendants seek dismissal on the ground that plaintiff's claims are barred by application of the doctrine of *res judicata* (claim preclusion). This argument lacks merit. Under the doctrine of *res judicata,* a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *See EDP Med. Computer Sys. v. United States,* 480 F.3d at 621, 624 (2d Cir.2007). Defendants cite no authority supporting the contention that the dismissal of plaintiff's *habeas corpus* petition bars his *Bivens* claims on *res judicata* grounds, nor is the Court aware of any.[FN3] A *Bivens* claim that necessarily implicates the validity or duration of an inmate's confinement "is not cognizable" until the inmate successfully challenges the va-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

lidity or duration of that confinement by way of a *habeas* proceeding. *Tavarez,* 54 F.3d at 110 (citing *Heck v. Humphrey,* 512 U.S. 477, 484–85 (1994)); *accord Edwards v. Balisok,* 520 U.S. 641, 645–48 (1997) (extending *Heck* rule to inmates' challenges to prison disciplinary proceedings that resulted in loss of good time credits). Such a *Bivens* claim does not accrue until the successful conclusion of the *habeas* proceeding, *see Heck,* 512 U.S. at 489–90; thus, it could not properly have been raised within the *habeas* proceeding. To the extent that plaintiff in the case at bar seeks relief that implicates the validity of his disciplinary penalty, and thus the duration of his confinement, his claims are not barred by *res judicata.* Nor is there any basis to apply the doctrine to his other claims.

> FN3. The Court has found one unpublished Ninth Circuit decision issued in 1998, *Brown v. Paige,* 162 F.3d 1167 (Table), 1998 WL 756970 (9th Cir.1998), which dismissed a *Bivens* action on alternative grounds, one of which was the application of *res judicata* to the dismissal of the plaintiff's petition under 28 U.S .C. § 2241. In support of dismissal on this ground, the Ninth Circuit cited *Hawkins v. Risely,* 984 F.2d 321, 325 (9th Cir.1993), which concerned collateral estoppel, not *res judicata,* and *Van Strum v. Lawn,* 940 F.2d 406, 409 (9th Cir.1991), which stated only that section 1983 actions and *Bivens* actions "are identical save for the replacement of a state actor under § 1983 by a federal actor under *Bivens."* The *Brown* case has never been cited, and the Court does not view it as authoritative.

**\*5** In support of their *res judicata* argument, defendants cite only two cases that could arguably apply to the instant case: *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996), and *Burgos v. Hopkins,* 14 F.3d 787, 792–93 (2d Cir.1994). *Kulak* and *Burgos,* however, concern collateral estoppel (issue preclusion),

not *res judicata* (claim preclusion). Collateral estoppel precludes a party from relitigating an issue that has been actually litigated and decided in a prior action, provided that: (1) there is an identity of issue which has necessarily been decided in the prior action and is decisive of the present action; and (2) there has been a full and fair opportunity to contest the decision now said to be controlling. *See Kulak,* 88 F.3d at 71–72. *Kulak* and *Burgos* applied the doctrine of collateral estoppel to preclude inmates from relitigating in section 1983 actions issues that had been decided in the inmates' unsuccessful *habeas* proceedings. Because collateral estoppel precludes relitigation of only those issues that have already been litigated and decided, it does not bar relitigation of issues that could have been raised previously but were not. Therefore, even if the doctrine of collateral estoppel were applied in the instant case, it would not warrant dismissal of the entire complaint now before the Court. Moreover, even where there is an identity of issues, collateral estoppel does not bar a plaintiff's claims if he can show he did not have a full and fair opportunity to litigate the issues in the prior proceeding. *Id.* Whether plaintiff had a full and fair opportunity cannot be resolved on this Rule 12(b)(6) motion.[FN4] Dismissal on the ground of *res judicata* or collateral estoppel is denied.

> FN4. Plaintiff might well succeed in making such a showing; he was unrepresented, and the *habeas* court held no evidentiary hearing. *Compare Kulak* and *Burgos,* both of which concerned the collateral estoppel effect of issues determined after full hearings.

The Court now considers the merits of plaintiff's section 1983 claims.

*First Cause of Action*

The first cause of action claims that defendants filed the incident report (# 1951307) underlying the disciplinary proceeding in issue in retaliation for plaintiff's exercise of his First Amendment rights. To

Slip Copy, 2014 WL 1794588 (N.D.N.Y.)
**(Cite as: 2014 WL 1794588 (N.D.N.Y.))**

state a First Amendment retaliation claim, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). A finding in plaintiff's favor would necessarily imply that there was no proper non-retaliatory basis for the misbehavior report and subsequent disciplinary proceeding and punishment.[FN5] Such a finding necessarily implicates the duration of plaintiff's confinement and thus is barred by *Heck* and *Balisok.* Because plaintiff's *habeas corpus* petition was denied—and apparently not appealed—he cannot now collaterally attack the duration of his confinement by way of this *Bivens* action. *See Balisok,* 520 U.S. at 645–48. Therefore, repleading this cause of action would be futile; better pleading will not cure it. The first cause of action, claiming that the filing of incident report # 1951307 was retaliatory, is dismissed without leave to replead.

> FN5. There is no constitutional violation where a misbehavior report is motivated by a sufficient proper reason, even if it was also motivated by an improper reason. *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

*Second Cause of Action*

**\*6** The second cause of action may be read as challenging the conditions of plaintiff's confinement in the special housing unit ("SHU") resulting from the disciplinary proceeding based on incident report # 1951307. Judge Trimble's dismissal of the *habeas* petition forecloses plaintiff from challenging the SHU sentence itself on the ground that it was based on an invalid disciplinary sanction. *See Heck* and *Balisok.* Any such claim is dismissed without leave to replead on the ground of futility.

Plaintiff is not necessarily foreclosed, however, from obtaining relief based on the conditions he ex-

perienced while in SHU. Although he is precluded by the outcome of his *habeas* proceeding from claiming that his SHU confinement denied him a liberty interest without due process, he may be able to establish an Eighth Amendment claim of cruel and unusual punishment. The Second Circuit explains:

> To demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test. First, the plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs. Second, the plaintiff must demonstrate that the defendants imposed those conditions with deliberate indifference.

*Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations and quotation marks omitted). Petitioner's allegations fail to meet either test sufficiently to allege a plausible claim.

In view of plaintiff's *pro se* status, the Court gives him an opportunity to replead this claim. The Court adds that, in addition to addressing the two tests set forth in *Jolly,* plaintiff should include allegations supporting a finding of personal involvement of each defendant against whom he wishes to pursue this claim. With respect to supervisory defendants, the Second Circuit has construed personal involvement "to mean direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). If plaintiff chooses to replead an Eighth Amendment claim based on the conditions of his SHU confinement, the Court recommends that he also plead whether and how he exhausted his administrative remedies regarding SHU conditions.

*Third Cause of Action*

Slip Copy, 2014 WL 1794588 (N.D.N.Y.)
**(Cite as: 2014 WL 1794588 (N.D.N.Y.))**

The third cause of action alleges defendants retaliated against plaintiff by confiscating his property, including his legal mail. A prison official's conduct in confiscating, losing, or destroying an inmate's property may constitute an adverse action for purposes of a retaliation claim. *See, e.g., Mateo v. Bristow,* 2013 WL 3863865, *5 (S.D.N.Y. Jul. 16, 2013). As noted above, to state a First Amendment retaliation claim, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill,* 389 F.3d at 380. Depending on the circumstances, confiscation of legal mail may qualify as an adverse action. Although he lists a number of lawsuits he has brought, letters of complaint he has written to governmental officials and entities, and grievances he has filed, plaintiff does not specify which constitute a protected action in the context of this claim. Nor does he specify which of the many defendants may have known of any particular lawsuit, letter, or grievance; which specific defendants participated in the adverse action; or on what basis plaintiff alleges a causal connection between a particular lawsuit, letter, or grievances and the confiscation of his mail or other property. Nor does he set forth a basis for imposing liability on the supervisory defendants. Plaintiff does not plausibly plead a retaliation claim based on confiscation of his mail or other property.

**\*7** The allegation that prison officials intentionally confiscated plaintiff's legal mail might also support a claim of unconstitutional denial of plaintiff's access to the courts. *See Franco v. Kelly,* 854 F.2d 584, 588 (2d Cir.1988). To state a claim for denial of access to the courts, including a claim based on interference with legal mail, plaintiff must allege actual injury, *i.e.,* that the defendants' actions hindered his efforts to pursue a particular legal claim. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Accordingly, without identification of the underlying action that was hindered, and the manner in which it was hin-

dered, plaintiff does not properly plead actual injury, and thus does not plead a First Amendment violation. *See Christopher v. Harbury,* 536 U.S. 403, 415 (2002) ("[T]he underlying cause of action ... is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation."). Plaintiff fails to satisfy this requirement.[FN6] Moreover, plaintiff does not specify how each named defendant was personally involved in this alleged deprivation. Plaintiff does not plausibly plead a claim for denial of access to the courts. The third cause of action is dismissed with leave to replead.

> **FN6.** Plaintiff asserts that, due to the misconduct of defendants Helms, Poirier, and Schults, his "Petition for Rehearing and/or Suggestion for Rehearing En Banc" in *United States v. Marino,* First Circuit Appeal No. 09–1854, was not filed until December 21, 2009 and was dismissed as untimely on January 8, 2010. A review of the docket in that appeal establishes that the First Circuit's January 8, 2010 order striking the petition states as follows: "The petition for panel rehearing and for rehearing en banc is stricken as unauthorized. *See Lykus v. Corsini,* 565 F.3d 1 (1st Cir.2009); 28 U.S.C. § 2244(b)(3)(E)." Thus, the petition was stricken not because it was untimely, but because a petition for rehearing or rehearing en banc of an application for leave to file second or successive habeas petition is barred by 28 U.S.C.A. § 2244(b)(3)(E).

*Fourth Cause of Action*

Plaintiff claims that defendants retaliated against him by manipulating his custody and security points from 11 to 24 points, resulting in his transfer to United States Penitentiary Pollock, Louisiana, a facility which "has a history of 15 murders, over 300 stabbings, over 300 knife shots & known as a 'Lock Down' institution preventing Marino from access to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1794588 (N.D.N.Y.)
**(Cite as: 2014 WL 1794588 (N.D.N.Y.))**

the Courts, Law Library the exercise of his Due Process, also in violations of the 8th Amendment's Cruel & Unusual Punishment." It is not clear what protected action underlies this claim. As for an adverse action, some courts have indicated that a prison transfer may constitute an adverse action where, as here, a plaintiff claims he was transferred to a facility imposing more onerous conditions. *See, e.g., Tuitt v. Chase,* 2013 WL 877439, *9 ("The transfer of a prisoner is not considered an 'adverse action' unless it results in the prisoner being subjected to more onerous conditions."). Here, even assuming that plaintiff's transfer constitutes an adverse action, plaintiff pleads no basis for finding the transfer was retaliatory. Attached to the complaint is a form dated April 27, 2006 showing his classification as 11, and a form dated February 2, 2011 showing his classification as 24. These forms, showing an increase in plaintiff's security classification at an unspecified time during a period of almost five years, do not support a finding of a causal connection between whatever protected act plaintiff relies on and the change in his classification. Moreover, plaintiff appears to claim that his security classification was revised shortly after the December 3, 2009 incident, in which case the December 3, 2009 incident and the December 15, 2009 disciplinary determination would provide defendants with a proper non-retaliatory ground for raising plaintiff's security points, regardless of whether they also had a retaliatory motive, thus defeating this claim. *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (stating that where adverse action "is motivated by both proper and improper reasons, the action may be sustained if it would have been taken even in the absence of the improper reason."). This cause of action is dismissed with leave to replead. If plaintiff chooses to replead, he should spell out what protected action he is relying on, which of the defendants he claims is responsible for the reclassification, and the basis for alleging a causal connection between the protected action and the reclassification.

*Fifth Cause of Action*

**\*8** The fifth cause of action alleges defendants intentionally placed plaintiff in their "Diesel Therapy Program" (that is, transferred him frequently) from December 3, 2009 through July 13, 2010. As a result, plaintiff claims, he "was without his legal mail & legal work." He adds: "In fact Marino did not receive his legal work until August 2010. Marino received some of his 'Legal Mail' from 3–6 months later, some was lost, some was destroyed, some was sent back to sender." As discussed above in the context of the third cause of action, to state a claim for denial of access to the courts based on interference with legal mail, plaintiff must allege actual injury, that is, that the defendants' actions hindered his efforts to pursue a particular legal claim. *See Davis,* 320 F.3d at 351. Accordingly, without identification of the underlying action which was hindered, and the manner in which it was hindered, plaintiff does not properly plead actual injury. Thus, he does not plead a First Amendment violation in this respect. *See Christopher,* 536 U.S. at 415. Moreover, plaintiff does not specify how most of the named defendants were involved in this alleged deprivation, nor does he set forth a basis for supervisory liability. Plaintiff does not plausibly plead a claim for denial of access to the courts. The fifth cause of action is dismissed with leave to replead.

*Sixth Cause of Action*

The sixth cause of action is for intentional infliction of emotional distress, a New York State common-law claim. The Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(e), provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." [FN7] Plaintiff's claim for intentional infliction of emotional distress is barred as a matter of law by section 1997e(e). *See Thompson v. Carter,* 284 F.3d 411, 417–18 (2d Cir.2002). The sixth cause of action is dismissed without prejudice.

FN7. Section 1997e(e) does not, however, warrant dismissal of the entire complaint.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1794588 (N.D.N.Y.)
**(Cite as: 2014 WL 1794588 (N.D.N.Y.))**

The absence of physical injury does not restrict a plaintiff's ability to recover nominal damages, punitive damages, or injunctive or declaratory relief for constitutional wrongs. *See Thompson v. Carter,* 284 F.3d 411, 417–18 (2002).

*Equal Protection*

In his objection to the Report–Recommendation and Order, plaintiff refers to an equal protection "class of one" claim. To succeed on such a claim, a plaintiff must establish that no rational person could regard plaintiff's circumstances to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy. *See Ruston v. Town Bd. for Town of Skaneateles,* 610 F.3d 55, 59–60 (2d Cir.2010). There is nothing in plaintiff's papers to suggest that he has a viable class of one claim. Any such claim is dismissed without prejudice.

*Due Process*

In the body of the complaint, plaintiff repeatedly refers to the Fifth Amendment right to due process. Any due process claim plaintiff may assert based on the disciplinary proceeding regarding the December 3, 2009 incident lacks merit as a matter of law because it is barred by *Heck* and *Balisok.* Any due process property interest claim regarding the items allegedly confiscated from plaintiff's cell on December 3, 2009 lacks merit as a matter of law because plaintiff had statutory post-deprivation remedies available. *See* 31 U.S.C. §§ 3723(a)(1); 3724. If plaintiff intended to plead either of these claims, they are dismissed without leave to replead on the ground of futility.

**\*9** Plaintiff also refers to his Sixth Amendment due process rights. It appears that he is claiming that the procedures utilized in the disciplinary hearing violated his Sixth Amendment rights to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense. A prison disciplinary proceeding is not, however, a criminal prosecution, and the Sixth Amendment does not apply. *See Sash v. Zenk,* 439 F.3d 61, 63 (2d Cir.2006)* ("Prison disciplinary hearings are not treated as 'criminal' for purposes of the Sixth Amendment."). In any event, any such claim would be barred by Heck and Balisok. Any Sixth Amendment claims based on the procedures utilized in the disciplinary proceeding are dismissed without leave to replead on the ground that they are futile.

*Fourth Amendment*

Plaintiff also cites to the Fourth Amendment. Plaintiff cannot maintain a Fourth Amendment claim that he was subjected to an unreasonable cell search, because "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). Any Fourth Amendment claim based on the fact that his cell was searched on December 3, 2009 is dismissed without leave to replead on the ground of futility.

*Other Allegations*

In various parts of the complaint, plaintiff refers to lawsuits he has brought, letters he has written, and grievances he has filed. In this rambling, single-spaced 34–page complaint, which contains more than 100 numbered paragraphs and an additional 20 pages of exhibits, these references are insufficient to apprise the Court of what additional claims plaintiff may wish to assert. All claims not specifically addressed above are dismissed with leave to replead. If plaintiff decides to file an amended complaint, the Court recommends that he avoid inserting repetitious or irrelevant allegations.

**CONCLUSION**

The complaint is dismissed with leave to replead, except that, as explained above, certain claims are dismissed without leave to replead on the ground of futility. If plaintiff decides to serve and file an amended complaint, he is advised that the amended

Slip Copy, 2014 WL 1794588 (N.D.N.Y.)
**(Cite as: 2014 WL 1794588 (N.D.N.Y.))**

complaint will completely supersede and replace the initial complaint. Therefore, the amended complaint should contain all claims plaintiff wishes to pursue. Any defendant not named in the amended pleading will no longer be a defendant in the action. If plaintiff claims that his rights were violated by more than one defendant, or on more than one occasion, he should include a corresponding number of paragraphs in his amended complaint for each such allegation, with each paragraph specifying the alleged act of misconduct; the date on which such misconduct occurred; the names of each and every individual who participated in such misconduct; where appropriate, the location where the alleged misconduct occurred; and the nexus between such misconduct and the rights allegedly infringed.

**\*10** Any amended complaint shall be filed and served on or before the date set forth below. Plaintiff is warned that if he fails to file and serve an amended complaint in compliance with this Memorandum–Decision and Order on or before that date, the case will be dismissed.

It is therefore

ORDERED that the Report–Recommendation and Order (Dkt. No. 47) is accepted insofar as it summarizes the facts and procedural background of this case, and otherwise rejected; and it is further

ORDERED that defendants' motion to dismiss (Dkt. No. 34) is granted as set forth herein; and it is further

ORDERED that the complaint is dismissed with leave to replead in accordance with this Memorandum–Decision and Order; and it is further

ORDERED that if plaintiff does not submit a timely amended complaint, the matter will be reviewed by this Court for judgment dismissing the action; and it is further

ORDERED that if plaintiff does submit a timely amended complaint, the case shall be returned to the magistrate judge for further proceedings; and it is further

ORDERED that *ANY AMENDED COMPLAINT SHALL BE FILED AND SERVED ON OR BEFORE JUNE 6, 2014;* and it is further

ORDERED that *PLAINTIFF IS WARNED THAT IF HE FAILS TO FILE AND SERVE AN AMENDED COMPLAINT IN COMPLIANCE WITH THIS MEMORANDUM–DECISION AND ORDER ON OR BEFORE JUNE 6, 2014, THE CASE WILL BE DISMISSED;* and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this Memorandum–Decision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

N.D.N.Y.,2014.
Marino v. Watts
Slip Copy, 2014 WL 1794588 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2012 WL 1075830 (S.D.N.Y.)
**(Cite as: 2012 WL 1075830 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Cesar MATEO, Plaintiff,
v.
Kevin O'CONNOR, Jeffrey Macisaac, Steven Purcell,
Richard Ward, J. Jarvis, Paul Guarino, Lieutenant
Laporto, Mark Royce, and New York State Depart-
ment of Correctional Services, Defendants.

No. 10 Civ. 8426(LAP).
March 29, 2012.

### MEMORANDUM OPINION AND ORDER
LORETTA A. PRESKA, Chief Judge.

**\*1** This is one of several actions Cesar Mateo ("Mateo"), a prisoner currently incarcerated at Sing Sing Correctional Facility ("Sing Sing"), has brought *pro se* against various New York State prison officials under 42 U.S.C. § 1983. In this case, Mateo is suing the New York State Department of Correctional Services ("DOCS") and eight of its employees: Corrections Sergeant Kevin O'Connor ("O'Connor"), Corrections Officer Jeffrey Macisaac ("Macisaac"), Corrections Officer Steven Purcell ("Purcell"), Corrections Officer J. Jarvis ("Jarvis"), Corrections Lieutenant Richard Ward ("Ward"), Corrections Lieutenant Laporto ("Laporto"), Corrections Captain Mark Royce ("Royce"), and Civilian Maintenance employee Paul Guarino ("Guarino"). All of these defendants worked at the Green Haven Correctional Facility ("Green Haven") while Mateo was incarcerated there.

Mateo's complaint alleges verbal and physical harassment by O'Connor, Macisaac, Purcell, and Jar-

vis on August 21 and 22, 2008; the filing of a false inmate misbehavior report ("IMR") by O'Connor, Macisaac, Purcell, Ward, and Guarino on August 22, 2008; a biased disciplinary hearing conducted by Laporto, Guarino and O'Connor on September 3, 2008; and a biased appeal conducted by Royce on September 9, 2008. Mateo claims these actions directly violated his civil rights under the Fourteenth Amendment and that they were undertaken in retaliation for Mateo's past grievance filings, in violation of the First Amendment. Mateo also alleges that O'Connor, Macisaac, Purcell, Ward, Royce, Guarino, and Laporto conspired in this retaliation. With his complaint, Mateo provided a copy of a grievance filed on August 22, 2008 against O'Connor, Macisaac, Purcell, Jarvis, Ward, and Rodriguez (the "Grievance"). Mateo concedes that he never completed an appeal of the Grievance. (Compl.¶ 20.)

On April 15, 2011, defendants moved to dismiss the complaint in its entirety. (Defs.' Mem. Law Supp. Mot. Dismiss ("MTD") (Doc. No. 17).) Defendants argue that the Eleventh Amendment bars Mateo's claims against DOCS, (*id.* at 4–6), and that Mateo failed to: exhaust his administrative remedies before bringing suit, (*id.* at 68); allege the personal involvement of each defendant (*id.* at 9–14); state claims for retaliation or conspiracy (*id.* at 14–18), and allege a liberty interest requiring due process (*id.* at 18–21). On April 26, 2011, Mateo filed an affirmation in opposition to the motion, seeking in part to excuse his failure to exhaust his administrative remedies. (Doc. No. 25.) On June 17, 2011, defendants entered a reply. (Doc. No. 20.) For the reasons that follow, the Court grants defendants' motion and dismisses all of Mateo's claims with prejudice.

### BACKGROUND
The following facts are taken from Mateo's complaint and are not a finding of fact by the Court. In-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1075830 (S.D.N.Y.)
**(Cite as: 2012 WL 1075830 (S.D.N.Y.))**

stead, the Court assumes these facts to be true for purposes of deciding the pending motion to dismiss, and construes them in a light most favorable to plaintiff, the non-moving party.[FN1]

> FN1. In considering a motion to dismiss, the Court accepts all well-pleaded factual allegations in the complaint as true, and draws all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). The court may also consider any documents that are attached to, referenced in, or integral to the preparation of the pleadings. *See id.* at 152–53.

**\*2** On August 11, 2008, Mateo was moved from Green Haven's "F–Block" housing unit to its "H–Block" housing unit "to be harassed, framed and set-up ... in retaliation for ... numerous written grievances against correction officers at Green Haven." (Compl.¶ 6.)

On the morning of August 21, defendant Corrections Officer Maclsaac, while issuing Mateo a pass to participate in a hearing for an unrelated grievance, "belligerently and menacingly, said ... do not ever write grievances against H–BLOCK staffs" or that Mateo would "get fucked up." (*Id.* ¶ 7.) Upon his return to H–Block, Maclsaac ordered Mateo to face the wall, defendant Corrections Officer Jarveis stood watch, and non-defendant Corrections Officer J. Vasquez pressed Mateo against the wall and pat-frisked him. (*Id.*) Maclsaac then said in a low tone of voice that "he can fuck me up, knock off my teeth, that it will happen to me right in this place ... for writing grievances." (*Id.*) After a long wait, Maclsaac sent Mateo to his cell, where he discovered that the water and electricity had been cut off. (*Id.* ¶ 8.) Mateo wrote a complaint to the prison superintendent but did not file a grievance. (*Id.*)

On the afternoon of August 21, Mateo returned

from the recreation yard to find his clothes on the floor and his possessions tampered with, and Maclsaac, Jarveis and J. Vasquez standing outside his cell laughing. (*Id.* ¶ 9.) Maclsaac then said "that is what happen [sic] when you write grievances" and threatened to beat up Mateo unless he entered his cell. (*Id.*) That evening, Mateo wrote another letter to the superintendent explaining the situation but was denied permission to leave his cell for dinner and went to bed without mailing the letter. (*Id.*)

On the morning of August 22, Maclsaac observed Mateo carrying letters en route to breakfast. (*Id.* ¶ 10.) Maclsaac asked Mateo if the letters were grievances, but Mateo stated they were legal mail. (*Id.*) Maclsaac demanded to see the letters, and Mateo said no. (*Id.*) Defendant Corrections Sergeant O'Connor was then called on the radio. (*Id.*) O'Connor escorted Mateo back to his cell with a large group of officers, again denying him a meal. (*Id.*)

Shortly afterward, an officer informed Mateo that he had been transferred to "G–Block." (*Id.* ¶ 11.) While Mateo was carrying his property out of his cell, Maclsaac "was harassing and provoking [Mateo], calling [him] pussy, bitch, and standing [in his] way." (*Id.*) O'Connor and Jarveis were with Maclsaac, who then threwe some of Mateo's property down the stairs. (*Id.*) As O'Connor escorted Mateo to G–Block, he told Mateo that he should know better than to write grievances. (*Id.*)

On the evening of August 22, in G–Block, Mateo received a "false, fabricated" inmate misbehavior report, charging Mateo with threatening Maclsaac and with causing a flooding and disturbance. (*Id.* ¶ 12.) The misbehavior report was allegedly authored by Maclsaac and signed by Maclsaac, O'Connor, defendant Corrections Officers Purcell and Ward, and defendant maintenance worker Guarino. (*Id.*)

**\*3** That night, Mateo handed the duty officer the

Not Reported in F.Supp.2d, 2012 WL 1075830 (S.D.N.Y.)
**(Cite as: 2012 WL 1075830 (S.D.N.Y.))**

Grievance. (*Id.* ¶ 18.) The Grievance describes the morning incidents of August 22 but without much detail. (*Id.*) It then states that Mateo was issued a "retaliatory misbehavior report" and that he now fears being "hurt by staffs," noting "I fear for my life; I fear to be set up. My property, legal / personal file is not secure ." (*Id.* at 811.) Mateo's Grievance was stamped by Green Haven's Inmate Grievance Program as "received" on August 26, 2008 and annotated "retaliation by block 8/26/08." (*Id.*)

Mateo claims that the Grievance "was coded '49' which indicates Staffs Harassment, which required an expedite process, and to be responded to within 25 days by the Superintendent." (*Id.* ¶ 20 .) The Grievance was ultimately investigated by non-defendant Corrections Captain Burnett and denied by the superintendent, but Mateo complains that the investigation "took over 90 days." (*Id .*) Mateo claims that, at the time, he "had problems understanding the grievance process and its Directive." (*Id.*) Nevertheless, he alleges that as soon as he received the superintendent's response to the Grievance, he "immediately, appealed it to CORC [Central Office Review Committee], which is the last step." (*Id.*) Mateo alleges that he placed his appeal form in the appropriate box outside of the mess hall but that he

never received a response from CORC, which had 30 days to issue a response or decision, which indicates that it either refused or waived its response or decision or this grievance's appeal seems to have not been processed to CORC, intentionally, to frustrates [sic] the exhaustion of this administrative remedy, which I assert as the deliberated action of defendants O'Connor and MacIsaac.

(*Id.*) Mateo does not provide a copy of the appeal form, claiming that his copy was removed from his personal property, either when he was moved into Green Haven's Special Housing Unit, or when he was transferred out of Green Haven. (*Id.*)

On September 3, Mateo was found guilty by hearing officer Laporto of the charges in the inmate misbehavior report on the "fabricated evidence and biased testimony of Guarino and O'Connor." (*Id.* ¶ 15.) Mateo claims that he received "a disposition of the maximum penalty, in retaliation." (*Id.*) Mateo was apparently assigned to thirty days in keeplock, with a loss of commissary and phone privileges, from August 22 through September 21, and also a loss of package privileges from September 3 through October 3. (*Id .* at 11.) Mateo appealed the guilty finding on September 9 to defendant Royce, who "arbitrarily and capriciously, affirmed the guilty finding and disposition, in retaliation, in favor of his comrades [sic] officers." (*Id.* ¶ 16.)

Mateo filed harassment and retaliation claims against O'Connor, MacIsaac, and Purcell on August 27, 2008 in the Northern District of New York. (*Mateo v. O'Connor,* No. 08–0923(DNH) (N.D.N.Y.).) Mateo's case was subsequently transferred here, because the complaint's allegations involved incidents at Green Haven, which is in this district. This Court dismissed Mateo's complaint because he filed it within mere days of the incidents of alleged harassment and retaliation, making exhaustion "impossible in so short a time frame ." *Mateo v. O'Connor,* No. 08 Civ. 11053(RJH)(DCF), 2010 WL 3199690, at *3 (S.D.N.Y. Aug. 12, 2010). This Court informed Mateo that his case could be re-filed "with the addition of paragraphs explaining how administrative remedies have been exhausted." *Id.* (citations omitted).

**\*4** On September 21, 2010, Mateo filed the present complaint.

### DISCUSSION

**A. Standards**

**I. Motion to Dismiss**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1075830 (S.D.N.Y.)
**(Cite as: 2012 WL 1075830 (S.D.N.Y.))**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). However, the Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal,* 129 S.Ct. at 1949.

In the case of a *pro se* litigant, the Court reads the pleadings leniently and construes them "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (citations and internal quotation marks omitted). This guidance applies with particular force when the plaintiff's civil rights are at issue. *See McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004); *see also Flaherty v. Lang,* 199 F.3d 607, 612 (2d Cir.1999). To survive a Rule 12(b) (6) motion to dismiss, a *pro se* plaintiff's factual allegations must, however, be "enough to raise aright to relief above the speculative level." *Twombly,* 550 U.S. at 555.

## II. Section 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *McKithen v. Brown,* 481 F.3d 89, 99 (2d Cir.2007).

Mere threats, verbal harassment or profanity,

without any injury or damage, are not actionable under Section 1983. *Harris v. Keane,* 962 F.Supp. 397, 406 (S.D.N.Y.1997). Likewise, the filing of a false misbehavior report against an inmate does not constitute "a *per se* constitutional violation" actionable under Section 1983, provided the inmate is afforded due process protection via a disciplinary hearing. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, such actions, if taken in retaliation against an inmate for pursuing a grievance, may "violate[ ] the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments" and thus become actionable under Section 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996).

To state a *prima facie* retaliation claim for filing a grievance, an inmate must allege that an official took an "adverse action" against him, and that there was a causal relationship between the grievance filing and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). An "adverse action" is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Id.* at 381 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). Actions below this threshold are deemed *de minimis* and outside the ambit of actionable First Amendment retaliation. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001)). Because retaliation claims are easily fabricated, the courts must "examine prisoners' claims of retaliation with skepticism and particular care," *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir., 1995), requiring "detailed fact pleading ... to withstand a motion to dismiss." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

### III. Exhaustion of Administrative Remedies

**\*5** The Prison Litigation Reform Act of 1995 ("PLRA") states in relevant part, "[n]o action shall be brought with respect to prison conditions under [Section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are avail-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1075830 (S.D.N.Y.)
**(Cite as: 2012 WL 1075830 (S.D.N.Y.))**

able are exhausted." 42 U.S.C. § 1997e(a). This administrative exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

DOCS maintains a three-tiered administrative review and appeals system for prisoner grievances. *See* N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 7, § 701.5. Prior to pursuing a Section 1983 action in federal court, an inmate in the DOCS system must exhaust all three levels. *See Porter,* 534 U.S. at 524. First, he must file an inmate grievance complaint form or a written grievance with the Inmate Grievance Resolution Committee ("IGRC"). *See* 7 NYCRR § 701.5(a). Second, if he is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. *See id.* § 701.5(c). Finally, an inmate may appeal any superintendent's written denial to the CORC. *See id.* § 701.5(d).

For inmate allegations of harassment or other misconduct by prison employees, DOCS provides an expedited procedure. Such grievances are forwarded directly to the prison superintendent who will determine whether the grievance presents a bona fide harassment issue. *See id.* §§ 701.8(a)(c). The superintendent may request an investigation by the Inspector General's Office and must render a decision within twenty-five calendar days of receiving the grievance. *See id.* §§ 701.8(d)-(f). An inmate may appeal the superintendent's response by filing a notice of decision to appeal to CORC within seven calendar days of receiving the response. *See id.* § 701.8(h). If the superintendent does not render a decision within twenty-five calendar days, the inmate may appeal the grievance to the CORC. *See id.* § 701.8(g).

A final decision by CORC is required in order to exhaust administrative remedies. *Torres v. Carry,* 672 F.Supp.2d 338, 344 (S.D.N.Y.2009). Such a re-

quirement is particularly appropriate for expedited harassment grievances, which, unlike regular grievances, have only one level of administrative review at which to address violative practices and take ameliorative steps to mitigate damages. *See Cruz v. Jordan,* 80 F.Supp.2d 109, 119–120 (S.D.N.Y.1999).

The Court of Appeals has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Id.* at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, the Court should consider whether special circumstances have been plausibly alleged that otherwise justify the prisoner's failure to comply with the administrative procedural requirements. *Id.* (citations omitted).

**B. Relief Available**

**\*6** As an initial matter, Mateo seeks injunctive relief and monetary damages from the individual defendants. But Mateo cannot obtain injunctive relief from them, because he is no longer incarcerated in Green Haven. An inmate's transfer out of a facility moots any claims he has for injunctive relief against officials of that facility. *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006). Mateo also claims to seek damages from the DOCS and from the other defendants in their official capacities. Such claims are barred by the Eleventh Amendment. *Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002). Accordingly, only Mateo's claims for damages from defendants in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1075830 (S.D.N.Y.)
**(Cite as: 2012 WL 1075830 (S.D.N.Y.))**

their individual capacities are properly before this Court.

## C. Analysis

Defendants argue that all of Mateo's claims are subject to dismissal for failure to exhaust his administrative remedies. (MTD at 6–8.) Because this Court agrees, it need not reach defendants' alternative arguments.

Failure to exhaust "is an affirmative defense under the PLRA, and ... inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Dismissal under Rule 12(b)(6) for non-exhaustion is appropriate only if a plaintiff's failure to exhaust is evident on the face of the complaint. *Id.* at 215. Here, Mateo's complaint includes a copy of the Grievance purportedly supporting his claims and a section of his complaint entitled "Exhaustion of Grievance", which squarely admits his failure to exhaust his remedies with CORC. (*See* Compl. ¶ 20 ("I have never received a response from CORC....".) Accordingly, an exhaustion defense is available with this Rule 12(b)(6) motion.

Retaliation claims "fit[ ] within the category of 'inmate suits about prison life,' and therefore must be preceded by the exhaustion of state administrative remedies available." *Lawrence v. Goord,* 304 F.3d 198, 200 (2d Cir.2002). Likewise, the policies and procedures of a prison's disciplinary and grievance programs may themselves be the subject of a grievance. *Taylor v. Artus,* No. 05 Civ. 271, 2007 WL 4555932, at *7 (N.D.N.Y. Dec. 19, 2007) (citing 7 NYCRR § 701.3(e)(1), (2); N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E). Thus, all of Mateo's present claims are subject to the PLRA's administrative exhaustion requirement.

Mateo's August 22 Grievance alleges that he was verbally and physically harassed by defendants O'Connor and MacIsaac and that these defendants, together with defendants Purcell, Ward, Guarino, and Jarvis, conspired to submit a false misbehavior report against Mateo, all in retaliation for filing grievances. (*See* Compl. at 8–11.) Because the Grievance included allegations of harassment, it was sent directly to the facility superintendent pursuant to 7 NYCRR § 701.8. (*See* Compl. ¶ 20.) Mateo claims that he appealed the first denial of his Grievance to CORC immediately after it was denied in late November but concedes that he never received an appellate decision on his Grievance from CORC, and that he never otherwise pursued his appeal to its conclusion. (*See id.*) As Mateo failed to obtain a final decision from CORC before bringing suit, these claims are subject to dismissal unless he can show that his failure is justified.

**\*7** Mateo did not identify any grievance directed to his claims of bias at the hearing and appeal. Accordingly, these claims are also subject to dismissal unless Mateo can show that he was justified in failing to grieve them.

Mateo presents four arguments under *Hemphill* to excuse the absence of administrative exhaustion, but none are availing.

First, Mateo argues that "the Inmate Grievance directive is confusing and at the time of the incidents and filing grievances I did not understood [sic] it." (Opp.¶ 11.) However, as this Court has previously recognized, Mateo appealed at least six other grievances to CORC, all filed at the same time as the events in this action. *See Mateo v. O'Connor,* 2010 WL 3199690, at *3 n. 5 (noting CORC's recognition of grievances filed on August 11, 2008; September 9, 2008; September 15, 2008; September 22; 2008; September 24, 2008; and October 1, 2008). In a separate action before this Court, Mateo has provided proof of exhaustion of three grievances from this time. Complaint Ex. A *Mateo v. Alexander,* No. 10 Civ. 8427(LAP)(DCF), 2012 WL 864805 (S.D.N.Y. Mar. 14, 2012) (grievance filed June 18, 2008, CORC de-

Not Reported in F.Supp.2d, 2012 WL 1075830 (S.D.N.Y.)
**(Cite as: 2012 WL 1075830 (S.D.N.Y.))**

cision rendered November 26, 2008); *id* . Ex. B (grievance filed July 2, 2008, CORC decision rendered August 27, 2008); *id.* Ex. C (grievance filed August 11, 2008, CORC decision rendered October 1, 2008). Thus, when Mateo allegedly appealed his Grievance to CORC in late November, 2008, (*see* Compl. ¶ 20), he had already received at least two CORC decisions on other grievances and possibly more. Mateo cannot plausibly have reasonably misunderstood, at the end of 2008, the procedures for grieving an issue or for obtaining a response from CORC.

Second, Mateo argues under *Boyd v. Corrections Corp. of America,* 380 F.3d 989 (6th Cir.2004), that the superintendent's untimely response and CORC's alleged failure to reply rendered the grievance procedure "unavailable." (Opp.¶ 11). Defendants deny that CORC received an appeal, (MTD at 8). But even assuming that Mateo filed an appeal and that the superintendent and CORC missed their response deadlines, the Court of Appeals has not adopted the position taken in cases like *Boyd* that a delay in responding to a grievance demonstrates per *se* unavailability. *See Rivera v. Anna M. Kross Center,* No. 10 Civ. 8696, 2012 WL 383941, at *4 (S.D.N.Y. Feb.7, 2012) (citing *Hemphill,* 380 F.3d at 686 n. 6). In any event, Mateo's immediate appeal of the superintendent's reply, his familiarity with the grievance process, and his receipt of other decisions of appeals from CORC all demonstrate that the administrative process was "available" to him throughout this period and that he could reasonably have inquired with CORC as to the status of his appeal of the Grievance.

Third, Mateo argues that his failure to fully grieve his complaints should be excused because he feared reprisal from by MacIsaac and O'Connor. (*See* Compl. ¶ 18 ("I risked my person to write and file grievances ... taking a chance, and risking physical harm from MacIsaac and O'Connor as they threatened...."); Opp. ¶ 8 ("At H–Block my first amendment to file grievance and of speech was chilled, temporarily ... The

defendants threats of harm against my person and the issued false inmate misbehavior report chilled my speech.").)

**\*8** The threat of retaliation can render grievance procedures "unavailable" if " 'a similarly situated individual of ordinary firmness' " would be so fearful as to believe that such procedures were unavailable. *See Snyder v. Whittier,* 428 Fed. Appx. 89, 91 (2d Cir.2011) (summary order) (quoting *Hemphill,* 380 F.3d at 688). Alternatively, defendants can be estopped from the defense of non-exhaustion if they prevented an inmate from availing himself of grievance procedures. *Id.* (citing *Hemphill* at 686).

Mateo's argument is again undermined by his continued filing of grievances and lawsuits during and after the period in question. *See id.* at 92 ("[Petitioner's] assertion that he feared retaliation in the first place ... is belied by his testimony that he complained ... within two hours of the assault.... Our conclusion is further underscored by the fact that [petitioner] complained to no less than four other individuals about the attack, between the time he disclosed details of the attack to [the officer], and the time when he finally attempted to file a formal grievance."); *Davis v. Torres,* No. 10 Civ. 00308, 2011 WL 3918098, at *6 (S.D.N.Y. Aug. 29, 2011) ("Where plaintiff alleges that he submitted numerous grievances, he cannot also contend that he was meaningfully deterred from doing so."). Mateo filed his Grievance about the H–Block staff on the night of August 22, within 48 hours of the threatening events. Mateo then filed two additional grievances while on keeplock, and at least three more grievances before receiving an initial response to his August 22 Grievance. (Compl.¶ 20.) Mateo even filed federal claims against O'Connor and MacIsaac within days of the incident in the predecessor to this case. Mateo's own behavior thus renders implausible claims that defendants' threats made the grievance process unavailable from September 2008 (when grievances as to the hearing were due) through the end of 2008 (when his appeal to CORC was due) or that he rea-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1075830 (S.D.N.Y.)
**(Cite as: 2012 WL 1075830 (S.D.N.Y.))**

sonably relied on their threats. *See also Harrison v. Stallone,* No. 06 Civ. 902, 2007 WL 2789473, at *6 (N.D.N.Y. Sept. 24, 2007) ("If every plaintiff bringing a retaliation claim could have the exhaustion requirement excused by alleging a fear of further retaliation, it would create a general exception to exhaustion for retaliation claims").

Finally, Mateo suggests that Maclsaac and O'Connor may have intercepted his grievance appeal after he deposited it, preventing it from reaching CORC (*See* Compl. ¶ 20; Opp. ¶ 9,) This conclusory suggestion is unsupported by any factual allegations and belied by Mateo's complaint insofar as he claims to have deposited his appeal in late November, 2008, but alleges no interactions with Maclsaac or O'Connor after the September 3, 2008 hearing.

In sum, because Mateo clearly availed himself of an available grievance procedure throughout the period at issue in this complaint and because no special circumstances have been plausibly alleged that would justify Mateo's failure to exhaust his administrative remedies in that procedure, all of his claims are dismissed.

**\*9** In 2010, this Court dismissed Mateo's claims without prejudice, and with leave to refile them upon a showing of administrative exhaustion. Mateo has failed to do so in the present action, and the time limits for him to file new grievances, or to complete an appeal of his August 22 Grievance with CORC, have long since passed. The Court of Appeals has held that "dismissal with prejudice, when remedies are no longer available, is required 'in the absence of any justification for not pursuing [such] remedies.' " *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (quoting *Berry v. Kerik,* 366 F.3d 85, 87–88 (2d Cir.2004)); *see also Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 239–240 (W.D.N.Y.2010); *Baez v. Kahanowicz,* 469 F.Supp.2d 171, 180 (S.D.N.Y.2007).

**CONCLUSION**

Accordingly, because Mateo failed to properly grieve any of the claims in his complaint, defendants' motion to dismiss (Doc. No. 16) is GRANTED, and plaintiff's claims are dismissed with prejudice. The Clerk of the Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,2012.
Mateo v. O'Connor
Not Reported in F.Supp.2d, 2012 WL 1075830 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Charles McALLISTER also known as Charles
McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor, Mohawk Cor-
rectional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
Signed Oct. 28, 2014.
Filed Oct. 29, 2014.

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York
State Attorney General, The Capitol, Keith J. Starlin,
AAG, of Counsel, Albany, NY, for Defendant.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate
Judge Hummel's October 9, 2014 Re-
port–Recommendation and Order, *see* Dkt. No. 81,
and Plaintiffs objections thereto, *see* Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant
times, in the custody of the New York Department of
Corrections and Community Supervision, commenced
this action pursuant to 42 U.S.C. § 1983. In his orig-
inal complaint, Plaintiff asserted claims against Brian
Fischer, Lucien J. LeClaire, Patricia LeConey, Carol
Woughter, and John and Jane Does. Defendants
moved for summary judgment. *See* Dkt. No. 49. By
Report–Recommendation and Order dated July 6,
2012, Magistrate Judge Homer recommended that this

Court dismiss all claims against the named individuals
and direct Plaintiff to join Harold Call as a Defendant.
*See* Dkt. No. 55. This Court accepted the Report and
Recommendation and Order in its entirety and di-
rected Plaintiff to file an amended complaint to "in-
clude only one cause of action a procedural due pro-
cess claim in connection with his disciplinary hearing
and one Defendant hearing officer Call ." *See* Dkt. No.
58 at 4–5.

Plaintiff thereafter filed his amended complaint
and requested compensatory and punitive damages.
*See* Dkt. No. 64, Amended Complaint at 4. In this
amended complaint, Plaintiff alleged that Defendant
violated his constitutional rights under the First,
Eighth and Fourteenth Amendments. *See* Dkt. No. 64,
Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure. *See* Dkt. No. 74. In a Re-
port–Recommendation and Order dated October 9,
2014, Magistrate Judge Hummel recommended that
this Court grant Defendant's motion in part and deny
his motion in part. *See* Dkt. No. 81 at 33. Plaintiff filed
objections to Magistrate Judge Hummel's recom-
mendations. *See* Dkt. No. 83.

Where a party makes specific objections to por-
tions of a magistrate judge's report and recommenda-
tion, the court conducts a *de novo* review of those
recommendations. *See Trombley v. Oneill,* No.
8:11–CV–0569, 2011 WL 5881781, \*2 (N.D.N.Y.
Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)(2); 28
U.S.C. § 636(b)(1)(C)). Where a party makes no ob-
jections or makes only conclusory or general objec-
tions, however, the court reviews the report and rec-
ommendation for "clear error" only. *See Salmini v.
Astrue,* 3:06–CV–458, 2009 WL 1794741, \*1
(N.D.N.Y. June 23, 2009) (quotation omitted). After

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

conducting the appropriate review, a district court may decide to accept, reject, or modify those recommendations. *See Linares v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660, *10 (N.D.N.Y. Sept. 29, 2009) (quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general or conclusory, given his *pro se* status, the Court has conducted a *de novo* review of Magistrate Judge Hummel's Report–Recommendation and Order. Having completed its review, the Court hereby

**\*2 ORDERS** that Magistrate Judge Hummel's October 9, 2014 Report–Recommendation and Order is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a

copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER**[FN1]

> **FN1.** This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"),[FN2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing—and one Defendant—hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

> FN2. McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

## I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not

specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU"). FN3 Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15 FN4 (unauthorized exchange) and 180.17 (unauthorized assistance).FN5 *Id.;* Am. Compl. ¶ 7.

> FN3. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

> FN4. Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

> FN5. Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses, documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which ap-

pear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4** McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion[FN6]

> FN6. All unpublished decisions referenced herein are appended to this report and recommendation.

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depo-

sitions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g.,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

*Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

> FN7. Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvment with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of the misconduct in the Tier III hearing and imposed SHU time. He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for

his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

legal claim." *Davis*, 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra*, McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky*, 123 F.3d at 247.

**\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment
#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

### a. Denial of Liberty Interest

*\*10* In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-two days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant

hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard ( *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days was atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest ( *Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

However, review of directive 4913 reveals that the personal and legal property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

**b. Procedural Due Process**

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time

credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

**i. Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

### ii. **Hearing Officer Bias/Pre-determination of Guilt**

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide

the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at \*11 (N.D .N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \* 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at \*8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at * 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at *2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii. Failure to Investigate

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law

library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

### iv. Confidential Witness

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

**\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not

provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity and substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could

support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–2, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at *3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at *4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17, McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would

provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. Directive 4913

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at *12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. Equal Protection

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

**\*17** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

Call, throughout the entire disciplinary hearing de-

prive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at *12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. **Qualified Immunity**

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken."

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

*Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon—the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony ( *Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal

documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at *3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

### IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

a. dismissing plaintiff's First Amendment claims;

b. dismissing plaintiff's Eighth Amendment claims;

c. dismissing plaintiff's challenge to the constitu-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 5475293 (N.D.N.Y.)
**(Cite as: 2014 WL 5475293 (N.D.N.Y.))**

tionality of Directive 4913;

d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

a. plaintiff's Fourteenth Amendment procedural due process claims;

b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

N.D.N.Y.,2014.
McAllister v. Call
Slip Copy, 2014 WL 5475293 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 2801043 (M.D.Fla.)
**(Cite as: 2014 WL 2801043 (M.D.Fla.))**

**C**

Only the Westlaw citation is currently available.

United States District Court, M.D. Florida,
Fort Myers Division.
Donald McKEE, Plaintiff,
v.
DIRECTOR, FLORIDA CIVIL COMMITMENT
CENTER, Defendant.

No. 2:11–cv–579–Ftm–38DNF.
Signed June 19, 2014.

Donald McKee, Arcadia, FL, pro se.

Donald Anthony Chinquina, Gregory A. Kummerlen,
Wiederhold, Moses, Kummerlen & Waronicki, PA,
West Palm Beach, FL, for Defendant.

**OPINION AND ORDER**[FN1]

> FN1. Disclaimer: Documents filed in
> CM/ECF may contain hyperlinks to other
> documents or Web sites. These hyperlinks
> are provided only for users' convenience.
> Users are cautioned that hyperlinked docu-
> ments in CM/ECF are subject to PACER
> fees. By allowing hyperlinks to other Web
> sites, this court does not endorse, recom-
> mend, approve, or guarantee any third parties
> or the services or products they provide on
> their Web sites. Likewise, the court has no
> agreements with any of these third parties or
> their Web sites. The court accepts no re-
> sponsibility for the availability or function-
> ality of any hyperlink. Thus, the fact that a
> hyperlink ceases to work or directs the user to
> some other site does not affect the opinion of

the court.

SHERI POLSTER CHAPPELL, District Judge.

**\*1** This case is before the Court on the Defendant
Director Florida Civil Commitment Center's ("De-
fendant's") Second Motion for Summary Judgment
(*Doc. 57,* filed January 30, 2014); and Plaintiff Donald
McKee's ("Plaintiff's") Response in Opposition to
Defendant's Second Motion for Summary Judgment
(*Doc. 59,* filed March 5, 2014). For the reasons dis-
cussed herein, the Court concludes that Defendant is
entitled to summary judgment on all of Plaintiff's
claims.

**I.** *Background and Procedural History*

Plaintiff initiated this action by filing a *pro se*
civil rights complaint pursuant to 42 U.S.C. § 1983.
The claims raised in the civil complaint stem from
Plaintiff's exposure to environmental tobacco ("ETS")
smoke at the Florida Civil Commitment Center
("FCCC") in Arcadia, Florida. Plaintiff's second
amended complaint is currently before this Court
(*Doc.20* ).

*a. Plaintiff's Claims*

In his second amended complaint, Plaintiff al-
leges the following:

> Therapeutic Security Technicians ("TSTs") are
> utilized as security staff by the FCCC to "[observe]
> resident behavior in the housing unit and [the TSTs]
> are instructed to contact certified security if interven-
> tions are required." (*Doc. 20 at 2* ). Security officers
> who are certified by the state are more highly paid
> than TSTs. *Id.* Because some of the TSTs are "overly
> familiar and friendly with residents at FCCC", many
> of them are not effective. *Id.* Moreover, the FCCC is
> "chronically short staffed" and at times the TSTs are
> required to abandon their posts without relief. *Id.*
> During large portions of the day, there are no staff

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2801043 (M.D.Fla.)
**(Cite as: 2014 WL 2801043 (M.D.Fla.))**

members in the housing units. *Id.* at 3.

Since April of 2009, FCCC policy has forbidden the use of tobacco products by FCCC staff or its residents (*Doc. 20 at 2* ). Despite the FCCC's prohibition against the use of tobacco, tobacco products are present and used by residents. *Id.* Plaintiff alleges that because all incoming mail is searched and residents are searched after receiving visitors from the community, the only way for tobacco and other contraband to enter the FCCC is through corrupt staff. *Id.* Plaintiff further alleges that the FCCC has "a lucrative market for tobacco products in the form of loose leaf tobacco, to be smoked." *Id.* Plaintiff alleges that he is forced to inhale second hand smoke, and as a result, he "is experiencing effects from this secondhand smoke as if he was a smoker." *Id.* at 3.

Plaintiff informed the director of the FCCC of the "smoking issue" but received no response (*Doc. 20 at 3* ). Plaintiff also sought help from the FCCC's medical department concerning health problems caused by breathing second hand smoke, and was told to alert security to the smokers. Plaintiff believes that alerting security would be useless because the offenders would merely deny the allegations and seek to harm the informant. *Id.*

Plaintiff alleges a Fourteenth Amendment due process claim on the ground that he fears for his future health and well-being as a result of his exposure to second-hand smoke (*Doc. 20 at 4* ). Plaintiff asserts that GEO, the corporation that runs the FCCC, seeks to maximize profits by maintaining only minimal staffing levels which leads to a lack of oversight at the FCCC. *Id.* at 3. Plaintiff also alleges that corrupt staff members at the FCCC distribute tobacco products to the residents for profit. *Id.*

**\*2** Plaintiff seeks injunctive relief against Defendant. Specifically, Plaintiff wants the FCCC to implement a policy requiring the presence of certified

security officers in all housing units at all times or, alternatively, Plaintiff asks to be housed alone in a cell in a housing unit of his choice for the duration of his time at the FCCC (*Doc. 20 at 4* ).

**b. Plaintiff's Motion for Sanctions**

On February 6, 2013 Plaintiff filed a motion for sanctions in which he argued that Defendant intentionally destroyed, or allowed to be destroyed, approximately 830 crucial video clips showing the use of tobacco by residents at the FCCC (*Doc.33* ). Plaintiff had made three separate demands to Defendant that the FCCC preserve video clips. The Magistrate Judge concluded that the first thirty-three video clips, those requested in Plaintiff's first two demands, were important evidence and that Defendant's spoliation of those clips was predicated on bad faith (*Doc.50* ).[FN2] The Court recognized that Plaintiff was disadvantaged by the clips' destruction, but that he could still prove his case by finding witnesses to his exposure to second-hand smoke at the FCCC. *Id.* at 14. The Court specifically noted:

> FN2. Judge Frazier limited his order to the first thirty-three video clips sought by Plaintiff because Plaintiff's third request to the defendant was "so unreasonable, overbroad, and unduly burdensome, that a request for a protective order would have undoubtedly been granted if one had been sought." (*Doc. 50 at n. 3* ).

While Plaintiff argues that he is unable to locate residents willing to document incidents of smoking because of the fear of retaliation (*Doc. 33 at 5* ), this argument is belied by the fact that Plaintiff has attached to his response in opposition to Defendant's [first] motion for summary judgment two affidavits from FCCC residents regarding the smoking policy at the FCCC (*Doc.43* ). Moreover, Plaintiff has not asserted that he has been retaliated against as a result of filing a lawsuit regarding tobacco use at the FCCC. Finally, Plaintiff states that he is forced to

Slip Copy, 2014 WL 2801043 (M.D.Fla.)
**(Cite as: 2014 WL 2801043 (M.D.Fla.))**

breathe air "rife with second hand tobacco smoke" for at least four hours per day (*Doc. 41 at 3* ). If the smoking is as pervasive as Plaintiff alleges, he will be able to find, among the numerous staff and residents at the FCCC, witnesses who will state such. (*Doc. 50 at 14* ). As sanctions for the destruction of the video clips, the Court struck Defendant's pending motion for summary judgment and re-opened discovery so that Plaintiff could seek additional evidence in support of his assertion that he was exposed to an unreasonably high level of tobacco smoke. *Id.* at 17. Defendant was also directed to provide Plaintiff with information regarding smoking violations at the FCCC. *Id.* at 17–18. Defendant complied with the order on November 21, 2013, documenting 63 incidents where a resident violated the FCCC's tobacco policy (*Doc.51* ).

### c. Defendant's Motion for Summary Judgment

After the second discovery period closed, Defendant Director filed a second motion for summary judgment on January 30, 2014. In the motion, Defendant argues that Plaintiff has not put forth evidence establishing either the objective or subjective prong of an environmental tobacco smoke ("ETS") claim (*Doc. 57 at 12–14* ). In support of his motion for summary judgment, Defendant filed Plaintiff's September 27, 2011 sick call request (*Doc.57–1* ); Affidavit of Cindy Neads (*Doc.57–2* ); Affidavit of Tim Budz (*Doc.57–3* ); an air quality environmental report (*Doc.57–4* ); Tim Budz' July 23, 2009 Memorandum to FCCC residents (*Doc.57–5* ); Tim Budz' January 13, 2011 Memorandum to FCCC staff (*Doc.57–6* ); Affidavit of Donald Sawyer (*Doc.57–8* ); and Plaintiff's medical records (Doc. 40–2). In response to an order from this Court, Defendant also filed a list of each occurrence from April 2009 until October 24, 2013 in which a staff member or resident at the FCCC was caught violating the institution's tobacco policy (*Doc.51* ).

**\*3** In response to Defendant's motion for summary judgment, Plaintiff filed his own affidavit and an FCCC resident communication form indicating that

Plaintiff has refused protective custody (*Doc.60–1* ).

### II. *Legal Standards*

### a. Constitutional Standards

Plaintiff filed this action as a civil detainee confined at the FCCC pursuant to the State of Florida's Involuntary Commitment of Sexually Violent Predator's Treatment and Care Act. *See* Fla. Stat. §§ 394.910–.913. As a person who is civilly confined, Plaintiff is in a position analogous to a criminally confined prisoner. *See Pullen v. State,* 802 So.2d 1113, 1119 (Fla.2001) ( "the curtailment of the fundamental right of liberty is implicated in both criminal proceedings and involuntary civil commitments"). Nevertheless, an individual who has been involuntarily civilly committed has "liberty interests under the due process clause of the Fourteenth Amendment to safety, freedom from bodily restraint, and minimally adequate or reasonable training" as required to ensure safety and freedom from restraint. *Dolihite v. Maughon,* 74 F.3d 1027, 1041 (11th Cir.1996) (citing *Youngberg v. Romeo,* 457 U.S. 307, 322, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). Thus, while civilly committed residents at the FCCC are "totally confined" and subject to internal regulations much like those established by the Florida Department of Corrections,[FN3] they are due a higher standard of care than those who are criminally committed. *Id.* Indeed, the Eleventh Circuit Court of Appeals has held that persons subjected to involuntary civil commitment "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.*

FN3. *See* Fla. Stat. § 394.912(11).

A criminally confined prisoner, has an Eighth Amendment right to be free from cruel and unusual punishment. *Whitley v. Albers,* 475 U.S. 312, 318–19, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). As the rights

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2801043 (M.D.Fla.)
**(Cite as: 2014 WL 2801043 (M.D.Fla.))**

of the involuntarily civilly committed are "at least as extensive as the rights of the criminally institutionalized," actions which would violate the Eighth Amendment rights of a prisoner, would likewise constitute a violation of the due process rights of an individual who was been involuntarily civilly committed. *See Dolihite,* 74 F.3d at 1041. Indeed, the Eleventh Circuit has recognized that "relevant case law in the Eighth Amendment context also serves to set forth the contours of the due process rights of the civilly committed." *Id .; see also Lavendar v. Kearney,* 206 F. App'x 860, 863 (11th Cir.2006). Therefore, while recognizing that Plaintiff is not a prisoner, this Court will examine relevant Eighth Amendment case law in its consideration of this case.

**b. Summary Judgment Standard**

Summary judgment is appropriate if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Supreme Court has explained the summary judgment standard as follows:

**\*4** [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant may meet this burden by presenting evidence that would be admissible at trial indicating there is no dispute of material fact or by showing that the non-moving party has failed to present evidence in support of some elements of its case on which it bears the ultimate burden of proof. *Celotex,* 477 U.S. at

322–324.

If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. *Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir.1991). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, (1986).

**c. Standards for claims based upon exposure to environmental tobacco smoke**

In order to prevail on an Eighth Amendment claim based upon a prisoner's exposure to environmental tobacco smoke, the plaintiff must establish one of two distinct types of claims—a future-injury claim or a present-injury claim. *See Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). In a present-injury claim, the plaintiff must establish that he suffers a serious medical need for a smoke-free environment and that prison officials displayed deliberate indifference to that need, resulting in an actual injury to the plaintiff's health. A claim for injunctive relief in a future-injury case does not require a plaintiff to show any presently existing health problems. The focus in an action for injunctive relief under *Helling* is on whether the level of ETS to which a prisoner has been involuntarily exposed "is such that his future health is unreasonable endangered," and an assessment of whether society "considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling,* 509 U.S. 35, 36 (emphasis in original).

Plaintiff asserts that his complaint is limited to potential future harm caused by his exposure to environmental tobacco smoke (*Doc. 59–1 at 2* ). To

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

prevail on such a claim, Plaintiff must prove both the objective and subjective elements of an Eighth Amendment violation.

### III. *Analysis*

#### a. Objective Element

**\*5** Under the 'objective component' prong of the *Helling* test, a prisoner "must show that he himself is being exposed to unreasonably high levels of ETS." *Helling,* 509 U.S. at 35. The objective component further considers "a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by ETS." *Id.* at 36. The Court must also "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.*

Defendant asserts that Plaintiff cannot satisfy the objective prong of *Helling* because he has not shown that he has been exposed to unreasonably high levels of environmental tobacco smoke (*Doc. 57 at 13* ). In fact, argues Defendant, Plaintiff has failed "to present any objective evidence as to the levels of ETS to which he himself was exposed." *Id.* Defendant further argues that Plaintiff has not established that he will have health issues in the future as a result of second-hand tobacco smoke. *Id.*

In support of his position, Defendant has attached an April 27, 2011 air quality report from T. Baldwin Environmental Services and Const. Inc. which indicates that ten air samples were taken from the FCCC on March 31, 2011 and that "[t]he quality of air [at the FCCC] is above average and environmentally safe." (*Doc. 57–4 at 1* ). Defendant also references Plaintiff's medical records and has attached a statement from Cindy Neads, a nurse at the FCCC (*Doc. 57–2 at 1–2* ). Neads attests that she has reviewed Plaintiff's med-

ical records from early 2009 until June 21, 2013 and that the only record in which Plaintiff complained of second hand smoke was a single sick call request from September 27, 2011, four days prior to filing the instant lawsuit. *Id.* at 2. Neads attests that Plaintiff "did not complain of lung issues or any other issues that could be related to second hand smoke from 2009 through the present other than the previously discussed sick call request from September 27, 2011." *Id.* at 2. Neads attests that Plaintiff denied having headaches, lung conditions, bronchitis or emphysema on February 25, 2011 and February 27, 2012 (*Doc. 57–2 at 2* ).

Despite this Court's admonition in the October 14, 2013 order (*Doc.50* ) that "Plaintiff will need to find witnesses to his exposure to second-hand smoke at the FCCC[,]" and despite having two separate discovery periods to gather such evidence, Plaintiff does not attach a single statement from any staff member or FCCC resident or any other evidence documenting Plaintiff's exposure to second hand smoke.[FN4] Likewise, Plaintiff has offered no admissible evidence to rebut Defendant's scientific finding that the air quality at the FCCC was "above average and environmentally safe ." (*Doc. 57–4 at 1* ). Plaintiff merely asserts in his own affidavit that he was exposed to too much second-hand smoke (*Doc.59–1* ). Plaintiff claims to experience the heaviest exposure to ETS between noon and 1 p.m. when he is locked in his housing unit, and the other residents smoke tobacco in the living and bathroom areas, because "[a]t this time TST's are called away to perform other duties and/or take breaks." (*Doc. 59–2 at 4* ). According to Plaintiff, "[a]ir in the housing unit then noticeably contains ETS in amounts sufficient to potentially cause future harm to my health." (*Doc. 59–1 at 4* ).

> FN4. Plaintiff alleges that 839 destroyed video clips would have shown numerous incidents of residents and employees smoking but that "[t]he videos sought were destroyed by Defendant, ultimately resulting in the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

court[']s imposition of sanctions." (*Doc. 59–1 at 3* ). Plaintiff's implication that the destruction of the 839 clips resulted in the imposition of sanctions against Defendant is a misstatement of the Court's prior order. Only 33 of those clips were at issue in the spoliation order. Even so, these 33 clips no longer exist, and it was clearly explained to Plaintiff that he had a responsibility to obtain admissible evidence to defeat Defendant's motion for summary judgment. Plaintiff was provided with explicit instructions from the Court regarding the evidence he needed to support his claim (*Doc. 50 at 14* ). Plaintiff cannot now rely solely on his allegations that the clips "would have" supported his claims.

Plaintiff asserts that his fear of being threatened with retaliation "informed [his] decision to forgo affidavits and testimony from fellow residents." (*Doc. 59–1 at 3* ). Even if Plaintiff is reluctant to seek affidavits from FCCC staff or residents, Plaintiff does not allege that he attempted to engage in *any* available discovery method such as interrogatories or requests for admissions, or that he asked any resident or staff member to make a statement regarding Plaintiff's exposure to ETS or to verify Plaintiff's statements regarding the general staffing levels at the FCCC or the number of "anonymous" reports that were made regarding incidents of smoking. In other words, Plaintiff engaged in absolutely no discovery to support his claim that he is exposed to unreasonable levels of ETS.

**\*6** The Eleventh Circuit has consistently held that a party's conclusory allegations, without more, are insufficient to enable the non-moving party to withstand summary judgment. *Holifield v. Reno,* 115 F.3d 1555 (11th Cir.1997); *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990) (conclusory, self-serving, or uncorroborated allegations in affidavit could not create issue of fact sufficient to defeat well supported summary judgment); *Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir.2000) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value.") (citation omitted). Thus, the Court finds that Plaintiff's limited anecdotal evidence regarding his lunch-time exposure level is insufficient to overcome Defendant's objective evidence that Plaintiff was not exposed to excessive levels of ETS.

Recognizing that he has presented no evidence of his own ETS exposure at FCCC, Plaintiff directs this Court to a June 2006 Surgeon General's report which concluded that "there is no safe level of exposure to ETS." (*Doc. 59–1 at 2* ). Plaintiff asserts that because there is "ample evidence" of smoking at the FCCC, he need not make the individualized showing required by *Helling. Id.* Presumably then, Plaintiff contends that he only need show that he has been exposed to some second-hand smoke, no matter how limited, to satisfy *Helling's* objective prong, and because there is no dispute that there is some level of ETS at the FCCC, he has satisfied this requirement (*Doc. 59–1 at 4* ). This argument misses the mark.

*Helling* requires that a plaintiff's exposure to ETS must result in the kind of risk to health that "violates contemporary standards of decency to expose *anyone* unwillingly to such a risk ." 509 U.S. at 36 (emphasis in original). The fact that Plaintiff subjectively fears that the FCCC's imperfect enforcement of its no-smoking policy has exposed him to ETS in amounts sufficient to pose a threat to his future health does not demonstrate that the exposure level presents a risk of harm so serious that it would violate "contemporary standards of decency." Moreover, a consideration of the referenced 2006 Surgeon General's report does not change this Court's conclusion.[FN5] The findings in the report—that ETS exposure results in greater observed health maladies in a general popula-

Slip Copy, 2014 WL 2801043 (M.D.Fla.)
**(Cite as: 2014 WL 2801043 (M.D.Fla.))**

tion—does not address what Plaintiff experienced. The inquiry is not whether ETS is generally harmful, or whether it has been shown to cause increased risks in populations exposed to it; the inquiry is whether *Plaintiff's* particular exposure to ETS caused *Plaintiff* to suffer a greater risk of harm. *Helling,* 509 U.S. at 35 ("With respect to the objective factor, [a plaintiff] must show that *he himself* is being exposed to unreasonably high levels of ETS.") (emphasis added). A general study is not sufficient to make the individualized showing of risk *Helling* requires. To decide otherwise would be to conclude that the constitution requires an absolutely smoke free prison environment and render the first prong of the *Helling* test meaningless because once an inmate showed that he was exposed to any secondhand smoke—no matter how limited, fleeting, or minute—his burden of proof on the first *Helling* prong would be satisfied. *See King v. Henry,* Case No. 5:09–cv–365/MCR/EMT, 2011 WL 5877070 (N.D.Fla. Sept.19, 2011) (recognizing that a prisoner cannot rely on the 2006 Surgeon General's report or a WHO report to satisfy *Helling* 's objective prong because such reports "underscore general health risks associated with ETS; however, this evidence does not objectively establish [the plaintiff's] individual and particular level of exposure or attendant risk."); *Giddens v. Roberts,* Case No. 1:05–CV–112, 2007 WL 891516, at *3 (M.D.Ga. March 21, 2007) (rejecting Plaintiff's reliance on the Surgeon General's report to prove the objective prong of the *Helling* test because "in order to prevail upon a claim for exposure to ETS, a plaintiff must do more than merely set out that the exposure is adversely affecting his health. He must present *evidence* showing that he is being exposed to ETS at a level that creates an unreasonable risk of serious damage to his future health.") (emphasis in original); *Hunt v. Cassese,* Case No. 5:10–CT–3132–D, 2011 WL 6130796, at *3 (E.D.N.C. Dec.8, 2011) (rejecting Plaintiff's reliance on the 2006 Surgeon General's report to prove the objective prong of the *Helling* test because the plaintiff failed to show any connection between the hypothetical risks of ETS exposure and the plaintiff's ex-

posure to ETS); *Durham v. Hood,* Case No. 05–cv–01282–MSK–KLM, 2010 WL 918066, at *5 (D.Colo. March 11, 2010) ("General studies, medical journals, and statistics are not sufficient to make the individualized showing of risk that is required, and without such an individualized showing, [the prisoner's] claim fails. To conclude otherwise would be to render ETS cases strict liability; once an inmate showed that he was exposed to secondhand smoke, his burden of proof is satisfied because exposure generally means increased health risks."); *but compare Hicks v. Corrections Corp. of America,* 2009 WL 2969768, at *7 (W.D.La. Sept.11, 2009) (finding that the Surgeon General's report "established conclusively" that exposure to second hand smoke is unhealthy and dangerous and that plaintiff's evidence that he was exposed to second hand smoke almost 24 hours a day every day satisfied the plaintiff's burden of proof on the objective element); *Perkins v. Terrell,* Case No. 08–CV–1906, 2010 WL 5488234, at *8 (W.D.La. Dec.6, 2010) (relying on *Hicks* to conclude that "almost any unwanted exposure to ETS would be enough to defeat summary judgment as to the objective element.").

> FN5. The 2006 Surgeon General's report, *The Health Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General,* may be found at: http://www.ncbi.nlm.nih.gov/books/NBK44 328/# rpt-smokeexp.ch1.s5

**\*7** Plaintiff's failure to demonstrate that *he* has suffered an increased risk of future harm from exposure to ETS in amounts that violate contemporary standards of decency prevents him from satisfying the objective prong of the *Helling* test. *See Helling,* 509 U.S. at 36 (recognizing that it is the plaintiff's burden to show that "the risk of which he complains is not one that today's society chooses to tolerate."); *In re Royal Caribbean Cruises Ltd.,* 403 F.Supp.2d 1168, 1173 (S.D.Fla.2005) (granting summary judgment where nonmoving party "failed to put forth any evidence" to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2801043 (M.D.Fla.)
**(Cite as: 2014 WL 2801043 (M.D.Fla.))**

refute affidavit submitted by moving party); *Gantt v. Whirlpool Fin. Nat'l. Bank,* Case No. 99–470–AH–M, 2000 WL 1375298 (S.D.Ala. Aug.22, 2000) (summary judgment appropriate because plaintiff failed to come forward with evidence to refute defendant's affidavit).

**b. Subjective Element**

Even if this Court were to conclude that Plaintiff has satisfied the objective prong of the *Helling* test, which he cannot for the reasons outlined above, Plaintiff would need to come forward with sufficient evidence to show that Defendant acted with deliberate indifference to Plaintiff's plight. *Helling,* 509 U.S. at 35. To establish that a prison official acted with deliberate indifference, the plaintiff must show that the prison official had "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." *Brown v. Johnson,* 387 F.3d 1344, 1351 (11th Cir.2004). In regard to ETS, "the adoption of the [no] smoking policy ... will bear heavily on the inquiry into deliberate indifference." *Helling,* 509 U.S. at 36.

Defendant asserts that Plaintiff cannot make the necessary subjective showing because there is no evidence that he was aware that Plaintiff could suffer a medical condition in the future related to second hand smoke (*Doc. 57 at 14* ). Defendant also argues that the FCCC implemented a no-smoking policy in 2009 and that the "FCCC worked diligently to enforce the non-smoking policy at FCCC." (*Doc. 57 at 15* ). In support, Defendant reasserts that Plaintiff repeatedly denied to medical staff that he suffers from headaches, lung condition, bronchitis or emphysema—all conditions that would have been caused by, or aggravated by ETS and which could have alerted Defendant to a potential future health problem (*Doc. 57–1 at 2* ). Defendant attaches the affidavits of Tim Budz, prior director of the FCCC, and Donald Sawyer, present director of the FCCC (*Doc. 57–3; Doc. 57–8* ). In the affidavits, both directors attest that the FCCC is a non-smoking facility and that any resident or staff

member caught smoking would be disciplined, although neither could remember when or if a staff member had been caught smoking at the FCCC. *Id.* Both assert that the resident handbook states that the FCCC is a nonsmoking facility and that residents are expected to follow the handbook. *Id.* Both attest that residents can anonymously report smoking at the FCCC and that such reports are taken seriously. *Id.* Defendant also directs the Court to a memorandum sent to FCCC residents on July 23, 2009 which stated that "[a]s clearly communicated in the resident council meeting on 6/17/09, FCCC is and will remain a smoke and tobacco free facility." (*Doc.57–5* ). Finally, Defendant attaches a January 13, 2011 memorandum to the FCCC staff in which Tim Budz "applauds" the staff's "effort at maintaining a healthy and smoke free environment at FCCC!" (*Doc.57–6* ). The memorandum directs staff to a video outlining the benefits of working in a smoke-free environment, offered employees assistance with smoking cessation, and forbad smoking in the driveway of the FCCC (*Doc.57–6* ). Defendant has submitted a list of sixty-three incidents between June 9, 2009 and August 5, 2013 in which a resident was caught smoking (*Doc.51–1* ).

**\*8** In his own affidavit, Plaintiff argues that because of the large number of residents at the FCCC, the small number of documented smoking incidents listed by Defendant evidences a lack of a good faith effort to prohibit smoking at the FCCC (*Doc. 59–1 at 7* ). Again, Plaintiff offers no evidence, other than his own unsubstantiated allegations and suspicions, to rebut Defendant's assertion that the FCCC actively attempts to enforce its no-smoking policy or that the small number of reported smoking incidents could be the result of an overall small number of smoking incidents. Rather, Plaintiff relies on *Cassady v. Donald,* 447 F. App'x 28 (11th Cir.2011) to support his contention that his affidavit evidence alone can establish that prison officials were deliberately indifferent to an inmate's ETS exposure and defeat a motion for summary judgment. Plaintiff's reliance on *Cassady* is misplaced. In that case, Cassady was forced to share a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2801043 (M.D.Fla.)
**(Cite as: 2014 WL 2801043 (M.D.Fla.))**

cell with a chronic smoker who smoked four packs of cigarettes per day. 447 F. App'x at 30. The Eleventh Circuit noted that "numerous" inmates had submitted affidavits stating that they routinely smoked indoors without punishment; that the prison officials did not allow outdoor smoking breaks; that indoor smoking was a daily occurrence but they had never witnessed a prison official discipline an inmate for smoking indoors; and that many inmates frequently violated the policy against indoor smoking with impunity. Id. at 31. In addition, Cassady had written letters, filed grievances, and spoken with prison officials regarding the unreasonable levels of second-hand smoke. Further, Cassady had submitted evidence that he suffered from asthma or reactive airway disease that caused him to be particularly susceptible to second-hand smoke. Id. The Eleventh Circuit concluded that given the amount of evidence submitted by Cassady, a material issue of fact existed as to whether prisoner officials had violated his constitutional rights, and the district court had erred by granting summary judgment. The Court contrasted Cassady's evidence with that offered by the plaintiff in Kelley v. Hicks, 400 F.3d 1282 (11th Cir.2005), in which "the only evidence provided was 'personal observations of smoke inside the prison' and his personal opinion that the ventilation in the prison was inadequate." Id. The court specifically noted that, unlike the Plaintiff in Kelley (where the district court's dismissal at summary judgment was affirmed), Cassady had "submitted multiple affidavits from other inmates to corroborate his allegations[.]" Id. at 32.

Unlike Cassady, Plaintiff has not submitted affidavits or other admissible evidence in opposition to Defendant's motion for summary judgment in which an FCCC resident or staff member attests that the FCCC's smoking ban is routinely ignored. Nor has Plaintiff submitted evidence that he suffers from any ailment that makes him particularly susceptible to the effects of ETS. To the contrary, the evidence submitted by Defendant indicates that Plaintiff did not suffer from ETS related health issues and with the exception

of one sick call request, made only four days prior to filing the instant complaint, Plaintiff has submitted no evidence, other than his own self-serving affidavit, that he complained to medical staff about his exposure to second hand smoke or his fears that such exposure could cause future harm.

**\*9** Plaintiff disputes Defendant Budz' attestation that residents may anonymously report smoking at the FCCC and that these anonymous complaints are taken seriously, by stating that he submitted a single written complaint to Budz informing him of the smoking issue which was not responded to. Plaintiff does not provide a copy of the complaint, indicate the date it was sent, describe its contents, or assert that the single complaint was sufficient to show that Budz had "subjective knowledge of a risk of serious harm to Plaintiff's health." FN6 Nor does it appear that Plaintiff served interrogatories or asked Defendant to provide him with a list of the anonymous reports filed on this issue.

> FN6. To the extent Plaintiff challenges Budz' statement that anonymous complaints were investigated by asserting that he (Plaintiff) was not contacted regarding his own anonymous complaint, it is unclear to the Court how Defendant was expected to contact the writer of an anonymous complaint. Given the alleged pervasiveness of ETS at the FCCC, Plaintiff does not explain why he did not submit numerous anonymous complaints to the administration prior to filing this lawsuit. To the extent that Plaintiff did not utilize the anonymous reporting procedure described in Budz' and Sawyer's affidavits, it is unclear how Defendant was expected to know of, and respond to, a serious risk cause by any resident's exposure to ETS if he is not informed of such.

Plaintiff also asserts that when he complained to the medical staff about his ETS exposure, the medical staff did not investigate. Instead, Plaintiff was advised

Slip Copy, 2014 WL 2801043 (M.D.Fla.)
**(Cite as: 2014 WL 2801043 (M.D.Fla.))**

to let security know who violated the FCCC's no-smoking policy (*Doc. 59–1 at 6; Doc. 57–1* ). Plaintiff does not assert that he actually alerted security as to who was violating the smoking policy as was instructed by the medical staff; rather Plaintiff admits that he has not done so because "[t]his is a strategy that is worse than useless as offending residents would simply deny the allegation, and look to harm the person who informed on them." (*Doc. 20 at 3* ). Nor has Plaintiff provided any evidence that Defendant was aware of this single medical visit in which Plaintiff complained of the effects of ETS.

In the instant case, all Plaintiff has done is list personal observations of residents smoking inside the FCCC facility and speculate that smoking is allowed because of GEO Corporation's reluctance to hire sufficient security guards. The scant evidence and allegations offered by Plaintiff cannot support a conclusion that Defendant was subjectively aware of and ignored Plaintiff's serious medical needs and does not overcome Defendant's evidence showing that the FCCC implemented a non-smoking policy which it attempted to enforce. As noted, the Supreme Court has concluded that a facility's adoption of a smoking policy "will bear heavily on the inquiry into deliberate indifference." *Helling,* 509 U.S. at 36. At most, Plaintiff has established that Defendant was negligent in enforcing the FCCC's non-smoking policy. Mere negligence, however, is insufficient to establish deliberate indifference. *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir.2003); *see also Kelley v. Hicks,* 400 F.3d 1282 (11th Cir.2005) (although the plaintiff had established that some smoking occurred inside the prison in violation of the prison's smoking policy, at most, this established that prison officials were negligent in their enforcement of the smoking policy).

Defendant has met his burden of showing that Plaintiff cannot satisfy the required elements of his claim, and Plaintiff has failed to show a material issue of fact that precludes summary judgment. Defendant is entitled to judgment as a matter of law, and his motion for summary judgment is due to be granted.

**IV.** *Conclusion*

**\*10** Plaintiff has failed to show that there is a genuine issue of material fact regarding whether Defendant was deliberately indifferent to Plaintiff's future health as a result of exposure to unreasonable levels of environmental tobacco smoke at the FCCC.

Accordingly, it is hereby **ORDERED:**

1. Defendant Director, Florida Civil Commitment Center's Second Motion for Summary Judgment (*Doc.57* ) is **GRANTED.**

2. With no remaining defendants or claims, the **Clerk of Court** is directed to terminate all pending motions, enter judgment accordingly, and close this case.

**DONE** and **ORDERED.**

M.D.Fla.,2014.
McKee v. Director, Florida Civil Commitment Center
Slip Copy, 2014 WL 2801043 (M.D.Fla.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry; F. Englese; Sergeant Edwards; K. Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
March 31, 2010.

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***
Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

"even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[FN1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[FN2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

FN1. *See also White v. The State of New York,* 00-CV-3434, 2002 U .S. Dist. LEXIS

18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN2. The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[FN3] Moreover, any failure by the IGRC or the superintendent to timely

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[FN4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[FN5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[FN6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

FN3. *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

FN4. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.); *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

FN5. *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

FN6. *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance

of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [cita-

tions omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[FN7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[FN8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[FN9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim,[FN10] (b) the inmate was specifically informed that the claim in question was grievable,[FN11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC,[FN12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[FN13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[FN14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[FN15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[FN16]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN7. The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

FN8. *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

FN9. *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and

opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

FN10. *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

FN11. *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

(S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

FN12. *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

FN13. *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

FN14. *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

FN15. *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

FN16. *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [FN17]

> FN17. *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact,

'actually available to him.' "); *Winston v. Woodward,* 05-CV-3715, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[FN18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[FN19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[FN20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [FN21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied, --- U.S. ----,* 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury.[FN22]

FN18. *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

FN19. *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7

(S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

FN20. *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue); *Dukes v.*

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

*S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.") [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

FN21. *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

FN22. *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

*Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587,

2007 WL 389003, at *8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [FN23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [FN24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [FN25]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

FN23. The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

FN24. In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on

November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

FN25. For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

**B. Estoppel**

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.[FN26]

> FN26. *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at \*19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at \*16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at \*16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at \*6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at \*1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

plaintiff could have accomplished on his own.").

### C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at \*8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plain-

tiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations,[27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order.[28]

FN27. *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

FN28. The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

(i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is ***DISMISSED* in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

N.D.N.Y.,2010.
Murray v. Palmer
Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 3278966 (S.D.N.Y.)
**(Cite as: 2011 WL 3278966 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Eon SHEPHERD, Plaintiff,
v.
Commissioner Brian FISHER et al., Defendants.

No. 08 Civ. 9297(LTS)(RLE).
July 27, 2011.

### MEMORANDUM ORDER

LAURA TAYLOR SWAIN, District Judge.

**\*1** Plaintiff Eon Shepherd ("Plaintiff"), proceeding *pro se,* brings this motion to amend his original complaint pursuant to Federal Rule of Civil Procedure 15(a). Plaintiff seeks to add claims against ten new defendants, including J. Demers, M. Fraioli, A. Lopez, L. Lyder and R. Maldacker (collectively, "Mail Room Defendants"); Corrections Officers Swan, Sample and Castine (collectively, "Corrections Officers"); Captain Edward Burnett ("Burnett") and Deputy Superintendent of Programs Robert Cunningham ("Cunningham"), alleging violations of Plaintiff's civil rights pursuant to 42 U.S.C. §§ 1983, 1985 and 1988. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331. For the following reasons, the Court will deny Plaintiff's motion to the extent that he seeks to add the prospective Mail Room Defendants and Cunningham, and will grant the motion in all other respects.

### BACKGROUND

The following relevant facts are drawn from the proposed Amended Complaint unless otherwise indicated.[FN1] Plaintiff is and has been at all times material to this action an inmate under the care, custody

and control of the New York State Department of Correctional Services ("DOCS"). His claims arise out of incidents that allegedly violated his legal mail rights, free exercise of religion rights and due process rights.

> FN1. The Court may consider any statements or documents incorporated into the complaint by reference, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit. *See Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000). Plaintiff's proposed Amended Complaint references exhibits attached to Plaintiff's Reply Memorandum. All exhibits referenced by the Amended Complaint are considered to be incorporated therein.

### Legal Mail Handling

The Mail Room Defendants allegedly tampered with Plaintiff's legal mail on three occasions. On March 2, 2007, Plaintiff received legal mail from the attorney general that the Mail Room Defendants opened and delivered through the regular institutional mail system. On April 24, 2007, Plaintiff received legal mail from his attorney that the Mail Room Defendants opened and delivered via regular institutional mail. On June 1, 2007, the Mail Room Defendants opened and read Plaintiff's legal mail outside his presence and removed confidential medical records that had been sent by his attorney. The mail was delivered via regular institutional mail. (Am.Compl.¶ 27.)

### Religious Practices

Plaintiff is a devoted Rastafarian. His religious beliefs do not allow the cutting or touching of his hair, which is grown out in the form of dreadlocks. (*Id.* ¶¶ 34–35.) On March 12, 2007, the Corrections Officers conducted a pat frisk of Plaintiff before allowing him

Not Reported in F.Supp.2d, 2011 WL 3278966 (S.D.N.Y.)
**(Cite as: 2011 WL 3278966 (S.D.N.Y.))**

into the yard for evening recreation. While conducting the pat frisk, the Corrections Officers pulled and ripped Plaintiff's hair. (*Id.* ¶¶ 37, 48.)

Plaintiff fasts in observation of certain religious holidays. On one such holiday in October 2005, Plaintiff was to receive a religious meal to break his fast. Prior to the holiday, Plaintiff had "forward[ed] a letter to the Rastafarian office [sic] informing them that he was confined to his cell requesting his meal be sent to him." (*Id.* ¶ 34.) Plaintiff never received the meal. (*Id* .) Plaintiff also did not receive his religious meal after fasting for a holiday on May 5 of an unspecified year, when Plaintiff was confined in the Special Housing Unit ("SHU") and, prior to the holiday, had forwarded a letter to both the Rastafarian office and Cunningham to request that his meal be sent to him. (*Id.* ¶ 41 .)

*Suspected Contraband*

**\*2** On February 28, 2008, Plaintiff was searched by corrections officers after they received an anonymous note that he had contraband in his hair. (*Id.* ¶ 40.) After the officers found the suspected contraband, Plaintiff was issued a misbehavior report. Burnett was assigned as the hearing officer for the disciplinary hearing. Burnett denied Plaintiff's requests to view the anonymous note, a color photo of the alleged contraband and a state police lab report regarding a test of the contraband. (*Id.* ¶ 42.) Burnett allegedly lied to Plaintiff by stating that he had not turned over the contraband to the state police. (*Id.* ¶ 45.) In fact, the police tested the contraband and determined that the substance was marijuana. (Pl.'s Reply Mem., Ex. E.) Burnett found Plaintiff guilty of possessing methamphetamine and confined Plaintiff in SHU for nine months. (*Id.* ¶ 45.)

*DISCUSSION*

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Courts generally grant leave to amend in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Foman v. Davis,* 371 U.S. 178, 182 (1962). An amendment is futile if it would not be capable of withstanding a motion to dismiss. *See Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002).

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). This standard applies to all civil actions. *Iqbal,* 129 S.Ct. at 1953. In the case of a pro se litigant, the Court reads pleadings leniently and construes them to raise "the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). However, the pleadings must still contain factual allegations that raise a "right to relief above the speculative level." *Dawkins v. Gonvea,* 646 F.Supp.2d 594, 603 (S.D.N.Y.2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Defendants argue that Plaintiff's motion to amend should be denied as futile and untimely.

*Claims Against the Prospective Mail Room Defendants*

Interference with an inmate's legal mail implicates a prisoner's right to free speech and access to the courts as guaranteed by the First and Fourteenth Amendments. *Davis v. Goord,* 320 F.3d 346, 351 (2d. Cir.2003). To state a violation of the right to free speech arising from interference with an inmate's legal mail, an inmate must allege an ongoing practice by prison officials of interfering with his mail or some harm suffered due to the tampering. *Davis,* 320 F.3d at 352. To state a violation of the right of access to the courts, an inmate must allege that the tampering was part of an ongoing practice of unjustified censorship or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3278966 (S.D.N.Y.)
**(Cite as: 2011 WL 3278966 (S.D.N.Y.))**

that it prejudiced the inmate's legal actions. *Id.* at 352. While an inmate has a right to be present when his legal mail is opened, *Wolff v. McDonnell,* 418 U.S. 539, 574–76 (1974), in order to state a claim, an inmate must show "that prison officials regularly and unjustifiably interfered with the incoming legal mail rather than merely showing an isolated incident." *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001). *See Davis,* 320 F.3d at 352 (plaintiff's two alleged instances of mail interference without any allegations that the interference constituted a constitutional violation were insufficient to state a claim for denial of access to the courts or violation of the right to send and receive legal mail).

**\*3** Plaintiff has alleged three instances of interference with his legal mail involving the prospective Mail Room Defendants. Even construed liberally, these allegations do not contain facts sufficient to state a claim for the violation of the right to free speech or access to the courts. Plaintiff has not alleged that the Mail Room Defendants' interference with his legal mail was part of an ongoing practice, was prejudicial to his legal actions or impaired the legal representation he received. Moreover, Plaintiff has not asserted the violation of any specific constitutional right that may have resulted from the alleged violation of attorney-client privilege. Accordingly, Plaintiff fails to state a claim against the Mail Room Defendants and the motion to amend this aspect of the complaint will be denied. In addition, the proposed amendment to assert a claim against Cunningham alleging that his negligent training of the Mail Room Defendants led to a violation of Plaintiff's rights will not be permitted, as Plaintiff has not adequately stated any predicate offense.

*Claim Against Cunningham for Failure to Provide Religious Meals*

Plaintiff seeks to amend his complaint to allege that Cunningham violated Plaintiff's right to free exercise of his religion by failing to provide Plaintiff with specially requested religious meals on holy days.

(Am.Compl.¶ 46.)

"Imposition of liability under section 1983 requires a defendant's direct involvement in the alleged constitutional violation." *Prescott v. Risker Island Med. Staff,* 09 Civ. 255, 2011 WL 1435218, at *4 (S.D.N.Y. Apr. 12, 2011) (citation omitted). The Second Circuit has evaluated the personal involvement of a supervisor using the five-category test articulated in *Colon v. Coughlin.* 58 F.3d 865, 873 (2d Cir.1995). A supervisor's personal involvement could be demonstrated by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873. The Second Circuit has not yet addressed the impact on the Colon five-factor test of the Supreme Court's holding in *Ashcroft v. Iqbal* that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 129 S.Ct. 1937, 1948 (2009). However, even assuming that all five of the *Colon* factors remain viable bases for alleging personal involvement in this case, Plaintiff's Amended Complaint lacks allegations sufficient to state a claim against Cunningham for a violation of Plaintiff's right to free exercise of religion.

**\*4** Plaintiff alleges merely that "Cunningham as [D]eputy [Superintendent] of Programs was in charge

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3278966 (S.D.N.Y.)
**(Cite as: 2011 WL 3278966 (S.D.N.Y.))**

of the ministerial department and ... prohibited [P]laintiff from the free exercise of his religion by failing to provide [P]laintiff with his religious meals." *See* Am. Compl. ¶ 46. He does not proffer any additional facts to show that Cunningham, by virtue of his office, was directly responsible for the provision of religious meals, created a policy that deprived Plaintiff of his religious meals, or played any other role in the alleged deprivation that could support a finding of personal involvement under any prong of the *Colon* test. Therefore, this proposed claim against Cunningham is futile, and the motion to amend this aspect of the complaint will be denied.

*Claims Against Burnett*

To proceed on a due process claim, a plaintiff must plead facts sufficient to show the deprivation of a liberty interest without due process of law. *Dawkins v. Gonye,* 646 F.Supp.2d 594, 605 (S.D.N.Y.2009). In the context of a prison disciplinary hearing, "[t]he due process protections afforded a prison inmate do not equate to 'the full panoply of rights' due to a defendant in a criminal prosecution." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (quoting *Wolff v. McDonnell* 418 U.S. 539, 556 (1974)). However, the Supreme Court has identified several procedural safeguards to which inmates are constitutionally entitled when faced with disciplinary charges, including:

(1) advance written notice of the disciplinary charges; (2) a reasonable opportunity to call witnesses and present evidence at a hearing; (3) a fair and impartial hearing officer; (4) a written statement of disposition, including findings of fact and the reasons for the disciplinary action; and (5) support by "some evidence" of any conviction.

*Hernandez v. Selsky,* 572 F.Supp.2d 446, 450 (S.D.N.Y.2008) (citing *Wolff,* 418 U.S. at 563–67; *Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

Plaintiff has alleged facts sufficient to state a claim that Burnett deprived Plaintiff of his due process rights by failing to act as a fair and impartial hearing officer. Taking Plaintiff's allegations as true, Burnett lied about whether the contraband found in Plaintiff's hair had been independently tested by the state police and witlheld the results of those tests, which indicated that Plaintiff had not, in fact, possessed the methamphetamine on which the charge was based.

Nor is the proposed amendment rendered futile by the doctrine of qualified immunity. "Prison officials are charged with knowledge of relevant decisional law, especially the decisions of the circuit in which they perform their official duties." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). An inmate's right to an impartial decisionmaker in a disciplinary hearing has been recognized by the Supreme Court and the Court of Appeals for this circuit. *Wolff v. McDonnell,* 418 U.S. 539 (1974); *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). In addition, it is clearly established that withholding evidence in a prison disciplinary proceeding without a reasonable explanation for the non-disclosure constitutes a proper basis for a due process claim. *See, e. g., Sira,* 380 F.3d at 75–76; *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 612 (S.D.N.Y.2009). Here, Burnett not only allegedly withheld evidence without justification: he allegedly lied about the very existence of exculpatory evidence in the form of a state police lab report, in violation of clearly established law. Accordingly, Plaintiff will be permitted to amend his complaint to incorporate the proposed claim against Burnett.

*Claims Against Corrections Officers Castine, Swan, and Sample*

**\*5** The Supreme Court of the United States has long held that "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment[s] ...." *Cruz v. Beto,* 405 U.S. 319, 322 n. 2 (1979). Furthermore, the Second Circuit has recognized that "[a] fundamental tenet of [Rastafarianism] is that a Rastafarian's hair is not to be combed or cut

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3278966 (S.D.N.Y.)
**(Cite as: 2011 WL 3278966 (S.D.N.Y.))**

....' " *Benjamin v. Coughlin,* 905 F.2d 571, 573 (2d Cir.1990). Plaintiff's allegations that the Corrections Officers pulled and ripped his hair in violation of his religious beliefs are sufficient to state a claim for violation of his free exercise rights, and, on the facts as alleged by Plaintiff, the Corrections Officers are not clearly entitled at this stage to qualified immunity. This aspect of Plaintiff's motion is granted, accordingly.

*CONCLUSION*

For the foregoing reasons, Plaintiff's motion to amend his complaint is denied to the extent Plaintiff seeks to add the prospective Mail Room Defendants and Cunningham, and is granted in all other respects.

Plaintiff shall file and serve on all Defendants an Amended Complaint, setting forth the claims permitted by this Memorandum Order and those elements of his original complaint that he still wishes to pursue, no later than August 19, 2011. The Amended Complaint will completely replace the original complaint, so all relevant information and continuing claims must be included in the Amended Complaint. Defendants shall have until September 9, 2011, to file and serve their responses.

This Memorandum Order resolves docket entry no. 49.

This case remains referred to Magistrate Judge Ellis for general pretrial management.

SO ORDERED.

S.D.N.Y.,2011.
Shepherd v. Fisher
Not Reported in F.Supp.2d, 2011 WL 3278966 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

▷
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Alan E. SIMMONS, Plaintiff,
v.
Michael K. NALLEY, Darryl D. Drew, David Snyder,
and David Salamy, Defendants.

Civ. No. 9:03–CV–1093 (FJS/RFT).
Sept. 30, 2009.

West KeySummary**Prisons 310** ☞**160**

**310** Prisons
   **310II** Prisoners and Inmates
      **310II(B)** Care, Custody, Confinement, and
Control
         **310k160** k. Tobacco. Most Cited Cases

**Sentencing and Punishment 350H** ☞**1536**

**350H** Sentencing and Punishment
   **350HVII** Cruel and Unusual Punishment in General
      **350HVII(H)** Conditions of Confinement
         **350Hk1536** k. Hazardous and unhealthful
conditions. Most Cited Cases
    Prison staff did not act with deliberate indifference to an inmate's rights under the Eighth Amendment as there was no evidence that staff failed to implement the Bureau of Prisons' (BOP) non-smoking regulations. In addition, there was nothing in the record to indicate what level of environmental tobacco smoke (ETS) the inmate was exposed to. U.S.C.A. Const.Amend. 8.

Syracuse University College of Law, Office of Clinical Programs, Michael A. Schwartz, Esq., Gary J. Pieples, Esq., of Counsel, Syracuse, N.Y., for Plaintiff.

Hon. Andrew T. Baxter, United States Attorney, Northern District of New York, Barbara D. Cottrell, Assistant United States Attorney, of Counsel, Albany, N.Y., for Defendants James T. Foley Courthouse.

**MEMORANDUM–DECISION AND ORDER**
FREDERICK J. SCULLIN, JR., Senior District Judge.

## I. INTRODUCTION

**\*9** Currently before the Court are Plaintiff's objections to Magistrate Judge Treece's August 17, 2009 Report–Recommendation and Order, in which he recommended that the Court grant Defendants' motion for summary judgment.

## II. BACKGROUND

Plaintiff brought this civil rights action, pursuant to *Bivens v. Six Unknown Names Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging that (1) Defendants Nalley and Drew violated his Eighth Amendment rights by deliberately failing to enforce Bureau of Prisons ("BOP") policy regarding smoking inside prisons and thereby exposing him to abnormally high levels of environmental tobacco smoke ("ETS") and causing him physical injury and (2) Defendants Snyder and Salamy retaliated against him for his efforts to protect his health by repeatedly assigning him to cells primarily housing smokers and punishing him with extended stays in segregated confinement. *See* Third Amended Complaint at 9–10.

Defendants moved for summary judgment, *see* Dkt. No. 107; and Plaintiff opposed that motion, *see* Dkt. No. 110.[FN1] In a Report–Recommendation and

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

Order dated August 17, 2009, Magistrate Judge Treece recommended that the Court grant Defendants' motion. *See* Dkt. No. 112. Plaintiff filed timely objections to that recommendation. *See* Dkt. No. 113.

> FN1. As Magistrate Judge Treece noted in his Report–Recommendation and Order, Plaintiff did not file a response to Defendants' Statement of Material Facts. *See* Report–Recommendation and Order at 2 n. 2.

### III. DISCUSSION

**A. Standard of review**

In reviewing a magistrate judge's report-recommendation, the district court may decide to accept, reject or modify those recommendations. *See* 28 U.S.C. § 636(b)(1). The court conducts a *de novo* review of the portions of the magistrate judge's recommendations to which a party objects. *See Pizarro v. Bartlett,* 776 F.Supp. 815, 817 (S.D.N.Y.1991). *De novo* review is not required, however, if a party fails to file specific objections. *See Wilds v. United Parcel Serv.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003) (noting that where "no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record"). Nor is a court required to conduct *de novo* review where the parties' objections to the magistrate judge's recommendation repeat the arguments that the parties made in the original pleadings. *See Edwards v. Fischer,* 414 F.Supp.2d 342, 346–47 (S.D.N.Y.2006) (citations omitted). Finally, even if the parties file no objections, the court must ensure that the face of the record contains no clear error. *See Wilds,* 262 F.Supp.2d at 169 (quotation omitted).

**B. Summary judgment standard**

**\*10** Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). Furthermore, when a plaintiff fails to respond to a defendant's factual assertions contained in its Statement of Material Facts, the court will accept as true the factual assertions contained in that Statement of Material Facts to the extent that those facts are supported by the evidence in the record.

**C. Plaintiff's Eighth Amendment claim**

The crux of Plaintiff's Eighth Amendment claim is that Defendants Drew and Nalley deliberated failed to enforce BOP's smoking policy, thereby exposing Plaintiff to abnormally high levels of ETS. *See* Third Amended Complaint at ¶ 43.

To establish an Eighth Amendment violation premised on the conditions of confinement, a plaintiff must show that the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and that the prison officials were deliberately indifferent to those needs. *Wilson v. Seiter,* 501 U.S. 294, 297–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citation omitted). In *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993), the Supreme Court held that this standard applies to Eighth Amendment claims premised on the risk of physical injury from exposure to second-hand smoke. In this context, a plaintiff must demonstrate exposure to levels of ETS that have caused or pose an unreasonable risk of causing serious damage to his health that is "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.* at 36. Furthermore, in determining whether the defendants acted with deliberate indifference, the court must consider "the prison authorities' current attitudes and conduct," including

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

whether they have adopted, and to what extent that have enforced, a smoking policy. *See id.*

Applying these legal principles to the facts of this case, Magistrate Judge Treece noted that, in response to Defendants' motion for summary judgment, "Plaintiff offer[ed] absolutely no evidentiary support for [his] contention [that Defendants failed to enforce BOP's smoking policy], in the form of affidavits or otherwise, which could rebut Nalley and Drew's assertions that they maintained and enforced BOP and FCI RayBrook smoking policies." *See* Report–Recommendation and Order at 8. Furthermore, he found that, "[b]eyond Plaintiff's conclusory allegations, there is simply nothing in the record to suggest that Defendants Nalley and Drew displayed deliberate indifference to Plaintiff's health." *See id.* at 8–9.

**\*11** Finally, Magistrate Judge Treece found that "Plaintiff [had] failed to introduce *any* evidence, beyond his own allegations in the Complaint, regarding the levels of ETS that he was allegedly exposed to." *See id.* at 9. Therefore, Magistrate Judge Treece concluded that Plaintiff had failed to demonstrate that the level of ETS to which he was exposed was " 'so grave that it violate[d] contemporary standards of decency to expose anyone unwillingly to such a risk.' " *Id.* (quoting *Helling v. McKinney,* 509 U.S. at 36). Therefore, for both of these reasons, Magistrate Judge Treece concluded that Plaintiff had failed to establish an Eighth Amendment claim against Defendants Nalley and Drew.

Plaintiff's counsel filed a two-page summary of Plaintiff's handwritten objections, together with those objections, to Magistrate Judge Treece's recommendations.[FN2] Plaintiff asserts that Magistrate Judge Treece did not resolve the ambiguities and draw reasonable inferences in his favor. To support this contention, he directs the Court's attention to page 42 of Defendants' Exhibit 6, attached to their summary judgment motion, which, he claims, shows that his

statements regarding assignment to the SHU were not requests for assignment to the SHU but were designed to trigger placement in the SHU as an escape from the regular cells which had high levels of ETS. *See* Summary of Plaintiff's Objections at 2. Furthermore, Plaintiff claims that, after fifteen days in SHU, he was transferred to a cell with even higher levels of ETS than SHU and his original cell. *See id.*

> FN2. The Court reviewed both counsel's summary and Plaintiff's handwritten objections. The Court notes that Plaintiff's handwritten objections are both difficult to read and difficult to understand. Having reviewed both the summary and the handwritten objections, the Court finds that the summary of Plaintiff's objections is accurate and, therefore, will cite to that summary for ease of reference.

Plaintiff also contends that he has shown that, despite the no-smoking policy at Ray Brook, he was exposed to high levels of ETS in various parts of the facility and that the medical evidence in this case shows that he had a persistent cough that was directly linked to inhaled irritants. *See id.* In addition, Plaintiff claims that an issue of fact exists as to whether the level of ETS was unreasonably high and, therefore, constituted a violation of contemporary standards of decency. Finally, Plaintiff argues that Defendants' Exhibits 5, 6 and 7 show that he informed them of his medical condition and repeatedly complained to them about the high levels of tobacco smoke. *See id.* Therefore, he asserts that "Defendants cannot be heard to say they did not know [he] had a medical problem exacerbated by ETS ... [and that] by ignoring [his] complaints and housing him in punitive segregation, they clearly failed to take remedial action, and this failure constitutes a showing of deliberate indifference." *See id.*

The Court has reviewed the documents to which Plaintiff refers in his objections and finds that none of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
(Cite as: 2009 WL 3199552 (N.D.N.Y.))

them support his claim that Defendants were deliberately indifferent to his concerns about ETS or that they failed to implement or ensure compliance with BOP's non-smoking regulations. Furthermore, there is nothing in the record to indicate what the level of Plaintiff's exposure to ETS was at Ray Brook. Therefore, the Court adopts Magistrate Judge Treece's recommendation and dismisses Plaintiff's Eighth Amendment claim.

**D. Plaintiff's First Amendment retaliation claim**

*12 Plaintiff alleges that Defendants Snyder and Salamy retaliated against him "for his efforts to protect his health and to protect himself from violations of his Eighth Amendment rights" by "repeatedly assigning [him] to cells housing primarily smokers ... and punishing him with extended periods of segregation for refusing [those] cell assignments." *See* Third Amended Complaint at ¶ 45.

To prevail on a retaliation claim, a plaintiff must prove "that he engaged in constitutionally protected conduct and ... that the conduct was a substantial or motivating factor for the adverse action taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). Thus, there must be a " 'causal connection between the protected speech and the adverse action.' " *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quotation omitted). Even if the plaintiff is able to carry this burden, the defendant will still be entitled to summary judgment if he can show, by a preponderance of the evidence, that he would have taken the same action in the absence of the plaintiff's First Amendment activity. *See Davidson v. Chestnut,* 193 F.3d 144, 148–49 (2d Cir.1999).

Since Defendants did not challenge Plaintiff's allegation that he had engaged in constitutionally protected conduct, Magistrate Judge Treece assumed that he had met the first element of his retaliation claim. *See* Report–Recommendation and Order at 11. With respect to the adverse actions element, Plaintiff contended that Defendants retaliated against him by

placing him in SHU and, upon his release from SHU, placing him in a twelve-man cell with high levels of ETS due to unsanctioned smoking. *See id.*

Plaintiff served two terms in SHU due to his refusal to enter his assigned cell. At the time of the first incident in December 2004, Defendant Snyder served as the Chairperson of the Unit Disciplinary Committee ("UDC"), which is comprised of staff members whom the Warden designates. *See id.* at 12. "The UDC has the power to impose minor sanctions, and can also recommend sanctions to the Discipline Hearing Officer ("DHO"), who renders a final disposition." *See id.* (citation omitted). Defendant Snyder served as UDC Chairperson at the initial hearing against Plaintiff on December 4, 2004, after which the UDC referred the matter to the DHO. *See id.* at 12–13 (citation omitted). The DHO held a hearing on December 14, 2004, at which Plaintiff admitted to the charge; and the DHO found him guilty of refusing a direct order and sanctioned him to fifteen days segregated confinement. *See id.* at 13 (citation omitted).

On the same day that Plaintiff was released from SHU, he received another incident report for refusing a direct order. *See id.* Defendant Snyder again served as the UDC Chairperson for Plaintiff's initial hearing and again referred the case to the DHO. *See id.* (citation omitted). At the DHO hearing on January 14, 2005, Plaintiff again admitted to refusing a direct order and was sentenced to fifteen days in segregated confinement. *See id.* (citations omitted).

*13 Magistrate Judge Treece noted that his review of the record showed that "Defendant Snyder did not have the authority to sentence Plaintiff to a term in SHU, and in fact, served only as the UDC Chairperson, nor was he otherwise involved in the incidents that led to Plaintiff's confinement." *See id.* (citing Snyder Decl. at ¶ 11). Furthermore, Magistrate Judge Treece stated that "Plaintiff [had] not presented any evidence that [Defendant] Snyder was involved in the assignment of Plaintiff to a cell, either before his re-

Page 5

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

fusal to stay in the Genesee B Unit on December 1, 2004, or upon his release from SHU on December 29, 2004, when he refused placement in the 12–man cell." *See id.* at 13–14. Therefore, Magistrate Judge Treece recommended that, "[b]ecause Plaintiff has failed to demonstrate that [Defendant] Snyder took any adverse actions against him," the Court dismiss the claim against Defendant Snyder. *See id.* at 14.

Defendant Salamy is a Case Manager at Ray Brook. *See id.* (citation omitted). Defendant Salamy wrote a memorandum about a conversation he had with Plaintiff on December 29, 2004, after Plaintiff was released from SHU and had then disobeyed another direct order to return to his assigned cell. *See id.* Furthermore, Defendant Salamy denies any involvement in Plaintiff's transfer to SHU on either occasion and contends that he did not retaliate against Plaintiff in any way. *See id.* (citing Salamy Decl. at ¶ 7). Magistrate Judge Treece noted that "[t]here is no evidence in the record that [Defendant] Salamy had any involvement in Plaintiff's placement in SHU on either occasion or in the 12–man cell after his release from SHU on December 29, 2004." *See id.* Furthermore, Magistrate Judge Treece stated that "Plaintiff has offered no evidence, documentary or otherwise, to rebut [Defendant] Salamy's sworn Declaration ... [and, therefore,] there is no question of material fact regarding any adverse action [Defendant] Salamy allegedly took against Plaintiff." *See id.* Therefore, he recommended that the Court dismiss Plaintiff's retaliation claim against Defendant Salamy. *See id.* at 15.

In his objections, Plaintiff asserts that "Magistrate Judge Treece improperly discounted the roles that [D]efendants Snyder and Salamy played in reassigning him to the Special Housing Unit." *See* Plaintiff's Objections at 2. Furthermore, Plaintiff argues that Magistrate Judge Treece's reliance solely on Defendants' affidavits to show that they played no role in punishing him, while discounting the fact that he produced no affidavits to show that they did play a role in punishing him, "flies in the face of the re-

quirement that ambiguities and inferences be resolved in his favor." *See id.* Finally, Plaintiff contends that Defendants' "own proof shows that he was retaliated against for complaining about unacceptably high levels of ETS...." *See id.*

Despite Plaintiff's arguments to the contrary, there is nothing in the record that supports his contentions that either Defendant Snyder or Defendant Salamy retaliated against him in any manner because he exercised his First Amendment right to complain about his exposure to ETS. Therefore, the Court adopts Magistrate Judge Treece's recommendation and dismisses Plaintiff's retaliation claim.

**IV. CONCLUSION**

**\*14** After carefully reviewing the entire file in this matter, including Magistrate Judge Treece's Report–Recommendation and Order, Plaintiff's objections thereto, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Treece's August 17, 2009 Report–Recommendation and Order is **ADOPTED** in its entirety; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

***REPORT–RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** Plaintiff Alan E. Simmons brings this civil rights action, pursuant to *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971),[FN1] alleging that (1) Defendants Michael K. Nalley and

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

Darryl D. Drew violated his Eighth Amendment rights by deliberately failing to enforce Bureau of Prisons (BOP) policy regarding smoking inside prisons, thereby exposing Plaintiff to abnormally high levels of environmental tobacco smoke (ETS), causing him physical injury, and (2) Defendants David Snyder and David Salamy retaliated against him for his efforts to protect his health by repeatedly assigning him to cells primarily housing smokers and punishing him with extended stays in segregated confinement. Dkt. No. 62, Third Am. Compl. (hereinafter "Compl.") at pp. 9–10.

> FN1. *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), recognized the existence of a cognizable claim in certain instances for alleged constitutional violations committed by federal agents. *See Ellis v. Blum,* 643 F.2d 68, 84 (2d Cir.1981) (noting that a *Bivens* action is a judicially-created remedy). Generally, case law under 42 U.S.C. § 1983 applies to *Bivens* cases. *Chin v. Bowen,* 833 F.2d 21, 24 (2d Cir.1987) (quoting *Ellis v. Blum,* 643 F.2d at 84).

Presently before the Court is Defendants' Motion for Summary Judgment, which was referred to this Court for a Report–Recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Court Judge. Dkt. No. 107 & Text Order, dated Feb. 18, 2009. Plaintiff opposes the Motion. Dkt. No. 110. For the reasons stated herein, it is recommended that the Defendants' Motion be **GRANTED.**

## I. BACKGROUND

At all relevant times, Plaintiff was an inmate at Ray Brook Federal Correctional Institution (hereinafter "FCI RayBrook"). Plaintiff was housed at FCI RayBrook from March 21, 2002, through October 28, 2005. Dkt. No. 108, Defs'. 7.1 Statement at ¶ 1.[FN2] Plaintiff contends that while at FCI RayBrook, he was exposed to high levels of ETS, to which he was aller-

gic, causing him to develop a chronic cough and to suffer headaches, chest discomfort, irritated sinus passages, diminished lung function, respiratory problems, increased phlegm, and lung and throat infections. Comp. at ¶¶ 8, 15, & 32. On two occasions, Plaintiff alleges he experienced incidents of sudden weakness, numbness, and paralysis. *Id.* at ¶ 33.

> FN2. Plaintiff has failed to respond to Defendants' 7.1 Statement as required under the Local Rules for the Northern District of New York, and therefore, we rely on the facts alleged in Defendants' 7.1 Statement. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* (emphasis in original)). In this respect, we note with lament that prior to obtaining representation in this case, Plaintiff, as a *pro se* litigant, managed to file a 7.1 Statement in response to the Defendants' previous Motion to Dismiss or in the alternative, for Summary Judgment. *See* Dkt. No. 31–1, Pl.'s 7.1 Statement. All attorneys providing representation in the Northern District of New York, on a *pro bono* basis or otherwise, are obliged to follow the Local Rules.

Plaintiff filed his initial *pro se* Complaint on September 5, 2003, against Michael K. Nalley, Darryl D. Drew, Kathleen Hawk Sawyer, Harley G. Lappin, and Harlan Smith. Dkt. No. 1. On February 3, 2004, those Defendants filed a Motion to Dismiss or, in the alternative, for Summary Judgment. Dkt. No. 13. During the pendency of that Motion, Plaintiff twice moved to amend his pleading, which motions were granted in both instances. Dkt. Nos. 35, 40, 42, 47, & 53. Plaintiff's *pro se* Second Amended Complaint was accepted for filing on March 21, 2005. Dkt. No. 53. On March 23, 2005, the Court granted Defendants' Motion to Dismiss in part, and directed Plaintiff to re-file his Second Amended Complaint (which con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

stituted his Third Amended Complaint). Dkt. No. 54. Plaintiff, now represented by counsel, filed his Third Amended Complaint, on May 20, 2005, against Defendants Nalley, Drew, Snyder, and Salamy. Dkt. Nos. 61–62. On October 23, 2006, Defendants filed a Motion to Dismiss the Third Amended Complaint, which was denied by the district court on January 14, 2008. Dkt. Nos. 86 & 92. Defendants filed the instant Motion for Summary Judgment on February 17, 2009. Dkt. No. 107.

## II. DISCUSSION
### A. Summary Judgment Standard

**\*2** Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the non-moving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary

case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

### B. Eighth Amendment Claim

Plaintiff alleges that Defendants Nalley and Drew deliberately failed to enforced BOP smoking policies and allowed Plaintiff to be exposed to abnormally high levels of ETS, thereby violating his Eight Amendment rights. Compl. at ¶ 43.

**\*3** The Eighth Amendment prohibits cruel and unusual punishment of inmates. U.S. Const. amend. VIII. To establish civil liability for a violation of the conditions of confinement under the Eighth Amendment, a § 1983 plaintiff must demonstrate that (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

(citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)).

In *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993), the Supreme Court held that the aforementioned standard applies to Eighth Amendment claims premised on the risk of physical injury from exposure to second-hand smoke. Thus, under the first, objective prong, a plaintiff must demonstrate exposure to levels of ETS that have caused or pose an unreasonable risk of causing serious damage to his health that is "so grave [ ] it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney,* 509 U.S. at 36. The second, subjective prong, whether the Defendants acted with deliberated indifference, "should be determined in light of the prison authorities' current attitudes and conduct," including whether a smoking policy has been adopted and the extent to which it has been enforced. *Id.*

Because both of the above prongs must be met in order to prove an Eighth Amendment violation, we may begin by considering whether there are questions of fact regarding whether Defendants acted with deliberate indifference under the subjective prong of the aforementioned Eighth Amendment standard. *Helling v. McKinney,* 509 U.S. at 35 (noting that a court may consider either element first, and need not consider the remaining element if there is a failure of proof on the first). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Plaintiff alleges that Defendants Drew and Nalley deliberately failed to enforce BOP smoking policy. Compl. at ¶ 43. Plaintiff also alleges that he "has spoken directly to both Nalley and Drew about these issues and has filed written grievances which ... should have been reviewed and addressed by Nalley and Drew." *Id.* at ¶ 28.

Defendant Nalley was the Warden at FCI Ray Brook from November 18, 2001, until June 14, 2003. Dkt. No. 107–7, Defs.' Mot. for Summ. J., Michael K. Nalley, Decl., dated Feb. 9, 2009 (hereinafter "Nalley Decl."), at ¶ 1. Nalley avers that the BOP has had a smoking policy in effect since 1994. That policy, explained in BOP Program Statement 1640.03 entitled *Smoking/No Smoking Areas,* became effective on August 1, 1994, and "directed all Wardens to identify smoking and non-smoking areas within their institution." *Id.* at ¶ 2 & Ex. 1, BOP Program Statement 1640.03 at ¶ 6. At the time Plaintiff arrived at FCI Raybrook on March 21, 2002, that institution had its own supplemental smoking policy, laid out in Institution Supplement RBK 1640.3A, which stated that

**\*4** areas of the institution were non-smoking areas unless designated otherwise by a sign reading "Designated Smoking Area." With regard to housing areas, the only cells where smoking was allowed were "individual cells." It further stated that a non-smoking inmate would not be housed with an inmate who smokes as a general rule. However, if a temporary situation arose where smokers had to be housed with non-smokers, the cell would become a non-smoking cell.

*Id.* at ¶ 3 & Ex. 2, RBK 1640.3A at ¶ 5.

Nalley states that he updated FCI Raybrook's smoking policy again on August 30, 2002, adding the rule that smoking was not allowed in any four, six, or twelve man cells. *Id.* at ¶ 4 & Ex. 3, RBK 1640.3B at ¶ 5. Finally, on April 4, 2003, Nalley sent out a memorandum to the entire inmate population in order to clarify FCI RayBrook's smoking policy. In that letter, Nalley reiterated the previously mentioned rules, and reminded inmates that "[t]he only area(s) where in-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

door smoking is allowed is in two man cells ... and in the Designated Smoking Area in the UNICOR factory. When a non-smoker is residing in a two man cell, the cell automatically becomes a no smoking cell." *Id.,* Ex. 4, Mem. dated Apr. 4, 2003. That memorandum also warns that "[i]nmates who violate this policy will be disciplined accordingly." *Id.* In that respect, Nalley swears that he encouraged strict compliance with the BOP and FCI RayBrook policies, and states that "many incident reports were written to inmates violating the smoking policy during [his] tenure as Warden." *Id.* at ¶ 6.

Defendant D.B. Drew served as Warden at FCI Raybrook from June 15, 2003, to February 5, 2005. Dkt. No. 107–9, D.B. Drew Decl., dated Feb. 2009, [FN3] (hereinafter "Drew Decl.") at ¶ 1. Drew states that as of July 15, 2004, the BOP smoking policy, Program Statement 1640.03, was superceded by a new Program Statement that effectively [FN4] banned indoor smoking at all BOP facilities. *Id.* at ¶ 2 & Ex. 1, Program Statement 1640.04, dated Mar. 15, 2004 at ¶ 8. In response to that policy change, Drew issued a new supplemental policy for FCI Raybrook which allowed smoking by inmates and staff only "in designated outside areas, and prohibited staff and inmates from smoking as they moved throughout the institution. Therefore, all housing cells became smoke free." *Id.* at ¶ 5 & Ex. 2, RBK 1640.3d, dated Aug. 23, 2004 at ¶ 5. Drew also sent several memoranda to staff and the inmate population prior to the implementation of the aforementioned BOP indoor smoking ban in order to prepare them for the policy change. *Id.,* Exs. 3–7, Mems. dated June 24, July 14, & Aug. 16, 2004. Finally, Drew swears that he "enforced and encouraged [his] staff to strictly enforce the smoking policy," and that "many incident reports were written for violations of the smoking policy" during his tenure as Warden. *Id.* at ¶ 7.

FN3. The exact date is not visible on Drew's Declaration.

FN4. The policy had an exception for smoke used in religious practices. Drew Decl., Ex. 1, Program Statement 1640.04 at ¶ 8(a).

In response to the Defendants' Motion, Plaintiff offers only the conclusory allegation that Nalley and Drew failed to enforce BOP smoking policy. *See* Pl.'s Mem. of Law at p. 9. Plaintiff offers absolutely no evidentiary support for that contention, in the form of affidavits or otherwise, which could rebut Nalley and Drew's assertions that they maintained and enforced BOP and FCI RayBrook smoking policies. In *Helling,* the Supreme Court held that the adoption of a smoking policy should "bear heavily on the inquiry into deliberate indifference." 509 U.S. at 36, *see also Colon v. Sawyer,* 2006 WL 721763, at *10 (N.D.N.Y. Mar.20, 2006) (evidence of BOP's increasingly aggressive smoking policies "somewhat undermines any claim of deliberate indifference." (internal citations omitted)).

**\*5** Beyond Plaintiff's conclusory allegations, there is simply nothing in the record to suggest that Defendants Nalley and Drew displayed deliberate indifference to Plaintiff's health. On a motion for summary judgment, "[c]onclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case." *Scott v. Coughlin,* 344 F.3d at 287. Because Plaintiff has failed to meet his burden of showing an issue of material fact exists on the subjective prong of the Eighth Amendment standard, we need not address the objective prong.

However, even if we were to assume, *arguendo,* that Plaintiff had met his burden under the subjective prong, we would find that he has failed to meet his burden under the objective prong as well. Plaintiff has failed to introduce *any* evidence, beyond his own allegations in the Complaint, regarding the levels of ETS that he was allegedly exposed to. As stated earlier, under the objective prong, a Plaintiff must demonstrate exposure to levels of ETS "so grave that it violates contemporary standards of decency to ex-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

pose anyone unwillingly to such a risk." *Helling v. McKinney,* 509 U.S. at 36. Thus, Plaintiff's Eighth Amendment claim should be dismissed on that ground as well. *See, e.g., Johnson v. Goord,* 2005 WL 2811776, at *7 (S.D.N.Y. Oct.27, 2005) (granting motion for summary judgment when plaintiffs failed to present any evidence that they were exposed to constitutionally significant levels of ETS and noting that plaintiffs "pro se status, while implicating a more liberal interpretation of their pleadings, does not excuse them from the burden of coming forward with concrete evidence from which a reasonable juror could return a verdict in their favor." (internal quotation marks and citations omitted)); *cf. Colon v. Sawyer,* 2006 WL 721763, at *8 (finding objective prong met when plaintiff's allegations were substantiated by affidavits of fellow inmates).

For these reasons, it is recommended that Plaintiff's Eighth Amendment claim be **dismissed.**

### C. First Amendment Retaliation Claim

Plaintiff alleges that Defendants Snyder and Salamy retaliated against him "for his efforts to protect his health and to protect himself from violations of his Eighth Amendment rights" by "repeatedly assigning [him] to cells housing primarily smokers ... and punishing him with extended periods in segregation for refusing [those] cell assignments." Compl. at ¶ 45.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

*6 In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). Thus, there must be a "causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138–39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at *5 (N.D.N.Y. Aug.30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (emphasis in original)). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.* If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148–49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

In their Motion, Defendants do not challenge Plaintiff's allegation that he engaged in constitutionally protected conduct, and therefore, for the purposes of deciding this Motion, we will assume that the first element of Plaintiff's First Amendment retaliation claim has been met. With respect to the adverse actions element, Plaintiff alleges that Defendants retaliated against him by (1) placing him in the Special Housing Unit (hereinafter "SHU") and (2) upon his release from SHU, placing him in a 12–man cell known to have high levels of ETS due to unsanctioned smoking. Dkt. No. 110, Pl.'s Resp. in Opp'n to Defs.' Mot. at pp. 4–5; Compl. at ¶¶ 36–37, 39–41, & 45.

**\*7** The record shows that Plaintiff spent two significant terms in SHU due to his refusal to enter his assigned cell. On December 1, 2004, Senior Officer R. Brown [FN5] wrote the following incident report:

> FN5. R. Brown is not a named defendant in this action.

[W]hile conducting routine shakedowns in the Metal Detector Building, Inmate Simmons, approached myself, and stated that he needed to be locked up because he couldn't stand the cigarette smoke in the housing unit anymore. I escorted Inmate Simmons to the Lieutenant's Office where he discussed this matter with Lieutenant Washington.... After the discussion Lieutenant Washington gave Inmate Simmons a direct order to go back to his housing unit. At this time Inmate Simmons refused to return to Genesee B unit and was then escorted to the Special Housing Unit.

Dkt. No. 107–3, David Snyder Decl., dated Jan. 2009 [FN6] (hereinafter "Snyder Decl."), Ex. 2, Inci-

dent Rep., dated Dec. 1, 2004.

> FN6. The exact date is not noted on the Declaration.

Lieutenant Washington [FN7] confirmed this description in a Memorandum, stating that he "assured Simmons that the [smoking] situation would be rectified but, he was not satisfied with my response," and then refused when "ordered to return to his assigned housing unit." *Id.,* Ex. 2, Mem., dated Dec. 1, 2004.

> FN7. Lieutenant Washington is not a named defendant in this action.

At that time, Defendant Snyder served as the Unit Disciplinary Committee ("UDC") Chairperson. *Id.* at ¶ 4. The UDC holds initial hearings when an inmate is charged with an infraction, and is made up of staff members designated by the Warden. The UDC may not include a reporting staff member, an investigating officer, nor a witness to the incident in question. *Id.* The UDC has the power to impose minor sanctions, and can also recommend sanctions to the Discipline Hearing Officer ("DHO"), who renders a final disposition. *Id.* Snyder served as UDC Chairperson in the initial hearing against Plaintiff held on December 7, 2004, after which the UDC referred the matter to the DHO. *Id.* at ¶ 7. The DHO hearing was held on December 14, 2004, before D. Ryan,[FN8] at which Plaintiff admitted to the charge and the DHO found him guilty of refusing a direct order; he was sanctioned with, *inter alia,* 15 days segregated confinement. *Id.* Ex. 5, DHO Hr'g Rep., dated Dec. 20, 2004.

> FN8. D. Ryan is not a named defendant in this action.

Plaintiff was released from SHU on December 29, 2004, and on that date, he received another incident report for refusing a direct order. Corrections Officer (C.O.) Scott Martelle [FN9] wrote in the report

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

that Plaintiff

FN9. Scott Martelle is not a named defendant in this action.

told me in the Genesee–B officers station that he did not want to be housed in his current cell. I told inmate [Simmons] that this was the only cell available to him at this time and gave him an order to accept his current cell assignment. Inmate Simmons then stated that he wasn't going to stay in that cell to lock him up and to wright [sic] him a shot, or 15 shots[,] he didn't care.

*Id.,* Ex. 6, Incident Rep. dated Dec. 29, 2004.

Defendant Snyder again served as the UDC Chairperson for Plaintiff's initial hearing, and again referred the case to the DHO. *Id.* The DHO hearing was held on January 14, 2005, before D. Ryan at which Plaintiff again admitted to refusing a direct order. *Id.,* Ex. 7, DHO Hr'g Rep., dated Jan. 19, 2005. Plaintiff was again sentenced to 15 days segregated confinement. *Id.*

**\*8** Our review of the documents in the record presents the conclusion that Defendant Snyder did not have the authority to sentence Plaintiff to a term in SHU, and in fact, served only as the UDC Chairperson, nor was he otherwise involved in the incidents that led to Plaintiff's confinement. Snyder Decl. at ¶ 11. Furthermore, Plaintiff has not presented any evidence that Snyder was involved in the assignment of Plaintiff to a cell, either before his refusal to stay in the Genesee B Unit on December 1, 2004, or upon his release from SHU on December 29, 2004, when he refused placement in the 12–man cell. Because Plaintiff has failed to demonstrate that Snyder took any adverse actions against him, it is recommended that his retaliation claim against Snyder be **dismissed.**

Defendant Salamy is a Case Manager at FCI RayBrook. Dkt. No. 107–6, David Salamy Decl.,

dated Jan. 30, 2009, at ¶ 1. On December 29, 2004, the date Plaintiff was released from his first stint in SHU and then disobeyed another direct order to return to his assigned cell, Salamy wrote a Memorandum regarding an interaction he had with Plaintiff in which he stated:

[I]nmate Simmons approached me and asked "is this further punishment?" I inquired to what he was talking about, and he replied, "well ... they let me out of Seg and now I'm in a 12–man cell. Is that more Punishment?" I realized that inmate Simmons was referring to the fact that he was recently released from SHU and assigned to the 12–man cell in Genesee B. I informed inmate Simmons he would have to talk to his counselor in the morning. Inmate Simmons then stated that he would be returning to SHU. At approximately 8:00 P.M. the same evening, inmate Simmons entered my office and again stated that he would be returning to SHU, and then left my office. I informed the unit office and Lieutenant Pickereign of his comments. [A] few minutes later inmate Simmons entered the officer's station and was ordered by Officer Martelle to accept his assigned cell. Simmons refused stating, 'lock me up, I'm not going to that cell. You can write a shot for all I care, or write 15 shots for all I care.'

Snyder Decl., Ex. 6, Mem. dated Dec. 29, 2004.

Salamy denies any involvement in Plaintiff's transfer to SHU on either occasion, and further asserts that he did not retaliate against Plaintiff in any way. Salamy Decl. at ¶ 7. There is no evidence in the record that Salamy had any involvement in Plaintiff's placement in SHU on either occasion or in the 12–man cell after his release from SHU on December 29, 2004. Again, Plaintiff has offered no evidence, documentary or otherwise, to rebut Salamy's sworn Declaration. Thus, we find that there is no question of material fact regarding any adverse action Salamy allegedly took against Plaintiff.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)
**(Cite as: 2009 WL 3199552 (N.D.N.Y.))**

Because Plaintiff has failed to rebut Salamy's documentary case, it is recommended that his retaliation claim be **dismissed** as against Salamy as well. *See Scott v. Coughlin,* 344 F.3d at 287.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 107) be **GRANTED** and Plaintiff's Third Amended Complaint (Dkt. No. 62) **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.
Simmons v. Nalley
Not Reported in F.Supp.2d, 2009 WL 3199552 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Pernorris TAYLOR, Sr., Plaintiff,
v.
Dr. CHALOM, Defendant.

Civil Action No. 9:10–CV–1494 (NAM/DEP).
Dec. 13, 2011.

Pernorris Taylor Sr., Rossevelt, NY, pro se.

Hon. Eric T. Schneiderman, Office of the Attorney General, Charles Quackenbush, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Pernorris Taylor, a former New York State prison inmate who is proceeding *pro so* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. In his complaint, though vague and sparse in terms of factual allegations, Taylor appears to claim that the defendant, a physician employed at the prison in which he was confined at the relevant times, failed to provide him with proper medical care and to exempt him from working in the facility mess hall due to his physical condition, in violation of his rights under the Eighth Amendment to the United States Constitution.

In response to Taylor's complaint, defendant has moved seeking its dismissal on two grounds. Defendant maintains that plaintiff's claims are procedur-

ally barred based upon his failure to avail himself of the internal prison system grievance process before commencing suit. Defendant additionally argues that in any event plaintiff's claims lack merit based upon his failure to allege a plausible medical indifference cause of action. For the reasons set forth below, I recommend that plaintiff's complaint be dismissed as both procedurally barred and lacking in substantive merit.

II. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a former prison inmate recently released from the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"); at the times relevant to his claims, Taylor was designated to the Ogdensburg Correctional Facility ("OCF"), located in Ogdensburg, New York. *See generally* Amended Complaint (Dkt. No. 6); *see also* Dkt. Entry dated August 31, 2011. Plaintiff claims to be physically disabled as a result of being struck by a motor vehicle in June of 2008 and suffering resulting back and knee injuries. Amended Complaint (Dkt. No. 6) § II(D). Plaintiff also suffers from a testicular cyst. *Id.* at § III.

Upon his arrival at Ogdensburg, plaintiff was assigned to work in the facility mess hall. Amended Complaint (Dkt. No. 6) § II(D); Statement of Case (Dkt. No. 18) p. 1. Plaintiff complained to prison officials claiming that he was unable to perform the duties required at the mess hall in light of his limitations in bending, lifting, and standing for long periods

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

of time resulting from his physical injuries. *Id.*

Though not clear from his complaint, as amended, it appears that plaintiff's claims go beyond his mess hall assignment to the alleged failure of Dr. M. Chalom, who is a prison physician at Ogdensburg, to provide him with adequate medical treatment, including to order x-rays desired by the plaintiff. Statement of Case (Dkt. No. 18) p. 1. Plaintiff also complains that Dr. Chalom, though aware of his condition from having received medical records of his treatment from Nassau County Medical University Hospital, nonetheless failed to remove him from mess hall duty.[FN2] Statement of Case (Dkt. No. 18) p. 2. Taylor further complains that Dr. Chalom did not provide him with an elastic support for his right knee. *Id.*

> **FN2.** Plaintiff also contends that because he has been exposed to Tuberculosis he should be not have been assigned to work around food. Statement of Case (Dkt. No. 18) p. 2. Because this argument implicates potential danger to other inmates, rather than the plaintiff, Taylor lacks a standing to assert such a claim. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) (to establish standing for purposes of the constitutional "case or controversy" requirement, a plaintiff "must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant").

## II. *PROCEDURAL HISTORY*

**\*2** Plaintiff commenced this action on December 10, 2010, and, at the directive of the court, filed an amended complaint on March 8, 2011 providing somewhat greater elaboration regarding his claims. Dkt. Nos. 1, 4, 6. In his complaint plaintiff names Dr. M. Chalom as the sole defendant and appears to assert a deliberate medical indifference claim under the

Eighth Amendment, seeking an award of monetary damages. *Id.*

In lieu of answering plaintiff's complaint, defendant has moved to dismiss plaintiff's claims both for failure to state a claim upon which relief may be granted and on the ground that the action is procedurally barred based upon the plaintiff's failure to exhaust available administrative remedies before commencing suit. Dkt. No. 15. That motion, which plaintiff has opposed, *see* Dkt. Nos. 18, 19, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 129, ——, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ——, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal,* 129 S.Ct. at 1949. In the wake of *Twombly* and *Iqbal,* the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

**\*3** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by

lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

B. *Failure to Exhaust*

In his motion defendant Chalom argues that plaintiff's claims are procedurally barred based upon his failure to file and pursue a grievance through the DOCCS internal administrative process prior to commencing this action.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see* *Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007).[FN3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[FN4]

> FN3. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

> FN4. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted).

**\*4** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[FN5] *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of

non-exhaustion by failing to properly raise or preserve it or whether, through his own actions in preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[FN6] *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.

> FN5. Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. *See, e.g., Newman v. Duncan,* NO. 04–CV–395, 2007 WL 2847304, at *2 n. 4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.).

> FN6. In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

Ordinarily, failure to exhaust is an affirmative defense which must be pleaded and established by the defendant. *See Arnold v. Goetz,* No. 01 Civ. 8993, 2003 WL 256777, *2–3 (S.D.N.Y. Feb.4, 2003) (collecting cases); *Torrence v. Pesanti,* 239 F.Supp.2d 230, 231 (D.Conn.2003) (citing *Jenkins v. Haubert,* 179 F.3d 19 (2d Cir.1999)). For this reason, dismissal under Rule 12(b) of the Federal Rules of Civil Procedure for failure to exhaust is not always appropriate. *See Kasiem v. Switz,* 756 F.Supp.2d 570, 574 (S.D.N.Y.2010). Such a dismissal is proper, however, when a plaintiff's failure to exhaust under the PLRA is "readily apparent" or "unambiguously established in the record," provided that the plaintiff has had notice of the argument and an opportunity to respond. *Tor-

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

rence, 239 F.Supp.2d at 231–32 (citing Snider v. Melindez, 199 F.3d 108, 111–14 (2d Cir.1999)).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. See Mingues v. Nelson, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing Mojias v. Johnson, 351 F.3d 606 (2d Cir.2003) and Snider, 199 F.3d at 112–13). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[FN7] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. Id. §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. Id. § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. Id. § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. Reyes v. Punzal, 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, inter alia, Sulton v. Greiner, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

> **FN7.** The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

**\*5** In response to the questions posed in the printed form utilized to file his complaint, plaintiff has acknowledged that his claim arose during the course of his confinement, and that there is a grievance procedure available at Ogdensburg, but that he did not file a grievance utilizing that procedure. Amended Complaint (Dkt. No. 6) § IV. Plaintiff notes instead that he

informed his counselor, Mr. M. Stoner, of the claim. Id. In his submission in opposition to the motion, plaintiff reiterates having informed his counselor concerning his grievance and states that his counselor did not advise him of the need to file a grievance, instead informing him that he should sign up for sick call to address the issue.[FN8] Statement of Case (Dkt. No. 18) p. 3.

> **FN8.** In support of his motion defendant Chalom has submitted an affidavit from Jeffrey Hale, the Assistant Director of the DOCS Inmate Grievance Program ("IGP"), in which he states that a search of records of the DOCCS Central Office Review Committee ("CORC") failed to reveal submission of any grievance appeal by Taylor to the CORC during the period of his incarceration at Ogdensburg. See Hale Decl. (Dkt. No. 15–2) ¶¶ 1–4. Because this issue is being addressed on a motion to dismiss pursuant to Rule 12(b)(6), I have not considered the Hale affidavit in making my recommendation. See, e.g., Friedl v. City of New York, 210 F.3d 79, 83–84 (2d Cir.2000) ("a district court errs when it considers affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.") (internal quotation marks, citations and alteration omitted).

The second prong of the Hemphill analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." Hemphill, 380 F.3d at 686 (citations omitted). In this instance defendant has properly raised the issue, and plaintiff fails to allege any conduct on the part of the defendant that deterred or inhibited his

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

filing of a grievance.

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676–77 (2d Cir.2004); *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ).

Based upon plaintiff's response to the motion, it does not appear that this narrow exception applies in this instance. Taylor states that he made his complaints regarding Dr. Chalom known to his counselor, who nonetheless failed to advise him of a need to file a grievance and instead directed him to sick call to address his issue. *See* Statement of Case (Dkt. No. 18) pp. 3, 5. Plaintiff does not allege that his counselor informed him that his complaint was not grievable, a circumstance which could potentially implicate a recognized exception to the otherwise steadfast statutory requirement of exhaustion. *Brown v. Koenigsmann,* No. 01 Civ 10013(LMM), 2005 WL 1925649, at *1 (S.D.N.Y. Aug. 10, 2005). Similarly, plaintiff cannot claim an estoppel from raising an exhaustion defense since it was not Dr. Chalom, but another prison official who, he intimates, dissuaded him from filing a grievance. *Id.*

**\*6** Under these circumstances, plaintiff's claims are procedurally barred based upon his failure to file and pursue a grievance related to the claims raised in his complaint.

C. *Deliberate Indifference*

In his motion Dr. Chalom also argues that plaintiff's complaint fails to assert a plausible deliberate medical indifference claim. In support of that contention defendant asserts that the plaintiff has neither pleaded facts demonstrating the existence of a serious medical need, nor has he established a plausible claim of subjective deliberate indifference on the part of Dr. Chalom to any such need.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

255, 268 (2d Cir.2009); *Price v. Reilly,* No. 07–CV–2634 (JFB/ARL), 2010 WL 889787, at *7–8 (E.D.N.Y. Mar.8, 2010). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279–81 (2d Cir.2006).

### 1. Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care ...", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin,* 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id.* at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment ... [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant

inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith,* 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n. 10 (quoting *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000)).

**\*7** Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136–37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

Plaintiff's complaint is devoid of specifics regarding his back and knee injuries, or his testicular cyst; rather, he merely alleges in a conclusory fashion that he has pain and soreness in both knees, back pain, and a great deal of "pain and suffering" from his cyst. Plaintiff's complaint does not contain any allegations as to what, if any, treatment he received for those conditions while at Ogdensburg. Instead, while noting that Dr. Chalom retrieved plaintiff's medical records from an outside medical facility where he apparently received treatment for his injuries, he alleges that Dr. Chalom did not arrange for x-rays or provide him with elastic support for his knee, and argues that the de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

fendant "had the authority to remove [sic] from the mess hall" implying that he should have but did not do so.[FN9] *See* Plaintiff's Opposition (Dkt. No. 18) p. 2 of 7. These allegations are insufficient to satisfy the objective prong of the deliberate indifference test. Plaintiff's complaint provides no information concerning the alleged inadequacy of treatment received for his medical conditions, and instead appears only to assert plaintiff's disagreement with the course of diagnosis and treatment followed by Dr. Chalom, a matter which is not cognizable under the Eighth Amendment. *See Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted); *Amaker v. Kelly,* No. 9:01–CV–877, 2009 WL 385413, at *14–16 (N.D.N.Y. Feb.9, 2009) (Scullin, S.D.J. and Peebles, M.J.).

> FN9. While plaintiff alleges that Dr. Chalom did not provide him with an elastic support for his knee, he also asserts that another physician, Dr. Aley, did provide him with the desired support. Plaintiff's Motion Opposition (Dkt. No. 18) p. 2 of 7.

2. *Subjective Element*

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the ence." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *Waldo v. Goord,* No. 97–CV1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.)

(same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40, 114 S.Ct. 1970, 128 L.Ed.2d 811).

**\*8** Plaintiff's complaint is similarly deficient in that it does not allege facts plausibly demonstrating that Dr. Chalom was deliberately indifferent to Taylor's condition. While the complaint does not specify the nature of actions or inactions by Dr. Chalom forming the basis for plaintiff's claims against him, his submission in opposition to the motion provides some degree of clarification. That document reveals that rather than ignoring plaintiff's medical condition, Dr. Chalom instead made efforts to secure his medical records. Again, while plaintiff asserts his belief that x-rays should have been ordered and that he was in need of surgery to his right knee, these allegations, which allege nothing more than a mere disagreement with the treatment he received, are insufficient to plausibly satisfy the subjective element of the deliberate indifference test. *See Rosales,* 10 F.Supp.2d at 264; *Amaker,* 2009 WL 385413, at *14–16.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint, which sets forth a deliberate medical indifference claim in only skeletal form, devoid of factual allegations which would permit the court to assess whether plaintiff has met the objective and subjective prongs necessary to plead a cognizable deliberate medical indifference cause of action, is subject to dismissal on the merits. In addition, because it appears clear from his complaint and submissions in opposition to defendant's motion that he failed to file and pursue to the CORC a grievance concerning his medical complaints, plaintiff is procedurally barred from maintaining this action.

Ordinarily, a *pro se* complaint should not be dismissed without leave to amend unless it appears clear that the plaintiff is unable to set forth any facts that would support a plausible cause of action. *See*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

*Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999); *Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile."). In this instance, however, because plaintiff has already amended once, and since it seems clear that he is procedurally barred from raising the claims set forth in his complaint based upon his failure to exhaust available internal administrative remedies, I recommend against permitting further amendment. *See Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991).

It is therefore hereby respectfully

RECOMMENDED that defendant's dismissal motion (Dkt. No. 15) be GRANTED, and that plaintiff's complaint be dismissed in all respects, without leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*9** It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further.

N.D.N.Y.,2011.
Taylor v. Chalom
Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Wayne THOMPSON, Plaintiff,
v.
BELLEVUE HOSPITAL, Rikers Island Facility, Dr.
John Doe, Lester Wright, Department of Corrections
Chief Medical Officer, Brian Fischer, Department of
Corrections Commissioner, Pedro Diaz, Regional
Medical Director, Dr. Whalen, Regional Medical
Director, Defendants.

No. 9:09–CV–01038 (NAM/GHL).
Aug. 29, 2011.

Wayne Thompson, Comstock, NY, pro se.

Heidell, Pittoni, Murphy, & Bach, L.L.P., Paul Stuart
Haberman, Esq., of Counsel, New York, NY, for City
Defendants.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, David L. Cochran, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for State
Defendants.

### REPORT–RECOMMENDATION and ORDER

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Wayne Thompson ("Plaintiff") alleges that Defendants violated his constitutional rights by failing to operate on his shoulder. (Dkt. No. 81.) Currently pending before the Court are two motions: (1) a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by

Defendants New York City Health and Hospitals Corporation (sued herein as Bellevue Hospital), the City of New York (sued herein as The Department of Corrections NYC), and Rikers Island ("City Defendants") FN1 (Dkt. No. 96); and (2) a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 filed by Defendants Lester Wright, Brian Fischer, Pedro Diaz, and Dr. Whalen ("State Defendants") (Dkt. Nos.91, 119). For the reasons that follow, I recommend that both motions be granted.

> FN1. Counsel for the City Defendants does not represent Defendant Doctor John Doe, who has not yet been identified or served. However, the City Defendants maintain that Defendant Doe should be dismissed for the same reasons applicable to the other City Defendants. (Dkt. No. 97 at 3 n. 3.)

### I. FACTUAL AND PROCEDURAL SUMMARY

Plaintiff alleges that when he was a pretrial detainee in New York City in July 2004, Defendant Doctor John Doe found that Plaintiff required surgery to repair a torn rotator cuff in his right shoulder. (Dkt. No. 81 at 1. FN2) However, Defendant Doe then "conspired with others within the NYC Department of Corrections and with the Bell[evue] Hospital medical department" to deny Plaintiff that surgery. *Id.* Plaintiff alleges that Defendant Doe told him he could not receive the surgery because he would not be able to receive appropriate physical therapy once he was transferred to Rikers Island. *Id.* Defendant Doe told Plaintiff that "if you win your criminal case you can come back to the Hospital and we will perform the surgery and if you are convicted you can take care of it when you get to prison." *Id.* at 2. In his opposition to the City Defendants' motion to dismiss, Plaintiff characterizes Defendant Doe's statements as "le[ading him] to believe that there existed a contractual agreement between the NYC and NYS Department of Corrections" under which "the state would obtain his medical records, take over the treatment and simply perform the recommended surgery." (Dkt. No. 103 at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

1–2.)

> FN2. Page references in citations to the amended complaint refer to the page numbers assigned by the Court's electronic filing system.

In July 2005, while Plaintiff was confined at Rikers Island, he dislocated his injured shoulder twice. (Dkt. No. 81 at 2.) Rikers Island medical staff put his shoulder back into place and he received a few sessions of physical therapy, but he was not taken back to Bellevue to see a doctor or have surgery. *Id.*

On August 21, 2006, Plaintiff entered the New York State Department of Corrections and Community Supervision ("DOCCS") system. (Dkt. No. 92 at 8 ¶ 5; N.Y. Dept. of Corr. & Cmty. Supervision Inmate Population Info. Search, http://nysdocslookup.docs.state.ny.us (last visited July 31, 2011).) The amended complaint alleges that "[u]pon his initial medical screening during intake at the Down[s]tate Reception Center, Plaintiff s[ough]t treatment for his shoulder injury and was instructed by the doctor to bring his injury to the attention of the medical department once he arrived at his permanent facility. When Plaintiff arrived at the Great Meadow Correctional Facility and was seen by the doctor, he brought his injury to the attention of the doctor [,] requesting surgery and explained the history surrounding the injury and his efforts to have it repaired." (Dkt. No. 81 at 3 .) The amended complaint does not describe the doctor's response.

**\*2** In the summer of 2007, Plaintiff dislocated his shoulder again. (Dkt. No. 92 at 8 ¶ 7.) In his opposition to the motion to dismiss, Plaintiff states that he was not seen by a DOCCS doctor until this injury occurred and that he "[o]bviously ... could not have learned that the state would not honor the City of New York's recommendation [regarding surgery] until he began receiving consultations." (Dkt. No. 103 at 3.)

Thereafter, Plaintiff's shoulder was evaluated and the treating physician, Doctor Mitchell Rubinovich, twice recommended surgery. (Dkt. No. 92 at 8 ¶ 8.) The recommended shoulder surgery was denied by APS Healthcare, Inc., DOCCS' independent review company.FN3 (Dkt. No. 81 at 3; Dkt. No. 92 at 8 ¶ 8; Dkt. No. 92–1 at 6.) Defendant Doctor Whalen, the Regional Medical Director, concurred with that decision. (Dkt. No. 81 at 3; Dkt. No. 92–1 at 6 .)

> FN3. APS Healthcare, Inc. is a privately held company that contracts with DOCS to review requests for specialty care. Requests for surgery are electronically submitted from the facility providers to APS Healthcare for approval. Requests may be approved, disapproved, or returned to the facility provider for further information. If a request is disapproved, the facility provider may appeal to the Regional Medical Director. *Phillips v. Wright,* No. 9:09–CV–1328, 2010 U.S. Dist. LEXIS 139859, at *3–4, 2010 WL 5565669, at *1–2 (N.D.N.Y. Aug.11, 2010).

On July 21, 2009, Plaintiff filed a grievance in which he claimed that Dr. Rubinovich's evaluations indicated that he needed surgery and that the medical department at Great Meadow Correctional Facility was indifferent to his medical needs. (Dkt. No. 92–1 at 2.) On the same day, Plaintiff sent a letter to Defendant Brian Fischer, the Commissioner of DOCCS, suggesting that Defendant Fischer "take action to see to it that I receive the necessary surgery that I full well know that I need." *Id.* at 8.

On August 3, 2009, the Inmate Grievance Resolution Committee ("IGRC") denied Plaintiff's grievance. (Dkt. No. 92–1 at 3; Dkt. No. 92 at 8 ¶ 10.))

On or about August 5, 2009, Plaintiff appealed the IGRC's denial to the superintendent. (Dkt. No. 92

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

at 8 at ¶ 11.) On the same date, Plaintiff received a letter from Defendant Lester Wright, Chief Medical Officer, responding to his July 21, 2009 letter to Defendant Fischer. (Dkt. No. 92 at 8 ¶ 13; Dkt. No. 92–1 at 10.) Defendant Wright stated that "[t]he Division of Health Services has investigated your concern and determined that the decision to have you pursue physical therapy prior to reconsidering shoulder surgery does not constitute a denial of medical attention ... If the physical therapy is not effective, orthopedic surgery will be reconsidered." (Dkt. No. 92–1 at 10.)

The Superintendent did not respond to Plaintiff's grievance within twenty days as required by DOCCS' regulations. The parties dispute what happened next. Plaintiff asserts that he appealed to the Central Office Review Committee ("CORC") on August 25, 2009. (Dkt. No. 92 at 8 ¶ 12; Dkt. No. 92–1 at 14.) Plaintiff has attached a copy of this appeal as an exhibit to his opposition to the State Defendants' motion for summary judgment. (Dkt. No. 92–1 at 14.) The State Defendants assert that Plaintiff never appealed to CORC. Jeffery Hale, the Assistant Director of the Inmate Grievance Program, declares that Plaintiff has never appealed *any* medical issue to CORC. (Dkt. No. 91–3 ¶¶ 4–5.)

Plaintiff declares that about one week after he appealed to CORC, he went to the IGRC office and inquired about the status of his grievance. (Dkt. No. 92 at 9.) Supervisor B. White told him that his grievance had been denied and that he would receive a copy in a few days. *Id.* Plaintiff declares that he "never received a copy of that denial." *Id.* at 2.

**\*3** On September 11, 2009, the Superintendent issued an untimely response to Plaintiff's grievance. (Dkt. No. 92 at 8 ¶ 11; Dkt. No. 92–1 at 6.) The Superintendent denied the grievance. (Dkt. No. 92–1 at 6.) Plaintiff does not assert that he believed that this was a CORC response.

Plaintiff signed and mailed his original complaint in this action on the same day. (Dkt. No. 1.) He asserts that he did so because he had not received a copy of the CORC denial as promised by B. White but had "received my Central Office denial from Defendant Lester Wright, Chief Medical Officer/Associate Commissioner and member of the Central Office Resolution Committee...." [FN4] (Dkt. No. 92 at 9.) The complaint was filed on September 14, 2009. (Dkt. No. 1.)

> FN4. Plaintiff apparently refers to the letter Plaintiff received from Defendant Wright on August 5, 2009.

Plaintiff alleges that Defendants' "denial of medical treatment" has "result [ed] in wear and tear of the surrounding cartilage and tissues [and] prolonged suffering, both physical and emotional." (Dkt. No. 81 at 7.) Plaintiff seeks compensatory and punitive damages and an injunction "to prevent the violation from continuing." *Id.*

The City Defendants now move to dismiss Plaintiff's complaint. (Dkt. No. 96.) The State Defendants move for summary judgment, arguing that Plaintiff's complaint must be dismissed because he failed to exhaust his administrative remedies before filing this action. (Dkt. No. 91.) Plaintiff has opposed the motions.[FN5] (Dkt.Nos.92, 103.) Both sets of Defendants have replied. (Dkt.Nos.110, 118.)

> FN5. The State Defendants argue that Plaintiff's opposition is flawed because he did not file a response to Defendants' Statement of Material Facts. (Dkt. No. 118 at 1.) It is true that Plaintiff failed to comply with Local Rule 7.1(a)(3). The closest Plaintiff came to responding to Defendants' Rule 7.1 Statement was his submission of a document entitled "Affidavit in Support of Opposition to NYS–Defendant's (sic) Motion for Partial

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

Summary Judgment for Failure to Exhaust." (Dkt. No. 92 at 7.) This document does not "mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs," as required by Local Rule 7.1(a)(3). However, in the interest of judicial efficiency and because the evidence in this case is not voluminous, I have performed an independent review of the record.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN6] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d

Cir.2008).

FN6. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

**\*4** A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown—that the pleader is entitled to relief ." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of ac-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

tion, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. CITY DEFENDANTS' MOTION TO DISMISS

### A. Conspiracy Claim

Plaintiff alleges that Defendant Doe "conspired with others within the NYC Department of Corrections and with the Bell[evue] Hospital medical department to deny Plaintiff his ... right to be treated for his serious medical injury." (Dkt. No. 81 at 1.) The City Defendants argue that the amended complaint fails to state a claim for conspiracy because (1) it fails to allege that the City Defendants entered into an agreement to achieve an unlawful end; and (2) it does not allege that the City Defendants were motivated by racial or other discriminatory animus. (Dkt. No. 97 at 14–16.) Defendants are correct.

Federal civil rights conspiracy claims may arise under two statutes: 42 U.S.C. §§ 1983 and 1985. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (quoting *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) (per curiam)). A mere allegation that defendants have violated a plaintiff's constitutional rights pursuant to a conspiracy is insufficient to state a claim. *Zembiec v. Cnty. of Monroe,* 766 F.Supp.2d 484, 498 (W.D.N.Y.2011). "To survive a motion to dismiss, [a] plaintiff must include some facts in his complaint tending to show that [the] defendants acted in a willful manner, culminating in an agreement, understanding or 'meeting of the minds,' that violated his rights ..." *McLaurin v. New Rochelle Police Officers,* 368 F.Supp.2d 289, 295 (S.D.N.Y.2005) (punctuation omitted).

**\*5** Here, as the City Defendants correctly note, the amended complaint does not allege any "meeting of the minds." Rather, it simply alleges that Defendant Doe "conspired with others within the NYC Department of Corrections and with the Bell[evue] Hospital medical department." (Dkt. No. 81 at 1.) The amended complaint includes no facts tending to show that there was any "meeting of the minds." Therefore, I recommend that the Court dismiss Plaintiff's § 1983 conspiracy claim.

To state a cause of action for conspiracy under 42 U.S.C. § 1985(3), "a plaintiff must allege (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). The conspiracy must "be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus ..." *Id.* Here, as discussed above, Plaintiff has not sufficiently alleged that a conspiracy existed. Even if he had, the amended complaint does not allege that Plaintiff is a member of any protected class [FN7] or that the City Defendants were motivated by class-based or invidious animus. Therefore, I recommend that the Court dismiss Plaintiff's § 1985 conspiracy claim.

> FN7. "[P]risoners are not a suspect class." *Benjamin v. Jacobson,* 172 F.3d 144, 165 (2d Cir.1999).

Where a *pro se* complaint fails to state a cause of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir.2000)* (internal quotation and citation omitted). Of course, an opportunity to amend is not required where the plaintiff has already amended the complaint. *See Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once). In addition, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted). Here, Plaintiff has already amended his complaint once. However, there is a possibility that he could amend his complaint to state a conspiracy claim. Therefore, I recommend that the Court grant leave to amend.

**B. Fraudulent Misrepresentation Claim**

Construed broadly, Plaintiff's complaint may assert a fraudulent misrepresentation claim against Defendant Doe. The City Defendants have not addressed this claim. I recommend that the Court *sua sponte* dismiss this claim pursuant to 28 U.S.C. § 1915(e)(2).

To state a claim for fraudulent misrepresentation under New York law, "a plaintiff must show that (1) the defendant made a material false misrepresentation; (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." [FN8] *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 186–87 (2d Cir.2004) (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995)).

FN8. Moreover, under Federal Rule of Civil Procedure 9(b), a party alleging fraud must "state with particularity the circumstances constituting fraud or mistake." Thus, the complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund,* 375 F.3d at 187 (quoting *Harsco Corp. v. Segui,* 91 F.3d 337, 347 (2d Cir.1996)).

**\*6** The amended complaint fails to state a claim for fraudulent misrepresentation. The amended complaint does not allege facts plausibly suggesting that Defendant Doe made a materially false representation. The amended complaint alleges that Defendant Doe said "if you win your criminal case you can come back to the Hospital and we will perform surgery and if you are convicted you can take care of it when you get to prison." (Dkt. No. 81 at 2.) Plaintiff now characterizes that statement as falsely representing that "there existed a contractual agreement between the NYC and NYS Department of Corrections" under which "the state would obtain his medical records, take over the treatment, and simply perform the recommended surgery." (Dkt. No. 103 at 1–2.) However, the amended complaint does not allege that Defendant Doe said any such thing. Therefore, I recommend that the court *sua sponte* dismiss Plaintiff's fraudulent misrepresentation claim against Defendant Doe.

I recommend that the Court grant Plaintiff leave to amend. As with the conspiracy claim, there is the slimmest of possibilities that Plaintiff could amend his complaint to plausibly suggest that statements were made by Defendant Doe or some other representative of the City Defendants that caused him to reasonably rely on a promise that "the state would obtain his medical records, take over the treatment, and simply perform the recommended surgery."

**C. Statute of Limitations**

The City Defendants argue that Plaintiff's federal

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

and state claims against them are barred by the applicable statutes of limitations. (Dkt. No. 97 at 5–12.) The City Defendants are correct.

The statute of limitations is an affirmative defense. *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 76 (2d Cir.2010). "An affirmative defense may be raised by a pre-answer motion to dismiss [for failure to state a claim] under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998); *Staehr v. Hartford Fin. Serv. Grp.,* 547 F.3d 406, 425 (2d Cir.2008). When filing a motion to dismiss for failure to state a claim rather than a motion for summary judgment, the defendant "must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004).

In *McKenna,* the Second Circuit stated that under this "more stringent" standard a motion to dismiss can only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* However, this pleading standard has undergone a shift in the seven years since *McKenna* was decided. The standard cited by the *McKenna* court was articulated in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In 2007, the Supreme Court "retired" that standard. *Twombly,* 550 U.S. at 570; *Iqbal,* 129 S.Ct. at 1944.

**\*7** As discussed above in Section II, the standard articulated in *Twombly* and *Iqbal* is that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570) (emphasis added). Thus, under the *Twombly/Iqbal* standard, a motion to dismiss "cannot be granted based on an affirmative defense when the plaintiff's recovery is ... plausible ... under the facts taken from the face of the complaint." *Brownmark*

*Films LLC v. Comedy Partners,* —— F.Supp.2d ——, 2011 U.S. Dist. LEXIS 72684, at * 16, 2011 WL 2648600, at *5 (E.D.Wis. Jul.6, 2011).[FN9] *See also St. John's Univ. v. Bolton,* 757 F.Supp.2d 144, 163 (E.D.N.Y.2010) (when considering a motion to dismiss for failure to state a claim as barred by the statute of limitations "the court looks to the latest accrual dates ... *reasonably suggested* by the facts alleged in the Complaint.") (emphasis added).

> FN9. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

1. *Federal Claims Against the City Defendants*

Plaintiff asserts federal civil rights claims against the City Defendants pursuant to 42 U.S.C. § 1983. (Dkt. No. 81 at 2, 6.) Claims arising under 42 U.S.C. § 1983 are governed by state statutes of limitations. *Wilson v. Garcia,* 471 U.S. 261, 266–267, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In New York, such claims are governed by the general three-year limitations period governing personal injury claims. *Owens v. Okure,* 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). Accrual of the claim, however, is a question of federal law. *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997). Under federal law, generally, a claim arising under 42 U.S.C. § 1983 "accrues" when the plaintiff "knows or has reason to know of the injury which is the basis of his action." *Pearl v. City of Long Island Beach,* 296 F.3d 76, 80 (2d Cir.2002).

Here, "the injury which is the basis" of Plaintiff's claims against the City Defendants is their failure to perform shoulder surgery on Plaintiff in 2004 and 2005.[FN10] (Dkt. No. 81 at 1–2.) In the amended complaint, Plaintiff alleges that he "did not learn of the [City Defendants'] violation until it was repeated by the [State] Defendants in the very same manner, to a fault." *Id.* at 3. In his opposition to the motion to dismiss, Plaintiff states that he "obviously ... could not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

have learned that the state would not honor the City of New York's recommendation until he began receiving consultations" in the summer of 2007. (Dkt. No. 103 at 3 .)

> FN10. As discussed above, Plaintiff has failed to state a claim for conspiracy or fraudulent misrepresentation against the City Defendants. Thus, I will not consider either of those claims as the basis of Plaintiff's injury for statute of limitations purposes.

Plaintiff's allegation that his federal claims against the City Defendants did not accrue until 2007 is not plausible. He learned of the alleged City policies preventing inmates from receiving surgery in 2004, when Defendant Doe told him that he would not be able to receive appropriate physical therapy at Rikers Island. (Dkt. No. 81 at 1.) At the very latest, he knew that the City Defendants would not provide him with surgery on August 21, 2006, when he transferred into state custody. Thus, Plaintiff's claims against the City Defendants accrued on or before August 21, 2006, and the statute of limitations expired three years later, on August 21, 2009. Plaintiff did not sign and mail his complaint in this action until September 11, 2009. (Dkt. No. 1.) Therefore, unless some exception applies, his claims against the City Defendants are barred by the statute of limitations.

**\*8** Plaintiff asserts in his complaint that his claims against the City Defendants are not time-barred because the continuing violation doctrine applies. (Dkt. No. 81 at 2–3.) Specifically, Plaintiff asserts that they City Defendants "deliberately instituted ... an effort to deprive a class of citizens [of] a protected right [and] have displayed their [d]eliberate [i]ndifference [ ] during the relevant time limitation period ... through [ ] their repeated examples of willful negligent acts, which disclose a pattern of conduct of denying prisoners meaningful medical treatment through their policymaking decisions, intended to defraud the state[']s taxpayers." *Id.* at 2. Plaintiff's argument is

without merit.

"The continuing violation doctrine is an exception to the normal knew-or-should-haveknown accrual date. When the plaintiff brings a Section 1983 claim challenging a discriminatory policy, commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Shomo v. City of New York,* 579 F.3d 176, 181 (2d Cir.2009) (citations and punctuation omitted). The Second Circuit has held that "the continuing violation doctrine can apply to ... claims of medical indifference brought under 42 U.S.C. § 1983 when the plaintiff shows an ongoing policy of deliberate indifference to *his or her* serious medical needs and some acts in furtherance of the policy within the relevant statute of limitations period." *Id.* at 179 (emphasis added). Courts "in the Second Circuit have been loath to apply the continuing violation doctrine absent a showing of compelling circumstances." *Smith v. Westchester Cnty.,* 769 F.Supp.2d 448, 464 n. 14 (S.D.N.Y.2011) (quoting *Trinidad v. N.Y.C. Dept. of Corr.,* 423 F.Supp.2d 151, 165 n. 11 (S.D.N.Y.2006)) (punctuation omitted).

Here, Plaintiff alleges that the City Defendants maintained an ongoing policy of "depriv[ing] a class of citizens [of] a protected right ... during the relevant time limitation period ..." (Dkt. No. 81 at 2.) However, Plaintiff does not allege that the City Defendants were deliberately indifferent to *his* serious medical needs within the statute of limitations period. He alleges, rather, that the allegedly unconstitutional policies may have affected *other* individuals within the three-year period before he filed his complaint.

Moreover, it is not enough that Plaintiff claims that the *State* Defendants violated his rights during the statutory period. *Shomo* illustrates this point. In *Shomo,* the plaintiff, who suffered right arm paralysis and limited use of his left arm, alleged that DOCCS medical personnel and security staff repeatedly refused to follow orders to assist him with his activities

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

of daily living, transfer him to special housing, or administer specific treatment. *Shomo,* 579 F.3d at 179–80. The defendants moved to dismiss the complaint on statute of limitations grounds because the conduct of which the plaintiff complained had occurred more than three years before the filing of the complaint. *Id.* at 180. The district court granted the motion, granting leave to amend as to some defendants and denying leave to amend as to others. *Id.* at 182. Among the defendants dismissed with prejudice were Dr. Singh and Physician Assistant Wright. *Id.* at 183. The Second Circuit affirmed the district court's decision to dismiss Dr. Singh and Physician Assistant Wright with prejudice, finding that "[t]here is no allegation that ... [the plaintiff] had further contact with Dr. Singh" within the statute of limitations period and that "[a]bsent any allegations of wrongful acts that could relate to conduct within the statutory time period, Shomo's claim against Physician Assistant Wright was also properly dismissed without leave to amend." *Id.* at 184.

**\*9** The Second Circuit's treatment of the claims against Dr. Singh and Physician Assistant Wright shows that it is not enough to simply allege that *someone* committed a wrongful act within the statute of limitations period. Rather, a plaintiff hoping to invoke the continuing violation doctrine must allege that *the defendant* committed a wrongful act within the statute of limitations period. As another district court has cogently observed, "[t]he Second Circuit's decision to affirm the dismissal of the claims against Dr. Singh and the physician assistant made clear that in order for the continuing violation doctrine to apply, plaintiff needed to show that *those specific individuals* committed at least one wrongful act within the statutory time period." *Gonzalez v. Wright,* 665 F.Supp.2d 334, 350 (S.D.N.Y.2009) (emphasis added).

Therefore, I find that the continuing violation doctrine does not save Plaintiff's claims against the City Defendants.

In his opposition to the motion to dismiss, Plaintiff argues that his claims against the City Defendants are saved by the doctrine of equitable estoppel. (Dkt. No. 103 at 1–5.) Plaintiff's argument is without merit.

In district courts within New York, the doctrine of equitable estoppel tolls the statute of limitations where "the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007). The burden is on the plaintiff to show that "the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel claim have ceased to be operational." *Id.* (punctuation omitted). "If a plaintiff cannot articulate any acts by defendants that prevented him from timely commencing suit," he has failed to meet his burden. *Id.* (punctuation omitted).

Plaintiff's equitable estoppel argument relies on Defendant Doe's statement that "if you win your criminal case you can come back to the Hospital and we will perform the surgery and if you are convicted you can take care of it when you get to prison." (Dkt. No. 81 at 2.) Plaintiff characterizes this as a promise that the state would definitely provide him with surgery. Accordingly, Plaintiff argues that the City Defendants "misled [him] into believing that ... upon their recommendation he would rec[ei]ve the necessary surgery needed to repair his injury once he was transferred into state custody." (Dkt. No. 103 at 2.) He explains further that he "could not have learned that the state would not honor the City of New York's recommendation until he began receiving consultations," which did not occur until the summer of 2007. *Id* . at 3. He concludes that the City Defendants "misrepresented the material facts to the Plaintiff, in order to dec[ei]ve him and have him believe that the only way he could rec[ei]ve the surgery that he needed was to wait until he was transferred into state custody." *Id.* at 5. As discussed above in Section III(B), these assertions are not sufficient to plausibly allege that the City Defendants engaged in fraud, misrepre-

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

sentation, or deception. Therefore, I recommend that the Court dismiss Plaintiff's federal claims against the City Defendants because they are barred by the statute of limitations.

**\*10** I recommend that the Court grant leave to amend. Although it appears unlikely, Plaintiff could perhaps amend his complaint to add facts plausibly alleging that the continuing violation doctrine or the doctrine of equitable estoppel applies.

2. *State Claims Against the City Defendants*

The City Defendants argue that to the extent that Plaintiff is asserting any state law causes of action against them, such as medical negligence, those claims are also barred by the statute of limitations. (Dkt. No. 97 at 10–12.) Defendants are correct.

New York General Municipal Law §§ 50–i and 50–e require plaintiffs suing cities or their employees to file a notice of claim within ninety days and commence the action within one year and ninety days of the events giving rise to the claim. *Lieber v. Village of Spring Valley,* 40 F.Supp.2d 525, 533 (S.D.N.Y.1999) (collecting cases). Here, Plaintiff did not commence this action within one year and ninety days. Therefore, I recommend that the Court dismiss any state claims that Plaintiff may be asserting against the City Defendants without leave to amend.

## IV. STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The State Defendants move for summary judgment of Plaintiff's claims against them, arguing that Plaintiff failed to exhaust his administrative remedies before bringing this action. (Dkt. No. 91–6 at 3–6.) Defendants are correct.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). In New York state prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2010).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at (b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written decision within two working days of the conclusion of the hearing. *Id.* at (b)(2).

**\*11** Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at (c).

Third, a grievant may appeal to CORC within

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

seven working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at (d).

Any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g) (2010).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

Here, Plaintiff completed the first step of the grievance process when he received a response from the IGRC on August 3, 2009. (Dkt. No. 92–1 at 3.) He completed the second step by appealing the IGRC's decision to the Superintendent (Dkt. No. 92 at 8 ¶ 11) and waiting twenty days for a decision. He also completed the second step by receiving an untimely response from the Superintendent on September 11, 2009. (Dkt. No. 92–1 at 6.)

Plaintiff did not, however, complete the third step of the DOCCS inmate grievance process. The State Defendants assert that Plaintiff did not even begin the third step. Jeffery Hale, Assistant Director of the Inmate Grievance Program, declares that he searched Plaintiff's records and "found that ... [Plaintiff] ha[d] not submitted administrative appeals [to CORC] from facility determinations ... related to any medical issues at all." (Dkt. No. 91–3 ¶ 4.) Plaintiff, however, claims that he did submit an appeal to CORC and has provided the Court with a copy of that appeal. (Dkt. No. 92 at 8 ¶ 12; Dkt. No. 92–1 at 14.)

Even drawing all inferences in Plaintiff's favor and assuming that Plaintiff did, in fact, appeal to CORC, it is undisputed that Plaintiff never received a response from CORC.[FN11] (Dkt. No. 92 at 1.) A final decision by CORC is required in order to exhaust administrative remedies. *Torres v. Carry,* 672 F.Supp.2d 338, 344 (S.D.N.Y.2009). Therefore, Plaintiff did not exhaust his administrative remedies.

> FN11. Plaintiff characterizes Defendant Wright's August 5, 2009, letter as a CORC response. (Dkt. No. 92 at 15; Dkt. No. 92–1 at 9–10.) That characterization is misplaced. Defendant Wright sent the letter to Plaintiff twenty days *before* Plaintiff appealed to CORC. Moreover, Defendant Wright's letter states clearly that it is being sent in response to Plaintiff's letter to Defendant Fischer. The letter does not mention Plaintiff's grievance or refer to the grievance appeals process in any way.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN12] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural require-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

ments." *Id.* (citations and internal quotations omitted).

> FN12. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

**\*12** Here, as discussed above, an administrative remedy was available to Plaintiff.[FN13] Plaintiff expressly stated that there was a prisoner grievance procedure at Great Meadow Correctional Facility through which he filed a grievance and appeals at each level. (Dkt. No. 92 at 9.) Thus, Plaintiff had available to him an administrative remedy which should have been pursued to completion before filing the instant action.

> FN13. To be "available" for purposes of the PLRA, an administrative remedy must afford "the possibility of some relief for the action complained of." *Booth v. Churner,* 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). In addition, a court deciding this issue must apply an objective test and determine whether a similarly situated person of ordinary firmness would have deemed the administrative remedy available. *Hemphill,* 380 F.3d at 688.

Second, Defendants are not estopped from asserting the exhaustion defense. A defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 162–63 (2d Cir.2004) (district court directed to consider whether defendants were estopped from asserting exhaustion defense where inmate alleged that he was beaten, threatened, denied grievance forms, and

transferred to another prison). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp .2d 484, 488 (W.D.N.Y.2008) Here, Plaintiff alleges that B. White, the Inmate Grievance Supervisor, inhibited Plaintiff from exhausting his available administrative remedies. However, B. White is not a named defendant. There is no record of any named Defendant preventing Plaintiff from completing the grievance process.

As for the third part of the inquiry, the existence of "special circumstances" justifying a plaintiff's failure to exhaust administrative remedies "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Special circumstances may exist due to a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Bailey v. Fortier,* 2010 U.S. Dist. LEXIS 108357, at *23–24, 2010 WL 4005258, at *7 (N.D.N.Y. Aug.30, 2010) (Peebles, Mag.) (citing *Murray v. Palmer,* 2010 U.S. Dist Lexis 32014, at *39–40, 2010 WL 1235591, at *6 (N.D.N.Y. Mar.31, 2010) (Suddaby, D.J.) (quoting *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")))[FN14]

> FN14. The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Plaintiff argues that B. White "intentionally s[ough]t to deprive [him] of [his] right to exhaust the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

procedure by furnishing false information on official department documents and by failing to log and file [his] formal grievance submitted to [the] Central Office" (Dkt. No. 92 at 9.) As noted above, Plaintiff has submitted a copy of a CORC appeal that he claims he filed, but that the State Defendants claim was never filed. Plaintiff also states that one week after he submitted the CORC appeal he inquired about its status and B. White told him "the grievance had been denied and that [he] would be receiving a copy of that denial within a couple of days." *Id.* Plaintiff has submitted additional evidence that DOCCS failed to properly log his CORC appeal-a letter from B. White stating that Plaintiff's grievance "was informally resolved by [Plaintiff]on 8/03/09." (Dkt. No. 92–1 at 12.) The record is clear, however, that the grievance was *not* informally resolved and that Plaintiff appealed the August 3, 2009, decision by the IGRC.

**\*13** However, no error by DOCCS caused Plaintiff to fail to grieve in the normally required way. I might reach a different conclusion if Plaintiff had waited in vain for a month or two for a CORC response before filing this lawsuit. However, he did not. Taking the evidence in the light most favorable to Plaintiff, he appealed to CORC on August 25, 2009. Under DOCCS regulations, CORC had thirty days to respond to Plaintiff's appeal. N.Y. Comp.Codes R. & Regs., tit. 7, § 701.6(g) (2010). Plaintiff signed and filed his complaint in this action less than thirty days after he submitted his appeal to CORC. He thus did not give CORC an opportunity to respond to his appeal before he proceeded to federal court. Such actions undermine one major purpose of the exhaustion requirement, which is to "provide prisons with a fair opportunity to correct their own errors." *Messa v. Goord,* —— F.3d ——, No. 10–1019–pr, 2011 U .S. Dist. LEXIS 15322, 2011 WL 3086827 (2d Cir. July 26, 2011) (quoting *Woodford,* 548 U.S. at 94) (punctuation omitted).[FN15] I might also reach a different conclusion if Plaintiff had argued that he believed that the Superintendent's untimely response, which Plaintiff received after he appealed to CORC, was a CORC

response. However, he admits that he never received a CORC denial. (Dkt. No. 92 at 9.) Therefore, I recommend that the Court dismiss Plaintiff's claims against the State Defendants without prejudice.

> FN15. Because one major purpose of the exhaustion requirement is to give prisons an opportunity to correct their own mistakes *before* a prisoner files suit, the Second Circuit has held that the PLRA requires dismissal of an action even where a prisoner shows that he received a CORC response after filing his lawsuit. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

**ACCORDINGLY,** it is

**RECOMMENDED** that the City Defendants' motion to dismiss (Dkt. No. 96) be ***GRANTED*** with leave to amend; and it is further

**RECOMMENDED** that the State Defendants' motion for summary judgment (Dkt. No. 91) be ***GRANTED*** without prejudice to refiling when Plaintiff has exhausted his administrative remedies: and it is further:

**RECOMMENDED** that Plaintiff motion for preliminary injunction (Dkt. No. 124) be ***DENIED AS MOOT;*** and it is further;

**ORDERED** that Defendants' request for an extension of time in which to respond to Plaintiff's motion for preliminary injunction (Dkt. No. 129) is *GRANTED.* The response deadline is adjourned without date pending the District Court's action on this Report–Recommendation; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Brownmark Films LLC v. Comedy Partners,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)
**(Cite as: 2011 WL 4369132 (N.D.N.Y.))**

—— F.Supp.2d ——, 2011 U.S. Dist. LEXIS 72684, 2011 WL 2648600 (E.D.Wis. Jul.6, 2011); *Bailey v. Fortier,* 2010 U.S. Dist. LEXIS 108357, 2010 WL 4005258 (N.D.N.Y. Aug.30, 2010); and *Murray v. Palmer,* 2010 U.S. Dist Lexis 32014, 2010 WL 1235591 (N.D.N.Y. Mar.31, 2010) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOUR-TEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. §* 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.
Thompson v. Bellevue Hosp.
Not Reported in F.Supp.2d, 2011 WL 4369132 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
**(Cite as: 2010 WL 2682307 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
Alex VEGA, Plaintiff,
v.
Mr. LAREAU, Corrections Sergeant; G. Labonte,
Corrections Officer; and Mr. Garbera, Corrections
Counselor, Defendants.

No. 9:04–CV–0750 (GTS/ATB).
March 16, 2010.

Alex Vega, pro se.

Charles J. Quakenbush, AAG, for Defendant.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate
Judge.

**\*1** This matter was referred to Magistrate Judge
Gustave J. Di Bianco for Report and Recommendation
by the Honorable Glenn T. Suddaby, United States
District Judge pursuant to 28 U.S.C. § 636(b) and
Local Rules N.D.N.Y. 72.3(c). Due to Judge Di
Bianco's retirement on January 4, 2010, the case was
reassigned to me. (Dkt. No. 70).

In his amended civil rights complaint, plaintiff
alleges that he was harassed and discriminated against
by defendants because of what defendants perceived
to be plaintiff's sexual orientation. (Amended Com-
plaint (AC)) (Dkt. No. 30). Plaintiff also alleges that,
after he filed grievances regarding the harassment and

discrimination, defendants retaliated against him by
filing false misbehavior reports, not allowing him to
attend his assigned program, and threatening to
transfer plaintiff out of protective custody and into
general population at another correctional facility.
(*Id.*) Plaintiff seeks substantial monetary relief.

Presently before the court is a motion for sum-
mary judgment pursuant to FED. R. CIV. P. 56 sub-
mitted by defendants Lareau, LaBonte, and Garbera.
FN1 (Dkt. No. 66). Defendants assert that plaintiff
cannot substantiate his claims of retaliation or equal
protection and, even if he could substantiate his
claims, that qualified immunity precludes liability for
damages. (*Id.*) Plaintiff has responded in opposition to
the motion. (Dkt. No. 68). Defendants have filed a
reply. (Dkt. No. 69). For the following reasons, this
Court will recommend that defendants' motion for
summary judgment be granted.

> FN1. The defendants' names are spelled as
> set forth in defendants' Declarations. (*See*
> Dkt. Nos. 66–4, 66–6, and 66–8). The Clerk
> of the Court has corrected the docket report
> accordingly. As discussed below, plaintiff
> has withdrawn his claims against defendants
> Garbera and Lareau.

**DISCUSSION**

**I. *Facts***

Plaintiff Alex Vega commenced this action under
42 U.S.C. § 1983, alleging deprivation of his civil
rights. The facts and procedural history of this case are
set forth more fully in the Decision and Order of
United States District Judge Suddaby filed on March
26, 2009, familiarity with which is assumed. (*See* Dkt.
No. 65). In that Decision and Order, all defendants
were dismissed except defendants Lareau, LaBonte,
and Garbera, and all claims were dismissed except
those alleging (1) retaliation by defendants LaBonte,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
**(Cite as: 2010 WL 2682307 (N.D.N.Y.))**

Garbera, and Lareau and (2) violation of plaintiff's right to equal protection by defendant LaBonte. (*Id.* at 31–32). The facts pertinent to defendants' present motion for summary judgment are related herein in the light most favorable to plaintiff as the non-moving party.

**A. Uncontested Facts**[FN2]

> FN2. These facts were set forth in defendants' Statement of Material Facts provided in accordance with Local Rule 7.1(a)(3) of the Northern District of New York. The facts set forth as uncontested were included in defendants' Rule 7.1 Statement, supported by record citations, and admitted by plaintiff in his response to defendants' Rule 7.1 Statement. (*See* Dkt. No. 66–3 ("Defendants' Rule 7.1 Statement"); Dkt. No. 68 at 1–2 ("Plaintiff's Response to Defendants' Rule 7.1 Statement")).

During the times relevant to this action, plaintiff was housed in the Assessment and Program Preparation Unit ("APPU") at Clinton Correctional Facility ("Clinton"). (*See generally* AC; Defs.' Rule 7.1 Statement ¶ 2; Dkt. No. 66–4 ("Garbera Declaration") ¶ 10). The Clinton APPU is a transitional unit at which inmates receive counseling and services in order to prepare them for longer-term residence at other prison facilities.[FN3] (Defs.' Rule 7.1 Statement ¶ 3; Gabrera Decl. ¶ 10). While housed at Clinton APPU, plaintiff was assigned to the church cleaning work detail which was usually supervised by defendant LaBonte. (Defs.' Rule 7.1 Statement ¶¶ 4, 9; Dkt. No. 66–6 ("LaBonte Decl.") ¶¶ 4–6, 21; AC ¶¶ 3(f), 8–9).

> FN3. APPU is also "a unit for those inmates who are considered 'victim prone' for various reasons." *Lewis v. Brooks,* 9:00–CV–1433, 2005 WL 928617, at *3 (N.D.N.Y. Mar. 10, 2005).

**\*2** Inmate Brooks was also incarcerated at Clinton during the time period relevant to plaintiff's claims. (Defs.' Rule 7.1 Statement ¶ 6; AC ¶¶ 8, 12, 21–22; LaBonte Decl. ¶¶ 9–11). As discussed below, defendant LaBonte and others suspected that plaintiff and Brooks were homosexual partners, which plaintiff disputes. Under Department of Correctional Services ("DOCS") Standards of Inmate Behavior, inmates are forbidden to engage in, encourage, solicit or attempt to force others to engage in sexual acts. (Defs.' Rule 7.1 Statement ¶ 7; 7 N.Y.C.R.R. § 270.2 (Disciplinary Rule 101.10)).

In January 2004, plaintiff was a low-ranking inmate on the Clinton church cleaning crew, in terms of seniority. (Defs.' Rule 7 .1 Statement ¶ 10; LaBonte Decl. ¶¶ 6, 16). On January 28, 2004, plaintiff appeared before the APPU program committee and was advised that he and inmate Brooks would not be allowed to work together in a work assignment. (AC ¶¶ 14–15). On January 29, 2004,[FN4] plaintiff filed a grievance describing a conversation that he had with defendant LaBonte on or about January 15, 2004 and complaining of statements made by members of the APPU committee members during the January 28, 2004 meeting. (Defs.' Rule 7.1 Statement ¶ 15; AC ¶¶ 20–23). The January 29, 2004 grievance did not mention defendant Lareau. (Defs.' Rule 7.1 Statement ¶ 17; Dkt. No. 66–9 ("Quakenbush Decl."), Ex. A).

> FN4. While it appears that the grievance dated January 29, 2004 was not actually "filed" until February 2, 2004, in keeping with plaintiff's allegations as set forth in his amended complaint, the Court will refer to this grievance as the January 29, 2004 grievance. (*See, e.g.,* AC ¶¶ 23, 53).

During the winter and spring of 2004, there were occasions when plaintiff was not brought to his job with the Clinton church cleaning crew. (Defs.' Rule

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
**(Cite as: 2010 WL 2682307 (N.D.N.Y.))**

7.1 Statement ¶ 19; AC ¶ 85; LaBonte Decl. ¶¶ 14, 16–22). Even on the days when he was not allowed to attend his church work program, plaintiff received full pay for those days. (Defs.' Rule 7.1 Statement ¶ 22; LaBonte Decl. ¶ 23). On April 16, 2004, defendant Lareau issued a misbehavior report, charging plaintiff with giving items of personal property to inmate Brooks without first obtaining the required authorization. (Defs.' Rule 7.1 Statement ¶ 26; Dkt. No. 66–8 ("Lareau Decl.") ¶ 6; Quakenbush Decl., Ex. B).

On April 16, 2004, correctional officer Charland searched plaintiff's cell and found a pair of scissors, which Charland believed to be contraband, and therefore he issued plaintiff a misbehavior report. (Defs.' Rule 7.1 Statement ¶ 27; Quakenbush Decl., Ex. B). On April 22, 2004, at a Tier II hearing conducted by Lt. Lacy, the charges against plaintiff regarding the scissors were dismissed, and plaintiff entered a plea of guilty to the unauthorized exchange of property charge filed by defendant Lareau. (Defs.' Rule 7.1 Statement ¶ 28; Quakenbush Decl., Ex. B). Plaintiff was sentenced to 15 days keeplock and 15 days loss of privileges. (*Id.*)

In the spring of 2005, plaintiff was transferred from Clinton to the Upstate Correctional Facility CADRE program. (Defs.' Rule 7.1 Statement ¶ 23; Garbera Decl. ¶¶ 10–14). The transfer came about via DOCS administrative processes over which none of three remaining defendants had any control. (Defs.' Rule 7.1 Statement ¶ 24; Garbera Decl. ¶¶ 13–16). At Upstate, plaintiff was placed in a selective and advantageous work program, for which plaintiff had to voluntarily sign a participation agreement. (Defs.' Rule 7.1 Statement ¶ 25l Garbera Decl. ¶¶ 14–15).[FN5]

> FN5. In addition to the facts outlined herein, Defs.' Rule 7.1 Statement includes the following recitation: "There is no competent, relevant, admissible evidence in the record that C.O. LaBonte, Counselor Garbera, or Lt. Lareau were motivated by a grievance to in-

flict any adverse retaliatory action against the plaintiff." Rule 7.1 Statement ¶ 18. While plaintiff admits the information set forth, (*see* Dkt. No. 68, ¶ 3), the Court will not consider this statement to be an uncontested fact, especially since retaliation is at the center of plaintiff's claims.

**B. Plaintiff's Additional Facts**[FN6]

> FN6. This version does not include the uncontested facts set forth above.

**\*3** On January 15, 2004, defendant LaBonte told inmate Peter Grieco, plaintiff's co-worker, that (1) LaBonte believed plaintiff was a homosexual because plaintiff associated with inmate Mark Brooks, and (2) plaintiff and Brooks would not be allowed to work in the same program at the same time. (AC ¶ 8). After inmate Grieco told plaintiff about Grieco's conversation with defendant LaBonte, plaintiff confronted LaBonte about the conversation, whereupon LaBonte repeated the statements to plaintiff, adding that "as long as plaintiff is assigned at the Church, inmate Brooks will 'NEVER' be assigned, for fear of 'homosexual acts' being committed between plaintiff and inmate Brooks." (*Id.* ¶¶ 9–11). In response, plaintiff told LaBonte that he was not homosexual; he had no record of homosexual acts in his file; and was only friends with Brooks. (*Id.* ¶ 12).

When plaintiff appeared before the APPU program committee on January 28, 2004, defendant Garbera told plaintiff that they all knew about plaintiff and inmate Brooks "being an[ ] item," and that plaintiff could not change his work program to be closer to Brooks. (AC ¶¶ 15, 16). Plaintiff told the committee that inmate Brooks was on the waiting list for the church and plaintiff was trying to leave his church job. (*Id.* ¶ 18). Moreover, while plaintiff made it clear to the committee members that he was not and never had been a homosexual, defendants Facteau, Ward and

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
**(Cite as: 2010 WL 2682307 (N.D.N.Y.))**

Garbera told plaintiff that he was *"guilty by association* of being a homosexual, because plaintiff associates and is friends with a 'known' homosexual (inmate Brooks), so get use[d] to being treated like a homosexual is treated in prison." (*Id.* ¶¶ 21, 22). On January 29, 2004, plaintiff filed a grievance against defendants LaBonte, Facteau, Ward, and Garbera concerning LaBonte's statements of January 15, 2004 and the statements and actions of Facteau, Ward, and Garbera on January 28, 2004. (*Id.* ¶ 23). Plaintiff alleges that after these incidents and the filing of the January 29, 2004 grievance, he was subjected to several retaliatory acts, including the loss of his work assignment and four false misbehavior reports, before he was transferred to Upstate in March 2005.

On February 9, 2004, plaintiff wrote to Berg, Assistant Superintendent of Clinton, complaining that plaintiff was not being taken to his church job as a form of retaliation by defendant LaBonte. (AC ¶ 36). On the morning of February 18, 2004, plaintiff was not taken to his job at the church because he "was on call out, as an 'ADD ON' for the A.P.P.U. Law Library." (*Id.* ¶ 38). While at the library, plaintiff and inmate Brooks submitted a request for Brooks to assist plaintiff with his legal work. (*Id.* ¶ 38). While they were still in the library, they were informed by law library officer McLain that their request was denied pursuant to instructions from defendant Garbera that plaintiff and Brooks could not be on library call-out at the same time. (*Id.* ¶ 39). After the conversation between McLain, plaintiff, and Brooks was complete, Garbera stood at the law library window taunting plaintiff and Brooks. (*Id.*) Later that morning, while plaintiff was in line leaving the law library, defendant Garbera approached him and said "GOT YA." (*Id.* ¶ 42).

**\*4** On the afternoon of February 18, 2004, defendant LaBonte did not take plaintiff to his assigned church job. (*Id.* ¶ 43). Plaintiff found out later that day that he had been placed on keeplock as a result of his being "out of place" in the law library. (*Id.* ¶¶ 44–45).

Plaintiff claims that proper procedures for placing him in keeplock were not followed. (*Id.* ¶ 45). On February 18, 2004, plaintiff wrote a letter of complaint to Artus, the Superintendent of Clinton, and Berg outlining "the facts of incidents that occurred earlier in the day," claiming that the actions taken were harassment and retaliation for his January 29, 2004 grievance. (*Id.* ¶ 46). In response to that letter, Berg told plaintiff, among other things, that Berg could not control defendant Garbera's actions, and that law library officer McLain had given plaintiff false information about what Garbera had said about plaintiff and inmate Brooks. (*Id.* ¶ 49).

On February 19, 2004, plaintiff was served with a misbehavior report written by correctional officer Mayo charging plaintiff with, among other things, being out of place and violating rules related to inmate movement. (AC ¶ 47). At the subsequent Tier II hearing, defendant LaBonte testified that he did not take plaintiff to his assigned program that day because plaintiff was listed as an "ADD ON" for the law library for the day in question and was called out of the law library for a meeting with his counselor. (*Id.* ¶ 51). As a result of LaBonte's testimony, plaintiff was found not guilty of the charges contained in the misbehavior report. (*Id.*) Plaintiff wrote to Berg on March 1, 2004 requesting the status of his January 29, 2004 unlawful discrimination grievance against LaBonte, Facteau, Ward, and Garbera which had been pending for 31 days. (*Id.* ¶ 53).

On March 27, 2004, plaintiff was not taken to his church job, although three other members of the church crew were. (AC ¶ 63). On March 29, 2007, when plaintiff asked defendant LaBonte why plaintiff was sometimes not taken to his church job, LaBonte said "because you are not allowed to work inside the Church and will only be used for outdoor work. Faggots, Queers, Homosexuals and Transsexuals are not allowed inside a house of God, and you surly [*sic* ] are one of those, since you are a friend with inmate Brooks." (*Id.* ¶ 64). On April 7, 2004, while plaintiff

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
**(Cite as: 2010 WL 2682307 (N.D.N.Y.))**

was working at the church, defendant LaBonte told plaintiff that he didn't want plaintiff working at the church and stated " 'I won't fire you, I won't refer you to the program Committee. You will resign before I do any of that.' " (*Id.* ¶ 68).

On April 16, 2004, plaintiff was placed on keeplock status for two misbehavior reports. (AC ¶ 71). Plaintiff was then called to defendant Lareau's office, and accused of purchasing items for inmate Brooks. (*Id.* ¶¶ 72, 73). Plaintiff claims that defendant Lareau intimidated plaintiff into admitting that he made purchases for inmate Brooks. (*Id.* ¶ 74). When plaintiff returned to his cell, it was being searched. (*Id.* ¶ 75). Defendant Lareau informed plaintiff that inmate Brooks was told that plaintiff "snitched" on him, and Lareau threatened plaintiff with a transfer to Southport Correctional Facility Special Housing Unit. (*Id.* ¶ 76). Both plaintiff and inmate Brooks were keeplocked pending an investigation of the matter. (*Id.* ¶ 77). On April 17, 2004, plaintiff received two misbehavior reports. (*Id.* ¶ 78). On April 22, 2004, plaintiff was found guilty of purchasing items for inmate Brooks. (*Id.* ¶ 79). The hearing officer told plaintiff that he would not lose his church job as a result of the disciplinary hearing. (*Id.*)

**\*5** On April 23, 2004, defendant LaBonte came to plaintiff's cell to retrieve the inclement weather clothing that plaintiff was issued for his church job; LaBonte demanded that plaintiff give him the winter gloves; plaintiff told defendant LaBonte that the gloves were at the church. (AC ¶ 81). LaBonte told plaintiff that he would have to pay for the gloves. (*Id.* ¶ 82). When plaintiff asked LaBonte if he was fired from his church job, LaBonte said "yes." (*Id.* ¶ 83). Plaintiff asked LaBonte if he was being terminated from his job because of his recent disciplinary proceeding or because LaBonte didn't want him working there. (*Id.*) LaBonte replied "I don't want you there, no faggots, queers or transsexuals work at [his] church area or in a house of God, and the ticket just gives me a reason to get rid of you." (*Id.*) LaBonte also threatened

that he could have plaintiff transferred at any time. (*Id.* ¶ 84).

Beginning on January 29, 2004, defendant La-Bonte did not allow plaintiff to attend his church job for 23 out of 36 working days. (AC ¶ 85). On May 4, 2004, plaintiff appeared before the APPU program committee and was told that he would not be assigned to any program except tailor shop, and therefore he should not ask to be re-assigned to the church. (*Id.* ¶ 89). Plaintiff claims that the church was understaffed, but there was a waiting list of six months to a year for the tailor shop. (*Id.* ¶¶ 90–91).

On October 28, 2004, plaintiff again appeared before the APPU program committee and was told that he would begin a new work program in the tailor shop on November 1, 2004. (AC ¶ 125). Plaintiff was warned that they would not tolerate any trouble from him at the tailor shop "like Plaintiff caused trouble at the Church Job," and plaintiff would be removed from the tailor shop if he caused trouble "and [would be] sent to SHU/Box for longer than he thought possible." (*Id.*) Prior to being assigned to work in the tailor shop, plaintiff was without programming for eight months. (*Id.* ¶ 126). On January 5, 2005, plaintiff appeared before the Clinton APPU Assessment Committee and was asked if he wished to be transferred out of Clinton APPU. (*Id.* ¶ 128). Because he had a list of more than twenty enemies, plaintiff stated that he did not want to be transferred out of APPU. (*Id.*) On January 5, 2005, defendant Garbera told plaintiff " 'You don't file law suits in my jail and expect not to have your ass thrown out of here by us Counselors.' " (*Id.* ¶ 133). On January 12, 2005,[FN7] Garbera told plaintiff " '[y]ou can't stop my method of getting you out of here, I Win.' " (*Id.* ¶ 135). Plaintiff was transferred to Upstate on March 16, 2005. (*See* Dkt. No. 37).

> FN7. While plaintiff's amended complaint states that Garbera's statement was made on January 12, 200**4**, given the sequence of events set forth in plaintiff's amended com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

plaint, it appears that this statement was made on January 12, 2005.

## II. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).

**\*6** In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

## III. *Retaliation*

Any action taken by a defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in and of itself, states a viable constitutional claim. *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988). In order for plaintiff's retaliation claim to survive summary judgment, plaintiff must establish that

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

*Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002).

The Second Circuit has defined "adverse action" in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003))

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
**(Cite as: 2010 WL 2682307 (N.D.N.Y.))**

(omission in original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

**\*7** The court must keep in mind, however, that claims of retaliation are " 'easily fabricated' " and " 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration' " and thus, plaintiff must set forth non-conclusory allegations. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (quoting *Dawes,* 239 F.3d at 491). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett,* 343 F.3d at 137.

**A. Defendants Lareau and Garbera**

In his opposition to Defendants' motion for summary judgment, plaintiff states that he is withdrawing all claims against Lareau and Garbera. (Dkt. No. 68 ¶ 2). Therefore, with respect to all of the claims against Garbera and Lareau, defendants' motion for summary judgment should be granted. *See e.g. Rosen v. City of New York,* No. 07 Civ. 6018, 2009 WL 3489986, at \*2 (S.D.N.Y. Oct. 28, 2009) (granting summary judgment with respect to claims withdrawn by plaintiff).

**B. Defendant LaBonte**

Plaintiff states that he filed a grievance on January 29, 2004 against defendant LaBonte complaining of comments made by defendant LaBonte on January 15, 2004 regarding plaintiff's sexual orientation, comments which plaintiff believed to be discriminatory. (AC ¶¶ 8–12, 22; *see also* Dkt. No. 66–10 at 12–14) ("January 29, 2004 grievance").[FN8] Defendants have submitted a copy of the January 29, 2004 grievance. (Dkt. No. 66–10 at 12–14). Plaintiff captioned the grievance *"UNLAWFUL DISCRIMINA-TION GRIEVANCE AGAINST: SGT. FACTO, COUNSELOR GARBERRA & MR. WARD."* (*Id.* at 12). At first glance, the grievance does not appear to

be filed against defendant LaBonte. (*Id.*) However, the body of the grievance does recount statements by defendant LaBonte as well as a conversation that plaintiff had with defendant LaBonte, clearly suggesting that plaintiff believed that defendant LaBonte was discriminating against plaintiff on the basis of what LaBonte perceived to be plaintiff's sexual orientation. (*Id.*) Moreover, Defendants' Rule 7.1 Statement concedes that plaintiff filed the January 29, 2004 grievance against LaBonte. (*See* Defs .' Rule 7.1 Statement ¶ 15). Therefore, despite its caption, the Court will consider the January 29, 2004 grievance to have been filed against defendant LaBonte. On February 9, 2004, plaintiff also submitted a letter to Berg complaining that defendant LaBonte was not taking plaintiff to his church job in "retaliation." (AC ¶ 36).

> **FN8.** The grievance is actually dated January 28, 2004, however, for sake of consistency the Court will still refer to it as the January 29, 2004 grievance. (*See* Dkt. No. 66–10 at 12).

There is no dispute that plaintiff's complaint and grievance constitute protected activity. *See Davis,* 320 F.3d at 352–53 (filing a prison grievance is a constitutionally protected activity). *See also Chavis v. Struebel,* 317 F.Supp.2d 232, 237–38 (N.D.N.Y.2004) (finding that letter of complaint could be basis for retaliatory conduct). Therefore, plaintiff meets the first prong of the test for retaliation. Plaintiff must further show that he suffered adverse action, and that there was a causal connection between that adverse action and the protected activity. If plaintiff can make these two showings, the court must determine whether defendants have established that they would have taken the same action even in the absence of the protected conduct.

**\*8** Plaintiff claims that, in retaliation for plaintiff's grievance and complaint against defendant LaBonte, LaBonte reduced the number of hours plaintiff was allowed to work at his church job.[FN9] (AC ¶ 85).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
**(Cite as: 2010 WL 2682307 (N.D.N.Y.))**

Construing plaintiff's amended complaint with great liberality, plaintiff may also allege that defendant LaBonte had plaintiff terminated from his church job in retaliation for plaintiff's grievance against LaBonte. (AC ¶ 83). Neither party has addressed this claim in their papers in support of or in opposition to the present motion. Plaintiff has, however, provided the Court with a copy of DOCS Directive # 4803, Inmate Program Placement. (Dkt. No. 68 at 11–13). That directive provides that the Program Chairperson of the Inmate Program Assignment Committee "shall be responsible for all program assignments and removals." (*Id.* at 12). Since defendant LaBonte is not alleged to be the Program Chairperson of the Inmate Program Assignment Committee, no reasonable factfinder could conclude that defendant LaBonte had the authority to remove plaintiff from his church job.

> FN9. In his amended complaint, plaintiff also alleged that defendant LaBonte retaliated against plaintiff by issuing plaintiff a false misbehavior report on April 24, 2004. (AC ¶ 86). LaBonte's misbehavior report claimed that plaintiff lost state issued gloves. (*Id.*) Plaintiff admitted that he lost the gloves and entered a plea of guilty to the charge. (*Id.* ¶ 95). In his March 26, 2009 Decision and Order, District Judge Suddaby noted that "[w]hen it is undisputed that an inmate has in fact committed prohibited conduct, no retaliatory discipline claim can be sustained." (Dkt. No. 65 at 25) (citing *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). Since Plaintiff admitted that he lost the state issued gloves, Defendant LaBonte would have taken the adverse action even in the absence of the protected conduct, and that portion of plaintiff's retaliation claim against LaBonte was dismissed by Judge Suddaby. (Dkt. No. 65 at 25).

Plaintiff alleges that, beginning on January 29, 2004, defendant LaBonte refused to let plaintiff attend his church job for a total of 23 out of 36 working days. (AC ¶ 85). As discussed below, on some of those occasions, plaintiff did not attend due to reasons beyond defendant LaBonte's control. Further, defendant LaBonte points out that plaintiff received full pay even on the days that he was held back from his job. (LaBonte Decl. ¶ 22).

A job reassignment or termination can under certain circumstances constitute adverse action necessary to support a claim of retaliation. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) ("[A] claim for relief may be stated under section 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights."); *Baker v.. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990) ("a claim for relief can be stated under section 1983 for job for reassignments or terminations which were in retaliation for an inmate's efforts to seek vindication of his [or her] legal rights ..."); *Gill v. Calescibetta,* No. 9:00–CV–1553, Report and Recommendation, 2009 WL 890661, at *11–12 (N.D.N.Y. Mar. 11, 2009) (Peebles, M.J.), *adopted* 2009 WL 890661, at *1–4 (N.D.N.Y. Mar. 31, 2009) (Suddaby, J.) (the termination of a job assignment can constitute adverse action for purposes of a retaliation analysis). As noted, defendant LaBonte was not in a position to terminate or change plaintiff's job assignment. This court doubts that plaintiff could establish that periodically keeping him from attending a job, with no monetary or other apparent penalty, constitutes the type of "adverse action" that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights. We need not resolve whether plaintiff has demonstrated the existence of a genuine issue of material fact as to whether defendant LaBonte took adverse action against plaintiff because, as discussed below, summary judgment can be predicated more securely on other grounds.

**\*9** To show retaliation in violation of the First Amendment, a plaintiff must demonstrate that constitutionally protected conduct was a substantial or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
**(Cite as: 2010 WL 2682307 (N.D.N.Y.))**

motivating factor for a prison official's adverse action. *Bennett,* 343 F.3d at 137. Plaintiff claims that because LaBonte's adverse actions began ***after*** plaintiff filed a grievance against him, the actions were in retaliation for the grievance.

> However, more than conclusory allegations [of a causal connection] are required to survive a summary judgment motion. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *Bartley v.. Collins,* No. 95 Civ. 10161, 2006 WL 1289256 (S.D.N.Y. May 10, 2006). Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives. *Colon,* 58 F.3d at 872–73; *Bartley,* 2006 WL 1289256, at *8.

> *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007) (Hurd, J.). Plaintiff asserts that because defendant LaBonte began excluding him from his assigned church job ***immediately*** after plaintiff filed a grievance against him, "it is clear that the only reason why plaintiff was excluded from the work crew was because of the grievance that he filed against Officer LaBonte." (Dkt. No. 68 at 7).

In this case, plaintiff filed a grievance against defendant LaBonte on January 29, 2004. (AC ¶ 23). Beginning on that date, plaintiff claims that defendant LaBonte did not take plaintiff to his church job for 23 out of the next 36 working days. (*Id.* ¶ 85). The close proximity in time between the filing of grievance and LaBonte's action in not taking plaintiff to his assigned job is evidence which could lead a reasonable fact-finder to conclude that LaBonte's actions were causally related to plaintiff's grievance against him. *See Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."). *See also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)

(temporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation).

Plaintiff argues further that defendant LaBonte's conduct was retaliatory because "just prior to the grievance being filed" plaintiff had received "positive evaluations" from defendant LaBonte with respect to plaintiff's work at the church. (Dkt. No. 68 at 7). While evidence of plaintiff's ***"prior*** good discipline" might suggest that LaBonte's actions subsequent to the grievance were be retaliatory, in this case, one of the evaluations submitted by plaintiff was actually dated February 12, 2004—after plaintiff filed a grievance against LaBonte. (*Id.* at 9). Defendant LaBonte's February 12, 2004 evaluation actually praises plaintiff's work performance and in fact recommends that plaintiff receive a pay increase. (*Id.*) This evidence suggests that defendant LaBonte was ***not*** taking retaliatory action against plaintiff. If defendant LaBonte was truly intent on retaliating against plaintiff and keeping him from his church job for improper motives, LaBonte could have issued plaintiff an unsatisfactory evaluation and would not have recommended a pay increase.

**\*10** Plaintiff's own statements provide further evidence to undercut his argument that LaBonte was retaliating against plaintiff on account of his January 29, 2004 grievance. When appealing another grievance, plaintiff stated that his misbehavior report for being "out of place" in the law library "was dismissed ONLY after Corrections Officer G. LaBonte, appeared at [plaintiff's] hearing and stated that [plaintiff] DID IN FACT" have library call out on the day in question. (Dkt. No. 66–10 at 10). LaBonte's conduct in this instance-in February 2004–is totally opposite to an act of retaliation.

This court doubts that, despite the evidence of temporal proximity, plaintiff could persuade a reasonable factfinder that his grievance against LaBonte was a substantial or motivating factor in LaBonte's

decision to exclude plaintiff from the church work program. Again, however, we need not resolve this issue and will recommend summary judgment on other grounds.

Even though plaintiff has arguably presented some evidence to establish a link between the protected activity and the alleged retaliation,

[a] defendant is entitled to summary judgment on a retaliation claim "if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone." *Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999). "A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration," for two reasons. *Graham [v. Henderson],* 89 F.3d [75,] 79 [2d Cir.1996]. First, "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Id.* Second, "we have been cautioned to recognize that prison officials have broad administrative authority." *Id.*

*Miller v. Loughren,* 258 F.Supp.2d 61, 62 (N.D.N.Y.2003) (Munson, S.J.). *See also Bennett,* 343 F.3d at 139 (Once plaintiff produces evidence sufficient to raise a material question of fact as to retaliation, the burden shifts to the defendant to demonstrate through admissible evidence that the challenged actions would have occurred in any event.).

The record contains the affidavit of defendant LaBonte wherein he asserts that plaintiff was not taken to his assigned job on numerous occasions for legitimate administrative reasons. *See generally* LaBonte Decl. Defendant LaBonte was the officer primarily charged with supervising the church work crew. (LaBonte Decl. ¶ 4; Defs.' Rule 7.1 Statement ¶ 4). Defendant LaBonte states, and plaintiff concedes, that plaintiff was a low-ranking inmate on the church cleaning crew. (Defs.' Rule 7.1 Statement ¶ 10; Pl.'s

Response to Defs.' Rule 7.1 Statement ¶ 3). In fact, LaBonte states that plaintiff was "one of the least senior members of the church crew, if not the lowest ranking." (LaBonte Decl. ¶ 6). As the supervising officer for the church work crew, it was LaBonte's responsibility to determine on a day to day basis how many inmates were needed to complete jobs at the church on any given day. (LaBonte Decl. ¶ 17). This determination was made based upon the amount of work to be done on a particular day. (*Id.*) If there were insufficient jobs to be completed on any given day, plaintiff, "[a]s the junior member of the church detail ... would be the first to be cut." (*Id.*)

**\*11** Defendant LaBonte further states that during the period in question, plaintiff did not attend his work program at the church for various reasons beyond LaBonte's control. (LaBonte Decl. ¶¶ 21–22). For example, plaintiff missed some days because he had signed up to attend library call out. (*Id.* ¶ 21). In February 2004, plaintiff was keeplocked as a result of a disciplinary report issued by correctional officer Mayo. (*Id.*) On April 2, 2004, plaintiff had a medical call out; on April 8–9, 2004, the church crew did not work because the church was used for religious observances; and on April 16, 2004 plaintiff was keeplocked. (*Id.*) On other days, when defendant LaBonte was not scheduled to work, LaBonte's relief officer decided whether or not plaintiff attended his church job. (*Id.* ¶ 22). Defendant LaBonte points out that plaintiff received full pay for the days he was not included in the church work crew. (*Id.* ¶ 23).

LaBonte further states that "[t]ensions had developed between [plaintiff] and other church crew inmates because of the situation with inmate Brooks." (LaBonte Decl. ¶ 18; *see also* Dkt. No. 68 at 9 (Inmate Progress Report dated February 12, 2004 wherein LaBonte noted that "Inmate Vega has had minor disagreements with coworkers, but has been able to work through them.")). LaBonte states that members of the church crew reside in the same cell block, and other members of the crew were aware of Brooks' attempt to

join the crew, and "resented that an inmate 'couple' might become part of their work crew." (LaBonte Decl. ¶ 12). Because plaintiff was attempting to get his friend Brooks assigned to the church crew, LaBonte believed that the other members of the church work crew felt that plaintiff "was pushing to get a benefit which other prisoners knew better than to seek." (*Id.* ¶ 13). Tensions among inmates present security concerns because they can give "rise to an increased potential for violence during work at the church" and present "a danger to inmates as well as to the single security officer attending the work detail." (*Id.* ¶ 18). Because of this tension, LaBonte states that "if the church job could be done with one less inmate [he] would choose to leave [plaintiff] behind." (*Id.*)

LaBonte states that, based upon his observations of the behavior of plaintiff and Brooks, as well as upon reports from security staff and other inmates, he believed that plaintiff and Brooks might be involved in a homosexual relationship.[FN10] (LaBonte Decl. ¶ 7). The existence of such a relationship is not relevant; rather, LaBonte's and Garbera's statements are evidence of LaBonte's state of mind or perception. The fact that LaBonte **perceived** that such a relationship may have existed between plaintiff and Brooks demonstrates only the **reasonableness** of LaBonte's actions and his concern that the security of the facility could be implicated by such a perceived relationship.[FN11]

FN10. Defendant Garbera, a Corrections Counselor at Clinton, has stated that during the time relevant to plaintiff's allegations, he "recall [ed] noting that [plaintiff's] attentive behavior toward inmate Brooks—who was making overt efforts to present himself as female—suggested [plaintiff's] interest in a homosexual relationship. Not only would this violate DOCS regulations, it carried a potential for physical danger. We were aware of the facts of the plaintiff's Broome County conviction, an extremely violent rape and homicide. We had to be concerned about the

possibility of similar behavior." (Garbera Decl. ¶ 19).

FN11. A fact is "material" only if it has some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248. *See also Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248

**\*12** Defendant LaBonte has thus provided permissible reasons for keeping plaintiff from his job assignment-namely staffing and security concerns.[FN12] *See, e.g., Hudson v. McMillan,* 503 U.S. 1, 6 (1992) (noting that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security ." (internal quotation marks and citation omitted). Plaintiff has not submitted sufficient evidence to raise a question of fact as to the reasonableness of defendant LaBonte's actions, but relies only upon his own conclusory statement that "[b]ecause of the positive Work Performance Evaluations that plaintiff received during his period assigned to the Cleaning Crew, there is no other plausible excuse for LaBonte to hold back" plaintiff from the church cleaning crew except in retaliation for plaintiff's grievance against LaBonte. (Dkt. No. 68 at 5). Plaintiff's statement that there is no "other plausible excuse" for defendant LaBonte's actions is contradicted by the actual facts in this case, and plaintiff's retaliation claim fails because LaBonte has produced sufficient evidence that he would have taken the same action for valid reasons. *See Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996) (finding that even assuming that a retaliatory motive existed, defendant would still be entitled to summary judgment because there are "proper, non-retaliatory reasons" for the actions taken). *See also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (A finding of sufficient

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
**(Cite as: 2010 WL 2682307 (N.D.N.Y.))**

permissible reasons to justify state action is "readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority.") (quotation marks omitted).

> FN12. Defendant LaBonte's decision to have only enough inmates present at the church on a given day to complete the required jobs is reasonable. It is also reasonable to assume that idle inmates would present more of a security concern than inmates who are kept busy performing required tasks.

Accordingly, I find that no reasonable factfinder could conclude in plaintiff's favor with respect to the retaliation claim against defendant LaBonte. Thus, plaintiff's claim that defendant LaBonte retaliated against plaintiff for filing a grievance or complaint should be dismissed.

**IV.** *Equal Protection*

Plaintiff claims that defendant LaBonte denied him equal protection by not allowing plaintiff to attend his prison job because the defendant LaBonte believed plaintiff to be a homosexual.

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.* 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, *or malicious or bad faith intent to injure a person.' "* *Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005) (emphasis in original) (quoting *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980)).

**\*13** "Sexual orientation has been held to be a basis for an equal protection claim under Section 1983." *Emblen v. Port Authority of New York/New Jersey,* No. 00 Civ. 8877, 2002 WL 498634, at \*7 (S .D.N.Y. Mar. 29, 2002) (citing *Quinn v. Nassau County Police Dep't,* 53 F.Supp.2d 347, 356–57 (E.D.N.Y.1999) (noting that the Supreme Court has found that government discrimination against homosexuals, in and of itself, violates the Equal Protection Clause) (citing *Romer v. Evans,* 517 U.S. 620 (1996)). *See also Holmes v. Artuz,* 95 CIV. 2309, 1995 WL 634995, at \*1 (S.D.N.Y. Oct. 27, 1995) (removal from a prison job because of declared sexual orientation may state a claim under Section 1983) (citing *Kelley v.. Vaughn,* 760 F.Supp. 161, 163 (W.D.Mo.1991) (denying motion to dismiss on ground that inmate who claims his bakery prison job was terminated solely because of sexual orientation may have a valid equal protection claim)); *Howard v. Cherish,* 575 F.Supp. 34, 36 (S.D.N.Y.1983) (recognizing in dicta that complaint might state claim under § 1983 if it alleged that individual was discriminated against solely because of sexual orientation).

Defendant LaBonte correctly contends that plaintiff has no right to his prison job. *See Gill v. Mooney,* 824 F.2d at 194. However, that is not the question presented on this equal protection claim. Instead, the question is whether plaintiff was protected from discrimination based upon his perceived sexual orientation. In this respect, District Judge Suddaby has already concluded that plaintiff stated an equal protection claim sufficient to survive a motion to dismiss or for judgment on the pleadings.[FN13] (Dkt. No. 65 at 24–25). *See also Bussey v. Phillips,* 419 F.Supp.2d 569, 588 (S.D.N.Y.2006) ("A '[p]laintiff has no right to any particular prison job, but prison officials cannot discriminate against him on the basis of [an impermissible consideration] in work assignments.' ")[FN14] (quoting *LaBounty v. Adler,* No. 89 Civ. 4242, 1999 WL 961776, at \*2 (S.D.N.Y. Oct. 21, 1999) (other citation omitted).

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
**(Cite as: 2010 WL 2682307 (N.D.N.Y.))**

FN13. Despite the fact that plaintiff's equal protection allegations survived the pleading stage, the standard of proof at summary judgment is more demanding; plaintiff's allegations "must be supported by specific facts raising a genuine issue for trial." *Bussey,* 419 F.Supp.2d at 582.

FN14. In *Bussey,* the impermissible consideration was race. *Id* .

Plaintiff has alleged that defendant LaBonte did not allow plaintiff to attend his church job on multiple occasions, even though other inmates were taken to their church job on those days, because LaBonte perceived plaintiff to be homosexual. (AC ¶¶ 36, 52, 53, 63, 64, 83, 85). The fact that plaintiff asserts that he is not homosexual is irrelevant to his equal protection claim. *See Emblem,* 2002 WL 498634 at *7 (when plaintiff alleges denial of equal protection on the basis of homosexuality, the fact that plaintiff is not a homosexual is "irrelevant").

In *Romer v. Evans,* the Supreme Court, without specifically examining whether homosexuals are a suspect class, used the rational basis test to invalidate an amendment to the Colorado constitution prohibiting all governmental action designed to protect homosexuals from discrimination. *Romer,* 517 U.S. at 631–35. *See also Anderson v. Branen,* 799 F.Supp. 1490, 1492 (S.D.N.Y.1992) ("An equal protection analysis of discriminatory acts against homosexuals must be conducted pursuant to a rational basis test."). Thus, in order to establish an equal protection violation, plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation and internal quotations omitted)

**\*14** As stated above, defendant LaBonte has set forth numerous legitimate penological reasons supporting his decision to exclude plaintiff from the church work crew on multiple occasions, the most important being the need to maintain prison security and order. *See Hudson,* 503 U.S. at 6 (noting that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (internal quotation marks and citation omitted)).

[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of ... convicted prisoners .... '[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.'

...

Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel .... Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee ... the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.

*Bell v. Wolfish,* 441 U.S. 520, 546–47 (1979) (internal citations and footnote omitted). *See also Griffin v. Donelli,* No. 05–CV–1072, Report–Recommendation and Order, 2010 WL 681394, at *11 (N.D.N.Y. November 24, 2009) (Homer, M.J.), *adopted* on *de novo* review, 2010 WL 681394, at * 1 (N.D.N.Y. Feb. 24, 2010) (McAvoy, S.J.) (finding that "[o]rder [and] security ... are valid and substantial penological interests that staff in a prison environment are entitled to, and are in fact required to act upon.").

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

Based upon his observations of interactions between plaintiff and inmate Brooks as well as reports from security staff and other inmates, defendant LaBonte was concerned that conflicts might arise between plaintiff and other members of the church crew. (LaBonte Decl. ¶ 12–13). Defendant LaBonte's concerns were validated by LaBonte's receipt of a letter from inmate Brooks indicating that a member of the church work crew (not plaintiff) had made sexual advances to Brooks which were refused. (*Id.* Ex. A). A reasonable factfinder could conclude that this letter, coupled with LaBonte's suspicion that plaintiff and inmate Brooks might be involved in a relationship, provided a reasonable basis for LaBonte to believe that plaintiff's presence in the church work crew could present safety concerns.

Apart from defendant LaBonte's reasons for excluding plaintiff from his assigned job, plaintiff's own statements are fatal to his claim that defendant LaBonte discriminated against him on the basis of plaintiff's perceived sexual preference. In his January 29, 2004 grievance, plaintiff stated that "I was soon to learn that it *WAS NOT* Officer LaBonte who was DISCRIMINATING against me and Inmate Brooks, but a Superior Officer, who gives the orders. (Dkt. No. 66–10 at 13) (emphasis in original).

**\*15** Based upon the evidence, a reasonable factfinder could conclude that defendant LaBonte's concern for institutional safety, his attempt to maintain staffing on the church work crew at reasonable levels, and his policy of cutting the hours of more junior members of the work crew first, all suffice to satisfy the rational basis test and constitute legitimate reasons to exclude plaintiff from the church work crew on various days. Moreover, no reasonable factfinder could conclude that defendant LaBonte had the authority to remove plaintiff from his church job. Accordingly, I find that no reasonable factfinder could conclude in plaintiff's favor with respect to the equal protection claim against LaBonte. Thus, plaintiff's claim that defendant LaBonte violated plaintiff's right to equal protection should be dismissed.

**V.** *Qualified Immunity*

In the alternative, defendants argue that they are entitled to qualified immunity with respect to plaintiff's claims that he was retaliated against for engaging in a protected activity in violation of the First Amendment and denied equal protection in violation of the Fourteenth Amendment. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), *modified by Pearson v. Callahan,* ––– U.S. ––––, 129 S.Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory in all cases"). The Court may also examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. However, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. Since the Court has concluded in this case that no First or Fourteenth Amendment violations occurred, the Court need not address qualified immunity.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the motion for summary judgment filed on behalf of defendants Lareau, LaBonte, and Garbera (Dkt. No. 66) be **GRANTED** and the amended complaint be **DISMISSED WITH PREJUDICE AS TO ALL REMAINING DEFENDANTS AND CLAIMS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to

Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)
**(Cite as: 2010 WL 2682307 (N.D.N.Y.))**

file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72.

N.D.N.Y.,2010.
Vega v. Lareau
Not Reported in F.Supp.2d, 2010 WL 2682307 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
**(Cite as: 2002 WL 731691 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Charles WOODS, Plaintiff,

v.

Glenn S. GOORD, Commissioner Docs; Dr. Lester N.
Wright, M.D., Mph Associate Commissioner Chief
Medical Officer; Charles G. Greiner, Superintendent
of Green Haven Corr. Fac.; Dr. Norman Salwin,
Acting Health Service Director Green Haven Corr.
Fac.; Dr. Carl J. Koenigsmann, Green Haven Corr.
Fac. Health Service Director; Lawrence Zwillinger,
Regional Health Servens Administrator; Dr. Charles
John Bendheim, Medical Doctor; Dr. Lester S. Silver,
U.P.D. Medical Provider; Dr. Steven Weinstent,
U.P.D. Physiatrist; Barbara Whitney, Medical Rec-
ords Clerk; Dr. John Galeno; M. Jones, Correctional
Officer; Correction Physician Services, Inc. (CPS),[FN1]
Defendants.

> FN1. Plaintiff refers to Charles Greiner as
> "Grenier" at times, Greiner at other times,
> and occasionally just "Charles," but is suffi-
> ciently precise such that the Superintendent
> of Green Haven, Charles Greiner, can be
> identified. The correct spelling of "Salwin"
> appears to be Norman Selwin. *See* Defend-
> ants' (Goord et al.) Memorandum in Support
> of Motion to Dismiss ("Goord Def. Mem .")
> at 1. While defense counsel uses the name
> Weinstent, *see* Galeno Defendants' Memo-
> randum in Support of Motion to Dismiss
> ("Galeno Def. Mem.") at 1, the correct
> spelling appears to be Weinstein.

No. 01 CIV. 3255(SAS).
April 23, 2002.

Charles Woods # 82–A–5434, Unit for the Physically
Disabled, Green Haven Correctional Facility,
Stormville, for Plaintiff (Pro Se).

Melinda Chester–Spitzer, Assistant Attorney General,
Office of the Attorney General of the State of New
York, New York, for Defendants Goord, Wright,
Greiner, Selwin, Koenigsmann, Zwillinger,
Bendheim, Silver and Whitney.

Tracy M. Larocque, Esq., Pennock & Breedlove LLP,
Clifton Park, for Defendants Weinstein, Galeno and
CPS.

OPINION AND ORDER
SCHEINDLIN, D.J.

**\*1** Charles Woods, proceeding *pro se,* brings this
action pursuant to 42 U.S.C. § 1983 against the New
York Department of Corrections ("DOCS") and its
officials, and various supervisors, health care provid-
ers and employees of Green Haven Correctional Fa-
cility ("Green Haven"), for failing to provide him with
medical care in violation of the Eighth Amendment.
Woods also brings claims under Title II of the Amer-
icans With Disabilities Act ("ADA"), 42 U.S.C. §
12132, and section 504 of the Rehabilitation Act of
1973, 29 U.S.C. § 794, for discrimination on the basis
of disability. He seeks monetary damages and injunc-
tive relief.

Defendants Glenn Goord, Lester Wright, Charles
Greiner, Norman Selwin, Carl Koenigsmann, Law-
rence Zwillinger, Charles John Bendheim, Lester
Silver, and Barbara Whitney (collectively, the "Goord
defendants") now move to dismiss the Complaint and
Amended Complaint pursuant to Rule 12(b)(6). De-
fendants Steven Weinstein, John Galeno and Correc-
tion Physician Services ("CPS") (the "Galeno de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
**(Cite as: 2002 WL 731691 (S.D.N.Y.))**

fendants") move to dismiss all claims pursuant to Rule 12(c). For the reasons below, the motions are granted in part and denied in part. The claims against the remaining defendants are dismissed.[FN2]

> FN2. There are five additional defendants. "M. Jones" is named in the caption of the Amended Complaint, but apparently has not been served. Additional defendants are mentioned in the body of the Amended Complaint: "Selim Ace," "Mar[ ]y Kate Moddox Williams," "Randy Duprey," and DOCS. See 6/18/01 Amended Complaint ("Am.Compl.") ¶¶ (F); (O)-(P); (T). Although these individuals and this entity are not listed in the caption, I will treat them as if they were named defendants. In addition, I will construe the plaintiff's opposition papers to contain factual allegations to the extent that they are consistent with the allegations in the Amended Complaint. See *Burgess v. Goord,* No. 98 Civ.2077, 1999 WL 33458, at *1 n. 1 (S.D.N.Y. Jan. 26, 1999) ("In general, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.") (citing cases); *see also Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (stating that courts should include in their analysis of motions to dismiss "not only the assertions made within the four corners of the Complaint itself, but also those contained in the documents attached to the pleadings or in documents incorporated by reference.").

## I. BACKGROUND

The following allegations are drawn from the Amended Complaint and Woods's opposition papers.

### A. The Parties

Charles Woods is a 63–year–old prisoner currently incarcerated at Green Haven Correctional Facility ("Green Haven") in Stormville, New York. *See* Am. Compl. ¶ (D) at 2; 1/11/02 Plaintiff's Opposition to Defendants' Motion ("Pl.Opp.2d") at 10.[FN3] Defendant Glenn Goord is the Commissioner of DOCS. *See* Am. Compl. ¶ (G) at 2. Defendants Lester Wright, M.D., and Lawrence Zwillinger, are DOCS's Chief Medical Officer and Regional Health Administrator, respectively. *See id.* ¶¶ (I), (L) at 3. Defendant Charles Greiner is the Superintendent of Green Haven. *See id.* ¶ (H) at 2. Defendants Norman Selwin and Carl J. Koenigsmann are Green Haven's Medical Director and Health Services Director, respectively. *See id.* ¶¶ (J), (K) at 3. Dr. Lester S. Silver is the Medical Director for Green Haven's Unit for the Physically Disabled ("UPD"), where plaintiff resides. *See id.* ¶ (N) at 3.

> FN3. Plaintiff submitted a first opposition brief on December 6, 2001. *See* 12/6/01 Objection to Motion and Conference Hearing.

Plaintiff has also sued the following health care professionals. Doctors Charles J. Bendheim, Steven Weinstein and John Galeno each treated plaintiff directly. Dr. Bendheim was the primary care physician for plaintiff and other physically disabled inmates at the time of most of the alleged events. *See id.* ¶ (M) at 3. Defendant Selim Ace is a physical therapist employed by DOCS, and defendant Mary Kate Moddox Williams is his assistant. *See id.* ¶¶ (O)-(P) at 4.

### B. Summary of Woods's Medical History at Green Haven

Woods was first incarcerated at Green Haven in December 1995. *See id.* ¶ 1. In early 1996, Woods asked to see a doctor after he began experiencing pain in his hands, knees, elbows, hips and back. *See id.* ¶ 3. He was seen by Dr. Bendheim, who referred him to Dr. Helen Feng, a rheumatologist at Albany Medical Center ("AMC"). *See id.* Dr. Feng examined Woods on May 31, 1996, the first of many such visits. *See id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
**(Cite as: 2002 WL 731691 (S.D.N.Y.))**

Feng and other specialists have since determined that Woods suffers from Rheumatoid Arthritis, Degenerative Joint Disease and leukemia. *See id.* ¶¶ 2, 20. From 1996 to the present, plaintiff has thus required extensive care, including chemotherapy.

**\*2** Woods alleges that from 1996 to 1999, Dr. Bendheim delayed or did not schedule many specialist-ordered appointments. He alleges that, following surgery on Woods's elbow in 1999, Dr. Weinstein denied him physical therapy in 2000 and 2001. Plaintiff also alleges that from 1996 to the present he has requested, but has been denied, surgery to replace his knees, hips, and elbows with prostheses. In addition, since 1996, Woods has consistently requested a lightweight wheelchair due to the extreme pain he experiences in trying to operate his current, heavy wheelchair. These allegations are fully discussed in Part IV, *infra.*

On April 19, 2001, after years spent exhausting prison grievance procedures, *see infra* note 16, plaintiff filed his original Complaint. *See* 4/19/01 Complaint ("Compl."). On June 21, 2001, plaintiff filed an Amended Complaint. Plaintiff seeks $250,000 in compensatory damages from each defendant for a total of $5,000,000. *See id.* ¶¶ 34, (A)-(C).[FN4]

> FN4. Plaintiff does not address the fact that $250,000 multiplied by the number of defendants (17) does not equal $5,000,000.

## II. LEGAL STANDARD

A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000) (quotation marks and citation omitted).[FN5] "At the Rule 12(b)(6) stage, [t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of

the pleading that a recovery is very remote and unlikely but that is not the test." *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000) (citation, quotation omitted).[FN6] The task of the court in ruling on a Rule 12(b)(6) motion is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' *Id.* (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "take as true all of the allegations contained in plaintiff's complaint and draw all inferences in favor of plaintiff." *Weinstein v. Albright,* 261 F.3d 127, 131 (2d Cir.2001).

> FN5. Plaintiff opposes *summary judgment* in his 40–page brief, to which nearly one hundred pages of exhibits are attached. *See* Pl. Opp.2d. But because defendants moved to dismiss for failure to state a claim, they need not comply with Local Rules 3(g) or 56.1, or any other rule pertaining to summary judgment, as plaintiff argues.

> FN6. The same standard applies to Rule 12(c) motions to dismiss. Fed.R.Civ.P. 12(c); *see Simpri v. New York City Agency for Children's Servs.,* No. 99 Civ. 6712, 2001 WL 1661910, at *2 (S.D.N .Y. Dec. 28, 2001) (citing *Irish Lesbian and Gay Org. v. Giuliani,* 143 F.3d 638, 644 (2d Cir.1998)).

Because "most pro se plaintiffs lack familiarity with the formalities of pleading requirements, [courts] must construe pro se complaints liberally, applying a more flexible standard to evaluate their sufficiency." *Lerman v. Board of Elections in the City of New York,* 232 F.3d 135, 140 (2d Cir.2000) (citing *Hughes v. Rowe,* 449 U.S. 5, 9–10 (1980), and *Haines v. Kerner,* 404 U.S. 519, 520–21 (1972)). Courts must remain particularly "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations." *Gregory,* 243 F.3d at 691. "Com-

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
**(Cite as: 2002 WL 731691 (S.D.N.Y.))**

plaints based on civil rights statutes must include specific allegations of facts showing a violation of rights instead of a litany of general conclusions that shock but have no meaning." *Burgess,* 1999 WL 33458, at *2 (citing, *inter alia, Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987)). "However, assertions must truly be bare for dismissal to be appropriate." *Id.* (citing *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 672 (2d Cir.1995)).

### III. ELEVENTH AMENDMENT IMMUNITY

**\*3** Plaintiff brings both federal and state claims against all defendants, including state agencies DOCS and CPS, in their official as well as individual capacities. *See* Am. Compl. ¶¶ (D)-(V) ("The Parties"), 32–33.

### A. Federal Claims

The Eleventh Amendment bars suit in federal court by a citizen of a state against a state or its agencies, unless the state has waived immunity to suit, *see Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100–01 (1984), or Congress has abrogated the state's immunity, *see Quern v. Jordan,* 440 U.S. 332, 343–44 (1979). *See also Farricelli v. Holbrook,* 215 F.3d 241, 244–45 (2d Cir.2000); *Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993). Because New York has not waived its immunity, *see Oyague v. State,* No. 98 Civ. 6721, 2000 WL 1231406, at *5 (S.D.N.Y. Aug. 31, 2000), and 42 U.S.C. § 1983 was not intended to abrogate states' immunity, *see Quern,* 440 U.S. at 343–44, the Eleventh Amendment bars plaintiff's claims against both DOCS and CPS because they are state agencies.[FN7]

> FN7. Woods's claims against DOCS and CPS in their individual capacities are dismissed for failure to state a claim.

A state official is also entitled to invoke Eleventh Amendment immunity to the extent that she is sued in her official capacity, because such suit is deemed to be one against the state itself. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998). In addition, suits for monetary damages from the state treasury are barred. *See Edelman v.. Jordan,* 415 U.S. 651, 677 (1974). Thus, plaintiff's claims for money damages against the defendants in their official capacities are dismissed for failure to state a claim on which relief may be granted. *See Spencer,* 139 F.3d at 111; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993).

### B. State Law Claims

Plaintiff alleges negligence and violations of New York State Corrections Law against all defendants. *See* Am. Compl. ¶¶ 32–33. Absent a waiver by the state, however, the Eleventh Amendment also bars *state law* claims against state officials in their official capacity. *See Pennhurst,* 465 U.S. at 99–101. New York has made no such waiver. To the contrary, New York explicitly bars state law claims brought by state prisoners against state law correction personnel in federal court, *see* N.Y. Corr. Law § 24, and the federal courts are bound by this provision, *see Ierardi v. Sisco,* 119 F.3d 183, 186 (2d Cir.1997). Plaintiff's state claims are dismissed in their entirety.

### IV. EIGHTH AMENDMENT CLAIMS (PURSUANT TO 42 U.S.C. § 1983)

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that defendants, while acting under color of state law, denied plaintiff a constitutional or federal statutory right. *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Ruggiero v. Krzeminski,* 928 F.2d 558, 562–63 (2d Cir.1991). The Eighth Amendment's prohibition against cruel and unusual punishment of prison inmates has been construed to include the denial of adequate medical care. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Estelle v. Gamble,* 439 U.S. 97, 104 (1976) (holding that such behavior amounts to an "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment); *Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at *7 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcer-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
(Cite as: 2002 WL 731691 (S.D.N.Y.))

ated is entitled to receive adequate medical care."). Prison officials violate this right when they are deliberately indifferent to an inmate's serious medical needs. *See Estelle,* 429 U.S. at 104; *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001).

**\*4** The Second Circuit has interpreted *Estelle* to consist of objective and subjective elements: *First,* a court must determine whether, objectively speaking, plaintiff's condition is such that the alleged deprivation of medical assistance is " 'sufficiently serious." ' *Hathaway v. Coughlin,* 37 F.3d 63, 66–67 (2d Cir.1994) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). This "standard contemplates a 'condition of urgency, one that may produce death, degeneration, or extreme pain." ' *Id.* (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). A serious medical need arises where " 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)). *See, e.g., Rivera v. Goord,* 119 F.Supp.2d 327, 332, 337 (S.D.N .Y.2000) (pain and facial swelling, migraines and burning in eyes gave rise to serious medical need); *Arce v. Banks,* 913 F.Supp. 307, 309 (S.D.N.Y.1996) (failure to treat small cyst on forehead not sufficiently serious).

*Second,* a court must consider whether the official " 'kn[ew] that an inmate face[d] a substantial risk of serious harm, and disregarded that risk by failing to take proper measures to abate it ." ' *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (quoting *Farmer,* 511 U.S. at 837). The failure to render proper care must result from a "sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson v. Seiter,* 501 U.S. at 298). "[T]he subjective element of deliberate indifference entails something more than mere negligence but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin II,* 99 F .3d 550, 553 (2d Cir.1996) (citing

*Farmer,* 511 U.S. at 835). While mere medical malpractice is not tantamount to deliberate indifference, certain instances of medical malpractice may rise to that level. *See id.* (citing *Farmer,* 511 U.S. at 847).

Here, it is largely undisputed that plaintiff's medical needs were serious. *See* Galeno Def. Mem. at 5. The key questions in this case turn on whether plaintiff has pleaded facts which show that each defendant was deliberately indifferent to those needs. As stated earlier, Woods's allegations must be assumed true for purposes of this discussion.

A. Dr. Bendheim

Beginning in early 1996, Dr. Bendheim established a pattern of sending plaintiff to specialists, and then ignoring their orders for monthly follow-up visits and blood work. Courts have held that a prison official's delay in scheduling appointments and failure to follow orders of a doctor constitutes denial of adequate medical care. *See, e.g., Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) ("Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors."); *Brown v. Coughlin,* 758 F.Supp. 876, 882–83 (S.D.N.Y.1991). Moreover, a pattern "might be taken to show that the described incidents were not accidents, inadvertent failures, or random occurrences of medical malpractice." *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 182 (N.D.N.Y.1996) (quotation omitted).

**\*5** At plaintiff's first appointment with Dr. Feng at AMC on May 31, 1996, he was ordered to return one month later. Yet Dr. Bendheim waited until January 31, 1997, *seven* months later, to send plaintiff for a follow-up visit.[FN8] *See* Am. Compl. ¶¶ 3–4. He then failed to have plaintiff's blood work done in advance of the visit, as ordered. *See id.* ¶ 4. Subsequently, rather than schedule plaintiff for an appointment one month from January 31, Dr. Bendheim did not do so until June 10, 1997, *six* months later. *See id.* ¶ 6. Again, Bendheim failed to take the necessary steps to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
**(Cite as: 2002 WL 731691 (S.D.N.Y.))**

have plaintiff's blood work done. *See id.*

> FN8. This claim is not time-barred because the last such act occurred less than three years before plaintiff filed his Complaint. "When a plaintiff challenges a policy that gives rise over time to a series of allegedly unlawful acts, it will often be the case that plaintiff might bring his claim after the first such act, and yet the law may render timely a claim brought prior to the expiration of the statute of limitations on the last such act." *Connolly v. McCall,* 254 F.3d 36, 40 (2d Cir.2001). *See also id.* (New York statute of limitations of three years for personal injury actions applies to Eighth Amendment claims brought pursuant to section 1983 in New York).

After this appointment, plaintiff saw Dr. Feng in July 1997 and September 1997. *See id.* Yet the pattern of delayed visits continued. In January of 1998, Bendheim failed to schedule a follow-up visit with a hematologist as ordered by a "Dr. Scroggion" in late 1997. *Id.* ¶ 17. In August 1999, Dr. Bendheim ignored orders issued by St. Agnes Hospital—where plaintiff had undergone elbow surgery in the Fall of 1999—to schedule appointments with a hematologist and a rheumatologist. *See* Pl. Opp.2d at 39.[FN9] As a result of Dr. Bendheim's actions, plaintiff's weight dropped dramatically and his white blood cell count became unstable. *See* Am. Compl. ¶ 4.

> FN9. Plaintiff does not mention any defendant in connection with this last omission, but liberally construing his pleadings which elsewhere tie Bendheim to a failure to schedule such appointments, I conclude that plaintiff intended to name Bendheim here.

Bendheim thus repeatedly flouted the orders of trained specialists over several years.[FN10] Further, he never rescheduled plaintiff's knee surgery that was put off in June 1996 due to a shortage of beds.[FN11] *See id.* ¶ 17. Although the proof may show otherwise, these allegations state a claim of deliberate indifference to plaintiff's serious medical needs. Defendants' motion is denied with respect to plaintiff's Eighth Amendment claims against Dr. Bendheim.

> FN10. Bendheim does not contend that his opinion differed from that of Dr. Feng or any other specialist with respect to plaintiff's allegations regarding the need for follow up visits. *See Amaker v. Goord,* No. 98 Civ. 3634, 2002 WL 523371, at *6 (S.D.N.Y. Mar. 29, 2002) (citing *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622 (S.D.N.Y. Oct. 15, 1999) ("[A] prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim."), and *Muhammad v. Francis,* No. 94 Civ. 2244, 1996 WL 657922, at *6 (S.D.N.Y. Nov. 13, 1996) ("It is well established that mere differences in opinion regarding medical treatment do not give rise to an Eighth Amendment violation.")).

> FN11. Bendheim's argument, that plaintiff does not state a claim because he received plenty of care, is unavailing. *See Hathaway,* 37 F.3d at 68 (defendant doctor's frequent examinations of plaintiff did not preclude finding of deliberate indifference because "course of treatment was largely ineffective, and [he] declined to do anything more to improve [plaintiff's] situation."); *Ruffin v. Deperio,* 97 F.Supp.2d 346, 353 (W.D.N.Y.2000) (stating that deliberate indifference could be pleaded despite frequent treatment by prisoner's doctors where treatment was "cursory" or evidenced "apathy").

**B. Dr. Weinstein**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
(Cite as: 2002 WL 731691 (S.D.N.Y.))

Following plaintiff's elbow surgery in Fall 1999, Dr. Weinstein refused to carry out plaintiff's surgeon's orders—on seven different occasions in late 2000 and early 2001—by denying plaintiff's requests for physical therapy. *See* Pl. Opp.2d at 38. Instead, Dr. Weinstein prescribed "home treatment" or "self-exercise," despite the fact that plaintiff could not use his arms to do anything including such basic functions as washing or dressing himself. Pl. Opp.2d at 38. I must draw the reasonable inference that, at times, no one was available to assist plaintiff in doing those things.

While plaintiff may not be able to prove his case against Dr. Weinstein, that is not the test here. By alleging that Dr. Weinstein intentionally refused to provide the treatment ordered by a specialist, such that plaintiff was virtually incapacitated, plaintiff has successfully pleaded that Dr. Weinstein was deliberately indifferent to his serious medical needs.

## C. Dr. Silver

On September 16, 2000, Dr. Silver examined plaintiff's elbow, which was dripping fluid and causing him "excruciating pain." Pl. Opp.2d at 22–3. Plaintiff requested surgery and a bone scan; Silver's response was "soap it." *Id.* at 22. While a medical doctor's determination is presumed correct, in certain instances a physician may be deliberately indifferent if he consciously chooses "an easier and less efficacious" treatment plan. *Chance,* 143 F .3d at 703. *See also Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974); *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989). Because plaintiff may be able to prove that such was the case here, this claim cannot be dismissed against Dr. Silver. In addition, on February 8, 2001, plaintiff was taken to St. Agnes Hospital for surgery on his elbow, but was turned away because "the facility failed to properly arrange this trip." Pl. Opp.2d at 23. When he arrived back at Green Haven, he asked Dr. Silver to reschedule the surgery but Dr. Silver refused. *See id.* Once again, allegations that a prison doctor failed to follow the orders of specialists or schedule surgery where the plaintiff's condition is

admittedly grave, states a claim of deliberate indifference. Defendants' motion with respect to Dr. Silver is denied.

## D. Dr. Galeno

**\*6** On August 17, 1999, Dr. Galeno performed surgery on plaintiff's elbow, then "failed to order antibiotics" despite "s[eeing] plaintiff's... infection." Am. Compl. ¶ 12. Instead, Dr. Galeno prescribed "Noprxen" for plaintiff's pain. Pl. Opp.2d at 39. As a result, plaintiff's elbow was infected for three days. *See* Am. Compl. ¶ 12.

While plaintiff alleges that Galeno was aware of some risk to plaintiff, his case against Galeno fails on both prongs. *First,* the alleged deprivation of care caused a localized infection that lasted for three days, which is not a condition approaching urgency, degeneration or great pain. *See Hathaway,* 37 F.3d at 66. *Second,* there was "no delay" in prescribing *some* treatment, and "the fact that plaintiff felt something more should have been done ... [is] not a sufficient basis for a deliberate indifference claim." *Brown v. McElroy,* 160 F.Supp.2d 699, 704 (S.D.N.Y.2001). The allegations against Dr. Galeno state, at most, a claim for one instance of medical malpractice, and therefore must be dismissed. *See Estelle,* 439 U.S. at 104; *Pritchett v. Artuz,* No. 99 Civ. 3957, 2000 WL 4157, at *3 (S.D.N.Y. Jan. 3, 2000).

## E. Supervisory Defendants: Goord, Greiner, Wright, Selwin, Koenigsmann, and Zwillinger

Plaintiff claims that Goord, Greiner and Wright "failed to remedy a constitutional deprivation and are personally involved." Pl. Opp.2d at 12. He asserts that all of the supervisors named in this lawsuit, Goord, Greiner, Wright, Selwin, Koenigsmann and Zwillinger, had "authority and ability" to address his problems but did not. *Id.* at 34.

It is well established that personal liability cannot be imposed on a state official under a theory of *re-*

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
**(Cite as: 2002 WL 731691 (S.D.N.Y.))**

*spondeat superior. See Black v. Coughlin II,* 76 F.3d 72, 74 (2d Cir.1996); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).* "The plaintiff must plead ... that the defendant had some direct [or personal] involvement in or responsibility for the misconduct." *Thompson v. State of New York,* No. 99 Civ. 9875, 2001 WL 636432, at *6 (S.D.N.Y. Mar. 15, 2001) (citing *Hendricks v. Coughlin,* 114 F.3d 390, 394 (2d Cir.1997)). A supervisory official may be personally involved in a section 1983 violation where the official: (1) directly participated in the infraction or ordered that the action be taken; (2) failed to remedy a wrong after learning of the violation; (3) created or allowed the policy or custom under which the incident occurred; (4) was grossly negligent in managing subordinates who caused the incident; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *See Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). To succeed on a claim under section 1983 a plaintiff must allege personal involvement by each defendant in the alleged constitutional deprivation. *See Keyes v. Strack,* No. 95 Civ. 2367, 1997 WL 187368, at *3 (S.D.N.Y. Apr. 16, 1997).

**\*7** The *alleged constitutional deprivations,* upon which supervisory liability may be predicated, are: (1) Bendheim's pattern, from 1996 to 1999, of delaying the scheduling of appointments with specialists and not carrying out their orders. and his failure to re-schedule knee surgery; (2) Weinstein's failure to follow a specialist's orders regarding physical therapy; and (3) Silver's opting for the easiest course of treatment for plaintiff's elbow, and failure to reschedule elbow surgery in February 2001.[FN12] Plaintiff argues that the grievances he filed and the letters he wrote to these supervisors, *see* Am. Compl. ¶¶ 4, 5, 8, 13, establish their personal involvement in these alleged constitutional deprivations, *see* Pl. Opp.2d at 12–15, 19–22.

FN12. *See Poe v. Leonard,* 282 F.3d 123, 126 (2d Cir.2002) (holding that in order for a supervisor to be held liable under section 1983, a subordinate must have violated the law). Plaintiff argues that the supervisory defendants were personally involved in two additional claims. First, plaintiff argues that he was unconstitutionally denied a light-weight wheelchair. *See* Pl. Opp.2d at 18–19, 25, 32–33. Plaintiff does not allege, however, that any individual defendant or defendants are responsible for this deprivation. Therefore, this claim must be dismissed. In July 1999, plaintiff's elbow required immediate attention, but surgery was delayed for three months. *See* Am. Compl. ¶ 21. Here, too, plaintiff fails to implicate any defendant and thus the claim must be dismissed.

> The test for personal involvement of supervisory officials implies some alleged violation of a federal right. *See Poe,* 282 F.3d at 126. Where, as here, plaintiff does not successfully allege any violation, *supervisory* liability is not adequately pleaded, either. Personal involvement in an alleged violation cannot exist where there is no alleged violation.

### 1. Commissioner Goord and Superintendent Greiner

Plaintiff alleges that Goord and Greiner "ignored *all* [of his] grievances and appeals, [and] also failed to act on direct information indicating that [the *Milburn* decree is not being enforced]." Pl. Opp.2d at 13 (emphasis added). [FN13] Even construed liberally, however, "direct information" does not refer to anything other than the letters plaintiff wrote to Goord and Greiner, because no other specific facts are alleged with respect to these defendants. *See id.* at 13–14, 19–20, 22. Receipt of letters or grievances, however, is insufficient to impute personal involvement. *See Thompson,* 2001 WL 636432, at *7; *Rivera,* 119 F.Supp.2d at 344; *Pritchett,* 2000 WL 4157, at *6;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
**(Cite as: 2002 WL 731691 (S.D.N.Y.))**

*Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998).[FN14] "Were it otherwise, virtually every prison inmate who sues for constitutional torts by [prison officials] could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor]." *Thompson,* 2001 WL 636432, at *7. Greiner "passed upon" several of plaintiff's letters by referring them to Lester Wright. *See, e.g.,* 12/10/99 Letter from Wright to Goord, Ex. 6 to Am. Compl. (stating that Commissioner Goord had forwarded plaintiff's September 13, 1999 letter to him). Referring medical complaint letters to lower-ranked prison supervisors, however, does not constitute personal involvement. *See Ramos v. Artuz,* No. 00 Civ. 149, 2001 WL 840131, at *8 (S.D.N.Y. July 25, 2001). Because there are no further allegations regarding Goord or Greiner, plaintiff's case is dismissed as against them.

FN13. In 1980, Judge Robert Ward of this Court certified a class of present and future Green Haven inmates challenging the constitutionality of Green Haven's provision of health care services. *See Shariff v. Artuz,* No. 99 Civ. 321, 2000 WL 1219381, at *4 n .5 (S.D.N.Y. Aug. 28, 2000) (referring to "*Milburn v. Coughlin,* No. 79 Civ. 5077 (S.D.N.Y.)"). The parties entered into a series of agreements culminating in the 1991 modified consent decree, requiring Green Haven to create and maintain an ADA and Rehabilitation Act-compliant unit for the physically disabled—the UPD—and establishing certain guidelines for adequate medical care. *See id.; see also McKenna v. Wright,* No. 01 Civ. 6571, 2002 WL 338375, at *7 n. 9 (S.D.N.Y. Mar. 4, 2002) (recognizing Milburn consent decree). *Green v. Bauvi,* 792 F.Supp. 928, 936 n. 12 (S.D .N.Y.1992) (same). To the extent that plaintiff is alleging a violation of the *Milburn* decree, his action is not properly before this

Court and thus cannot be considered. *See McKenna,* 2002 WL 338375, at *7 n. 9 (holding that plaintiff must refile with Judge Ward who retains supervision over enforcement of the Milburn decree); *Kaminsky v. Rosenblum,* 737 F.Supp. 1309, 1317 n. 6 (S.D.N.Y.1990) ("[Issue of whether Milburn decree was violated] is not, and cannot be, before this Court. Violations of the *Milburn* decree can be remedied only by bringing the alleged violations to the attention of the able District Judge [Ward] who retains supervision over that decree."). Thus, plaintiff's claims to enforce the *Milburn* decree are denied.

FN14. In *Burgess,* I stated that "courts have found personal involvement of a supervisory official where a plaintiff has sent letters or orally informed the official of an ongoing constitutional violation." 1999 WL 33458, at *5 (quoting *Heron v. Dalsheim,* No. 95 Civ. 2625, 1999 WL 2871, at *5 (S.D.N.Y. Jan. 4, 1999)). I note, however, that this statement of law is now against the weight of authority. In any event, plaintiff in *Burgess* alleged that a supervisor said to him "something to the effect that he saw no reason why plaintiff could not take the stairs one day out of the week." *Id.* at *1, *5. This allegation evinced a lack of personal involvement outside of the official's receipt of plaintiff's complaints. *See id.* at *5.

2. Associate Commissioner Wright and Health Services Director Koenigsmann

Wright and Koenigsmann, on the other hand, did not merely receive plaintiff's letters, but also responded to them. *See* Pl. Opp.2d at 22. On December 10, 1999, Wright wrote to plaintiff, explaining that plaintiff's letter to Goord had been forwarded to him. *See* 12/10/99 Letter from Wright to Woods ("12/10/99 Wright Ltr."), Ex. 6 to Am. Compl. Wright allegedly

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
**(Cite as: 2002 WL 731691 (S.D.N.Y.))**

gave the following explanation in response to plaintiff's complaint that he was not seeing the rheumatologist often enough:

> **\*8** You have been examined by a rheumatologist on May 6 and July 22 of this year; received a prosthetic elbow brace on July 28, 1999, been evaluated by the orthopedic surgeon on August 18, September 10, September 27 and November 8 of this year, and had surgery on your right elbow on November 12, 1999. On August 24, 1999 your white blood cell count was 116,000 and this test was repeated at St. Agnes Hospital the same day with a result of 95.5. On September 3 it was 80.8; on September 24 it was 76.4 and on November 4, is was 74.7. You were scheduled to see the hematologist in follow-up at Westchester Medical Center on October 4, but you refused. You had a decompressive laminectomy of your neck on April 27[,] 1999. Your left shoulder triplearthrodesis was postponed to accommodate your neck surgery; as have your bunion surgery and left foot triplearthrodesis....

12/10/99 Wright Ltr. Plaintiff alleges that Wright responded on two other occasions with similarly informative, thorough letters. *See* 10/18/00 Letter from Wright to Goord, Ex. 22 to Am. Compl.; 1/24/01 Letter from Wright to Goord, Ex. 6 to Am. Compl. In response to his complaint regarding the alleged denial of physical therapy, plaintiff alleges that Koenigsmann wrote on May 4, 2000:

> I have investigated the allegations made in your letter and discussed your case at length with the Physical Therapy department as well as reviewed the documentation involved in the event. On 5/1/00 you began therapy for your right elbow. The recommendation for Physical Therapy was made both by Physiatry and the Orthopedic Surgeon as well as the types of therapy I.e. [sic] active range of motion and strengthening exercises. When you arrived in Physical Therapy you were instructed to begin active range of motion exercises, you declined to participate in this program and insisted on Passive

range of motion. This was not indicated or recommended for your treatment. With that you stated that you would do that in your cell on your own and refused therapy. To be clear, the Physical Therapy personnel were fully prepared to have you participate in the program but the type of therapy must be per the recommendations of the Physicians and Physical Therapists. To refuse care because they will not comply with the program that you want but do not need is potentially hindering maximum recovery from the surgery. I urge you to agree to return to Physical Therapy and follow the program that was arranged for you.

5/4/00 Letter from Koenigsmann to Woods, Ex. 20 to Am. Compl. Plaintiff argues that Wright and Koenigsmann thus had actual knowledge of these wrongs committed by their subordinates but did not attempt to remedy them except to respond to his complaints.

One court has held that where a supervisor's "involvement went beyond merely the receipt of complaint letters," to "responding, explaining the treatment and defending the institution," personal involvement was established. *Ramos,* 2001 WL 840131, at \*8 (Pitman, J.). *See also Rashid v. Hussain,* No. 95 Civ. 676, 1997 WL 642549, at \*2–\*3 (N.D.N.Y. Oct. 15, 1997) (Pooler, J.) (detailed responses to prisoner's letter establish personal involvement). This is by no means the majority rule, however. *See, e.g., Joyner v. Greiner,* No. 01 Civ. 7399, 2002 WL 550092, at \*5 (S.D.N.Y. Mar. 28, 2002) (McMahon, J.) (holding that prison doctor's response to plaintiff's letter did not plead personal involvement); *Ramsey v. Coughlin,* 1 F.Supp.2d 198, 204 (W.D.N.Y.1998) (holding that plaintiff's claim that supervisor responded to his letters is not sufficient to establish personal involvement).

**\*9** Wright and Koenigsmann's provision of information and advice based on diagnoses from their staff does not appear to constitute "fail[ure] to remedy

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
**(Cite as: 2002 WL 731691 (S.D.N.Y.))**

a wrong." *Colon,* 58 F.3d at 873. Supervisors are entitled to rely on and adopt the recommendations of prison doctors without incurring a charge of personal involvement. *See Thompson,* 2001 WL 636432, at *7; *Keyes,* 1997 WL 187368, at *3. Moreover, it may be said here: "Far from establishing deliberate indifference, [the medical supervisor's] response demonstrates appropriate attention to plaintiff's circumstances." *Joyner,* 2002 WL 550092, at *5. On the other hand, plaintiff alleges that Wright and Koenigsmann responded to his complaints in a detailed, specific manner, a factor not present in *Joyner. See also Rashid,* 1997 WL 642549, at *3 (stating that where defendant merely responded to plaintiff's letter, no personal involvement would be established, but opposite is true where defendant responded in such a way as to suggest notice of the "duration and extent of [plaintiff]'s condition"). Because the depth of their responses indicates full awareness of plaintiff's situation, Wright and Koenigsmann may actually have failed to remedy a wrong by, for instance, not intervening to schedule a rheumatology appointment or ensuring that physical therapy treatment was provided. The motions to dismiss are denied with respect to Wright and Koenigsmann.

3. Acting Health Service Director Selwin

Woods alleges that Norman Selwin "constantly ... denied [plaintiff] medical treatment for his neck, shoulder, wrist, elbows, knees, rheumatoid arthritis monthly appointments, MRI and x-ray consults." Pl. Opp.2d at 20. Beyond this conclusory allegation which provides no dates or time frame, there is no other allegation of Selwin's personal involvement, as defined in *Colon v. Coughlin,* with respect to any of the established allegations of deprivation. The Complaint and Amended Complaint are thus dismissed with respect to Selwin for failure to state a claim.

4. Regional Health Administrator Zwillinger

Plaintiff does allege sufficient facts to state a claim against Zwillinger. [FN15] In 1998, Zwillinger was "constantly contacted by Dr. Robert Cohen M.D.

(Medical Auditor assigned by Judge Ward U.S.D.J.) and Margaret K. Loftus from Prisoner's Rights Project regarding plaintiff's constitutional deprivation of adequate medical care and the violation of the burn v. Coughlin stipulation." Pl. Opp.2d at 15. Both Cohen and Loftus specifically requested that Zwillinger remedy the lack of regularly scheduled rheumatology appointments. *See* 9/25/98 Letter from Loftus to Zwillinger, Ex. 11 to Am. Compl. ("Mr. Woods ... has not been to see his Rheumatoid Arthritis specialist in over four months."); 8/21/98 Letter from Cohen to Zwillinger, Ex. 10 to Am. Compl. ("Could you please review the care of Mr. Woods with [respect to] ..: 1. Lack of access to specialty care, specifically rheumatology consultation. Mr. Woods needs to be seen regularly by a rheumatologist and is being denied access to necessary consultation.").

> FN15. Several allegations against Zwillinger are dismissed for failure to state a claim. Plaintiff alleges that in January 1996 and as late as March 19, 1996, Zwillinger, Koenigsmann, and Selwin "[led] [the medical team] to believe plaintiff had a reconstruct[ive] should[er] operation at St. Agnes, where in fact plaintiff never had reconstructive surgery, plaintiff had arthroscopic surgery." Am. Compl. ¶ 16. Plaintiff claims that the effort to mislead the medical team as to the type of surgery he had in 1996 at St. Agnes continues to this day, as does his suffering because of it. *See id.* These allegations are wholly inexplicable and as such, fail to state a claim for which relief can be granted.

**\*10** Thus, Zwillinger had knowledge, beyond receipt of letters or grievances from plaintiff, of an alleged unconstitutional deprivation. *See Poe v. Pearl,* No. 94 Civ.2058, 1997 WL 76576, at *6 (D.Conn. Jan. 29, 1997) ("A supervisor acts with deliberate indifference if he has actual or constructive knowledge of unconstitutional practices and fails to act on the basis of information available to him."). Outside health and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
(Cite as: 2002 WL 731691 (S.D.N.Y.))

legal professionals appealed directly to Zwillinger on behalf of Woods, and he did nothing. *See Ramos,* 2001 WL 840131, at *9–*10 (holding that prison official's receipt of direct and detailed pleas from the Legal Aid Society regarding plaintiff's deprivation of treatment, and failure to respond appropriately, constituted deliberate indifference). Zwillinger thus exhibited deliberate indifference to Woods's serious medical needs by failing to act on Cohen's or Loftus's pleas. *See Colon,* 58 F.3d at 873. Defendants' motion is denied as to Zwillinger.

### F. Defendants Ace, Williams and Duprey

Plaintiff does not allege any facts, in either complaint or in his opposition papers, with respect to Selim Ace, Mary Kate Moddox Williams or Randy Duprey. "The courts have consistently held that, where the complaint names a defendant in the caption but no allegations indicating exactly how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to th[ose] defendant[s] should be granted." *Marable v. Kurtz,* No. 99 Civ. 1387, 2000 WL 1279763, at *4 (S.D.N.Y. Sept. 11, 2000) (citation omitted). The Complaint and Amended Complaint are dismissed as to Ace, Williams and Duprey.

### V. QUALIFIED IMMUNITY

Defendants argue that, in the event that the Court rules that plaintiff has stated a claim against any defendant, such defendant's actions were objectively reasonable and therefore entitled to qualified immunity.

The defense of qualified immunity "shields public officials from liability for their discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Hathaway,* 37 F.3d at 67 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The court in *Hathaway,* referring to the unconstitutional deprivation of a prisoner's right under the Eighth Amendment to adequate medical care,

stated that "[e]ven where, as here, a plaintiff's federal rights are well-established, qualified immunity is still available to an official if it was 'objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

"Although qualified immunity is typically addressed at the summary judgment stage of the case, the defense may be raised and considered on a motion to dismiss. The motion will be granted if the complaint fails to allege the violation of a clearly established constitutional right." *Hardy v. Jefferson Community Coll.,* 260 F.3d 671, 677 (6th Cir.2001) (citation omitted). An immunity defense usually depends on the facts of the case, however, making dismissal at the pleading stage inappropriate. *See Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir.2001); *King v. Simpson,* 189 F.3d 284, 289 (2d Cir.1999) (reversing district court's dismissal on ground of absolute immunity because factual showing was necessary where plaintiff alleged constitutional violation). Thus, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds. *See Alvarado,* 267 F.3d at 651 (citing *Jacobs v. City of Chicago,* 215 F.3d 758, 765 n. 3 (7th Cir.2000)). Here, plaintiff *has* successfully alleged a constitutional violation against Bendheim, Weinstein, and Silver, and personal involvement in at least one of those violations by Zwillinger. A determination as to whether these defendants' actions were "objectively reasonable" is necessarily fact-based. Thus, defendants' qualified immunity defense must be rejected at this stage.

### VI. CLAIM AGAINST BARBARA WHITNEY

**\*11** Woods claims that defendant Barbara Whitney copied plaintiff's medical records and released them to the Attorney General's office "without getting an Authorized medical release form, which is a violation of ... plaintiff's confidentiality." Pl. Opp.2d at 27–28. Woods does not specify when this was done.

It is settled law that release of an inmate's medical

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
**(Cite as: 2002 WL 731691 (S.D.N.Y.))**

records in defense of litigation does not violate any right of the inmate when he has filed suit against prison officials. *See, e.g., Gill v. Gilder,* No. 95 Civ. 7933, 1997 WL 419983, at *2 (S.D.N.Y. July 28, 1997) (citing *Crawford v. Manion,* No. 96 Civ. 1236, 1997 WL 148066, at *1 (S.D.N.Y. Mar. 31, 1997) (Mukasey, J.)). Plaintiff thus waived all rights to privacy in his medical records when he put his medical condition in issue in a lawsuit. In the absence of any allegation that Barbara Whitney's action occurred before suit was instituted or was for some purpose other than the defense of litigation, this claim is dismissed.

## VII. DISCRIMINATION CLAIMS AND ADMINISTRATIVE EXHAUSTION

Plaintiff also claims that defendants have violated his rights under Title II of the ADA and section 504 of the Rehabilitation Act (1) by denying him a light-weight wheelchair; and (2) because in 1998, defendant Jones, a corrections officer, forced plaintiff to stand up so that he could be frisked, causing him to fall. *See* Pl. Opp.2d at 18–19, 25, 32–33; Am. Compl. ¶ 18. To state a claim under Title II of the ADA, a prisoner must show "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity that provides the service, program or activity is a public entity." *Shariff,* 2000 WL 1219381, at *4 (quoting *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995)). *See also* 42 U.S.C. § 12132. To state a claim under section 504 of the Rehabilitation Act, a prisoner must allege facts showing that "(1) he is a 'qualified individual with a disability'; (2) he is 'otherwise qualified' to participate in the offered activity or program or to enjoy the services or benefits being offered; (3) he is being excluded from participation or enjoyment solely by reason of his disability; and (4) the entity denying the inmate participation or enjoyment receives federal financial assistance." *Shariff,* 2000 WL 1219381, at *4 (quoting *Clarkson,* 898 F.Supp. at 1036). *See also* 29

U.S.C. § 794(a).

Before reaching the merits of these claims, it is necessary to examine whether plaintiff has exhausted prison remedies for these complaints. The Prison Litigation Reform Act of 1980 requires that prisoners pursue available administrative remedies before bringing any federal claim in federal court. *See* 42 U.S.C. § 1997e.[FN16] Recently, the Supreme Court clarified the parameters of this requirement. *See Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988 (2002). "All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy [or] effective." *Id.* Dismissal on the basis of failure to exhaust is now mandatory, whereas it was once within the discretion of the district court. *See id.* (citing *Booth v. Churner,* 532 U.S. 731, 739 (2001)).

> FN16. Woods has exhausted administrative remedies for his Eighth Amendment claims. *See* Am. Compl. ¶ 13. Woods's voluminous attachment to his opposition papers shows, *inter alia,* that he has filed grievances regarding (1) Dr. Bendheim's delay in scheduling follow-up visits with Dr. Feng; (2) denial of physical therapy; and (3) lack of treatment of elbow and denial of knee surgery. Further, defendants do not argue that Woods has failed to exhaust available remedies for these claims.

**\*12** Woods does not allege nor offer any evidence that he followed prison grievance procedures for his disability discrimination claims. Thus, they must be dismissed without prejudice.

## VIII. INJUNCTIVE RELIEF

The Eleventh Amendment is not a bar to suits in equity against state officials. *See Keyes,* 1997 WL 187368, at *4 (citing *Dube v. State Univ. of New York,* 900 F.2d 587, 595 (2d Cir.1990)). "A state official

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
**(Cite as: 2002 WL 731691 (S.D.N.Y.))**

acting in his official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar." *Dube, 900 F.2d at 595.* Plaintiff seeks an order from the Court requiring "the defendants [to] provide for the plaintiff appropriate [ ] medical treatment in the future." Am. Compl. ¶ (D). Plaintiff does not further specify the nature of the injunctive relief he requests.

The *Milburn* decree "governs the provision of health care services at Green Haven." *McKenna, 2002 WL 338375, at *7 n. 9. See also supra* note 13. In light of Judge Ward's exclusive supervision of the *Milburn* decree, *see Kaminsky, 737 F.Supp. at 1317 n. 6,* it is not within this Court's jurisdiction to order the broad injunctive relief that Woods requests. Woods's request that appropriate medical care be provided to him in the future is tantamount to a suit to enforce the *Milburn* decree and, as such, must be refiled with Judge Ward. *See McKenna, 2002 WL 338375, at *7 n. 9; Kaminsky, 737 F.Supp. at 1317 n. 6; supra* note 13. This portion of the Complaint and Amended Complaint is dismissed.

IX. CONCLUSION

For the foregoing reasons, the Complaint and Amended Complaint are dismissed to the extent that they assert (1) monetary claims against defendants in their official capacities; and (2) state law claims against defendants in any capacity. Plaintiff's claims brought under the ADA and Rehabilitation Act are dismissed for failure to exhaust administrative remedies. Plaintiff's claim for injunctive relief is denied.

Defendants' motions to dismiss are granted with respect to defendants DOCS, CPS, Goord, Greiner, Selwin, Duprey, Jones, and Whitney, and additional defendants Ace, Moddox Williams and Duprey. The motions are denied in part, and granted in part, as to defendants Wright, Koenigsmann, Zwillinger, Bendheim, Weinstein, and Silver. The claims that have been dismissed against these individuals are

listed at notes 12 and 15, *supra.* A conference is scheduled for May 10, 2002 at 4:30 p.m.

    SO ORDERED:

S.D.N.Y.,2002.
Woods v. Goord
Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.